Nos. 2014-1537, -1566

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

GLOBAL TRAFFIC TECHNOLOGIES LLC,

*Plaintiff-Appellee*,

v.

RODNEY K. MORGAN AND KM ENTERPRISES, INC.,

*Defendants-Appellants*,

AND

STC, INC.,

*Defendant-Appellant.*

Appeals from the United States District Court
for the District of Minnesota in Case No. 0:10-cv-04110-ADM-JJG,
Judge Ann D. Montgomery

**BRIEF OF DEFENDANT-APPELLANT STC, INC.**

ROBERT A. ARCAMONA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

LOUIS W. TOMPROS
ANANT K. SARASWAT
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Defendant-Appellant
STC, Inc.*

September 8, 2014

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant STC, Inc. certifies the following:

1.    The full name of every party or *amicus* represented by us is:

    STC, Inc.

2.    The names of the real party in interest represented by us is:

    STC, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Robert A. Arcamona, Anant K. Saraswat, Louis W. Tompros.

HELLMUTH & JOHNSON:  Terrance C. Newby, Jonathan D. Jay (both formerly of Leffert Jay & Polglaze).

SHUMAKER & SIEFFERT, PA:  Nicholas S. Kuhlmann (formerly of Leffert Jay & Polglaze).

LEWIS, RICE & FINGERSH, L.C.:  Frank B. Janoski, Michael J. Hickey, Jerina D. Phillips.

Elizabeth L. Taylor

Dated:  September 8, 2014            */s/ Louis W. Tompros*
                                       LOUIS W. TOMPROS

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ......................................................................v

STATEMENT OF RELATED CASES ......................................................x

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

STATEMENT OF THE ISSUES................................................................4

STATEMENT OF THE CASE....................................................................5

FACTS AND PROCEDURAL HISTORY .................................................6

I.　　TRAFFIC PREEMPTION SYSTEMS.........................................6

II.　　THE EMTRAC SYSTEM ............................................................7

III.　　THE '398 PATENT......................................................................9

IV.　　GTT'S OPTICOM SYSTEM .....................................................15

V.　　CLAIM CONSTRUCTION .......................................................16

VI.　　NONINFRINGEMENT..............................................................21

　　A.　　Claim 1 ...........................................................................21

　　B.　　Claim 16 .........................................................................24

　　C.　　STC's Intent ...................................................................24

VII.　　DAMAGES................................................................................27

　　A.　　Lost Profits .....................................................................27

　　B.　　Marking ..........................................................................27

SUMMARY OF ARGUMENT .............................................................30

ARGUMENT ..................................................................................32

I.      STANDARD OF REVIEW .........................................................32

II.     THE DISTRICT COURT FAILED TO CONSTRUE THE
        DISPUTED MEANS-PLUS-FUNCTION LIMITATIONS OF
        CLAIM 1 ACCORDING TO 35 U.S.C. § 112(f) ........................33

        A.      The District Court Erred By Giving Means-Plus-Function
                Terms Plain And Ordinary Meaning...................................34

        B.      Properly Construed, The Disputed Terms Require
                Reversal Of The Judgment Of Infringement.......................36

                1.      Nothing in the '398 patent links wires with "means
                        for transmitting the vehicle data." ................................37

                2.      Nothing in the '398 patent links or associates a
                        processor with "means, associated with the location,
                        for receiving the vehicle data."......................................39

        C.      STC Properly Preserved Its Claim Construction
                Arguments .....................................................................41

III.    THE DISTRICT COURT ERRED BY NOT CONSTRUING
        CLAIM 1's "MAPPING MEANS, ASSOCIATED WITH THE
        LOCATION . . . " TO REQUIRE MEANS LOCATED AT
        THE INTERSECTION................................................................42

IV.     THE DISTRICT COURT ERRED BY CONSTRUING "MAP
        OF ALLOWED APPROACHES" IN BOTH CLAIM 1 AND
        CLAIM 16 TO ALLOW A RECTANGLE TO BE AN
        "APPROACH" ...........................................................................43

V.      THERE WAS NO EVIDENCE THAT STC INFRINGED
        CLAIM 16, DIRECTLY OR INDIRECTLY................................47

        A.      There Was No Evidence Of Direct Infringement By STC ......47

B.    There Was No Evidence Of Indirect Infringement By STC ..........................................................................................49

VI.   THE DISTRICT COURT ERRONEOUSLY FOUND WILLFUL INFRINGEMENT.......................................................51

VII.  THE DAMAGES AWARD WAS IMPROPER...........................................52

    A.    GTT Did Not Mark Its Products ........................................52

        1.   GTT failed to properly mark its Opticom System as a matter of law. ...............................................................53

        2.   GTT failed to offer substantial evidence of marking. .................59

    B.    The District Court Erred By Failing To Exclude The Testimony Of GTT's Damages Expert ...............................................63

CONCLUSION ....................................................................................67

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Amsted Industries, Inc. v. Buckeye Steel Casings Co.*,
  24 F.3d 178 (Fed. Cir. 1994) .................................................................32, 33, 60

*Baran v. Medical Device Technologies, Inc.*,
  616 F.3d 1309 (Fed. Cir. 2010) ........................................................................34

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*,
  682 F.3d 1003 (Fed. Cir. 2012) ...................................................................32, 51

*Belden Technologies Inc. v. Superior Essex Communications LP*,
  733 F. Supp. 2d. 517 (D. Del. 2010).............................................................54, 61

*BMC Resources, Inc. v. Paymentech, L.P.*,
  498 F.3d 1373 (Fed. Cir. 2007) ........................................................................47

*Biomedino, LLC v. Waters Technologies Corp.*,
  490 F.3d 946 (Fed. Cir. 2007) ..........................................................................39

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989)..................................................................................53, 60, 61

*Bonner v. ISP Technologies, Inc.*,
  259 F.3d 924 (8th Cir. 2001) ............................................................................32

*Calmar, Inc. v. Emson Research, Inc.*,
  850 F. Supp. 861 (C.D. Cal. 1994) ...................................................................62

*Cohesive Technologies, Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008) ........................................................................52

*Commil USA, LLC v. Cisco Systems, Inc.*,
  720 F.3d 1361 (Fed. Cir. 2013) ...................................................................50, 51

*Conoco Inc. v. Energy & Environmental International, L.C.*,
  460 F.3d 1349 (Fed. Cir. 2006) ........................................................................42

*Creative Pioneer Products Corp. v. K-Mart Corp.*,
  5 U.S.P.Q.2d 1841 (S.D. Tex. 1987) ................................................................54

*Creative Pioneer Products Corp. v. K-Mart Corp.*,
No. H-83-4137, 1987 WL 54482 (S.D. Tex. July 10, 1987)..............................58

*Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ...................................................64, 65

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..................................................................63

*DIRECTV Group, Inc. v. United States*,
670 F.3d 1370 (Fed. Cir. 2012) .......................................................40

*DSU Medical Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) (en banc) ...................................65, 66

*Gemstar-TV Guide International, Inc. v. International Trade Commission*,
383 F.3d 1352 (Fed. Cir. 2004) .......................................................40

*Global Traffic Technologies, LLC v. Emtrac Systems, Inc.*,
946 F. Supp. 2d 884 (D. Minn. 2013)..................................................5

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011)...............................................................49

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
91 F.3d 1580 (Fed. Cir. 1996) .......................................................34

*H.J., Inc. v. International Telephone & Telegraph Corp.*,
867 F.2d 1531 (8th Cir. 1989) ....................................................64, 65

*Howard v. Missouri Bone and Joint Center, Inc.*,
615 F.3d 991 (8th Cir. 2010) .........................................................32

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011).............................66

*J & M Corp. v. Harley-Davidson, Inc.*,
269 F.3d 1360 (Fed. Cir. 2001) .......................................................37

*John L. Rie, Inc. v. Shelly Bros., Inc.*,
366 F. Supp. 84 (E.D. Pa. 1973).................................................53, 54

*Joy Technologies, Inc. v. Flakt, Inc.*,
    6 F.3d 770 (Fed. Cir. 1993) ...............................................................47

*Kadant Johnson, Inc. v. D'Amico*,
    No. 10-2869, 2012 WL 38319 (E.D. La. Jan. 9, 2012) ...............................54, 55

*Kemco Sales, Inc. v. Control Papers Co., Inc.*,
    208 F.3d 1352 (Fed. Cir. 2000) ...................................................33, 36

*Kudlacek v. DBC, Inc.*,
    25 F. App'x 837 (Fed. Cir. 2001) (nonprecedential).....................................41, 42

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..................................................................63

*Lighting Ballast Control LLC v. Philips Electronics North America Corp.*,
    744 F.3d 1272 (Fed. Cir. 2014) (en banc) ...........................................32

*Loral Fairchild Corp. v. Sony Corp.*,
    181 F.3d 1313 (Fed. Cir. 1999) ...................................................40, 41

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996) .......................................................33

*Memphis Community School District v. Stachura*,
    477 U.S. 299 (1986)..................................................................66

*Metrologic Instruments, Inc. v. PSC, Inc.*,
    No. 99-4876, 2004 WL 2851955 (D.N.J. Dec. 13, 2004) ...........................54, 55

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*,
    671 F.3d 1291 (Fed. Cir. 2012) ...........................................36, 37, 42

*Micro Chemical, Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003) .....................................................32

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
    138 F.3d 1437 (Fed. Cir.1998) .......................................................59

*Noah Systems, Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012) .....................................................38

*O2 Micro International Ltd. v. Beyond Innovation Technology Co.*,
   521 F.3d 1351 (Fed Cir. 2008) ....................................................33, 35

*Oracle America, Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014) .........................................................32

*OSRAM Sylvania, Inc. v. American Induction Technologies, Inc.*,
   701 F.3d 698 (Fed. Cir. 2012) ...........................................................48

*Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005) .........................................................42

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   739 F.3d 1367 (Fed. Cir. 2014) .........................................................35

*Rutherford v. Trim-Tex, Inc.*,
   803 F. Supp. 158 (N.D. Ill. 1992)................................................54, 55

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) .............................................36, 38, 42

*Sessions v. Romadka*,
   145 U.S. 29 (1892)...........................................................................53

*Shum v. Intel Corp.*,
   629 F.3d 1360 (Fed. Cir. 2010) .........................................................40

*Stryker Corp. v. Intermedics Orthopedics, Inc.*,
   891 F. Supp. 751 (E.D.N.Y. 1995), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996) .........62

*SynQor, Inc. v. Artesyn Technologies, Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013) .........................................................49

*Thorner v. Sony Computer Entertainment America LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) .........................................................44

*Versata Software, Inc. v. SAP America, Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013) .........................................................64

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003) .........................................................40

*Washburn v. Kansas City Life Insurance Co.*,
    831 F.2d 1404 (8th Cir. 1987) ..........................................................48

*Wayne-Gossard Corp. v. Sondra, Inc.*,
    434 F. Supp. 1340 (E.D. Pa. 1977), *aff'd sub nom., Wayne-Gossard*
    *Corp. v. Sondra Manufacturing Co.*, 579 F.2d 41 (3d Cir. 1978)...............53, 61

*Wechsler v. Macke International Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007) .......................................................51

## STATUTES AND RULES

28 U.S.C.
    § 1295(a)(1) ...........................................................................4
    § 1338(a) ..............................................................................4

35 U.S.C.
    § 112(f).........................................................................passim
    § 287...........................................................................passim
    § 287(a) .......................................................................passim

Fed. R. Evid. 702 ...................................................... 52, 63, 66

## OTHER AUTHORITIES

Epstein, Roy J., *The Market Share Rule with Price Erosion:  Patent*
    *Infringement Lost Profits Damages After Crystal*, 31 AIPLA Q.J. 1
    (2003)................................................................................63, 64

Oxford English Dictionary (3rd ed. 1996)..............................................46

Random House Webster's Unabridged Dictionary (2nd ed. 1997)........................46

1 Webster's Third New International Dictionary (Merriam-Webster 1993)...........46

Webster's Online, available at
    http://www.merriamwebster.com/dictionary/approach (last accessed Jul.
    20, 2014) ...........................................................................46

## STATEMENT OF RELATED CASES

No other appeals from this action were previously before this or any other appellate court.

On July 21, 2014, Appellants KM Enterprises, Inc. and Rodney K. Morgan filed a motion for an emergency stay pending appeal. On July 22, 2014, this Court (Bryson, J.) temporarily stayed enforcement of the judgment pending the Court's consideration of the motion. On July 22, 2014, Appellant STC, Inc. ("STC") likewise filed a motion for an emergency stay pending appeal. On July 24, 2014, this Court (Bryson, J.) likewise temporarily stayed enforcement of the judgment against STC. On August 25, 2014, a motions panel of this Court (O'Malley, Wallach, and Hughes, JJ.) lifted the temporary stay of enforcement "[w]ithout prejudicing the ultimate disposition by a merits panel."

Appellee Global Traffic Technologies, Inc. has commenced enforcement proceedings in several counties in Illinois and Minnesota against STC, to collect on the judgment in this case: *Global Traffic Technologies, Inc. v. Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.*, Case No. 27-CV-14-12221 (District Court of the Fourth Judicial Circuit, County of Hennepin, Minnesota); *Global Traffic Technologies, Inc. v. Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.*, Case No. 2014-L-5 (Circuit Court of the Second Judicial Circuit, Hamilton County, Illinois); *Global Traffic Technologies, Inc. v. Rodney K. Morgan, STC,*

*Inc., and KM Enterprises, Inc.*, Case No. 14-L-52 (Circuit Court of the Second Judicial Circuit, Jefferson County, Illinois).  Those actions will be directly affected by this Court's decision in this appeal.

# INTRODUCTION

STC manufactures components for the EMTRAC Priority Management System (the "EMTRAC System"), which allows a vehicle such as an ambulance to preempt a traffic signal at an intersection and pass through quickly and safely.  The EMTRAC System is a ***vehicle-based*** system—all of the key preemption processing is performed in the vehicle.  A Vehicle Computer Unit mounted on the vehicle monitors the vehicle's position using the Global Positioning System ("GPS").  If the Vehicle Computer Unit determines that the vehicle is within a designated area near an intersection, it wirelessly sends a preemption instruction to a controller at the intersection, instructing the controller to change the traffic lights (for example, from red to green) so that the vehicle can safely pass through.

Appellee Global Traffic Technologies, Inc. ("GTT") claims that the EMTRAC System infringes U.S. Patent No. 5,539,398 ("the '398 patent", A172-189).  The '398 patent covers an ***intersection-based***—as opposed to vehicle-based—traffic preemption system.  In the '398 patent, a "vehicle module" on the vehicle tracks the vehicle using GPS and wirelessly sends the vehicle's position, heading, and speed to an "intersection module" located at an intersection.  The "intersection module" then determines whether the vehicle is traveling on a recognized route to the intersection, and if so, changes the traffic signals accordingly.  All of the processing to determine whether and when a traffic signal

should be preempted takes place *at the intersection*, not on the vehicle.  The '398 patent is embodied in GTT's Opticom System, which competes with the EMTRAC System.

The evidence at trial confirmed the fundamental differences between the EMTRAC System and the claims of the '398 patent.  The evidence also showed that STC had no knowledge of the '398 patent prior to GTT's filing suit in 2010.  The evidence further showed that when STC's president, Brad Cross, learned of the '398 patent, he evaluated it and concluded in good faith that the EMTRAC System did not infringe.

These facts compelled a judgment of no direct infringement, no indirect infringement, and no willful infringement.  The district court entered judgment of infringement, however, based on several legal errors.  These errors included:

1)    failing to construe two disputed case-dispositive means-plus-function claim limitations to identify any corresponding structure at all, and instead allowing GTT's expert to argue plainly incorrect constructions of those terms to the jury;

2)    construing the "map of allowed *approaches*" required by the asserted claims to cover a map of static rectangular areas, rather than a map of directional routes, despite clear teachings in the patent to the contrary;

3)      upholding the jury's verdict against STC of direct infringement of a method claim without any evidence that STC performed the method; and

4)      upholding the jury's indirect infringement and willfulness verdicts without any evidence that STC (as opposed to any co-defendant) had the required knowledge or intent.

The district court compounded these errors by upholding an inflated damages award that was based on improper expert testimony and that was unavailable as a matter of law because of GTT's failure to properly mark its own Opticom System.

Because of these and other errors, this Court should reverse and direct judgment of noninfringement in STC's favor.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1338(a).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).  Judgment was entered on September 24, 2013.  STC timely filed a renewed motion for judgment as a matter of law on November 15, 2013.  The district court entered amended final judgment on May 16, 2014.  STC timely appealed on June 4, 2014.

## STATEMENT OF THE ISSUES

(1)    Whether the district court committed claim construction errors by:

(a)    refusing to construe two case-dispositive means-plus-function terms and instead leaving claim construction to the jury;

(b)    not construing the term "map of allowed approaches" to be a map of routes to an intersection, and denying judgment as a matter of law of noninfringement because the accused EMTRAC System uses a map of rectangular areas, not a map of routes; and

(c)    not construing "mapping means, associated with the location . . . " to require structures located at an intersection.

(2)    Whether the district court erred by denying judgment as a matter of law of noninfringement and no willful infringement where:

(a)    STC does not perform any steps of the asserted method claim, as required for direct infringement;

- 4 -

(b)    STC did not have the required knowledge or intent for indirect infringement; and

(c)    STC did not have the required knowledge or intent for willful infringement.

(3)    Whether the district court erred in allowing the jury's damages award to stand.

## STATEMENT OF THE CASE

GTT sued co-Appellant Rodney K. Morgan and others for infringement of the '398 patent on September 30, 2010.  *See* A5001-5009.  GTT later amended its Complaint to include Appellant KM Enterprises, Inc. ("KME"), and separately sued STC for infringement of the same patent.  *See* A5049-5059; A32221-32226.  The District of Minnesota consolidated the cases.  A5135-5140.

On May 24, 2013, the district court granted-in-part and denied-in-part GTT's motions for summary judgment, and denied the defendants' motions for summary judgment, in a published opinion.  *Global Traffic Techs., LLC v. Emtrac Systems, Inc.*, 946 F. Supp. 2d 884 (D. Minn. 2013).  On September 20, 2013, a jury returned a verdict finding that KME, Mr. Morgan, and STC had willfully infringed claims 1, 3, 8, 10, 16, and 17 of the '398 patent.  A170-171.  The jury awarded GTT $5,052,118 in damages.  *Id.*  The court denied STC and its co-defendants' motion for JMOL on April 25, 2014.  A19-A49.  On May 16, 2014,

the district court entered final judgment on the jury's infringement and damages

verdict, and additionally awarded GTT $2,526,059 in enhanced damages, $923,965

in prejudgment interest, and $1,384.14 in daily post judgment interest.  A55.

## FACTS AND PROCEDURAL HISTORY

## I.    TRAFFIC PREEMPTION SYSTEMS

Traffic preemption systems are intended to increase safety and efficiency at

street intersections by allowing certain vehicles (such as emergency vehicles) to

travel along a route without encountering any red traffic lights along the way.  *See*

A17662-17663.  As the vehicle approaches an intersection, the preemption system

will either change a red traffic light to green, or extend the duration of a green

light—in effect giving the vehicle "priority" to pass through the intersection.  *Id.*

Early traffic preemption systems were based on optical technology, where a

vehicle produces "strobes of lights directed at detectors mounted on or near traffic

lights" that cause a traffic light to turn from red to green or to hold the green light.

A184 (1:36-45).  Other systems use radio to transmit signals to intersections.

A184-185 (2:65-3:5).  The latest generation of systems, including the EMTRAC

System, rely on GPS to determine the position of the vehicle and decide whether to

preempt the signal at an intersection.  A17663; A17671; A5472.

## II.    THE EMTRAC SYSTEM

The current EMTRAC System is the successor of earlier radio-based systems (which were also marketed using the "EMTRAC" name).  A2479:2-2481:4; A7084-7085.  The original EMTRAC System was designed by STC's president, Brad Cross, in the mid-1980s.  A2479:2-2481:4.  They were marketed by Mr. Morgan (who is not an STC employee).  A7084-7085.  Mr. Cross's original ideas reflected in the EMTRAC System were eventually patented as U.S. Patent No. 4,914,434.  A2482:16-2483:3; A30001-30068.

In 1993, Mr. Cross began experimenting with a GPS-based system, A2497:17-2499:13, and in 2004, he began designing what became the current EMTRAC System.  A2495:15-2496:3.  STC manufactures components for the EMTRAC System, while Mr. Morgan and Mr. Morgan's company, KME, market the EMTRAC System.  A2524:13-20; A2555:14-2556:2.

The EMTRAC System is a ***vehicle-based*** system: the vehicle contains the components that decide whether to preempt a traffic light.  The EMTRAC System product manual explains that "[a]s an EMTRAC-equipped vehicle approaches the intersection, the vehicle computer compares the position and direction of the approaching vehicle with pre-defined detection-zone data (stored in its memory) to determine if a priority control request should be transmitted."  A5472.

- 7 -

In the EMTRAC System, there is a Vehicle Computer Unit in each vehicle. Inside that Vehicle Computer Unit (shown below) is "a GPS receiver, a computer board, and . . . transceiver module." A2530:19-2531:2.



A25732. The GPS receiver determines "the vehicle's position, direction, and velocity," and provides this information to a computer board—which is also inside the Vehicle Computer Unit. A5472. The GPS unit sends the GPS information to the computer board via a "cable." A1496:22-1497:9. The computer board includes a Rabbit 2000 processor (A1492:20-1493:7), as well as memory that stores a table of "detection zones"—boundaries around or near each intersection. *See* A2533:1-10; A2539:5-9; A5472. Each detection zone is a geographic area in the shape of a rectangle. A1482:6-17.

If the Rabbit 2000 processor determines from the GPS data that the emergency vehicle is within any of the rectangular "detection zones," it immediately generates a "priority request." A2538:15-23. A "priority request" is a request sent from a vehicle to an intersection to change a traffic signal as needed to allow the vehicle to pass through. A2531:6-20. The Vehicle Computer Unit sends the "priority request" to a "priority detector" located in an intersection. A2539:5-2541:2. Thus, all of the processing that leads to the decision to transmit the "priority request" takes place on the vehicle.

## III.    THE '398 PATENT

The now-expired '398 patent derives from an application filed on January 7, 1994 and issued on July 23, 1996. A173. The patent was originally issued to Minnesota Mining and Manufacturing Company ("3M"). *Id.* In 2007, 3M sold the '398 patent to GTT. A17666-17667.

The '398 patent describes and claims a particular type of ***intersection-based*** traffic preemption system. A "vehicle module" uses GPS signals to generate "vehicle data, such as position, heading, and velocity" and then wirelessly transmits that "vehicle data, along with other data" to an intersection "equipped with an intersection module to receive and process the vehicle data." A185-186 (3:47-58, 4:61-5:2). "If the vehicle data sufficiently matches the map of allowed

approaches to a particular intersection, the intersection module forwards the

vehicle's preemption request to the intersection controller."  A185 (3:62-65).

At trial, GTT asserted two independent claims—claims 1 and 16—as well as

dependent claims 3, 8, 10, and 17.  Independent claim 1 is an apparatus claim in

means-plus-function form:

> A system for determining whether a vehicle having an associated vehicle
> path is within an allowed approach of a location, comprising:
>
> > navigation means, associated with the vehicle, for generating vehicle
> > data at periodic intervals along the vehicle path, wherein the vehicle
> > data includes vehicle position data;
> >
> > ***means for transmitting the vehicle data***;
> >
> > ***means, associated with the location, for receiving the vehicle data***;
> >
> > ***mapping means, associated with the location,*** for storing a plurality
> > of positions corresponding to allowed approaches to the location and
> > providing therefrom a ***map of allowed approaches***; [and]
> >
> > evaluation means for comparing the vehicle data to the map of
> > allowed approaches to determine whether the vehicle path is within
> > an allowed approach.

A188 (9:26-42) (emphasis added).  Claim 16 is a method claim directed to a

"traffic control preemption method" that largely tracks the system of claim 1.

A188 (10:42-63).

There are four key aspects of the claims relevant to this appeal.  ***First***, the

only embodiment of the claimed "means for transmitting the vehicle data"

disclosed in the '398 patent is a wireless transmitter and antenna that transmits

vehicle data from the vehicle to an intersection.  A175 (Fig. 1), A186 (5:21-24)

("All of the data generated by GPS receiver 40 and by processor 60 (hereinafter

referred to collectively as 'vehicle data') is then transmitted via transmitter 80 and

antenna 101 to the intersection module 200.").  Other disclosures in the patent also

make clear that the transmission of vehicle data is wireless (namely, from the

vehicle to the intersection).  *See, e.g.*, A185 (3:53-58) ("The vehicle data, along

with other data . . . are transmitted via radio waves or some other medium" to an

intersection module "adapted to receive and process the vehicle data"); A186

(5:62-66) ("To track the vehicle, the vehicle module generates and transmits

vehicle data as it travels toward the intersection.  Processor 250 compares the

received vehicle data with the map of allowed approaches stored in map memory

260."); A187 (7:3-5) ("At periodic intervals 400 along approach path 440, the

vehicle transmits vehicle data to an intersection module 200 located at intersection

490."); *see also* A187 (7:23-25, 8:7-10).

    *Second*, the only disclosed embodiment for the "means, associated with the

intersection, for receiving the vehicle data" is a receiver and antenna located at the

intersection.  *See, e.g.*, A186 (5:25-30) ("Intersection module 200 includes a data

receiving antenna 210 which receives the vehicle data from the vehicle

transmitting antenna 101.  The vehicle data is then transmitted to a data receiver

230, which converts the radio frequency signal to digital form and outputs the

vehicle data to a processor 250."); *see also* A185 (3:55-57) ("Each intersection is

equipped with an intersection module adapted to receive and process the vehicle

data").

    Figure 1 depicts how a vehicle transmits vehicle data to an intersection

module, and how the intersection module receives the data:[1]



A175 (colors and annotation added).

---

[1]    All three "preferred embodiment[s]" of the patent are identical with respect
to how vehicle data is transmitted and received.  The embodiments differ ***only*** with
respect to the type of GPS system used, with the second and third embodiments
using "differential" and "pseudo-differential" GPS, respectively.  A186 (6:6-9,
6:46-47).

***Third,*** every disclosure of a "map of allowed approaches" in the patent shows a map located in the "intersection module," which is located at an intersection. *See, e.g.*, A185 (3:60-62) ("[e]ach intersection module contains a preprogrammed map of allowed approaches to the intersection"); A186 (5:57-60) ("A preprogrammed map of allowed approaches to the intersection is stored in map memory 260. The map is programmed into the intersection module"); A187 (7:3-5, 8:7-13, 8:38-40).

***Fourth***, the "approaches" of the "map of allowed approaches" limitation are routes to an intersection. *See, e.g.*, A185 (3:8-11) ("[P]rior art radio transmitter systems may erroneously pre-empt signal lights which are not on the approach route of an on-coming vehicle demanding preemption"); A185 (3:36-45) ("There is therefor a need for a traffic preemption system for locations where approaches to an intersection are not line-of-sight . . . . Such a system would desirably offer the following advantages . . . capability for easy implementation in applications with curving or abruptly angled approaches."); *see also* A184 (1:9-13, 2:60-64), A186 (5:55-57), A187 (8:1-14). In addition, Figure 4 shows that the "allowed approaches" are multiple sets of coordinates representing a route:

- 13 -



**FIG.4**

A178; *see also* A186-187 (6:66-7:2) ("Fig. 4 shows the operation (not to scale) of the preemption systems of Fig. 1 and Fig. 2.  A vehicle follows roadway 460 toward intersection 490 along approach path 440.").  Likewise, Figure 9 shows the "control flow for tracking of a vehicle by any one of the intersection modules"; the tracking is performed "to determine whether the vehicle requesting preemption is within an allowed approach."  A187 (8:35-39).  The intersection module repeatedly checks the vehicle data against "data points" in the "map of allowed approaches" to determine whether a "minimum number of matched vehicle data points are found."  A187 (8:41-57).



A183 (Fig. 9).

## IV.    GTT'S OPTICOM SYSTEM

GTT acknowledges that its Opticom System is "covered by one or more claims of the '398 patent."  A5053.  The Opticom System[2] has four basic components:  a mast mount radio receiver that is placed at the top of an intersection; a phase selector that is placed inside a traffic cabinet at the

---

2       GTT also produces an infrared-based traffic preemption system under the name "Opticom," that does not rely on GPS technology.  A1829:7-12.  Unless otherwise noted, all references in this brief to "Opticom" refer to the GPS-based traffic preemption system.

intersection; a vehicle control unit that is placed inside of a vehicle; and a radio/GPS antenna and receiver on a vehicle that receives GPS signals and sends radio signals.  A1889:9-25; A26390.

Like the '398 patent that it embodies, the Opticom System is an intersection-based system.  GTT markets its Opticom System as an "intelligent intersection" system whereby the "Opticom GPS system intersection equipment is programed with an approach map to define corridors for priority control activity."  A26967.  The 2011 Opticom System installation manual confirms that it is the "***intersection equipment*** [that] compares the information being received from the vehicle to the parameters stored in the intersection equipment's memory."  A26390 (emphasis added).  GTT's own CEO, Doug Roberts, similarly described the Opticom System as an "intersection centric" product.  A1909:14-16; *see also* A5302 (industry analyst describing Opticom System as a "smart cabinet" in which "roadside devices . . . make[] a determination on the appropriateness of a priority request").

## V.    CLAIM CONSTRUCTION

The parties submitted a Joint Claim Construction Statement to the district court on December 13, 2011.  A5109.  Among other claim terms, Defendants asked the court to construe the terms "transmitting the vehicle data" and "transmitting vehicle data," as used in claims 1, 11, 16, and 17, as "delivering data gathered by a vehicle to an intersection module that is located at an intersection."

A5130.  STC explained in its claim construction brief that this term appeared as part of a means-plus-function limitation in claim 1, and that the only structure disclosed in the patent corresponding to the function of transmitting the vehicle data was a wireless link.  A5178.  GTT argued that no construction was necessary.  A5124.

In addition, Defendants asked the court to construe the term "map of allowed approaches" as used in claims 1, 2, 11, 16, and 18 as a "preprogrammed map of routes to the intersection where the traffic signal that is to be preempted is located, said map being stored at the intersection."  A5124.  GTT again argued that no construction was necessary.  *Id.*

Finally, Defendants asked the court to construe "mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches" as used in claim 1 as "the device that stores a preprogrammed map of allowed approaches to the intersection is located at the intersection where the traffic signal that is to be preempted is located, and not in the vehicle."  A5119.  By contrast, GTT argued that the structure corresponding to the claimed "mapping means" was simply "memory configured to store data."  A5113.

The district court issued a claim construction order holding that "transmitting the vehicle data," "transmitting vehicle data," and "map of allowed

- 17 -

approaches" all have a "plain and ordinary meaning," without explaining what the plain and ordinary meaning was, or identifying any corresponding structure under 35 U.S.C. § 112(f). A10-16. The court construed "mapping means . . ." as a means-plus-function term and identified the corresponding structure as "computer map memory," but declined to require that the memory be located at the intersection (as every embodiment of the specification discloses). A8-10.

STC sought permission to file a motion for reconsideration of the claim construction order, again pointing out that "transmitting the vehicle data" appeared as part of a means-plus-function limitation (and thus that the "plain and ordinary meaning" construction was improper). A5755. The district court denied the request. A5792-A5793.

The parties addressed claim construction issues again in their cross-motions for summary judgment. A7080; A7124. STC again argued that the terms "means for transmitting the vehicle data" and "means, associated with the location, for receiving the vehicle data" were means-plus-function limitations, and that the EMTRAC System could not infringe as a matter of law because it does not have the corresponding structures disclosed in the specification. A7105-7107. Specifically, STC explained that the only structure identified in the '398 patent corresponding to the "means for transmitting the vehicle data" limitation was a ***wireless transmitter and antenna***, and that the limitation could not be satisfied by

the internal *wires* in the EMTRAC System's Vehicle Computer Unit linking the GPS receiver and the Rabbit 2000 processor, as GTT had alleged. A7105. In response, GTT did not dispute that its contention was that the wires satisfied the "means for transmitting the vehicle data" limitation. Instead, GTT argued that the specification of the '398 patent purportedly disclosed numerous different structures corresponding to the transmission of vehicle data. A13835. However, GTT could not and did not cite to any language in the '398 patent disclosing any structure for transmitting vehicle data other than the wireless transmitter and antenna. A13835-13837.

Additionally, STC argued that the Rabbit 2000 processor in the vehicle could not be the claimed "means, associated with the location, for receiving the vehicle data" because the only structure disclosed in the '398 patent for this function was a receiver and antenna located at the intersection. A7108. GTT again did not dispute that it believed the Rabbit 2000 processor, which has no antenna and is located on a vehicle and not at an intersection, was the "means, associated with the location, for receiving the vehicle data." Instead, GTT contended simply that the patent disclosed "processors" as structures that could receive vehicle data, and the Rabbit 2000 was a processor. A13838. The district court denied the parties' motions for summary judgment without construing any additional claim terms. A17706; A17689-17690.

- 19 -

STC again alerted the district court to its failure to construe the case-dispositive means-plus-function terms in its Motion *In Limine* Seeking Further Claim Construction—including the terms "means for transmitting the vehicle data" and "means, associated with the location, for receiving the vehicle data." A19615-19616. STC explained that, in expert reports filed after claim construction, GTT had made clear that it was relying on wires to satisfy the "means for transmitting the vehicle data" limitation, and a computer processor on the vehicle itself to satisfy the "means, associated with the location, for receiving the vehicle data" limitation. A19608; *see* A19932-19937; A19974. The district court denied the motion, but acknowledged that "[t]here may be particular terms as we proceed along that may be causing some problems." A1032:3-9.

At trial, GTT's counsel asked GTT's technical expert, Dr. Charles Neuhauser, to construe the means-plus-function terms by identifying the corresponding structures in the patent. A1505:21-1506:1; A1506:15-18. After GTT rested its case, STC orally renewed its request for construction of the means-plus-function terms. A2152:2-5. But even though GTT's counsel had elicited claim construction testimony in front of the jury, the court again denied the motion. A2154:7-11.

Following trial, the court invited the parties to raise objections to the jury instructions, and STC again renewed its request for construction of the means-plus-

function terms.  A2873:19-24.  The court denied STC's request and issued jury

instructions that construed all claim terms—including the means-plus-function

terms other than the "mapping means" term of claim 1—as having a "plain and

ordinary meaning."  A118; A2901:7-12.

Finally, STC again raised the court's refusal to construe the disputed means-

plus-function terms in its post-trial motion for judgment as a matter of law,

reiterating its position regarding the proper corresponding structures for "means for

transmitting the vehicle data" and "means, associated with the location, for

receiving the vehicle data."  A20766-20769.  GTT did not respond to this argument

on the merits, but instead argued that STC had somehow waived its claim

construction argument.  A20972-20978.  The court again declined to construe these

terms, stating that "no further claim construction was necessary" because "[t]he

language of the ['398] Patent was relatively clear."  A23.

## VI.  NONINFRINGEMENT

### A.  Claim 1

At trial, GTT's expert, Dr. Neuhauser, opined to the jury that the wires

within the EMTRAC System's Vehicle Computer Unit connecting the GPS

receiver to the computer corresponded to the "means for transmitting the vehicle

data" of claim 1.  A1504:16-1506:5.  Dr. Neuhauser also testified that the

"structure [] identified in the '398 patent for performing [the] function of receiving

vehicle data" was the "processor 250" shown in Fig. 1, and that the "processor 250" was the "same thing" as the Rabbit 2000 processor in the EMTRAC System. A1506:6-21. He concluded that the Rabbit 2000 processor was "associated with the location" not because the Rabbit 2000 processor was actually located at the intersection (in fact, it is on a vehicle), but rather because the processor evaluated "the data about the location of the detection zone." A1506:22-1507:10. With regard to the "mapping means, associated with the location" limitation, Dr. Neuhauser testified that the memory on the computer board in the EMTRAC System's Vehicle Computer Unit (again, in the vehicle, not at the intersection) corresponded to the "computer map memory" required by the court's construction. A1507:20-1508:8. Finally, Dr. Neuhauser testified that the "detection zones" stored in the Vehicle Computer Unit's memory were "rectangular area[s] near [] intersection[s]." A1468:13-23. He claimed that these "rectangular area[s]" were the "allowed approaches" of the '398 patent. A1507:20-1508:8.

STC's technical expert, Scott Andrews, testified that the only structures identified in the patent corresponding to the "means for transmitting" were a radio transmitter and antenna, and that GTT had not identified any radio transmitter or antenna corresponding to the claimed "means for transmitting." A2721:10-2722:14. Likewise, Mr. Andrews testified that the processor in the Vehicle Computer Unit could not be the "receiving means" of claim 1 because the patent

did not disclose a processor as being a "receiving means"—but rather disclosed a radio receiver and an antenna.  A2723:13-18.  Mr. Andrews further disputed Dr. Neuhauser's testimony that the processor could be "associated with" a location merely by processing data related to the location, explaining that this was "like saying I'm associated with the clock on the wall because I looked at it." A2723:19-2724:1.  Finally, Mr. Andrews testified that the "detection zones" stored in the Vehicle Computer Unit could not correspond to the claimed "allowed approaches" because each zone was a "boundar[y]" rather than a "plurality of positions" representing an approach.  A2724:2-24.

Following the jury's infringement verdict, STC renewed its argument that the EMTRAC System could not infringe claim 1 because it does not contain structures corresponding to the claimed "means for transmitting the vehicle data" and "means, associated with the location, for receiving the vehicle data" under the proper construction of those terms pursuant to 35 U.S.C. § 112(f).  A20766-20769. STC also renewed its argument that no reasonable jury could conclude that the EMTRAC System contained a "map of allowed approaches," as properly construed.  A20771-20773.  The district court denied STC's motion and found that no further construction of any disputed terms was necessary.  A23.

## B.    Claim 16

Claim 16 of the '398 patent is a method claim that essentially mirrors the system of claim 1.  GTT offered no evidence at all that STC ever performed the method of claim 16.  Instead, GTT's entire infringement analysis rested on Dr. Neuhauser's conclusion that the EMTRAC System worked "automatically" once it was turned on.  A1474:13-1475:20.  Dr. Neuhauser confirmed that it is "***the customer*** [who would] perform all these steps of claim 16" by operating the EMTRAC System.  A1500:1-13 (emphasis added).  Similarly, GTT elicited testimony from Defendant Mr. Morgan (whom GTT called as an adverse witness) that ***users*** of the EMTRAC System—not STC or any other defendant—performed the method of claim 16.  A1755:11-1756:1.

The jury returned a verdict that did not differentiate between direct and indirect infringement.  A168-169.  STC argued in its post-trial motion for judgment as a matter of law that GTT had failed to demonstrate that STC actually performed all the steps of claim 16.  A20775.  But the district court denied the motion with respect to claim 16, without addressing whether there was or was not evidence that STC itself performed the steps of method claim 16.  A23.

## C.    STC's Intent

Before, during, and after trial, STC disputed that it had the requisite intent for inducement or contributory infringement, or for a finding of willful

- 24 -

infringement.  In its summary judgment motion, STC argued that it could not be

liable for indirect infringement, at least prior to GTT filing suit, because STC

lacked knowledge of the '398 patent before then.  A7114-7115.  In denying

summary judgment on this issue, the district court discussed only *Mr. Morgan's*

knowledge of the patent and did not address STC's knowledge of it at all.  A17693.

At trial, GTT questioned *Mr. Morgan* about his knowledge of the '398 patent (*see,*

*e.g.*, A1732-1733), but again presented no evidence that *STC* or any of STC's

employees knew of the '398 patent prior to GTT's lawsuit.  Nor did GTT present

any evidence that STC or any STC employee ever—before or after suit—knew or

had reason to believe that the EMTRAC System infringed the patent.  At the close

of GTT's case, STC moved for judgment as a matter of law of noninfringement on

all theories and claims, and specifically argued that there was insufficient proof of

knowledge or intent required for indirect infringement.  A2152:14-19.  The district

court denied the motion without substantive analysis.  A2154:7-11.

       During STC's case, Mr. Cross testified that he did not learn of the '398

patent until GTT brought suit in 2010 against Mr. Morgan.  A2574:6-10;

A2582:18-20.  When Mr. Cross did learn of the patent, he reviewed it and

concluded that the EMTRAC System could not infringe because it is a "vehicle-

centric" system, whereas the '398 patent describes and claims an "intersection-

centric" system.  A2583:20-2584:6.

After trial, the Defendants filed a post-verdict motion for judgment as a matter of law arguing that Mr. Morgan did not have the necessary knowledge for induced or contributory infringement. A20596-20598. The Defendants expressly noted that "[t]he same analysis as applies to Mr. Morgan applies as well to the two corporate defendants," *i.e.* STC and KME, because "the record fails to support a finding of specific intent on the part of either STC or KME to induce infringement or knowledge as to the alleged infringing nature of the Emtrac System." A20598 n.1. Defendants further argued that none of them could be liable for contributory infringement because none of them "manufactured or sold components specifically designed for use in a device that was produced by another." A20612 n.4. The defendants further argued that "a verdict against any of the Defendants finding indirect infringement would be erroneous and contrary to the evidence." A20665 n.1. In opposing STC and its co-defendants' motion, GTT did not address STC's knowledge or intent ***at all***, but instead focused exclusively on whether ***Mr. Morgan*** had the necessary knowledge and intent for indirect infringement. A21012-A21019. Likewise, the district court analyzed only ***Mr. Morgan's*** knowledge and intent when denying the defendants' motion. A31-32. The district court did not discuss or consider any evidence of STC's liability under any indirect infringement theory—and, in fact, there is no such evidence.

## VII.  DAMAGES

### A.    Lost Profits

Prior to trial, STC filed a *Daubert* motion to exclude the testimony of GTT's damages expert, Mr. Donald Gorowsky.  STC explained that Mr. Gorowsky relied on faulty methodology by ignoring the "law of price elasticity of demand." A6458; A6463.  The district court denied the motion.  A17703-17705.

Mr. Gorowsky testified that GTT was entitled to $7,160,160 in damages due to lost profits from two sources:  (1) roughly $5 million in lost profits from lost sales; and (2) $2.1 million in lost profits from price erosion.  A2060:6-15.  Mr. Gorowsky concluded that GTT was entitled to lost profits based on its normal list price for its products—without any accounting whatsoever for how elasticity of demand might reduce the number of units GTT would be able to sell "but for" the EMTRAC System.  A2101:8-2103:25.  The district court denied STC's motion to strike this testimony.  A2153:10-14; A2154:7-11.  STC renewed its challenge to Mr. Gorowsky's methodology in its post-trial motion for judgment as a matter of law, and the district court again rejected it.  A25-26; A20782-20783.

### B.    Marking

STC also moved for summary judgment to limit damages as a result of GTT's failure to comply with the patent marking statute, 35 U.S.C. § 287(a). A7117.  STC argued that "[d]espite the fact that GTT's products are tangible goods

- 27 -

with adequate space on the exterior where GTT could mark or affix patent numbers, GTT failed to mark its actual products with notice of the '398 patent consistent with the requirements of section 287(a)." *Id.* In response, GTT acknowledged that it does not mark its Opticom System components, but rather marks "the packaging of the system's components." A13855-13863. The district court rejected STC's challenge to GTT's marking practice, acknowledging that "Courts that have considered the issue have split between a 'highly literal reading' of the marking statute's requirements and a more 'practical approach.'" A17694. The district court elected to apply to apply what it characterized as the "practical approach" and determined that "[w]hether marking on the packaging served as the most effective notice to the public of [the Opticom System] . . . is a factual issue for trial." A17694-17695.

At trial, GTT offered the testimony of its Chief Operating Officer and Chief Financial Officer Brian VanDerBosch to attempt to show compliance with the patent marking statute. A1973:3-1982:10. Mr. VanDerBosch admitted that GTT does not mark the components of the Opticom System, but that it would be possible to do so without impairing the system's operation or adding appreciable additional cost. A1994:8-1995:18. Mr. VanDerBosch also acknowledged that there was space on the system components for patent marking and that labels

containing non-patent information are already placed on the Opticom System components.  A1994:12-19.

STC moved for judgment as a matter of law of no pre-suit damages as a result of GTT's failure to comply with the marking statute.  A20785-20787.  The district court denied the motion.  A27-28; A48.

## SUMMARY OF ARGUMENT

The district court committed several errors, each of which requires reversal.

*First*, the district court erred by failing to construe two disputed means-plus-function limitations in claim 1—"means for transmitting the vehicle data" and "means, associated with the location, for receiving the vehicle data"—and instead concluding that those terms should be given their plain and ordinary meaning.  The court erred by leaving a dispute regarding the construction of means-plus-function terms to the jury, which in turn found infringement based on incorrect claim constructions.

*Second,* the district court erred by failing to require the structure corresponding to claim 1's "mapping means, associated with the location" to be located at the intersection.  This error allowed the jury to find infringement based on GTT's argument that a computer within the vehicle was a "mapping means, associated with the location."

*Third*, the district court erred by failing to construe the claimed "map of allowed approaches" in both claims 1 and 16 to require that the approaches be routes, as opposed to rectangles such as the "detection zones" in the EMTRAC System.

*Fourth*, the district court erred by denying judgment as a matter of law of no infringement of claim 16.  There was no evidence that STC itself performed the

claimed method, and no evidence that STC had the requisite knowledge or intent for indirect infringement.

*Sixth*, the district court erred in finding willful infringement despite itself acknowledging that STC had a good-faith infringement defense.

*Finally*, the district court erred in addressing damages by admitting expert lost profits and price erosion testimony that failed to address elasticity of demand, and by permitting GTT to obtain damages despite its failure to abide by the patent marking statute.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews issues of claim construction *de novo*.  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276 (Fed. Cir. 2014) (en banc).  This Court likewise reviews the objective prong of a willful infringement determination *de novo* and the subjective prong for substantial evidence.  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1006-1007, 1008 (Fed. Cir. 2012).

Regional circuit law applies to review of the denial of a motion for judgment as a matter of law, *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1378 (Fed. Cir. 2014), and the Eighth Circuit reviews such a denial *de novo*, using "the same standards as the district court."  *Howard v. Missouri Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010).

This Court also reviews the admission of expert testimony under Rule 702 under the regional circuit's standard of review, *see Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-1392 (Fed. Cir. 2003), which in the Eighth Circuit is abuse of discretion, *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 928 (8th Cir. 2001).

This Court reviews statutory interpretations of the patent marking statute *de novo*, *Amsted Industries Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 185 (Fed.

Cir. 1994), and application of the patent marking statute for substantial evidence,

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-1112 (Fed. Cir. 1996).

## II.   THE DISTRICT COURT FAILED TO CONSTRUE THE DISPUTED MEANS-PLUS-FUNCTION LIMITATIONS OF CLAIM 1 ACCORDING TO 35 U.S.C. § 112(f)

The district court refused to construe two disputed means-plus-function

limitations in claim 1:  "means for transmitting the vehicle data" and "means,

associated with the location, for receiving the vehicle data."  This was error.  A

district court "must construe" means-plus-function limitations.  *Kemco Sales, Inc.*

*v. Control Papers Co., Inc.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000); *see* 35 U.S.C.

§ 112(f) (a means-plus-function claim element "shall be construed to cover the

corresponding structure, material, or acts described in the specification and

equivalents thereof").  "When the parties raise an actual dispute regarding the

proper scope of [patent] claims, the court, not the jury, must resolve that dispute."

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed Cir.

2008).  Here, contrary to this established law, the district court refused to construe

two disputed means-plus-function limitations notwithstanding STC's repeated

requests that the court do so, and instead left it to the jury to construe these

limitations incorrectly.  Under the correct construction, no reasonable jury could

have concluded that the EMTRAC System infringes the '398 patent.

## A.    The District Court Erred By Giving Means-Plus-Function Terms Plain And Ordinary Meaning

Both "means for transmitting the vehicle data" and "means, associated with the location, for receiving the vehicle data" in claim 1 are means-plus-function terms under 35 U.S.C. § 112(f).  *See Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("Claim drafters conventionally use the preface 'means for' (or 'step for') when they intend to invoke [35 U.S.C. § 112(f)][.]").  Construction of a means-plus-function term requires both "determin[ing] the claimed function" and "identify[ing] the corresponding structure in the written description of the patent that performs that function."  *Baran v. Medical Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).

The parties disputed the "corresponding structure" for the disputed limitations throughout the course of this case.  STC argued in its opening claim construction brief that the only structure disclosed in the patent corresponding to the function of "transmitting the vehicle data" was a wireless link.  A5178.  The parties disputed the structure corresponding to that limitation and to the "means, associated with the location, for receiving the vehicle data" at both the summary judgment and motion *in limine* stages.  *See* A7105, A7108, A13835-13838 (conflicting structures at summary judgment stage); A19615, A19616, A19932, A19937 (conflicting structures at motion *in limine* stage).  Repeatedly, the district court declined to construe the limitations, stating that it would wait for the

- 34 -

"context" of trial to determine if further claim construction was necessary. A17689-17690; A1032:3-9. The "context" of trial clearly showed that claim construction was necessary, with both parties' experts giving conflicting testimony to the jury on this issue of what structures corresponded to the claimed means. *Compare* A1505:21-1506:1 (testimony of Dr. Neuhauser), *with* A2722:12-14 (testimony of Mr. Andrews). Yet the district court continually declined to construe the disputed terms and held, post-trial, that "no further claim construction was necessary" because "[t]he language of the ['398] Patent was relatively clear." A23.

The district court's failure to resolve this clear dispute was error. *See, e.g.*, *Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1369 (Fed. Cir. 2014) (vacating and remanding for further proceedings because the district court "erred in failing to construe the disputed claim language"); *O2 Micro*, 521 F.3d at 1362-1363. Furthermore, by failing to construe these terms, the district court improperly left it to the jury to decide the correct constructions based on competing expert testimony. See *id*. at 1362 ("By failing to construe [a claim] term, the district court left the jury free to consider [claim construction] arguments . . . the parties' arguments regarding [claim construction] were improperly submitted to the jury"). This is particularly problematic in the context of means-plus-function

limitations, which the court "must construe" when in dispute. *Kemco Sales*, 208

F.3d at 1360; *see also* 35 U.S.C. § 112(f).

**B.    Properly Construed, The Disputed Terms Require Reversal Of The Judgment Of Infringement**

The jury could not have found the EMTRAC System infringed claim 1

under the proper construction of the disputed means-plus-function limitations.  At

trial, the only evidence that the EMTRAC System met the "means for transmitting

the vehicle data" limitation was testimony from GTT's expert, Dr. Neuhauser, that

there is a wire carrying data from the GPS receiver to the processor in the

EMTRAC System.  A1504:16-1506:5.  Likewise, GTT's only argument that the

EMTRAC system met the "means, associated with the location, for receiving the

vehicle data" limitation was that the Rabbit 2000 processor, located in the vehicle

in the EMTRAC System, satisfied the limitation.  A1506:6-1507:19.

Both of these arguments rest on an improper construction of the disputed

means-plus-function limitations.  "[A] means-plus-function claim limitation is

limited to the structures disclosed in the specification and equivalents." *Mettler-

Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012).  A

"structure disclosed in the specification is [a] 'corresponding' structure only if the

specification or prosecution history clearly links or associates that structure to the

function recited in the claim." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 562

(Fed. Cir. 2013).  Furthermore, "[i]f a patentee chooses to disclose a single

- 36 -

embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof." *Mettler-Toledo*, 671 F.3d at 1296; *see also J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir. 2001) ("J & M is statutorily entitled only to claims that encompass embodiments of the 'gripping means' disclosed in the specification and their equivalents.").

Here, every embodiment described in the '398 Patent discloses the same structure for the "means for transmitting the vehicle data"—namely, a wireless transmitter and an antenna. Likewise, every embodiment discloses the same structure for the "means, associated with the location, for receiving the vehicle data"—namely, an antenna and a receiver located at the intersection. Nothing in the '398 patent links or associates any of the structures on which GTT relies with any of the functions recited in the disputed limitations.

### 1.    Nothing in the '398 patent links wires with "means for transmitting the vehicle data."

Dr. Neuhauser testified that the '398 patent identified a "combination of wires and radio links" that connected the GPS receiver in the vehicle module to the processor in the intersection module as the corresponding structure for the "means for transmitting the vehicle data." A1505:21-1506:1. But to the contrary, the only structure for transmitting vehicle data disclosed in the '398 patent is a ***wireless*** transmitter/antenna that transmits vehicle data from the vehicle to an intersection.

*See* A186 (5:21-24).  No other structure is linked or associated with "transmitting the vehicle data" in the patent.  And at no point did Dr. Neuhauser testify that a wire was an equivalent structure to a wireless transmitter—nor could it be, since a wire is precisely the opposite of a ***wireless*** transmitter.  Tellingly, the words "wire," "wires," or "cables" appear nowhere in the '398 patent, much less in the context of transmission of vehicle data.

GTT supported its argument that a wire could constitute the "means for transmitting the vehicle data" by looking to the patent Abstract.  A1596:22-1597:4.  The Abstract states only that "[t]he vehicle data is transmitted via radio transmission or some other medium."  A173 (Abstract).  This is the ***only*** language GTT found in the '398 patent to support its construction.  Such boilerplate "some other" language—which does not recite ***any*** structure at all—is not sufficient to clearly link or associate a structure to a function.  "[The] duty to link or associate structure to function is the *quid pro quo* for the convenience of employing [§ 112(f)]."  *Saffran*, 712 F.3d at 562.  This *quid pro quo* is not satisfied when a patentee uses generic boilerplate language such as "or some other medium" to claim undisclosed structures.  *Cf. Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311-1312 (Fed. Cir. 2012) ("If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.");

*Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007) ("a

bare statement that known techniques or methods can be used does not disclose

structure.  To conclude otherwise would vitiate the language of the [section 112(f)]

requiring 'corresponding structure, material, or acts described in the

specification.'").

### 2.    Nothing in the '398 patent links or associates a processor with "means, associated with the location, for receiving the vehicle data."

Dr. Neuhauser testified that the "processor 250" was the structure for

receiving data.  A1506:16-18.  However, at no point did he identify any language

in the patent supporting this view.[3]  In reality, as noted above, the ***only*** disclosed

structure for "receiving" the vehicle data in the '398 patent is the combination of

the "receiving antenna" and "data receiver" in the intersection module.  A186

(5:24-29).  The processor 250 is never disclosed as performing the function of

receiving the vehicle data.

Furthermore, Dr. Neuhauser's argument would render the phrase "associated

with the location" in the limitation effectively meaningless.  ***First,*** Dr. Neuhauser

---

[3]     In its opposition to Defendants' Motion *In Limine* Seeking Further Claim
Construction, GTT argued that the processor 250 was included in the structure
because "[t]he specification clearly states that 'Processor 250 compares the
received vehicle data with the map of allowed approaches.'"  A19938 (quoting
'398 patent at A186 (5:64-65)).  This argument is wrong as a matter of basic
English grammar.  The word "received" in the cited passage is an adjective that
modifies the word "data"—it is not used to indicate an action performed by the
processor.

argued that the Rabbit 2000 processor was associated with multiple locations over time. A1506:25-1507:10. But use of the word "the" before "location" requires that the association be with one specific location. *See, e.g.*, *DIRECTV Group, Inc. v. United States*, 670 F.3d 1370, 1381 (Fed. Cir. 2012) ("This use of a definite article raises an extraordinarily strong inference that a specific contractor is referenced."); *Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010) ("Our conclusion that there can only be one prevailing party in a given case is reinforced by the use of the definite article 'the' before 'prevailing party.'"); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("It is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'") (internal quotation marks omitted). Thus, even under GTT's own logic, the Rabbit 2000 processor could not have been "associated with *the* location."

*Second*, this Court has repeatedly recognized that disclosure of a structure for a means-plus-function limitation in a specific location limits the claim to a structure in that specific location. *See, e.g.*, *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1372 (Fed. Cir. 2004) ("[T]he ordinary meaning of 'storage means in a data processor' is a device capable of retaining data located within a data processing device or system"); *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d

- 40 -

1313, 1328 (Fed. Cir. 1999) ("Claim 1 of the '485 patent and the specification define the charge sink means both as to structure and location.").  It is undisputed that the Rabbit 2000 processor in the EMTRAC System is located *on the vehicle* and not at the intersection.  *See, e.g.*, A1492:20-1493:7; A2530:19-2531:2.  GTT cannot read "means, associated with the location, for receiving the vehicle data" to cover structures located on the vehicle.  *Cf. Kudlacek v. DBC, Inc.*, 25 F. App'x 837, 843 (Fed. Cir. 2001) (nonprecedential) ("Though Kudlacek now argues that he envisioned alternative structures not requiring the pad to be mounted to the screw, when drafting the '325 patent he purposefully invoked the *quid pro quo* of [§ 112(f)], and he cannot avoid the consequences of his choice.").

## C.    STC Properly Preserved Its Claim Construction Arguments

In its opposition to STC's motion for stay of judgment pending appeal, GTT suggested that certain claim construction arguments were not properly preserved. *See* Response to Appellant STC, Inc.'s Motion for Stay, *Global Traffic Tech. v. Morgan*, Case No. 14-1537, ECF No. 38 at 8-9 (Fed. Cir. July 30, 2014).  This is wrong.  STC argued in its claim construction brief that "transmitting the vehicle data" appeared in a means-plus-function limitation.  A5178.  Moreover, when disputes about the means-plus-function limitations became apparent after claim construction, STC *twice* asked the district court to construe the terms before trial. A19608-19609.  This Court has explained that the "district court may engage in

- 41 -

claim construction during various phases of litigation, not just in a *Markman* order." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006); *see also Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005) ("[D]istrict courts may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."). Here, STC's claim construction arguments on appeal were raised to the district court both during and after the district court's claim construction order. There was no waiver.

## III.    THE DISTRICT COURT ERRED BY NOT CONSTRUING CLAIM 1's "MAPPING MEANS, ASSOCIATED WITH THE LOCATION . . ." TO REQUIRE MEANS LOCATED AT THE INTERSECTION

Every disclosure in the patent of a "map" containing the "allowed approaches" points to a map located at the intersection. *See, e.g.*, A185 (3:60-62); A186 (5:55-60); A187 (7:3-5, 8:7-14, 8:38-40). Yet the district court refused to limit the corresponding structure for the "mapping means" to means located at an intersection. A7-8. The court's failure to restrict the structure for this limitation to that disclosed in the patent was erroneous. *See Saffran*, 712 F.3d at 562; *Mettler-Toledo*, 671 F.3d at 1296; *Kudlacek v. DBC, Inc.*, 25 F. App'x at 843.

Furthermore, like the court's error in giving other means-plus-function terms their plain and ordinary meaning, this claim construction error was case dispositive because it enabled GTT to argue to the jury that the "computer map memory"—

undisputedly stored *on the vehicle* in the EMTRAC System's Vehicle Computer Unit—was the "mapping means" required by the claim. A1507:20-1508:8. This too was error and requires reversal.

## IV.    THE DISTRICT COURT ERRED BY CONSTRUING "MAP OF ALLOWED APPROACHES" IN BOTH CLAIM 1 AND CLAIM 16 TO ALLOW A RECTANGLE TO BE AN "APPROACH"

Defendants asked the court to construe the term "map of allowed approaches" as a "preprogrammed map of *routes* to the intersection where the traffic signal that is to be preempted is located, said map being stored at the intersection." A5124 (emphasis added). The district court instead gave the term "map of allowed approaches" its "plain and ordinary meaning"—declining to adopt the concept of "routes." A10. At trial, GTT's expert Dr. Neuhauser testified, and the jury apparently concluded, that the rectangular "detection zones" used in the EMTRAC System were the "allowed approaches" of the patent. A1507:20-1508:8. However, the district court erred as a matter of law in giving "approaches" a "plain and ordinary meaning" construction that allowed the term to encompass rectangular "detection zones"—rather than routes.

The fundamental dispute between the parties as to this limitation is whether an "approach" can encompass a fixed area (like a rectangle on a map), or whether it requires movement (like a route). In construing a claim term, "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a

- 43 -

person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Here, the claims and the specification both confirm that the claimed "approaches" are routes, not rectangles.

The claims themselves contrast "approaches" with static locations such as "positions." Specifically, claim 16 makes clear that the "map of allowed ***approaches*** comprises a plurality of preprogramed allowed ***positions***." A188 (10:53-54) (emphases added). Claim 1 similarly distinguishes "approaches" from "positions" and specifically requires multiple "positions" to make up the "approaches." A188 (9:38-39). And dependent claim 2 makes clear that the "approach data" (the means for generating which is claimed in claim 2) is collected "at periodic intervals along the allowed approaches." A188 (9:47-48). Thus, the claim language itself makes clear that an "approach" is a route that includes multiple positions along a path, rather than a static geographic area.

The specification and drawings in the patent are even more explicit, and make clear that the "allowed approaches" must be routes traveled by a vehicle towards an intersection—as illustrated most clearly in Figure 4:



**FIG.4**

*See* A186-187 (6:66-7:2) ("Fig. 4 shows the operation (not to scale) of the preemption systems of Fig. 1 and Fig. 2.  A vehicle follows roadway 460 toward intersection 490 along approach path 440."); *see also, e.g.*, A183 (Fig. 9), A185 (3:8-11) ("[P]rior art radio transmitter systems may erroneously pre-empt signal lights which are not on the ***approach route*** of an on-coming vehicle demanding preemption") (emphasis added); A185 (3:36-45), A184 (1:9-13, 2:61-64), A186 (5:55-57), A187 (8:1-14, 8:35-39, 8:41-47).

Even apart from the claim language and the specification, the plain and ordinary meaning of "approaches" includes the concept of moving or becoming

near to something.  *See, e.g.*, Webster's Online, *approach*, available at

http://www.merriamwebster.com/dictionary/approach (last accessed Jul. 20, 2014)

("the act of ***moving or becoming near or nearer*** to someone or something")

(emphasis added); Oxford English Dictionary 64 (3rd ed. 1996) ("an act or means

of approaching"); Random House Webster's Unabridged Dictionary 103 (2nd ed.

1997) ("the act of drawing near"); 1 Webster's Third New International Dictionary

106 (Merriam-Webster 1993) ("a drawing near in space or time").  Thus, the "plain

and ordinary meaning" of allowed approaches also requires an "approach" to be a

route—not a rectangle.

　　　　The court's claim construction error requires reversal because had "map of

allowed approaches" been properly construed, no reasonable jury could have

accepted GTT's infringement argument.  As GTT's expert Dr. Neuhauser himself

admitted, the "detection zones" in the EMTRAC System are each "a little rectangle

on the surface of the earth" that is "near the intersection."  A1482:6-1483:3.  This

map of rectangles is not a map of routes to the intersection—as the claim term

"map of allowed ***approaches***" requires.

　　　　Put another way, an "approach" requires movement along a path (toward the

intersection)—whereas the "detection zones" of the EMTRAC System are static

geographic areas that do not require any indication of movement

whatsoever.  A1482:6-17.  When the EMTRAC Vehicle Computer Unit detects

that a vehicle is within a "detection zone" for a specific intersection, it generates and sends a priority request no matter which way (or even if) the vehicle is moving. A2538:15-2541:2. To illustrate the difference, consider what happens when the EMTRAC System is turned on when a vehicle is already within one of the "detection zones," but not moving at all. When the system is turned on, the Vehicle Computer Unit determines that the vehicle is within the "detection zone" and sends a priority request, even though the vehicle is not moving at all—much less following any "allowed approach" toward the intersection. Thus, because the "map" stored in and used by the EMTRAC system is merely a map of "detection zones," and because "detection zones" are not "approaches," the judgment of infringement of both claim 1 and claim 16 should be reversed.

## V. THERE WAS NO EVIDENCE THAT STC INFRINGED CLAIM 16, DIRECTLY OR INDIRECTLY

### A. There Was No Evidence Of Direct Infringement By STC

"A method claim is *directly* infringed *only* by one practicing the patented method." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993) (second emphasis added); *see also BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007) ("Direct infringement requires a party to perform or use each and every step or element of a claimed method or product."). There was no evidence whatsoever offered at trial to suggest that STC performed the traffic preemption method of claim 16. *See* A20775. In fact, GTT repeatedly elicited

testimony that it was end users and customers—not STC itself—that performed the actions that allegedly infringed claim 16.  *See* A1500:1-10; A1755:11-1756:1.

In opposing STC's motion for judgment of noninfringement as a matter of law, GTT again cited no evidence whatsoever that STC (or any other defendant) actually performed any steps of claim 16—but instead argued that there was "substantial evidence that *customers' use of the Emtrac GPS System* necessarily performs each and every step of claim 16."  A20982 (emphasis added).  Because GTT introduced no evidence whatsoever that STC performed any step of claim 16, the district court erred in not granting judgment as a matter of law of no direct infringement.  *See Washburn v. Kansas City Life Ins. Co.*, 831 F.2d 1404, 1407 (8th Cir. 1987) (finding judgment as a matter of law appropriate when "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party").  At a minimum, the district court's failure to address this issue at all requires that this Court vacate the judgment.  *See, e.g.*, *OSRAM Sylvania, Inc. v. American Induction Techs., Inc.*, 701 F.3d 698, 707 (Fed. Cir. 2012) ("Whether dealing with an issue of law like claim construction or an issue of fact such as infringement, [the Federal Circuit] must be furnished sufficient findings and reasoning to permit meaningful appellate scrutiny.") (internal quotation marks omitted).

### B.    There Was No Evidence Of Indirect Infringement By STC

The district court also erred in failing to grant judgment that STC did not indirectly infringe. "Liability for induced or contributory infringement under § 271(b) or (c) requires 'knowledge that the induced acts constitute patent infringement,' [including] actual 'knowledge of the existence of the patent that is infringed.'" *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1379 (Fed. Cir. 2013) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068, (2011)).

Here, there is no evidence that STC had the requisite knowledge for indirect infringement. Mr. Cross, STC's president, did not learn of the '398 patent until 2010, when GTT sued Mr. Morgan. A2574:6-10; A2582:18-20. Before then, when he was designing the accused product in 2003 and 2004, Mr. Cross had not thought it necessary to search for possible competitors' patents because the accused product was simply a modification of the pre-existing radio-based EMTRAC system, and because STC did not have the resources for a patent search. A2587:4-13 ("[A]t the time I was really thinking in terms of modifying the existing Emtrac product to use GPS . . . I really wasn't thinking of it as a huge product launch, so [I] didn't have the resources to do it, basically."). STC therefore cannot be liable for damages for inducement prior to 2010.

When Mr. Cross did learn of the '398 patent, he reasonably concluded that the EMTRAC System could not infringe because it was a ***vehicle-based*** system, rather than an ***intersection-based*** system. A2583:20-2584:6. Thus, even if STC had knowledge of the patent in 2010, it never had knowledge that any of its actions constituted infringement. Therefore, the district court should have granted STC's motion for judgment as a matter of law regarding indirect infringement. Instead, however, the district court denied the motion while addressing only the evidence of knowledge and intent by ***Mr. Morgan***—who is not and never has been an STC employee. *See* A31-32.

Moreover, the district court itself recognized that STC had a good-faith belief in noninfringement based on its claim construction positions in this case. *See* A44 ("Defendants argued vigorously through claim construction for a narrow reading of the patent. ***This view was not so unreasonable that it was asserted in bad faith***.") (emphasis added). "Under [this Court's] case law, it is clear that a good-faith belief of non-infringement is relevant evidence that tends to show that an accused inducer lacked the intent required to be held liable for induced infringement." *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367-1368 (Fed. Cir. 2013). Particularly in the absence of any evidence that STC had any knowledge whatsoever that any of its actions constituted patent infringement, the district court's finding of good faith precludes a finding of indirect infringement.

- 50 -

Thus, since there was no contrary evidence of intent on the part of STC and an

express finding that STC did not act in bad faith, the district court erred in not

granting judgment as a matter of law of no induced infringement by STC.

## VI.    THE DISTRICT COURT ERRONEOUSLY FOUND WILLFUL INFRINGEMENT

As discussed above, STC did not become aware of the '398 patent until GTT

sued Mr. Morgan in 2010.  Furthermore, STC believed that the EMTRAC System

did not infringe.  STC had good faith noninfringement defenses, as even the district

court recognized.  A44.  In light of this good-faith belief, the objective prong of the

willfulness inquiry fails as a matter of law.  *See, e.g.*, *Commil USA*, 720 F.3d at

1372-1373 ("[T]he objective prong of *Seagate* tends not to be met where an

accused infringer relies on a reasonable defense to a charge of infringement."

(quoting  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d

1003, 1005-1006 (Fed. Cir. 2012))); *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d

1286, 1292 (Fed. Cir. 2007) ("A primary consideration for willful infringement . . .

is whether the infringer had a good faith belief that the patent was invalid and/or

not infringed").

Moreover, as discussed in detail above, the judgment of infringement was

based on the district court's errors in claim construction.  But even if this Court

were to disagree with STC as to one or more of the claim construction positions

that form the basis for its appeal, at minimum "the proper claim construction [i]s a

- 51 -

sufficiently close question to foreclose a finding of willfulness." *Cohesive Techs.,*

*Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 n.4 (Fed. Cir. 2008).  The district

court's judgment of willful infringement should therefore be reversed.

## VII.   THE DAMAGES AWARD WAS IMPROPER

The jury's damages award of $5,052,118 is unsustainable for two reasons.

A55; A168-171.  *First*, GTT failed to comply with the patent marking statute.  35

U.S.C. § 287(a).  *Second*, GTT's expert damages testimony should have been

excluded under Federal Rule of Evidence 702.

### A.   GTT Did Not Mark Its Products

The patent marking statute states that an individual may "give notice to the

public" of a "patented article":

> either by fixing thereon the word "patent" or the abbreviation "pat.",
> together with the number of the patent or by fixing thereon the word
> "patent" . . . *or when, from the character of the article, this can not
> be done, by fixing to it, or to the package wherein one or more of
> them is contained, a label containing a like notice.*

35 U.S.C. § 287(a) (emphasis added).  Prior to the marking of a patented article in

accordance with Section 287, "no damages shall be recovered by the patentee in

any action for infringement."  *Id.*

There is no dispute that GTT believes its Opticom System is "covered by

one or more claims of the '398 patent" and therefore a "patented article" under

Section 287.  A5053.  Nor is there any dispute that GTT did not mark its Opticom

System with notice of the '398 patent. A1994:8-11. Instead, GTT marked the

shipping packages of the system's components and product manual. A1974:19-

1978:10; A1994:1-1995:18. This practice does not satisfy Section 287(a).

1.    **GTT failed to properly mark its Opticom System as a matter of law.**

The purpose of § 287 is to provide notice to the public of "the intellectual

property embodied in an article." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,

489 U.S. 141, 162 (1989). The statute allows an individual to mark a patented

article's packaging when, and only when, the "character" of that article is such that

marking the actual product "can not be done." *See Sessions v. Romadka*, 145 U.S.

29, 49-50 (1892) (marking packaging sufficient where spring catches were too

small to be legibly marked); *Wayne-Gossard Corp. v. Sondra, Inc.*, 434 F. Supp.

1340, 1364 (E.D. Pa. 1977), *aff'd sub nom.*, *Wayne-Gossard Corp. v. Sondra Mfg.

Co.*, 579 F.2d 41 (3d Cir. 1978) ("The statute . . . provides for alternative marking

only when the article cannot be directly marked.").

This Court has not decided what "character" justifies marking a package

instead of an actual product, and district courts are split. *See* A17693-17695.

Some courts have held that a product's packaging may be marked only when the

product is not physically capable of bearing a mark, while others consider whether

marking a package will "practically" effect notice better than marking a product.

*Compare, e.g.*, *John L. Rie, Inc. v. Shelly Bros., Inc.*, 366 F. Supp. 84, 90-91 (E.D.

Pa. 1973), *with Metrologic Instruments, Inc. v. PSC, Inc.*, No. 99-4876, 2004 WL 2851955, at *21 (D.N.J. Dec. 13, 2004).

However, district courts agree that where a product bears non-patent information and is physically capable of being marked with patent information, its "character" requires marking the actual product.  *See Rutherford v. Trim-Tex, Inc.*, 803 F. Supp. 158, 163 (N.D. Ill. 1992); *Metrologic Instruments*, 2004 WL 2851955, at *21; *Belden Techs. Inc. v. Superior Essex Commc'ns LP*, 733 F. Supp. 2d. 517, 534 (D. Del. 2010); *Kadant Johnson, Inc. v. D'Amico*, No. 10-2869, 2012 WL 38319, at *4 (E.D. La. Jan. 9, 2012); *Creative Pioneer Prods. Corp. v. K-Mart Corp.*, 5 U.S.P.Q.2d 1841, 1847-1848 (S.D. Tex. 1987).  This Court should affirmatively hold as a matter of law that where a patented article displays non-patent markings or printing and is physically capable of being marked with patent information, "then the alternate form of patent markings on the package is not sufficient compliance with the statue."  *Rutherford*, 803 F. Supp. at 163.

The text and purpose of § 287(a) confirm this position.  Marking a patented article's package is only proper when, given its "character," marking the actual product "***can not*** be done."  35 U.S.C. § 287 (emphasis added).  But where a product is already labeled with non-patent information, marking the product ***can be done***, as evidenced by the existence of other information.  Similarly, "public notice" is best served when an article bearing non-patent marks also includes

patent information. *See Kadant Johnson, Inc.*, 2012 WL 38319, at \*4 ("The

requirement . . . that an invention marked with non-patent lettering also include

patent lettering is tied to the purpose of the statute, that is, to give notice to the

public that the item is patented"). As the court in *Rutherford* concluded:

> The rationale behind stricter conformity to the marking provisions of § 287 when the article contains other markings is bound-up with the purpose of the statute to give notice to the public. Where the public finds markings or writings upon the article itself, the public should be able to rely upon the fact that a patent, if it exists, should also be noted with that writing.

*Rutherford*, 803 F. Supp. at 163; *see Metrologic Instruments*, 2004 WL 2851955,

at \*21 (stating that packaging may be the "next most logical place for effective

notice" only when "public finds no marking or writing on the product itself").

GTT did not comply with the patent marking statute because it does not

mark the Opticom System with patent notification, but rather marks only the

system's packaging and user manual. A1974:19-1978:10; A1994:1-1995:18; *see,*

*e.g.*, A25987 (product manual). GTT marks the components of the Opticom

System with non-patent information, and there is ample additional room on the

products for patent notification. For instance, the Opticom vehicle control unit—a

component that is placed in an emergency vehicle—contains numerous non-patent

markings and ample space for a patent notification:[4]

---

[4]    These photographs were taken of physical exhibits entered at trial. Some of these physical exhibits contain labels that were affixed to them in the course of litigation and are not part of the Opticom System as it is sold. The fact that these



A25963.  The Opticom vehicular radio and GPS receiver, which is similarly placed

in an emergency vehicle, is also marked with non-patent information and has

significant space for additional markings:



labels were easily affixed to the patented articles is further proof that there is no
reasonable argument as to why the "character" of the Opticom System is such that
public notice of the '398 patent on the system components "can not be done."

A25972-25973.  Similarly, the Opticom phase selector—the component that is

installed inside a traffic control cabinet—is already labeled with non-patent

information (indicated in red, below) and could easily bear patent markings:



A25967 (annotation added).  The final component of the Opticom System, the GPS

mast mount that is placed atop an intersection, likewise has ample space for patent

marking:



A25976.

GTT chooses not to mark its Opticom System despite testimony from its

own executive, Mr. VanDerBosch, that there is ample space on the system's

components to mark with patent information and that marking the components

would not impair the system's operation or add appreciable additional cost.

A1994:8-1995:18.  Mr. VanDerBosch admitted at trial that "it would have been

possible . . . certainly" to put a patent number on the Opticom product.  A1997:20-

23.  *Compare Creative Pioneer Prods. Corp. v. K-Mart Corp.*, No. H-83-4137,

1987 WL 54482, at *6 (S.D. Tex. July 10, 1987) (finding marking of packing

insufficient where patented article contained non-patent information and placing a

"marking on the product would have been a relatively simple matter.").

In sum, the Opticom System components are presently marked with non-patent information and contain space to bear patent markings. Their "character" is not such that marking the actual product "can not be done" as a matter of law. Thus, GTT failed to comply with Section 287(a) as a matter of law and the jury's damages award must be vacated.

### 2.    GTT failed to offer substantial evidence of marking.

Even if the Court were not to adopt the "character" interpretation of § 287 discussed above, GTT still failed to meet its burden to establish compliance with the marking requirement. A patentee bears the burden of proving compliance with Section 287(a), and thus must demonstrate why an article's "character" dictates marking a package rather than an article. *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir.1998).

The evidence presented at trial fails to demonstrate why the Opticom System's "character" dictates marking its packaging instead of the product itself. Mr. VanDerBosch testified that GTT did not mark the components of the Opticom System because: (1) the '398 patent is a "system" containing multiple component parts and that the "only time that [the] system is really together is when it is shipped from the manufacturer," A1980:9-23; (2) some components may not be in public view, A1980:24-1981:9; and (3) it was his understanding that 3M marked only the Opticom manuals and packaging before GTT acquired the technology,

A1979:14-22.  This was the only testimony supporting GTT's marking practice. But none of these considerations adequately demonstrate that the "character" of the Opticom System is such that marking the actual product "can not be done."

*First*, the terms of Section 287 must be met even where a patented article has various components functioning "as a system."  *See Amsted Industries, Inc. v. Buckeye Steel Casings Co.*, 24 F.3d 178, 185 (Fed. Cir. 1994) (rejecting argument that marking statute did not apply because defendant sent customers just one component (a center plate) for use in a patented system (a railroad car underframe)).  GTT could have marked *any one* of the Opticom components but chose not to mark *any* of them.  A1997:20-23.  It is irrelevant that the "only time that [the] system is really together is when it is shipped from the manufacturer." A1980:9-16.  Section 287 does not require that all components of a patented system be marked such that they are all viewable at the same time by a single individual.  Moreover, the "character" of the Opticom System is such that its components are in use for "five to seven years or longer", but it is shipped in packaging that is discarded immediately after the system is installed.  A1996:22-1997:3.  Various different people will see the components of the Opticom System for years in numerous locations and publicly-accessible intersections, but practically no one will see the system's packaging.  *See Bonito Boats, Inc.*, 489

U.S. at 162 (1989) (the marking statute is "designed for the information of the public") (internal quotation marks omitted).

*Second*, several components of the Opticom System are readily in public view. The GPS mast mount sits atop of every intersection capable of traffic preemption and the vehicular radio and GPS receiver has a component that is attached to the outside of an emergency vehicle. *See supra* p. 56 (white bulb attached to the black chord). Additionally, the vehicle control unit "could" be placed in various locations, including locations in public view. A1981:6-9. GTT has offered no reason why marking these components of the Opticom System "can not be done" or how public notice is effected more efficiently by marking a package than by marking these publically-viewable components.

*Third*, GTT produced no evidence that it is an industry-wide trade custom to mark installation manuals and the packaging of a GPS-based traffic preemption system. *See Belden Techs.*, 733 F. Supp. 2d at 535 ("Courts have noted that an *industry-wide* custom of marking product packaging 'could be a relevant factor' in assessing compliance with the marking statute.") (emphasis added); *see also Wayne-Gossard Corp.*, 579 F.2d at 43 (analyzing, in the context of a marking issue, the "dominant ladies' foot sock trade custom in this country"). GTT never even attempted to justify its marking practice as an industry-wide trade custom. Instead, it relied on the alleged benefit of marking the packaging of a system with

many components.  Nor did Mr. VanDerBosch provide any testimony on an industry-wide trade custom with respect to marking.  Rather, all Mr. VanDerBosch testified to was that the Opticom product *itself* had previously been (inadequately) marked by the prior patent owner in a way that violates Section 287.  A1978:24-1980:8 (describing 3M's marking practices with respect to the Opticom product).  Similarly, GTT failed to provide any evidence that marking installation manuals is an industry-wide trade custom.  *See Calmar, Inc. v. Emson Research, Inc.*, 850 F. Supp. 861, 868 (C.D. Cal. 1994) (the "clear language of section 287(a) and relevant case law indicate that merely marking some literature associated with a patented article is insufficient to satisfy the marking requirements of the statute"); *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 891 F. Supp. 751, 829 (E.D.N.Y. 1995), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996) ("The Court disagrees with the plaintiff's contention that by distributing literature containing the patent mark it met the statute's marking requirement.").  Thus, GTT failed to produce any evidence of industry-wide trade custom, and similarly failed to produce evidence that GTT complied with that custom when marking the packaging of the Opticom components.

For these reasons, GTT failed to put forth substantial evidence demonstrating that "from the character of the" Opticom System, marking the

components of that system "can not be done."  As a result, this Court should vacate

the jury's damages award.

### B.    The District Court Erred By Failing To Exclude The Testimony Of GTT's Damages Expert

GTT's entire damages theory rested on the expert testimony of Mr.

Gorowsky, who opined that GTT was entitled to roughly $5 million in lost profits

from lost sales, and an additional $2.1 million in lost profits from price erosion.

A2060.  But Mr. Gorowsky's price erosion theory should never have reached the

jury.

District courts have a "gatekeeping obligation" to prevent flawed expert

opinion from being presented to a jury.  *Kumho Tire Co.* v. *Carmichael*, 526 U.S.

137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).

Federal Rule of Evidence 702(c) requires an expert witness to offer testimony that

"is the product of reliable principles and methods."  The district court should have

excluded Mr. Gorowsky's price erosion theory because Mr. Gorowsky did not

account for the basic economic principle of price elasticity.

Price elasticity "is a fundamental concept when there is price erosion

because higher prices almost always lead to reduced quantity demanded."  Roy J.

Epstein, *The Market Share Rule with Price Erosion:  Patent Infringement Lost

Profits Damages After Crystal*, 31 AIPLA Q.J. 1, 13 (2003).  That is, if a product's

price increases, its demand will decrease, and vice versa.  "Many econometric tools

are available to determine price elasticity empirically." *Id.* Price elasticity is "critical" to defining market conditions. *H.J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531, 1538 (8th Cir. 1989).

This Court has sanctioned the use of price elasticity models in a lost profits analysis as a sound economic principle. *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1267 (Fed. Cir. 2013) (affirming award of lost profits where expert "accounted for price elasticity when calculating the number of lost sales"). In *Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.*, the plaintiff sought lost profits from lost sales as well as separate damages from lost profits from price erosion—just as GTT did. 246 F.3d 1336, 1345 (Fed. Cir. 2001). The Court found that district court correctly denied the plaintiff damages for price erosion where there was no evidence of a price elasticity analysis. *Id.* at 1359-1361.

Mr. Gorowsky's price erosion theory was based on the idea that the EMTRAC System forced GTT to reduce the price of the Opticom System from its normal level. However, he believed that cities who actually purchased the EMTRAC System would have purchased the same number of Opticom Systems even at a more expensive price "but for" the EMTRAC System being on the market. A2101:8-2103:17. In effect, Mr. Gorowsky testified that the market GTT competed in was completely inelastic—*i.e.* that price did not affect demand. But,

Mr. Gorowsky provided no economic evidence to support his theory that the GPS-based traffic preemption system market was this "very rare type of market." *Crystal Semiconductor Corp.*, 246 F.3d at 1359. His entire price erosion theory of lost profits was unreliably "divorced from the effect" that a higher price would put on demand for the Opticom System. *Id.* at 1357.

Mr. Gorowsky did state that "price sensitivity" would not apply to the Opticom System because "GPS traffic preemption systems are essential to public safety and efficiency" and thus price does not affect demand. A2102:5-19. However, Mr. Gorowsky made no attempt to base this on "hard evidence." *H.J., Inc.*, 867 F.2d at 1540 ("This court has been insistent upon market data or similar hard evidence in identifying the relevant market.").

Mr. Gorowsky further attempted to justify his failure to account for the basic economic principle of price elasticity by stating that "before Emtrac and the defendants had entered the market, GTT had established fair pricing its list prices for its system in the marketplace" and that "if Emtrac isn't there . . . then [the price of the Opticom System] price wouldn't have dropped." A2102:20-2103:9. But this does not explain why Mr. Gorowsky concluded that buyers of the Opticom System would have purchased at a higher price the same number of units they actually purchased from Appellants, and certainly does not indicate why he believed he did not need to account for price elasticity. *See DSU Med. Corp. v.*

- 65 -

*JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006) (en banc) (expert testimony must be based "in sound economic principle.").

Mr. Gorowsky's error warrants vacating the jury's damages award. GTT put forth two independent theories of damages at trial: lost profits from lost sales and lost profits from price erosion. A2060:6-15. The price erosion theory was legally defective. As a result, the case "must be remanded for a new trial on . . . damages." *Memphis Community School District v. Stachura*, 477 U.S. 299, 312-13 (1986) (ordering new damages trial where a jury awarded damages under three damages theories and one theory was found legally defective); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) ("We must set aside a general verdict if the jury was told it could rely on any of two or more independent legal theories, one of which was defective."). Because the jury awarded a single damages amount, it is "unknowable" how much of the award was attributed to this defective legal theory; this requires new proceedings. *See Stachura*, 447 U.S. 312-313 (ordering new damages trial where the Court was "not certain" that the defective damages theory was part of the damages award).

Mr. Gorowsky's failure apply any sort of price elasticity consideration was an error in methodology and his testimony should have been excluded from trial pursuant to Federal Rule of Evidence 702. Because it was not, this Court should vacate the damages award and remand for further proceedings.

- 66 -

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment below and direct judgment of noninfringement in favor of STC.

Respectfully submitted,

*/s/ Louis W. Tompros*

LOUIS W. TOMPROS
ANANT K. SARASWAT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

ROBERT A. ARCAMONA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006
(202) 663-6000

*Attorneys for Defendant-Appellant
STC, Inc.*

September 8, 2014

## CERTIFICATE OF SERVICE

I hereby certify that, on this 8th day of September, 2014 I filed the foregoing

Brief of Defendant-Appellant STC, Inc. with the Clerk of the United States Court

of Appeals for the Federal Circuit via the CM/ECF system, which will send notice

of such filing to all registered CM/ECF users.


September 8, 2014                    */s/ Louis W. Tompros*
                                     LOUIS W. TOMPROS
                                     WILMER CUTLER PICKERING
                                        HALE AND DORR LLP
                                     60 State Street
                                     Boston, MA  02109
                                     (617) 526-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 28.1(e)(2)(B), the brief contains 13,569 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


September 8, 2014                    */s/ Louis W. Tompros*
                                     LOUIS W. TOMPROS
                                     WILMER CUTLER PICKERING
                                       HALE AND DORR LLP
                                     60 State Street
                                     Boston, MA  02109
                                     (617) 526-6000

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Memorandum Opinion and Order on Claim Construction,
Dkt. No. 96 (July 13, 2012) ....................................................A1-A16 (TAB 1)

Judgment, Dkt. No. 327 (Sept. 24, 2013) .....................................A17-A18 (TAB 2)

Memorandum Opinion and Order, Dkt. No. 431
(Apr. 25, 2014) ....................................................................A19-A49 (TAB 3)

Judgment, Dkt. No. 432 (Apr. 28, 2014) .......................................A50-A51 (TAB 4)

Order denying [Dkt. 455], Defendants' Motion to Stay
Enforcement of Judgment; denying [Dkt. 459]
Defendants' Motion to Seal Document ; denying
[Dkt. 464] Defendants' Motion to Stay Execution
of Judgment, Dkt. No. 469 (May 14, 2014) .......................A52-A54 (TAB 5)

Judgment, Dkt. No. 470 (May 16, 2014) .......................................A55-A56 (TAB 6)

Final Jury Instructions, Dkt. No. 311 (Sept. 23, 2013).................A102-167 (TAB 7)

Jury Verdict, Dkt. No. 326 (Sept. 24, 2013)..............................A168-A171 (TAB 8)

U.S. Patent No. 5,539,398, issued July 23, 1996......................A172-A189 (TAB 9)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Global Traffic Technologies,
LLC,

        Plaintiff,

        v.

Emtrac Systems, Inc.;
Kristopher Morgan; Andrew
Morgan; Rodney K. Morgan; and
KM Enterprises, Inc.,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-4110 ADM/JJG

_____

Chad Drown, Esq., Timothy M. Sullivan, Esq., Ari B. Lukoff, Esq., David J. F. Gross, Esq., James W. Poradek, Esq., Katherine S. Razavi, Esq., Lucas J. Tomsich, Esq., and Timothy E. Grimsrud, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Plaintiffs.

Jonathan D. Jay, Esq., Terrance C. Newby, Esq., and Nicholas S. Kuhlmann, Esq., Leffert Jay & Polglaze, PA, Minneapolis, MN, on behalf of Defendants.

_____

## I. INTRODUCTION

On May 30, 2012, a Markman hearing was held before the undersigned United States District Judge in this patent infringement action by Plaintiff Global Traffic Technologies, LLC ("GTT") against Defendants Emtrac Systems, Inc., Kristopher Morgan, Andrew Morgan, Rodney K. Morgan, and KM Enterprises, Inc. ("KME") (collectively "Emtrac"). GTT alleges that Emtrac infringed claims of U.S. Patent No. 5,539,398 (the "'398 Patent"). Emtrac denies the infringement allegations and counterclaims for declaratory judgment of non-infringement and invalidity of the '398 Patent.

## II. BACKGROUND

The '398 Patent relates to a traffic preemption system ("TPS") based on Global Positioning Systems ("GPS"). Emergency vehicles and public transportation vehicles, referred to as "priority vehicles," are often equipped with a TPS. <u>See</u> Jay Aff. [Docket No. 83] Ex. 1 ("the '398 Patent") at 1:22-23. Without a TPS, priority vehicles would often be required to cross at intersections against a red light to get swiftly to their destination, thereby increasing the likelihood of traffic accidents. <u>Id.</u> at 1:27-32. A TPS functions to either prolong a green light to allow that vehicle to proceed through the intersection or switch the light from red to green. <u>Id.</u> at 1:41-45.

From its inception in the 1960s, TPS has evolved significantly. The first generation TPS was an optical preemption system, whereby an emitter on top of a vehicle produced strobes of light directed at detectors mounted on or near traffic lights. <u>See generally</u> '398 Patent at 1:36-39) (citing U.S. Patent No. 3,500,078)). These detectors then relayed a signal to the intersection cabinet, which processed the signal and directed the traffic light to change from red to green. <u>Id.</u> Optical systems have several disadvantages however, including that the vehicle must have a direct line of sight to the intersection for the strobe light to hit the detector, and weather may interfere with the transmission of the strobe light. <u>Id.</u> at 2:55-58, 3:42-43.

The second generation TPS was a radio preemption system, which sent radio signals from the vehicle to the intersection. <u>See</u> '398 Patent at 2:65-67. Radio preemption systems did not require a direct line of sight and they were not as focused or directionally-oriented as the optical systems. <u>Id.</u> at 3:31-33. However, this sometimes resulted in the unintended triggering of traffic signal systems at

2

**A2**

adjacent intersections.  Id. at 3:5-11.

Third generation TPS uses GPS, rather than diffused radio or optical signals, to enable priority

vehicles to pass unimpeded through selected intersections.  '398 Patent at 3:48-53.  Both GTT and

Emtrac have designed, patented, and produce TPS which utilize GPS technology.

On December 13, 2011, a Joint Claim Construction Statement [Docket No. 74] was filed,

identifying eight disputed terms in the '398 Patent.  At the Markman hearing, Emtrac withdrew its

request for this Court to construct the claim "intersection," leaving seven claims for construction below.

## III.  DISCUSSION

### A.    Standard of Review

Claim construction is a matter of law.  Markman v. Westview Instruments, Inc., 52 F.3d 967,

979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).  In construing claims, courts should look first to

intrinsic evidence, which includes the claims, the specification, and the prosecution history.  Vitronics

Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claim terms are "generally given

their ordinary and customary meaning," which is "the meaning that the term would have to a person of

ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the

patent application."  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  However, a

patentee can choose to be "his or her own lexicographer by clearly setting forth an explicit definition for

a claim term."  Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir.

1999).  "[A] claim term "should be construed consistently with its appearance in other places in the

same claim or in other claims of the same patent."  Rexnord Corp. v. Laitram Corp., 274 F.3d 1336,

1342 (Fed. Cir. 2001).  In addition, the specification is usually "dispositive; it is the single best guide to

the meaning of a disputed term." Vitronics, 90 F.3d at 1582. Courts are nonetheless cautioned not to import limitations from the specification into the claims. Phillips, 415 F.3d at 1323; Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[I]t is the *claims*, not the written description, which define the scope of the patent right."). However, specifications can limit the construction of a means-plus-function claim. Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1361 (Fed. Cir. 2000). Claims amenable to more than one construction should be interpreted so as to preserve their validity if reasonably possible. Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1356 (Fed. Cir. 1999) (quoting Modine Mfg. Co. v. U.S. Int'l Trade Comm'n, 75 F.3d 1545, 1556 (Fed. Cir. 1996)).

While courts can consider extrinsic evidence to educate themselves about the patent and technology at issue, it is improper to rely on extrinsic evidence in construing claims unless, after consideration of all the intrinsic evidence, ambiguity remains. Mantech Envtl. Corp. v. Hudson Envtl. Serv., Inc., 152 F.3d 1368, 1373 (Fed. Cir. 1998); Vitronics, 90 F.3d at 1584. Extrinsic evidence is "evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." Vitronics, 90 F.3d at 1584. Dictionaries may be useful to courts in understanding the ordinary and customary meaning of words, and courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Phillips, 415 F.3d at 1322-23 (quoting Vitronics, 90 F.3d at 1584 n.6)). Where the meaning of a word is readily understood without need for clarification or explanation, no claim construction is necessary. See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("[Claim construction] is not an

4

**A4**

obligatory exercise in redundancy.").

**B.      Claim Construction**

**1.      "associated with the location"**

GTT submits that the phrase "associated with the location" as used in Claim 1, does not need to be construed.  Emtrac disagrees and asks the Court to construe the phrase to mean "at the intersection where the traffic signal that is to be preempted is located, which also contains the intersection module that receives the vehicle data."

Claim 1 refers to "means, <u>associated with the location</u>, for receiving the vehicle data" and "mapping means, <u>associated with the location</u>, for storing a plurality of positions corresponding to the allowed approaches to the location. . ." '398 Patent at 9:34–39 (emphasis added).  The phrase "associated with the location" is unambiguous, well-understood, and a phrase which needs no construction by the Court.  See <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").  Dictionaries "are often useful to assist in understanding the commonly understood meaning of words" and are routinely used in claim interpretation.  <u>Id</u> at 1322.  "Associate" is alternatively defined as "to bring together or into relationship in any of various intangible ways (as in memory or imagination)," Merriam-Webster's Collegiate Dictionary 74 (11th Ed. 2007), "[t]o connect in the mind or imagination," The American Heritage Dictionary of the English Language 108 (5th ed. 2011), "[t]o correlate or connect logically or causally," <u>id.</u>, or to "connect (someone or something) with something else in one's mind," New Oxford

5

**A5**

American Dictionary 97 (3d. ed. 2010).  These definitions neither specify nor require physical connection or location within the definition of "associate."  The meaning of the phrase "associated with the location" — being logically or intangibly connected or related to a given place — is understandable by a juror, and further explanation risks confusion and redundancy.  See U.S. Surgical Corp., 103 F.3d at 1568.  Although the terms "associated" and "location" are broad words, inventors are "free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning. . . ." Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1367 (Fed. Cir. 2012).  Emtrac's proposed construction, with its locational limitation, would unduly limit the broad phrase "associated with the location."

While the words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in context of the specification and prosecution history, two exceptions to this rule exist: "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  Thorner, 669 F.3d at 1365 (citing Vitronics, 90 F.3d at 1580). Neither of these exceptions applies here.  Emtrac does not argue GTT acted as its own lexicographer, but instead appears to argue that GTT disavowed the full scope of the claim term in the specification. Emtrac's argument for incorporating these spatial limits relies on (1) the surrounding context of the claim and (2) the specification.  The specification cannot be used to incorporate limitations in this way. Phillips, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Moreover, the context of Claim 1 does not require the incorporation of spatial limits as Emtrac

requests. Emtrac argues that "location" in Claim 1 is limited to the intersection, in that it states it is a "system for determining whether a vehicle having an associated vehicle path is within an allowed approach of a location." '398 Patent at 9:26–28 (emphasis added). However, the phrase "associated with a location," even if the word "location" is interpreted to mean only an intersection, does not require Emtrac's claim construction limiting the intersection module to be located only at the intersection.

Emtrac also cites to the summary section of the '398 Patent, which states that "[e]ach intersection is equipped with an intersection module adapted to receive and process the vehicle data." Id. at 3:56–58. This argument fails, however, since the equipping of each intersection with an intersection module does not require that the module be physically located at the intersection. Further, GTT did not expressly and clearly disavow the full scope of its claim language. See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."); SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) (finding disavowal where the patentee disparaged prior art, repeatedly described his invention as a certain kind of design, and where the specification stated that the specific design was the basic "structure for all embodiments of the present invention contemplated and disclosed herein."). To disclaim or disavow a particular definition, the patentee must do so clearly and unmistakably. See Thorner, 669 F.3d at 1367. The '398 Patent did not criticize prior art where the TPS components were located in a vehicle, nor did it list reasons or advantages for locating maps at the intersection. Because GTT did not clearly disavow the plain and ordinary meaning and full scope of its claim, the

7

**A7**

disavowal exception does not apply and "associated with the location" is given its plain and ordinary meaning.

**2.    "mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches"**

In addition to arguing for a new construction of the phrase "associated with the location," Emtrac next contends that the entire phrase surrounding that language in Claim 1 falls under a means-plus-function limitation analysis and should thus be read as follows: "the device that stores a preprogrammed map of allowed approaches to the intersection is located at the intersection where the traffic signal that is to be preempted is located, and not in the vehicle."  GTT retorts that the phrase does not implicate the means-plus-function analysis.

Means-plus-function claim elements are interpreted according to 35 U.S.C. § 112, ¶ 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

"Whether certain claim language invokes 35 U.S.C. § 112, ¶ 6 is an exercise in claim construction and . . . a question of law."  Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 702 (Fed. Cir. 1998).  Under 35 U.S.C. § 112, ¶ 6, the Court engages in a two-step process in construing means-plus-function terms: (1) the Court construes the function recited, and (2) then determines what structures have been disclosed in the specification that correspond to the means for performing the identified function.  Kemco Sales, 208 F.3d at 1361.  A court "may not import into the

8

**A8**

claim features that are unnecessary to perform the claimed function." Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1352 (Fed. Cir. 2003) (citation omitted).

The parties do not agree that this claim phrase is in a means-plus-function form. The use of the phrase "means for" typically invokes means-plus-function analysis. Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1318 (Fed. Cir. 1999); see Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("Claim drafters conventionally use the preface 'means for' (or 'step for') when they intend to invoke [35 U.S.C. § 112(6)] . . . ."). The language here, "mapping means . . . for" is in means-plus-function form and invokes that analysis.

The function set forth in Claim 1 is plain: "storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches." '398 Patent 9:37-40. The second part of the analysis is what structures in the specification correspond to the means for performing these functions. Here, the "mapping means" is clarified in the specification as "map memory." '398 Patent at 5:57–59. GTT's proposed construction of this structure is "memory configured to store data," while Emtrac's proposed construction is "the device that stores a preprogrammed map of allowed approaches." Joint Claim Construction Statement 11, 14. Neither of these definitions adequately describes the structure. The Court construes the phrase "map memory" as "computer map memory," finding that "computer map memory" recites a sufficiently definite structure to perform the claimed function. See Optimal Recreation Solutions LLP v. Leading Edge Tech., Inc., 6 F. App'x 873 (Fed. Cir. 2001).

This structure definition does not include a specific placement; the physical location of the "computer map memory" is irrelevant to performing the twin functions of storing positions and providing

9

a map of allowed approaches. It appears that Emtrac argues that limitation should be based on the phrase "associated with the location," but as previously discussed, that phrase does not require that the mapping means be physically located at the intersection. The past participial phrase is set-off by commas from the rest of the sentence, and it serves to modify "mapping means" rather than to impose a limitation on the means-plus-function phrase. Therefore, no location limitation is warranted.

3.        **"map of allowed approaches"**

GTT proposes the term "map of allowed approaches" in Claims 1, 2, 11, 16, and 18 be given its plain meaning, while Emtrac urges a proposed construction of "a preprogrammed map of routes to the intersection where the traffic signal that is to be preempted is located, said map being stored at the intersection." Joint Claim Construction Statement 16. For the aforementioned reasons, this Court will not construe this claim to include a locational limitation and therefore rejects the language "said map being stored at the intersection." As for the other term changes proposed by Emtrac, the map of allowed approaches is already defined as being programmed in the claim. See '389 Patent at 10:24-25 ("a programmed map of allowed approaches to the intersection"), 10:27 ("the programmed map"). It is also defined as being programmed in the specification. See also '389 Patent at 5:59-61 ("The map is programmed into the intersection module while the module is in 'mapping' mode, as is described in more detail below . . . ."). Although the phrase "preprogrammed" is used in Claim 16, the phrase is redundant and would serve no purpose here. Further, because no location-specific limitation applies to the map of allowed approaches, the Court will construe the claim according to its plain meaning.

10

**A10**

4. **"associated with the vehicle"; "associated with a vehicle"**

As with all the claims to be construed, GTT urges this Court to adopt the plain meaning of this phrase as used in Claims 1 and 11. Emtrac proposes that this Court construe these phrases as "within or attached to the (a) vehicle that is approaching the intersection where the traffic signal that is to be preempted is located." As explained more fully in Section III(B)(1), the words "associated with a/the vehicle" do not limit the navigation means in Claim 1 or the vehicle module in Claim 11 to the physical location of the vehicle. Notwithstanding the specification in Figure 1 depicting an embodiment in which the navigation means is physically located on the vehicle, the word "associated" does not require such a reading and will not be construed to so limit the claims. Emtrac further argues that the geographic limitation is part of a means-plus-function clause; however, for the aforementioned reasons, the word "associated" is not such a limitation. Both phrases will be construed in their plain meaning.

5. **"associated with an intersection;" "associated with the intersection"**

GTT again urges this Court to adopt the plain meaning of this phrase as used in Claim 11, while Emtrac requests this Court to construe the phrase as "within or attached to equipment at the intersection where the traffic signal to be preempted is located." Because it has previously been determined that the phrases "associated with a/the location" and "associated with a/the vehicle" do not specify a specific location, the word "associated" here is likewise determined not to impose a physical, geographical limitation to the '398 Patent. The phrase will be construed in its plain meaning.

6. **"transmitting the vehicle data"; "transmitting vehicle data"**

GTT proposes that this Court give the phrase "transmitting [the] vehicle data" its plain meaning as used in Claims 1, 11, 16 and 17, while Emtrac proposes a construction of the phrase as "delivering

11

data gathered by a vehicle to an intersection module that is located at an intersection." As previously explained, the '398 Patent does not require such geographic limitation.

Emtrac also argues, for the first time in its Opening Claim Construction Brief [Docket No. 82], that the phrase "vehicle data" is indefinite under 35 U.S.C. § 112, ¶ 2, which would render "any claims containing this term invalid." Opening Claim Construction Brief 34. Specifically, Emtrac contends that Dependent Claim 8 and Dependent Claim 10 are at odds with Claim 1. Dependant Claim 8 defines "vehicle data" as "position heading and velocity data corresponding to the vehicle," while Dependent Claim 10 defines vehicle data as "further includ[ing] vehicle heading and vehicle velocity data." From these essentially redundant statements, Emtrac urges this Court to find the two statements irreconcilable and therefore "insolubly ambiguous" and "indefinite" in violation of 35 U.S.C. § 112, ¶ 2.

Emtrac's argument fails for several reasons. Foremost, Emtrac raises this indefiniteness argument for the first time in its Opening Claim Construction Brief filed on May 3, 2012. The argument was conspicuously absent from the Joint Claim Construction Statement, as well as from its interrogatory responses submitted in February 2011 and February 2012 or its court-ordered prior art statement submitted on June 30, 2011. See Tomsich Decl. [Docket No. 89] Exs. A–C.[1] The argument is impermissibly tardy. Federal Rule of Civil Procedure 37 requires that "[i]f a party fails to provide information . . . , the party is not allowed to use that information . . . , unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 16 grants courts the authority to set

---

[1] The only mention of indefiniteness in any of these documents comes in the prior art statement, where Emtrac attempts to hedge its position by reciting that "In proffering this Prior Art Statement, [Emtrac] in no way waives its right to assert other invalidity and unenforceability defenses, including but not limited to indefiniteness. . . ." Tomsich Decl. Ex. C at 3.

12

**A12**

management deadlines and impose sanctions, such as exclusion, when those deadlines are violated.

Fed. R. Civ. P. 16(b, f). Courts have routinely excluded arguments and evidence raised at a "late stage

of the proceedings." ELCA Enter., Inc. v. Sisco Equip. Rental & Sales, Inc., 53 F.3d 186, 190 (8th

Cir. 1995) (finding that because "parties must provide clear and accurate responses to discovery

requests," a party's "eleventh hour attempt to switch the basis for its alleged damages" was properly

excluded); see also Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1376 n.4 (Fed. Cir. 2008)

(finding even evidence submitted in technical compliance with the prior art requirements of 35 U.S.C. §

282 to be excludable when the late disclosure "stripped [the opposing party] of any meaningful

opportunity to prepare an adequate cross-examination of the reference."); McDavid Knee Guard, Inc.

v. Nike USA, Inc., 809 F. Supp. 2d 863, 878 (N.D. Ill. 2011) (finding that a party waived the

invalidity defense of indefiniteness when it had not previously raised the issue and offered no valid

reason for its failure). The failure to make this argument any time prior to the month before the claim

construction hearing is unjustified and prejudices GTT. Moreover, Emtrac has failed to muster any

argument as to why the indefiniteness argument was not timely raised. As a result, this argument is

rejected.

Even were this argument timely asserted, it fails on its merits. While Emtrac attempts to conjure

a radical inconsistency between Dependent Claims 8 and 10, it is evident that they are a redundant

mistake. Emtrac does not explain how defining vehicle data as "position heading and velocity data"

which "further includes vehicle heading and vehicle velocity data" is anything beyond inartful. While

redundant, the phrase "vehicle data" is not "insolubly ambiguous" — the vehicle data definitely includes

heading and velocity, perhaps more. Emtrac has failed to prove that the claim is indefinite by clear and

13

**A13**

convincing evidence.  Halliburton Energy Serv., Inc. v. M-I LLC, 514 F.3d 1244, 1249–50 (Fed. Cir. 2008).  "[T]wo claims with different terminology can define the exact same subject matter," Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006), and so the test is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification."  Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  The mere use of redundant definitions of vehicle data, as well as the interchangeable use of "position" and "vehicle" to describe "heading," do not render this claim indefinite.  The phrase, therefore, will be given its plain meaning.

Finally, Emtrac argues that the phrase "transmitting the vehicle data" or "transmitting vehicle data" should be construed as "delivering data via a wireless link gathered by a vehicle to an intersection module that is located within or attached to equipment at an intersection."  Emtrac argues that these phrases are part of a means-plus-function claim and that the wireless link is the only structure disclosed by the specification which could perform the function of transmitting vehicle data.  However, the phrase "transmitting [] vehicle data" is not a means-plus-function limitation — it is the function itself.  Moreover, the word "transmitting" is not geographically limited.  See American Heritage Dictionary 1846 ("To send from one person, thing, or place to another"); Oxford American Dictionary 1840 ("cause (something) to pass on from one place or person to another").  Accordingly, this phrase will be construed in its plain meaning.

### 7.    "an intersection module associated with an intersection and adapted to track the vehicle path, the intersection module comprising:"

GTT asserts that this phrase in Claim 11 can be given its plain meaning, while Emtrac proposes

14

**A14**

that the phrase be construed to mean "a device located within or attached to the intersection where the traffic signal that is to be preempted is located, and which contains (1) a preprogrammed map of allowed approaches to the intersection and (2) a processor that receives data from a vehicle and compares that data with the preprogrammed map of allowed approaches." Emtrac's proposed construction once again attempts to import a geographic location limitation into the term "intersection module" via the word "associated, but for the previously explained reasons, no such limitation is required. While Emtrac highlights the phrase in the Summary section of the '398 Patent — "[e]ach intersection is equipped with an intersection module" — as support for its proposition that the intersection module must be physically located at the intersection itself, the word "equipped" carries no such locational requirement. '398 Patent 3:56-57; see Oxford American Dictionary 586 (defining equip as to "supply with the necessary items for a particular purpose"); Merriam-Webster's Collegiate Dictionary 422 (defining "equip" as "to furnish for service or action by appropriate provisioning"). Further, the word "programmed" is not required to be construed as "preprogrammed." See Oxford American Dictionary 1395 (defining "program" as to "(1) provide . . . with coded instructions for the automatic performance of a task . . . (2) arrange according to a plan or schedule . . . ."). The remainder of Emtrac's proposed construction tracks language already in Claim 11, thereby rendering it redundant and unnecessary. Accordingly, this phrase will be construed in its plain meaning.

15

**A15**

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that, in interpreting the '398 Patent, the disputed terms will be construed in

accordance with this Order.

BY THE COURT:


    s/Ann D. Montgomery

ANN D. MONTGOMERY

U.S. DISTRICT JUDGE

Dated:  July 13, 2012.

AO450 (Rev  5/85)   Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

GLOBAL TRAFFIC TECHNOLOGIES, LLC

**JUDGMENT IN A CIVIL CASE**

V.

Case Number:  **10-4110 ADM/JJG**

EMTRAC SYSTEMS, INC.

[X] **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

The issues have been tried and a decision has been rendered.  The jury awarded damages to Plaintiffs in the amount of  $5,052,118.00.

September 24, 2013
Date

RICHARD D. SLETTEN, CLERK

s/ Gertie Simon

(By)                          Gertie Simon,    Deputy Clerk

s/Ann D. Montgomery

JUDGE ANN D. MONTGOMERY
UNITED STATES DISTRICT COURT



# UNITED STATES DISTRICT COURT
## District of Minnesota

Richard D. Sletten, Clerk
Lisa Rosenthal, Chief Deputy Clerk

| | | | |
|---|---|---|---|
| Warren E. Burger Federal Building and U.S. Courthouse 316 North Robert Street Suite 100 St. Paul, MN 55101 (651) 848-1100 | U.S. Courthouse 300 South Fourth Street Suite 202 Minneapolis, MN 55415 (612) 664-5000 | Gerald W. Heaney Federal Building and U.S. Courthouse and Customhouse 515 West First Street Suite 417 Duluth, MN 55802 (218) 529-3500 | U.S. Courthouse 118 South Mill Street Suite 212 Fergus Falls, MN 56537 (218) 739-5758 |

## CIVIL NOTICE

**The appeal filing fee is $455.00. If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> *This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

Form Modified 08/23/08

## A18

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Global Traffic Technologies,
LLC,

                    Plaintiff,

          v.

Emtrac Systems, Inc., Rodney K.
Morgan, STC, Inc., and KM
Enterprises, Inc.,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-4110 ADM/JJG

_____

Chad Drown, Esq., Timothy E. Grimsrud, Esq., Timothy Sullivan, Esq., and Lauren J. Frank,
Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Global Traffic Technologies,
LLC.

Jonathan D. Jay, Esq., Hellmuth & Johnson PLLC, Edina, MN; and, Terrance C. Newby, Esq.,
Leffert Jay & Polglaze, P.A., Minneapolis, MN, on behalf of KM Enterprises, Inc., STC, Inc.,
and Rodney K. Morgan.

_____

## I. INTRODUCTION

Defendants Rodney K. Morgan ("Morgan"), STC, Inc. ("STC"), and KM Enterprises,

Inc. ("KME") (collectively, the "Defendants") move for Judgment as a Matter of Law or New

Trial [Docket Nos. 411, 369, 372, 375, 378, 381], for a finding of Laches and Equitable Estoppel

[Docket No. 395], and for an amended ruling on the claim language of Claim 16 [Docket No.

401]. Plaintiff Global Traffic Technologies, LLC ("GTT") opposes these motions, and moves

for Confirmation of Willful Infringement, Enhancement of Damages, and Prejudgment Interest

[Docket No. 364]. For the reasons stated herein, Defendants' motions are denied and GTT's

motion is granted in part and denied in part.

**A19**

## II. BACKGROUND

On September 20, 2013, a jury found Defendants infringed GTT's Patent No. 5,539,398 (the "'398 Patent" or the "Patent"). The jury rejected Defendants' invalidity defenses concerning the '398 Patent and calculated damages in the amount of $5,052,118. Finally, the jury found by clear and convincing evidence that Defendants willfully infringed the '398 Patent.

## III. DISCUSSION

### A. Judgment as a Matter of Law ("JMOL") Standard

Rule 50(b) of the Federal Rules of Civil Procedure governs renewed motions for judgment as a matter of law. Under Rule 50, the court may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(1)- (3). The standard of review for granting a Rule 50(b) motion is whether sufficient evidence exists to support the jury verdict. A motion for judgment as a matter of law should only be granted when "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." Washburn v. Kan. City Life Ins. Co., 831 F.2d 1404, 1407 (8th Cir. 1987) (citation omitted). In deciding a motion for judgment as a matter of law, the court must view the evidence in the light most favorable to the party who prevailed before the jury, making all reasonable inferences in that party's favor. Id. (citation omitted). It is not the place of the court to substitute its own judgment for that of the trier of fact. Ryther v. KARE 11, 864 F. Supp. 1510, 1519 (D. Minn. 1994) (citing Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 803 (8th Cir. 1994)).

2

**A20**

## B. New Trial Standard

The decision whether to grant a new trial under Federal Rule of Civil Procedure 59(a) is committed to the discretion of the district court. Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995). "A new trial is required only when necessary to avoid a miscarriage of justice." Gearin v. Wal-Mart Stores, Inc., 53 F.3d 216, 219 (8th Cir. 1994) (citation omitted). "While the standard for granting a new trial is less stringent than for judgment as a matter of law, a new trial shall be granted only to prevent injustice or when the verdict strongly conflicts with the great weight of evidence." Maxwell v. J. Baker, Inc., 160 F.R.D. 580, 581 (D. Minn. 1995). Similar to the standard for granting judgment as a matter of law, a court reviewing a motion for a new trial is "not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Fireman's Fund Ins. Co. v. Aalco Wrecking Co., 466 F.2d 179, 186 (8th Cir. 1972) (quoting Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 35 (1944)).

## C. Claim Construction and Sufficiency of the Evidence for Infringement

Defendants argue "the Jury's finding of infringement of Claim 1 is erroneous, unsupportable by the language of the Patent and contrary to the evidence offered at trial regarding how the Emtrac System functions." Defs.' Br. Supp. JMOL [Docket No. 413] at 12. No reasonable jury, Defendants argue, could conclude the Emtrac System infringes Claim 1 of the '398 Patent, which provides:

> A system for determining whether a vehicle having an associated vehicle path is within an allowed approach of a location, comprising:
>> navigation means, associated with the vehicle, for generating vehicle data at periodic intervals along the vehicle path, wherein the vehicle data includes vehicle position data;
>> means for transmitting the vehicle data;

3

**A21**

means, associated with the location, for receiving the vehicle data;
mapping means, associated with the location, for storing a plurality of
      positions corresponding to allowed approaches to the location and
      providing therefrom a map of allowed approaches;
evaluation means for comparing the vehicle data to the map of
      allowed approaches to determine whether the vehicle path
      is within an allowed approach.

Defendants proceed line by line, making non-infringement arguments based, not on evidence presented at trial, but rather on their view of how claim terms should have been construed. Defs.' Br. Supp. JMOL, at 3-12. Defendants claim the Emtrac System does not generate "vehicle data" as that term is "defined by the Patent;" and does not transmit vehicle data; and does not receive data, "associated with the location;" and does not have "mapping means;" and does not determine if the vehicle is within an allowed approach. Id.

Claim terms are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

The Court construed the disputed Patent terms in July 2012. See Global Traffic Techs., LLC v. Emtrac Sys., No. 10-4110, 2012 U.S. Dist. LEXIS 96866 (D. Minn. July 13, 2012).[1] The Court determined all disputed terms in the claims are entitled to their plain and ordinary meaning. Id. Defendants suggested the Patent places location-specific limitations on the terms which would narrow the scope of the patent coverage. See id. The Court determined "that

---

[1] Claim construction is a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995).

Defendants' proposed construction, with its locational limitation, would unduly limit the broad phrase "associated with the location."  Id. at *8.

The Court addressed claim construction again in considering Defendants' summary judgment motion.  See Global Traffic Techs., LLC v. Emtrac Sys., 946 F. Supp. 2d 884 (D. Minn. 2013).  The Court determined further claim construction was unnecessary before trial.  The Markman hearing was sufficient and all terms were to be considered by the jury using their plain meaning.[2]

The course of trial did not change the Court's view of claim construction.  The language of the Patent was relatively clear, and no further claim construction was necessary.  Defendants are not entitled to judgment as a matter of law on this basis.

In addition to their claim construction arguments, Defendants argue that based on the evidence presented at trial, no reasonable jury could have found that the Emtrac System infringed Claim 1 or Claim 16.  In conflict with Defendants' argument, Plaintiff's expert, Dr. Charles Neuhauser, went through every limitation of the asserted claims and explained in detail where each limitation is found in the Emtrac GPS System.  Trial Tr. 347-88.  The jury evaluates the credibility of the parties' experts and the jury was entitled to credit Dr. Neuhauser's

---

[2] Claim construction was made procedurally more difficult and complicated by Defendants' tardy raising of terms claimed to be disputed.  See Global Traffic, 946 F. Supp. 2d at 904 ("The Court will not construe further claims at this time but will await the context of the trial to discern whether there are additional claim constructions germane to the contested issues at trial.").  In their JMOL brief, Defendants assert non-infringement of Claim 16 based on a number of claim construction arguments (many that are the same or similar to claim construction arguments already addressed in Claim 1 arguments).  Defendants did not request the Court to construe these terms for Claim 16.  See Markman Brs. [Docket Nos. 74 and 82], Mem. Supp Summ. J. [Docket No. 125], Motion in Limine [Docket No. 268], Trial Brief [Docket No. 271]; see also Trial Tr.  Section III.I. below discusses  Defendants' Claim 16 "Indefiniteness" argument.

testimony that the Emtrac System includes the features of Claims 1 and 16 of '398 Patent.

Energy Transp. Grp., Inc. v. William Demant Holding A/S, 697 F.3d 1342, 1352 (Fed. Cir. 2012). Defendants have not carried their "onerous burden" of showing that, even when the record is viewed most favorably to GTT, there is a "complete absence of probative facts" to support the jury's conclusions. Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 688-89 (8th Cir. 2001). Therefore, Defendants are not entitled to a judgment as a matter of law based on sufficiency of the evidence with regards to infringement.

For these same reasons, the Court is convinced there was no miscarriage of justice. The parties were given a fair opportunity to present their case and the jury weighed the evidence of infringement. Defendants are not entitled to a new trial.

### D. Admission of Morgan Testimony

"[A] district court has wide discretion in admitting and excluding evidence." Harris v. Chand, 506 F.3d 1135, 1139 (8th Cir. 2007). The Eighth Circuit "will not set aside a jury verdict unless the district court clearly and prejudicially abused its discretion in determining whether or not to admit evidence." Shaw Group, Inc. v. Marcum, 516 F.3d 1061, 1068 (8th Cir. 2008). To warrant a new trial, an evidentiary error must have been so prejudicial that a new trial, absent the error, would be likely to produce a different result. Pointer v. DART, 417 F.3d 819, 822 (8th Cir. 2005); Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008).

Defendants argue a new trial is warranted on Claim 16 because the Court permitted at trial "extensive cross examination of Defendant Kris Morgan on this issue of whether the Emtrac System infringed Claim 16." Defs.' Br. Supp. JMOL at 14. Morgan testified he intentionally chose not to read the Patent, read the 3M (which later became GTT) product manual for its GPS

6

**A24**

traffic preemption system, and designed and developed the Emtrac System. Trial Tr. 609-11.

Morgan, as a developer, professed intimate knowledge of the Emtrac System. Pl.'s Trial Ex. 77.

Morgan testified that he "encourag[ed] [Brad] Cross to help design it and manufacture" his

Emtrac System with GPS. Trial Tr. 637. Morgan repeatedly claimed the Emtrac System did not

infringe and the Court allowed GTT to ask Morgan questions on that point. Id. 611-12. The jury

weighed the evidence and the testimony of Morgan. Any new trial would also include vigorous

cross-examination of Morgan as a named defendant in the case. This ground for a new trial is

rejected.

### E. JMOL Damages

Defendants' contend Plaintiff's expert, Donald A. Gorowsky, used a fatally flawed

methodology to calculate the damages of infringement. In a pretrial order, the Court has

addressed Gorowsky's methodology, and found Gorowsky used methodologies approved by the

Federal Circuit. Global Traffic, 946 F. Supp. 2d at 910-13. The Court held, to the extent

Defendants disagreed with the expert's conclusions, Defendants could challenge them at trial.

Id. At trial Defendants thoroughly cross-examined Gorowsky. Defendants also presented

competing evidence and theories, arguing that there were viable competitors sufficient to justify

rejecting Gorowsky's two-supplier market theory. This argument may have been accepted by

the jury's decision to ameliorate Plaintiff's requested damages. Gorowsky estimated total

damages of $7.1 million, but the jury nevertheless returned a damages calculation of

approximately $5 million. The lower verdict implies the jury weighed the evidence and believed

GTT proved its case by a greater weight of the evidence on some, but not all of Gorowsky's

conclusions and the other evidence presented by GTT. The Court "will not engage in a weighing

7

**A25**

or evaluation of the evidence, as these are jury functions." Warren v. Prejean, 301 F.3d 893, 903 (8th Cir. 2002). The evidence presented at trial supports a jury finding on damages. See, e.g., Trial Tr. 481, 519, 639, 689, 719, 880, 946-53.

Defendants also argue the Court created prejudicial error by permitting Gorowsky to offer a "rebuttal opinion" using a report from Defendants' damages expert, Dr. Kenneth Serwin, that was never offered at trial. The only testimony that was elicited from Gorowsky about Defendants' unoffered expert report concerned methodology. Gorowsky testified that Serwin's report showed the use of the same methodology Gorowsky used, but came to different conclusions about the amount of damages. Trial Tr. 1666-68. GTT offered this testimony to rebut Defendants' attempts to undermine Gorowsky's methodology. The admission of this limited rebuttal opinion was not error. See id. 1670-71.

## F. Jury Instructions

Defendants object to Jury Instruction No. 35 regarding the notice and marking requirements of 35 U.S.C. § 287(a). See Final Jury Instr. [Docket No. 311].

"The trial court has a great deal of discretion in framing the jury instructions and the court need not give the exact language desired by the parties." Ryther, 108 F.3d at 847. Instructions do not have to be "technically perfect or even a model of clarity." Gill, 546 F.3d at 563. Rather, the relevant question is "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Shaw, 516 F.3d at 1068-69; accord Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1259 (Fed. Cir. 2004).

8

**A26**

The issue of marking was fairly and adequately submitted to the jury. The instruction stated, "'Marking' means that substantially all of the products, or if reasonable under the circumstances, the packaging of the products, made, offered for sale, or sold under the '398 patent are marked . . . ." This language reflects the state of the law. The law states:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a). Numerous courts, including the United States Supreme Court, have "focused on whether the method of marking the patented product provided notice, rather than on the precise mechanistic compliance with the statute." Heraeus Electro-Nite Co. v. Midwest Instr. Co., Civil No. 06-355, 2007 WL 3407128, at *3-4 (E.D. Pa. Nov. 14, 2007) (collecting cases); see Sessions v. Romadka, 145 U.S. 29, 50 (1892) ("It is not altogether clear that the stamp could not have been made upon the smaller sizes, but, in a doubtful case, something must be left to the judgment of the patentee . . . ."); Chicago Pneumatic Tool Co. v. Hughes Tool Co., 192 F.2d 620, 626 (10th Cir. 1951) (marking sufficient where containers of drill bit for deep wells marked).

At trial, GTT witnesses testified that GTT marks the packaging of its Opticom GPS product. Trial Tr. 856-57; see also Pl.'s Tr. Exs. 41, 43, 45, 47,51. GTT's witness, the chief

9

**A27**

operating officer, testified that GTT's marking was consistent and continuous since 2004, a holdover from how GTT's predecessor, 3M, marked its products.  Trial Tr. 849, 855, 858.  Furthermore, GTT testified that it marked the packaging and the operations manuals because the product was a system wherein the components were scattered in different places and often out of the view of the public.  Id.  853-54, 856-57 (Opticom products are installed in a vehicle's trunk and/or in a locked equipment cabinet, and/or on the traffic signal mast above the street); see also Pl.'s Trial Exs. 52-58, 60, 61, 65 (manuals).

Because the purpose of the statute is to provide notice to the public, "[n]umerous courts have found that placing patent numbers on a product's packaging complies with the Marking Statute even in situations where it was plainly possible to have physically placed the patent number on the product itself."  Heraeus, 2007 WL 3407128, at *4.  For example, marking the packaging may be sufficient when "marking the article itself would not provide sufficient notice to the public," Ethicon Endo-Surgery, Inc. v. Hologic, Inc., 689 F. Supp. 2d 929, 945 (S.D. Ohio 2010), when "conditions of use" make marking the packaging reasonable, or when marking the packaging is the "custom of this industry," Heraeus, 2007 WL 3407128, at *4.  Instruction No. 35 reflects the reasonable approach taken by the courts in judging notice and marking.  Therefore, Instruction No. 35  "fairly and adequately submitted the issues in the case to the jury." Shaw, 516 F.3d at 1068.

Defendants also believe the Court erred by not giving Defendants' Proposed Jury Instructions No. 4 (Means Plus Function Requirements/Step Plus Function Requirements), No. 5

(Method Claim–Order of Performance of Steps)[3] and No. 8 (Claim Interpretation/Person of Ordinary Skill in the Art). Defendants modified Federal Circuit Bar Association Model Patent Jury Instructions with language from cases they believed would enhance the jury's understanding of the applicable law. To the extent Defendants properly objected to the Court's instructions on the record, the Court addressed the objections and found that its Instructions conveyed to the jury the applicable law, fairly and adequately. See, e.g., Final Jury Instruction Nos. 17, 20, and 21.

## G. JMOL Infringement Defenses

Defendants seem to confuse JMOL and objections to jury instructions. Defendants submit that the Court should have granted Defendants motions for JMOL regarding (1) the conception date issue, including the Court's refusal to give Defendants' proposed jury instruction regarding GTT's lack of independent corroboration of its claimed 1992 invention date; (2) the prior art issue under 35 U.S.C. § 102(a); and (3) the 35 U.S.C. § 102(g) issues, including the Court's refusal to read the jury Defendants' proposed instruction regarding multiple inventors. None of the jury instruction objections, to the extent they were properly made, warrant a new trial. And, the jury had ample evidence to find Defendants' prior art evidence did not anticipate the '398 Patent and that a prior invention did not precede the '398 Patent invention.

---

[3] Defendants' objection to the Court's failure to give Defendants' Proposed Jury Instructions Nos. 4 and 5 are covered more fully below.

### 1. Conception Date

The instructions given to the jury regarding the date of invention used the exact language of the current Federal Circuit Bar Model Instructions, which includes language about corroboration:

> But, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea.

See Federal Circuit Bar Model Instruction 4.3(a). "In assessing corroboration of oral testimony, courts apply a rule of reason analysis; [u]nder a rule of reason analysis, an evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed. Cir. 1996) (internal citations and quotations omitted). GTT presented testimony of its inventors, the inventors' notebooks, and a supervisor's signature on the notebooks. The jury instruction appropriately reflects the requirement of corroboration and a reasonable jury could have believed that this evidence was reliable, accurate, and favorable to GTT.

### 2. Anticipation by Publication

Defendants offered the Gerland/Bradfield papers as prior art that anticipated the '398 Patent. At trial GTT offered several reasons why these papers did not anticipate the invention. As an example, GTT's expert Dr. Neuhauser testified that the Gerland/Bradfield papers do not disclose a number of limitations found in the asserted claims of the '398 Patent, including "maps of allowed approaches." Trial Tr. 392-96. The jury could reasonably find this expert testimony more credible than Defendants' expert. For this reason alone, Defendants are not entitled to JMOL with regard to anticipation.

12

**A30**

### 3. Prior Invention

Defendants fault the Court for failing to give the jury their "multiple inventors" instruction. See Defs.' Proposed Jury Instruction No. 27. However, Defendants do not complain that the prior invention instruction, Final Jury Instruction No. 30, included an incorrect statement of the law. And nothing in the instruction prevented Defendants from making their arguments about multiple inventors to the jury. Thus, the instruction adequately stated the law and Defendants were not entitled to the specific language they requested. Ryther, 108 F.3d at 847.

### H. Morgan's Personal Liability

Morgan is liable for inducement if (1) he knew of the patent, (2) intended to cause directly infringing acts, such as a city's use of the Emtrac GPS System, and (3) had specific intent or "knowledge that the induced acts constitute patent infringement." See Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2068, 2071 (2011). The evidence at trial showed Morgan knew about the '398 Patent in 2004, knew it related to GPS, and knew it related to traffic preemption. Trial Tr. 608-09, 655-56. Morgan intended cities to use the Emtrac GPS System. Morgan "get[s his] hands dirty everyday installing, testing, repairing" the Emtrac GPS System. Pl.'s Trial Ex. 77. Morgan testified that he "help[s] cities use the Emtrac GPS product." Trial Tr. 633.

Defendants argue GTT failed to introduce or offer evidence that Morgan specifically intended to cause infringement. Defendants contend that the only evidence on record is that Morgan knew of the '398 Patent but did not specifically review its language; therefore, since he did not read the '398 Patent, he could not have developed specific intent to infringe.

**A31**

Willfulness, and willful blindness, is discussed further below, but, in this context "specific intent may be inferred from circumstantial evidence." Ricoh Co., Ltd. v. Quanta Computer Inc., 550 F.3d 1325, 1342 (Fed. Cir. 2008). The Supreme Court has stated that the doctrine of willful blindness has two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. Global-Tech, 131 S. Ct. at 2071 (finding it hard to fathom under the circumstances of that case, how defendant could have ignored the patent "other than to manufacture a claim of plausible deniability in the event [defendant] was later accused of patent infringement."). Morgan was himself an owner of patents. Given his knowledge that a patent existed related to GPS traffic preemption, Morgan's refusal to look at the patent or to consult his company's counsel about the patent lacks credibility. GTT offered evidence and made precisely this argument at trial. The jury could have reasonably concluded Morgan believed there was a high probability that the patent would cover his Emtrac product if he examined it and that he deliberately avoided learning facts that would inform that risk.

Alternatively, the jury may not have found credible Morgan's ignorance of the '398 Patent. Morgan professed a knowledge of patent law and he claimed intimate involvement with the design, production, and sale of traffic preemption systems. A reasonable jury could have concluded Morgan read the Patent but nevertheless chose to infringe.

For these reasons, Morgan is not entitled to a JMOL on personal liability.

14

**A32**

## I.  Claim 16 Indefiniteness

Defendants' indefiniteness argument is based on their assertion that Claim 16 of the '398 Patent contains a step-plus-function limitation.  Defendants then argue that under step-plus-function requirements, Claim 16 is invalid for indefiniteness.

Yet again, Defendants essentially ask the Court to reopen claim construction for Claim 16.  As discussed above, this attempt to reopen claim construction is extremely tardy.  The Court sees no reason to reopen claim construction, as the claims are entitled to their plain and ordinary meaning.

Claim 16 does not include a step-plus-function limitation and the term "allowing" for Claim 16(g) is not indefinite.[4]  The parties agree that indefiniteness is an issue properly decided by the Court because it is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  Atmel Corp. v. Information Storage Devices, 198 F.3d 1374, 1378 (Fed. Cir. 1999).  Defendants argue Claim 16 is a step-plus-function claim simply because it uses the phrase "comprising the steps of."

Step-plus-function claims are a rarity in patent law, with "[o]nly a few cases hav[ing] found the existence of a step-plus-function claim element."  Seal-Flex, Inc. v. Athletic Track & Court Const., 172 F.3d 836, 850 n.5 (Fed. Cir. 1999) (Rader, J., concurring).  Step-plus-function claims typically use the phrase "steps for."  See Masco Corp. v. United States, 303 F.3d 1316, 1327 (Fed. Cir. 2002) (finding no step-plus-function claim where the claims used "steps of"

---

[4] Relatedly, Defendants argue that Claim 16's step-plus-function format required the Court give Defendants' Proposed Jury Instructions Nos. 4 and 5.  Since claim construction for Claim 16 is impermissibly tardy, and since Claim 16 is not a step-plus-function claim, Defendants were not entitled to these jury instructions.

15

**A33**

instead of "steps for"; the "step for" language "signals the drafter's intent to invoke [35 U.S.C.] § 112, paragraph 6"). The Court in Masco explained that even where the drafter employs "steps for" language, paragraph 6 of § 112 is implicated "only when steps plus function without acts are present." Id. (citing Seal-Flex, 172 F.3d at 849-50); see also Epcon Gas Sys. Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1028 (Fed. Cir. 2002).

In this case, Claim 16 is not in step-plus-function form. The language of Claim 16 does not employ the "steps for" format.[5] In addition, the language of Claim 16 clearly includes acts. Claim 16(a) refers to the act of "receiving", 16(b) recites the act of "processing." Claim 16(c), (d), (e), and (f) respectively refer to the acts of "transmitting," "providing," "comparing," and "determining." Finally, 16(g), which is the only specific limitation Defendants focus on, refers to the act of "allowing the vehicle to preempt the traffic signals associated with the intersection if the vehicle is within one of the allowed approaches." See Masco, 303 F.3d at 1327 (concluding that it will not "constrain the scope of coverage of a claim limitation without a showing that the limitation contains nothing that can be construed as an act").

Even if Claim 16 were in step-plus-function form, under established Federal Circuit law, the standard for indefiniteness "does not compel absolute clarity." Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005). Accordingly, to prove indefiniteness, Defendants must show "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution

---

[5] Defendants also make an argument that if the Court finds that Claim 16 is in a steps-plus-function form, or even if it is a method claim, then the steps need to be performed in the order they are written. But the presumption, unrebutted by Defendants, is that the steps of a method claim do not need to be performed in any particular order. See, e.g., Baldwin Graphic Sys. v. Siebert, Inc., 512 F.3d 1338, 1345 (Fed Cir. 2008).

history, as well as her knowledge of the relevant art area." <u>Halliburton Energy Serv. v. M-I LLC</u>, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). Moreover, "claims are not indefinite merely because they present a difficult task of claim construction." <u>Id.</u> at 1249. Rather, "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," then the claim is "sufficiently clear to avoid invalidity on indefiniteness grounds." <u>Id.</u>

In this case, Defendants cannot meet the clear and convincing evidence standard. GTT's expert Dr. Neuhauser walked through each part of Claim 16, explaining how a person skilled in the art at the time of the invention would understand the language. Trial Tr. 475-76. In particular, he testified that "allowing" is understood as the act of "releasing the request, allowing the request to issue." <u>Id.</u> This testimony reflects the plain and ordinary meaning of the claim, so Defendants would not be entitled to a ruling of indefiniteness, even if this issue had been properly raised.

## J. Issues Reserved for Court Determination

The issues of laches and equitable estoppel were not submitted to the jury, as these issues are "committed to the sound discretion of the trial judge." <u>A.C. Aukerman Co. v. R.L. Chaides Constr. Co.</u>, 960 F.2d 1020, 1028 (Fed. Cir. 1992). The Court reserved its decision on these issues after hearing the full trial testimony and receiving supplemental post-trial briefing. Trial Tr. 1660-63.

### 1. Laches

Laches is "an equitable defense to a claim for patent infringement." <u>Aukerman</u>, 960 F.2d at 1028. "In a legal context, laches may be defined as: (1) the neglect or delay in bringing suit to

17

**A35**

remedy an alleged wrong, (2) which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." Id. at 1028-29. The Court weighs "the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability." Id. at 1034. "The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." Id. at 1032. The prejudice against the defendant is measured as evidentiary or economic:

> Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts. Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.

Wanless v. GE, 148 F.3d 1334, 1337 (Fed. Cir. 1998). "A delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial." Id. If laches is established, damages prior to suit may be barred. Id. at 1028.

Seeking summary judgment, Defendants argued the laches "clock" started ticking when GTT learned that GPS was used to enhance an Emtrac System in 2004 or 2005. Global Traffic Tech., 946 F. Supp. 2d at 902. GTT responded that the clock only started to run sometime after 2007, when Defendants began selling the Emtrac GPS System accused of infringement. Id. GTT argues that earlier Emtrac systems, even the ones that used a GPS compass, did not infringe the '398 Patent. Id. In denying summary judgment, the Court held that these arguments represented genuine issues of material fact that would need to be developed at trial, but if the clock did not start until 2007 "three years is not an unreasonable time in which to consider whether or not to bring suit." Id.

18

**A36**

At trial, through Morgan's testimony, the evidence developed that the "second generation Emtrac GPS product accused of infringement" was launched in 2007. Trial Tr. 588. From 2004 through 2006, Defendants did not sell second generation units. Id. at 578-80, 585. Although Defendants showed that GTT was concerned about Emtrac's development of a GPS traffic priority system in 2004-2006, there was no clear act of infringement during that time to justify starting the laches clock. Defs.' Trial Exs. 27, 28, 31, and 32. A party may be charged with constructive knowledge of another's infringement in certain circumstances, including where the infringer's activities are "pervasive, open, and notorious" such that "a reasonable patentee would suspect they were infringing." Wanlass, 148 F.3d at 1338. Defendants have not shown that their incorporation of GPS into their Emtrac GPS System was pervasive, much less open and notorious. Simply "dabbling whether to get back into this market" as Morgan described his conduct, Trial Tr. 587-88, is not sufficient to place GTT on notice.

STC argues that even if KME is not entitled to laches, GTT unreasonably delayed bringing suit against STC until December 2011. GTT's explanation for its delay at trial was that in September 2010, GTT did not understand STC's deep involvement with Morgan, KME, and the infringing Emtrac GPS System. Instead, GTT thought that STC was "a contract manufacturer." Id. at 745. Through the discovery process in the lawsuit against KME and Morgan, GTT learned, as Brad Cross confirmed at trial, that STC's involvement was deeper than GTT initially though. STC, KME, and Morgan are a "joint venture" with respect to selling the Emtrac GPS System, id. at 1425, and STC also writes the source code, id. at 1426, provides technical support to customers id. at 1426-28, and drafts the product manuals, id. at 1437. Once GTT learned of this relationship, it filed suit against STC.

19

**A37**

Defendants also cannot satisfy the prejudice prong of their laches defense. Defendants have not argued that they suffered evidentiary prejudice. To prove economic prejudice, Defendants must show a change in economic position that occurred "because of and as a result of" delay by GTT bringing suit, "not simply a business decision to capitalize on a market opportunity." Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 774 (Fed. Cir. 1995). There was evidence at trial that Defendants' radio signal traffic preemption system was no longer selling after 2004. Trial Tr. 587. Morgan "looked up on the Internet what 3M [GTT's predecessor] had going on at the time." Id. at 655. He then "talked to Brad [Cross] about the equipment" and they "knocked it over a little bit and decided, yeah, we'd give it a shot and see if we could revive the Emtrac system, you might say." Id. at 655-56. Defendants argue that if GTT had caught them infringing sooner, then Defendants may not have invested further resources into the project. But, Morgan has testified that he knew about the '398 Patent in 2004. Id. at 608-09, 655-56. He just refused to look at it. Instead, Morgan looked at a 3M manual and tried to design with Brad Cross a device that was different enough from the product in the 3M manual that they hoped they would not be infringing. Defendants made a business decision to launch KME in 2007 and begin selling the Emtrac GPS System despite knowing there was a patent covering GPS traffic priority systems. Defendants cannot now claim prejudice for GTT's alleged delay, when Defendants did not do a thorough investigation of the legal risks they could be exposing themselves to when they launched their product. Defendants have not shown prejudice due to a delay in suit.

20

**A38**

## 2. Equitable Estoppel

"Three elements must be established to bar a patentee's suit by reason of equitable estoppel: (a) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. . . . ; (b) the alleged infringer relies on that conduct; and (c) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." <u>Aukerman</u>, 960 F.2d at 1028.

A patentee's "silence alone will not create an estoppel," <u>id.</u> at 1043-44, because "[n]o principle is better settled than that a party is not estopped by his silence unless it has misled another to his hurt," <u>Philadephia, W. & B.R. Co. v. Dubois</u>, 79 U.S. 47, 64 (1870). Rather, for "a patentee's 'misleading conduct' [to be] essentially misleading inaction," the "plaintiff's inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned." <u>Aukerman</u>, 960 F.2d at 1042.

Defendants argue that in 2009, GTT and Morgan met to discuss their competing products. Morgan claims GTT "suggested several times that GTT should resell his product rather than [GTT's] own." Trial Tr. 730. Defendants further argue Morgan was led to believe GTT would not sue him for infringement. GTT has its own version of the 2009 meeting with Morgan. Given the jury's consistent finding of infringement and its finding of willful infringement (discussed further below), the Court does not fully accept Defendants' version of this 2009 discussion. However, even if Morgan's version of the 2009 meetings could be believed, the equitable estoppel argument still fails because GTT's conduct was not

21

**A39**

"misleading."  See Altech Controls Corp. v. EIL Instr., Inc., 8 Fed. Appx. 941, 946 (Fed. Cir.

2001) ("district court abused its discretion in finding estoppel" based on meeting between parties

in which a "possible merger" was discussed).  To prevail, Defendants must prove GTT

"abandoned" an infringement claim against Defendants through misleading conduct.  Aukerman,

960 F.2d at 1042.  But a plaintiff's "willingness to engage in licensing negotiations with

[defendant] cannot be the basis of misleading conduct."  Vectra Fitness v. Icon Health & Fitness,

288 F. Supp. 2d 1155, 1166 (W.D. Wash. 2003).  Furthermore, even if GTT "attempt[ed] to

negotiate licenses" for the '398 Patent "followed by a period of silence," that would not

constitute "the necessary misleading conduct."  Meyers v. Asics Corp., 974 F.2d 1304, 1308

(Fed. Cir. 1992).  Defendants have not proven that its license negotiation with GTT was

misleading under this standard.  Therefore, Defendants are not entitled to equitable estoppel.

**K.  Willful Infringement**

The Federal Circuit has established a two-part test for determining willful infringement.

The plaintiff must first show that "the infringer acted despite an objectively high likelihood that

its actions constituted infringement of a valid patent."  In re Seagate, 497 F.3d 1360, 1371 (Fed.

Cir. 2007) (en banc).  Willful infringement "requires at least a showing of objective

recklessness."  Id.  The plaintiff then must show that the "objectively-defined risk" was "either

known or so obvious that it should have been known to the accused infringer" (the subjective

prong).  Id.

While the first part of the willfulness test—the objective prong—often involves "mixed

questions of law and fact," the Federal Circuit holds that it is ultimately a question of law subject

to de novo review that "is best decided by the judge."  Bard Peripheral Vascular, Inc. v. W.L.

**A40**

Gore & Associates, Inc., 682 F.3d 1003, 1005-06 (Fed. Cir. 2012) (en banc).  In determining the objective prong, however, the Federal Circuit holds that the Court may rely on underlying findings of fact by the jury.  Indeed, because the objective prong "tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement," the question "often posed is whether a defense or noninfringement theory was 'reasonable.'"  Id. at 1005-06.  A court may therefore "allow the jury to determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness."  Id. at 1008.  But "the ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge."  Id.  Accordingly, at the end of the day, "the court should determine, 'based on the record ultimately made in the infringement proceedings,' whether a 'reasonable litigant could realistically expect' [the asserted defenses] to succeed."  Id. (citation omitted).

In this case, Morgan's trial testimony is dispositive.  Morgan, himself a holder of patents, testified that he became aware of the '398 Patent around 2004.  Trial Tr. 608-09, 655-56.  He discussed the fact of the Patent's existence with Brad Cross.  Morgan also testified that he refused to review the Patent because he did not want to risk infringement.  However, he did study 3M's product manual.  Cross and Morgan testified they then attempted to design a product that was different than the 3M/GTT GPS system.  In 2007, Defendants began selling the accused GPS system.

No reasonable litigant, and certainly not a savvy businessman such as Morgan, could expect to avoid infringement by simply refusing to look at a patent, and then by designing around the patent holder's embodiment of its patent.  Plaintiff's product is not the same as

23

**A41**

Plaintiff's patent.  See Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834, 846 (Fed. Cir. 1992).  The Court finds that an objectively reasonable person, with knowledge that a patent exists in the field in which the potential infringers wish to compete, would not ignore the patent, but would investigate whether its design would infringe.[6]

The second part of the test is "subjective," and the jury can aid the Court in determining the underlying facts as to Defendants' subjective intent.  The jury found, from Defendants' testimony and the evidence, that GTT proved by clear and convincing evidence the second part of the test.  GTT persuaded the jury that Defendants "actually knew or should have known that their actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent."  Final Jury Instruction No. 24; Special Verdict Form [Docket No. 326] IV.  The evidence of record supports this conclusion.  The Court relies on the jury's verdict in finding Defendants' infringement was willful.

**L.  Enhancement of Damages**

Under 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed" by the jury.  An award of enhanced damages is appropriate when (1) the fact-finder determines that the infringer engaged in culpable conduct (i.e., willful infringement); and (2) the Court exercises its discretion to determine whether and to what extent to enhance damages.  Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996).  "An act of

---

[6] Even when a defendant has willfully ignored a patent, it is still possible that a defendant could create a product which did not infringe, or that the ignored patent was invalid.  Defendants might have fortunately been successful in designing around GTT's embodiment instead of the patent.  Or, Defendants might have been forgiven their inattention to the patent if the patent was invalid as anticipated or obvious.  When a jury or the Court finds a patent claim is invalid the question of willfulness is largely moot.  See, e.g., Krippelz v. Ford Motor Co., 667 F.3d 1261, 1269-1270 (Fed. Cir. 2012).

willful infringement satisfies [the] culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award." Id.

With respect to the second requirement, the Federal Circuit in Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992) set forth multiple factors to guide courts in determining whether to enhance damages. "The paramount determination . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances." Id. at 826. The Read factors include (1) "whether the infringer deliberately copied the ideas or design of another;" (2) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;" (3) "the infringer's behavior as a party to the litigation;" (4) "defendant's size and financial condition;" (5) "the closeness of the case;" (6) "the duration of defendant's misconduct;" (7) "remedial action by the defendant;" (8) "defendant's motivation for harm;" and (9) "whether defendant attempted to conceal its misconduct." Id. at 827.

GTT's request that the Court triple the damages award is denied.

**1. Deliberate Copying**

Defendants clearly had knowledge of the '398 Patent in 2004. Defendants claim they did not look at the '398 Patent, but rather looked at product manuals and attempted to design a system different from GTT's embodiment, presumably so as not to infringe. The Court and jury found that Defendants unreasonably, recklessly, and likely intentionally failed to read the '398 Patent. Defendants chose to risk ignoring the '398 Patent, but there is little evidence that Defendants took the '398 Patent and underlined deliberately copied it. Some evidence suggests Defendants

25

**A43**

were trying to build something new, but their conduct was reckless and willfully blind. Therefore, this factor weighs in favor of enhancing damages.

### 2. Good-Faith Belief of Invalidity

Defendants could not have had a good-faith belief in the invalidity of the '398 Patent at the time that they became aware of it in 2004 because they claim that they did not read the Patent. Therefore, this factor weighs in favor of GTT.

### 3. Behavior as Litigant

Even though Defendants could not have had a good-faith belief in the invalidity of the '398 Patent at the time that they became aware of it in 2004, as litigants they were entitled to attempt to and prove that they either did not infringe or that '398 Patent is invalid. Defendants argued vigorously through claim construction for a narrow reading of the patent. This view was not so unreasonable that it was asserted in bad faith. Similarly, Defendants' anticipation and obviousness defenses were honestly presented. The jury ultimately found the '398 Patent valid, but that does not make preserving their defenses bad faith litigation. That said, Defendants did create frustrating confusion with repeated attempts, some of dubious value and merit, to slip new claim construction analysis into arguments long after it was clear how the Court had construed the terms. This factor weighs in GTT's favor.

### 4. Defendants' Size and Financial Condition

GTT contends Defendants are a major player in the market for GPS Traffic Systems and Defendants have made millions of dollars in this market. Even so, Defendants will likely not be a major player in this market following this litigation. STC and KME have represented to the Court that they will have to conduct layoffs and possibly declare bankruptcy following entry of

26

**A44**

judgment.[7]  That said, January 7, 2014, marked the end of the '398 Patent's protection of GTT's invention.  STC and Morgan will not be excluded from the market going forward, to the extent that they can find funding to restart production.  Therefore this factor weighs neutrally.

### 5.  Closeness of the Case

GTT asserts Defendants knew of the patent in 2004, sold the infringing Emtrac GPS System starting in 2007, and Defendants continued to sell the infringing system after being sued for infringement.  As mentioned above, Defendants had good-faith invalidity defenses once litigation began; therefore, the Court finds that this factor does not weigh in favor of enhancing damages.

### 6.  Duration of Defendant's Misconduct

The duration of the infringement was long, but the jury's damage award reflects the period of infringement.  As mentioned before, Defendants were entitled to make invalidity defenses and contest claim construction.  Clearly, willfully ignoring a patent is misconduct, but enhancement of damages on this basis would be double or triple punishing Defendants.  There is no additional misconduct to which the Court can point to justify enhancing damages.

### 7.  Remedial Action by Defendants

GTT contends Defendants never took remedial action to cease infringement and never attempted to implement any design around the '398 Patent. Defendants explain that there is no evidence of remedial action because Defendants reasonably believed that the patent was invalid.

---

[7] Defendants did not supply any direct evidence to this effect, but did submit declarations under oath [Docket Nos. 349 and 350].

The jury rejected Defendants' assertion that the patent was invalid, but the defense was not so unreasonable as to enhance damages on that basis.

### 8. Defendants' Motivation for Harm

GTT contends Defendants specifically targeted GTT and sought "total supremacy over" GTT in the market. But GTT also claims that it was the only competitor in a two-supplier market. Therefore, since GTT was Defendants' only competition, it is unsurprising that the two companies would have competed vigorously. There is no evidence of any special maneuvering that would indicate competition beyond that expected between two competitors in a narrow niche market; therefore, this factor weighs against enhancing damages.

### 9. Defendants' Attempts to Conceal

GTT asserts that Defendants sought to conceal its infringing activity by insisting that the '398 Patent was invalid. Defendants contend that there is no evidence that they attempted to conceal their acts. The Court agrees. Defendants openly sold its Emtrac System starting in 2007. Therefore, this factor weighs against enhancing damages.

After reviewing the totality of the circumstances and weighing the Read factors, the Court concludes that an award of enhanced damages is warranted. Given that some significant factors weigh in favor of enhancing damages, the Court awards half the compensatory damage amount, $2,526,059, as an appropriate enhancement of damages.

## M. Prejudgment Interest

The Supreme Court has explained that "prejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." Gen. Motors Corp. v. Devex Corp., 461 U.S. 648, 654 (1983). Prejudgment interest is not a penalty

**A46**

but "serves to make the patent owner whole, for damages properly include the foregone use of money of which the patentee was wrongly deprived." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed. Cir. 1996). Accordingly, awarding "prejudgment interest is the rule, not the exception." Id.

The Federal Circuit affords district courts "wide latitude in the selection of interest rates." Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991). A variety of rates have been utilized by courts in patent cases, including statutory rates set by state statutes, the U.S. Treasury bill rate, the prime rate, the prime rate plus a percentage, and a rate on borrowed funds. See, e.g., 7-20 D. Chisum, Chisum on Patents, § 20.03 (citing cases that gather examples of different rates used by courts). In addition, "the determination whether to award simple or compound interest similarly is a matter largely within the discretion of the district court." Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 557 (Fed. Cir. 1984).

Prejudgment interest shall be awarded at a simple rate of 10% per annum not compounded on the $ 5,052,118 award. See Minn. Stat. § 549.09. As 35 U.S.C. § 284 does not specify a rate to be used for prejudgment interest, courts often use the statutory interest rate of the state in which they sit. See Bowling v. Hasbro, Inc., 582 F. Supp. 2d 192, 208 (D.R.I. 2008) (awarding the Rhode Island state rate of 12%). In Minnesota, this rate is 10% per annum. Minn. Stat. § 549.09. Even though the damages period began in 2007, the jury did not award GTT's full request for damages. Therefore, prejudgment interest will run from 2010, assuming that the jury discounted early infringement cases that it did not believe warranted recovery.[8] At 10% per

---

[8] In response to GTT's recommendation of the Minnesota state statutory rate of 10%, see Minn. Stat. § 549.09, Defendants suggest using the 52-week United States Treasury bill rate or the prime interest rate (estimated by Defendants' damages expert at 3.25%), compounded

annum from January 1, 2010, through October 31, 2013, the prejudgment interest is $923,965.

Daily interest is $1,384.14 for each day after October 31, 2013.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Defendants Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.'s Motions for Judgment as a Matter of Law or New Trial [Docket Nos. 411, 369, 372, 375, 378, 381] are **DENIED**;

2. Defendants' Motion for Laches and Equitable Estoppel [Docket No. 395] is **DENIED**;

3. Defendants' Motion for an Amended ruling on Claim 16 Indefiniteness [Docket No. 401] is **DENIED**;

4. Plaintiff Global Traffic Technologies, LLC's Motion for Confirmation of Willful Infringement, Enhancement of Damages, and Prejudgment Interest [Docket No. 364] is **GRANTED IN PART**, and **DENIED IN PART**;

5. Enhancement of Damages is awarded in the amount of $2,526,059; and,

---

annually. Defendants' expert did not even calculate the amount for the 52-week Treasury bill rate and that low rate does not serve to make the patent owner whole. The prime interest rate is also extremely low and does not serve to make the plaintiff whole.

**A48**

6.      Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 25, 2014.

AO450 (Rev. 5/85)  Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

Global Traffic Technologies,
LLC,

                            Plaintiff,

   V.

Emtrac Systems, Inc., Rodney K.
Morgan, STC, Inc., and KM
Enterprises, Inc.,

                            Defendants.

### JUDGMENT IN A CIVIL CASE

Case Number:   10-4110 ADM/JJG

☐ **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. Defendants Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.'s Motions for Judgment as a Matter of Law or New Trial [Docket Nos. 411, 369, 372, 375, 378, 381] are **DENIED**;

2. Defendants' Motion for Laches and Equitable Estoppel [Docket No. 395] is **DENIED**;

3. Defendants' Motion for an Amended ruling on Claim 16 Indefiniteness [Docket No. 401] is **DENIED**;

4. Plaintiff Global Traffic Technologies, LLC's Motion for Confirmation of Willful Infringement, Enhancement of Damages, and Prejudgment Interest [Docket No. 364] is **GRANTED IN PART**, and **DENIED IN PART**;

5. Enhancement of Damages is awarded in the amount of $2,526,059; and,

6. Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

| April 28, 2014 | RICHARD D. SLETTEN, CLERK |
|---|---|
| Date | |
| | s/ M. Price |
| | (By)               M. Price    Deputy Clerk |

C:\Users\price\Desktop\Blank Judgment Form.wpd

**A50**

Form Modified:  09/16/04



# UNITED STATES DISTRICT COURT
## District of Minnesota

| | | | |
|---|---|---|---|
| Warren E. Burger Federal Building and U.S. Courthouse 316 North Robert Street Suite 100 St. Paul, MN 55101 (651) 848-1100 | U.S. Courthouse 300 South Fourth Street Suite 202 Minneapolis, MN 55415 (612) 664-5000 | Gerald W. Heaney Federal Building and U.S. Courthouse 515 West First Street Suite 417 Duluth, MN 55802 (218) 529-3500 | Edward J. Devitt U.S. Courthouse and Federal Building 118 South Mill Street Suite 212 Fergus Falls, MN 56537 (218) 739-5758 |

## CIVIL NOTICE

**The appeal filing fee is $505.00. If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> *This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

**A51**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Global Traffic Technologies,
LLC,

             Plaintiff,

                                         **ORDER**

      v.                                 Civil No. 10-4110 ADM/JJG

Rodney K. Morgan, STC, Inc.,
and KM Enterprises, Inc.,

             Defendants.

_____

Chad Drown, Esq., Timothy E. Grimsrud, Esq., Timothy Sullivan, Esq., and Lauren J. Frank, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Global Traffic Technologies, LLC.

Jonathan D. Jay, Esq., Hellmuth & Johnson PLLC, Edina, MN; and, Terrance C. Newby, Esq., Leffert Jay & Polglaze, P.A., Minneapolis, MN, on behalf of STC, Inc.

Jana Yocom, Esq., Jana Yocom PC, Mount Vernon, IL; and, Andrew G. Birkeland, Rasmus Law Office, LLC, Minneapolis, MN, on behalf of KM Enterprises, Inc. and Rodney K. Morgan.

_____

On September 24, 2013, the undersigned United States District Judge recorded a

Judgment in the above captioned case. The document [Docket No. 327] was miscaptioned,

listing Emtrac Systems, Inc. as a Defendant.[1] On September 20, 2013, the jury had found KM

Enterprises, Inc., Rodney "Kris" Morgan, and STC, Inc. (collectively, "Defendants") infringed

claims 1, 3, 8, 10, 16 and 17 of United States Patent No. 5,539,398 ("'398 patent"). The jury had

also found that the asserted claims of the '398 patent were not invalid. The jury awarded

damages in the amount of $5,052,118. Finally, the jury had found Defendants willfully infringed

the '398 Patent.

_____

[1] At trial for simplicity reasons Defendants were collectively referred to as "Emtrac." The Court's orders and the jury's special verdict form correctly identified the Defendants at trial.

**A52**

On April 25, 2014, the Court decided issues it reserved for its own consideration following the full development of facts at trial [Docket No. 431]. The Court also decided issues of enhancement of damages and prejudgment interest. The Court found enhanced damages in the amount of $2,526,059 were appropriate to add to the jury's verdict. In addition, the Court found $923,965 in prejudgment interest through October 31, 2013, plus an additional $1,384.14 in interest for each day after October 31, 2013. On April 28, 2014, Judgment [Docket No. 432] was entered, again identifying Emtrac Systems, Inc. as a Defendant in the caption. The April 28 Judgment expected reference to Docket No. 327 to add the jury's awarded damages to calculate the total compensation award..

The purpose of this Order is to correct the captioning error and consolidate the damages information recorded in each judgment into one place for easy administration.[2]

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The jury returned a verdict of willful infringement and no invalidity of claims 1, 3, 8, 10, 16 and 17 of United States Patent No. 5,539,398 in favor of Plaintiff Global Traffic Technologies, LLC and against Defendants KM Enterprises, Inc., Rodney "Kris" Morgan, and STC, Inc.;

---

[2] After being alerted to these clerical errors, but before the entering of this Order, Defendants filed motions to stay enforcement of judgment pending appeal and a motion to seal documents. [Docket Nos. 455, 459 and 464]. No appeal has yet been filed. Therefore, Defendants' motions to stay are denied as premature, and documents Defendants submitted in support of their motions, not yet under seal, will be returned.

2

**A53**

The jury awarded damages to Plaintiff Global Traffic Technologies, LLC in the amount of $5,052,118;

2.     Enhancement of Damages is awarded in the amount of $2,526,059; and,

3.     Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

4.     Defendants Motions to Stay Enforcement of Judgment Pending Appeals [Docket Nos. 455 and 464] are **DENIED**, as premature; and,

5.     Defendants' Motion to Seal Pleading/Motion/Other Documents [Docket No. 459] is **DENIED** as moot. Documents submitted will be returned and will not be filed at this time.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 14, 2014.

3

**A54**

AO450 (Rev. 5/85)   Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

Global Traffic Technologies,
LLC,

Plaintiff,

**JUDGMENT IN A CIVIL CASE**

V.

Rodney K. Morgan, STC, Inc., and KM
Enterprises, Inc.,

Case Number:   10-4110 ADM/JJG

Defendants.

[X] **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. The jury returned a verdict of willful infringement and no invalidity of claims 1, 3, 8, 10, 16 and 17 of United States Patent No. 5,539,398 in favor of Plaintiff Global Traffic Technologies, LLC and against Defendants KM Enterprises, Inc., Rodney "Kris" Morgan, and STC, Inc.; The jury awarded damages to Plaintiff Global Traffic Technologies, LLC in the amount of $5,052,118;

2. Enhancement of Damages is awarded in the amount of $2,526,059; and,

3. Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

4. Defendants Motions to Stay Enforcement of Judgment Pending Appeals [Docket Nos. 455 and 464] are **DENIED**, as premature; and,

5. Defendants' Motion to Seal Pleading/Motion/Other Documents [Docket No. 459] is **DENIED** as moot. Documents submitted will be returned and will not be filed at this time.

May 16, 2014                                     RICHARD D. SLETTEN, CLERK
Date

s/   M. Price

(By)                                           M. Price    Deputy Clerk

C:\Users\price\Desktop\Blank Judgment Form.wpd

**A55**

Form Modified:  09/16/04



# UNITED STATES DISTRICT COURT
## District of Minnesota

| Warren E. Burger Federal Building and U.S. Courthouse 316 North Robert Street Suite 100 St. Paul, MN 55101 (651) 848-1100 | U.S. Courthouse 300 South Fourth Street Suite 202 Minneapolis, MN 55415 (612) 664-5000 | Gerald W. Heaney Federal Building and U.S. Courthouse 515 West First Street Suite 417 Duluth, MN 55802 (218) 529-3500 | Edward J. Devitt U.S. Courthouse and Federal Building 118 South Mill Street Suite 212 Fergus Falls, MN 56537 (218) 739-5758 |

## CIVIL NOTICE

**The appeal filing fee is $505.00. If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

*This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

**A56**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Global Traffic Technologies,
LLC,

                Plaintiff,

      v.

KM Enterprises, Inc., Rodney K.
Morgan, and STC, Inc.,

          Defendants.

**JURY INSTRUCTIONS**
Civil No. 10-2010 ADM/JJG

---

Chad Drown, Esq., James Poradek, Esq., Timothy E. Grimsrud, Esq., Luke Tomsich, Esq., Timothy Sullivan, Esq., and Lauren J. Frank, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Global Traffic Technologies, LLC.

Jonathan D. Jay, Esq., Terrance C. Newby, Esq., and Elizabeth L. Taylor, Esq., Leffert Jay & Polglaze, P.A.,  Minneapolis, MN, on behalf of KM Enterprises, Inc., STC, Inc., and Rodney Morgan.

---

Date submitted to jury:  September 19, 2013

JURY INSTRUCTION NO. 1

**A102**

Members of the jury, the instructions I gave at the beginning of the trial and during the trial are still in effect.  Now I am going to give you some additional instructions.

You have to follow all of my instructions – the ones I gave you earlier, as well as those I give you now.  Do not single out some instructions and ignore others, because they are all important.

You will have copies of some of the instructions with you in the jury room; others you will not have copies of.  This does not mean some instructions are more important than others.  Remember, you have to follow all instructions, no matter when I give them, whether or not you have written copies.

2

**A103**

JURY INSTRUCTION NO. 2

Now that you have heard the evidence and the argument, it becomes my duty to give you the instructions of the Court as to the law applicable to this case.

It is your duty as jurors to follow the law as I shall state it to you, and to apply that law to the facts as you find them from the evidence in the case. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. Neither are you to be concerned with the wisdom of any rule of law stated by me.

Counsel have quite properly referred to some of the governing rules of law in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by the Court's instructions.

Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of the case, or what that opinion is. It is not my function to determine the facts, but rather yours.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be governed by sympathy, prejudice or public opinion. All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

**A104**

JURY INSTRUCTION NO. 3

You have been allowed to take notes during the course of the trial, and you may take these notes with you to the jury room.  You should not consider these notes binding or conclusive, whether they are your notes or those of another juror.  The notes should be used as an aid to your memory and not as a substitute for it.  You should not give greater weight to a particular bit of evidence solely because it has been reduced to writing.  I want to make clear to you that it is your recollection of the evidence which should control, and you should disregard anything contrary to your own recollection which may appear from your own notes or those of another juror.

JURY INSTRUCTION NO. 4

You are to consider only the evidence in the case. But in your consideration of the evidence you are not limited to the bald statements of the witnesses. In other words, you are not limited to what you see and hear as the witnesses testify. You are permitted to draw, from the facts which you find have been proved, such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions which reason and common sense lead you to draw from facts that have been established by the evidence in the case.

You will make your decision based on what you recall of the evidence. You will not have a written transcript to consult.

5

**A106**

JURY INSTRUCTION NO. 5

There are, generally speaking, two types of evidence from which a jury may properly find the truth as to the facts of a case. One is direct evidence - such as the testimony of any eyewitness. The other is indirect or circumstantial evidence - the proof of a chain of circumstances pointing to the existence or non-existence of certain facts.

As a general rule, the law makes no distinction between direct or circumstantial evidence, but simply requires that the jury find the facts in accordance with the greater weight of all the evidence in the case, both direct and circumstantial.

6

JURY INSTRUCTION NO. 6

Once again, "evidence" includes the testimony of witnesses; documents and other things received as exhibits; any facts that have been stipulated--that is, formally agreed to by the parties. Certain things are not evidence.

(1)     Statements, arguments, questions and comments by lawyers are not evidence.

(2)     Exhibits that were identified by a party but were not offered or received in evidence are not evidence.

(3)     Objections are not evidence. Lawyers have a right and sometimes an obligation to object when they believe something is improper. If I sustained an objection to a question or an exhibit, you must ignore the question or the exhibit and must not try to guess what the information might have been.

(4)     Testimony and exhibits that I struck from the record, or told you to disregard, are not evidence and must not be considered.

(5)     Anything you saw or heard about this case outside the courtroom is not evidence.

7

**A108**

JURY INSTRUCTION NO. 7

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. An exception to this rule exists as to those whom we call "expert witnesses." Witnesses who, by education and experience, have become expert in some art, science, profession, or calling, may state their opinions as to relevant and material matters, in which they profess to be expert, and may also state their reasons for the opinion.

You should consider each expert opinion received in evidence in this case, and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely.

A109

JURY INSTRUCTION NO. 8

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness said, or only part of it, or none of it.

In deciding what testimony to believe, you may consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe.

In deciding whether or not to believe a witness, keep in mind that people sometimes hear or see things differently and sometimes forget things. You need to consider therefore whether a contradiction is an innocent misrecollection or lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or only a small detail.

9

## JURY INSTRUCTION NO. 9

During the trial of this case, certain testimony has been presented to you by way of deposition, consisting of sworn recorded answers to questions asked of the witness in advance of the trial by one or more of the attorneys for the parties to the case. The testimony of a witness who, for some reason, cannot be present to testify from the witness stand may be presented in writing under oath or on a video recording. Such testimony is entitled to the same consideration, and is to be judged as to credibility, and weighted, and otherwise considered by the jury, in so far as possible, in the same way as if the witness had been present, and had testified from the witness stand.

JURY INSTRUCTION NO. 10

A witness may be discredited or impeached by contradictory evidence; or by evidence that at some other time the witness has said or done something, or has failed to say or do something which is inconsistent with the witness's present testimony.

If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony in other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

A witness can be said to have knowingly testified falsely if you are presuaded that the witness understood that the testimony given was false and did not misstate or omit something because of mistake or accident or other innocent reasons.

11

**A112**

JURY INSTRUCTION NO. 11

As I did at the start of the case, I will first give you a brief summary of each side's contentions.  I will then provide you with detailed instructions on what each side must prove to prevail on each of its contentions.

As you know, GTT, the patent holder and Plaintiff in this case, contends that Defendants infringed its '398 Patent by making, using, selling and installing traffic control management systems, namely the Emtrac Priority Control System, in violation of GTT's rights under its patent.

Defendants deny that the Emtrac Priority Control System infringes GTT's '398 Patent, and they seek a judgment of non-infringement and invalidity.

Your job is to decide whether Defendants infringed the asserted claims of the '398 Patent and whether any of the asserted claims of that patent are invalid.  If you decide that one or more of the claims of the '398 Patent has been infringed and is not invalid, you will then need to decide any money damages to be awarded to GTT to compensate it for the infringement.  You will also need to make a finding as to whether the infringement was willful.  If you decide that there was infringement and that the infringement was willful, that decision should not affect any damages award you make.  It will be my duty to take willfulness into account at a later time.

12

**A113**

JURY INSTRUCTION NO. 12

There are two standards of proof that you will apply to the evidence, depending on the issue you are deciding. On some issues, you must decide whether certain facts have been proven by a greater weight of the evidence. A greater weight of the evidence means that the fact that is to be proven is more likely true than not; that is, the evidence in favor of that fact being true is sufficient to tip the scale, even if slightly, in its favor. On other issues that I will identify for you, you must use a higher standard and decide whether the fact has been proven by clear and convincing evidence; that is, you have been left with a clear conviction that the fact has been proven.

You have probably heard of the phrase "proof beyond a reasonable doubt." That is a stricter standard which applies in criminal cases. It does not apply in civil cases such as this. You should, therefore, put it out of your minds.

On a scale of these various standards of proof, as you move from greater weight of the evidence, where the proof need only be sufficient to tip the scale in favor of the party proving the fact, to beyond a reasonable doubt, where the fact must be proven to a very high degree of certainty, you may think of clear and convincing evidence as being between the two standards.

To prove infringement of any claim, GTT must persuade you by a greater weight of the evidence, i.e., that it is more likely than not, that Defendants have infringed that claim. To persuade you that any infringement was willful, GTT must prove that the infringement was willful by clear and convincing evidence.

13

**A114**

JURY INSTRUCTION NO. 13

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."  The patent claims are the numbered sentences at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.  The law says that it is my role to define the terms of the claims and it is your role to apply my definitions to the issues that you are asked to decide in this case.  Therefore, as I explained to you at the start of the case, I have determined the meaning of the claims and I will provide to you my definitions of certain claim terms.  You must accept my definitions of these words in the claims as being correct.  It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and validity.

14

**A115**

JURY INSTRUCTION NO. 14

I will now explain how a claim defines what it covers.

A claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. If a device or a method satisfies each of these requirements, then it is covered by the claim.

There can be several claims in a patent. Each claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed claim-by-claim. In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

Sometimes the words in a patent claim are difficult to understand, and therefore it is difficult to understand what requirements these words impose. It is my job to explain to you the meaning of the words in the claims and the requirements these words impose.

As I just instructed you, there are certain specific terms that I have defined and you are to apply the definitions that I provide to you.

By understanding the meaning of the words in a claim and by understanding that the words in a claim set forth the requirements that a product or process must meet in order to be covered by that claim, you will be able to understand the scope of coverage for each claim. Once you understand what each claim covers, then you are prepared to decide the issues that you will be asked to decide, such as infringement and invalidity.

15

**A116**

JURY INSTRUCTION NO. 15

This case involves two types of patent claims: independent claims and dependent claims.

An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, claims 1 and 16 of the '398 patent are each independent claims.

The remainder of the Asserted Claims, Claims 3, 8, 10, and 17, in the '398 patent are "dependent claims." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim(s) to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim(s) to which it refers. A product or process that meets all of the requirements of both the dependent claim and the claim(s) to which it refers is covered by that dependent claim.

16

**A117**

JURY INSTRUCTION NO. 16

I will now explain to you the meaning of some of the words of the claims in this case. In doing so, I will explain some of the requirements of the claims.  As I have previously instructed you, you must accept my definition of these words in the claims as correct.  For any words in the claim for which I have not provided you with a definition, you should apply their plain and ordinary meaning.  You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity.  These issues are yours to decide.

Claim 1:  The term "mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches" is in a means-plus-function form. The function is: "storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches." The structure or "mapping means" for performing the function is construed as "computer map memory."

The claims neither specify nor require physical connection or location within the definition of 'associate' in the Asserted Claims.

You should give the rest of the words in the claims their plain and ordinary meaning as the word would be understood by a person of ordinary skill in the art in question at the time of the invention.

JURY INSTRUCTION NO. 17

17

**A118**

In deciding what the level of ordinary skill in the field of the invention is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology.

## JURY INSTRUCTION NO. 18

I will now instruct you how to decide whether or not Defendants have infringed the '398 patent. Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another.

In this case, there are three possible ways that a claim may be infringed. The three types of infringement are called: (1) direct infringement; (2) active inducement; and (3) contributory infringement. Active inducement and contributory infringement are referred to as indirect infringement. There cannot be indirect infringement without someone else engaging in direct infringement. To prove indirect infringement, GTT must also prove that a defendant's indirect infringement caused direct infringement.

In this case, GTT has alleged that Defendants directly infringe the '398 patent. In addition, GTT has alleged that one or more of the Defendants are liable for actively inducing and/or contributing to the direct infringement of another entity.

In order to prove infringement, GTT must prove that the requirements for one or more of these types of infringement are met by a greater weight of the evidence, i.e., that it is more likely than not that all of the requirements of one or more of each of these types of infringement have been proved.

I will now explain each of these types of infringement in more detail.

19

JURY INSTRUCTION NO. 19

There are two types of "direct infringement": (1) "literal infringement" and (2) "infringement under the doctrine of equivalents." In order to prove direct infringement by literal infringement, GTT must prove by a greater weight of the evidence, i.e., that it is more likely than not, that one or more Defendants made, used, sold, or offered for sale within the United States a product or process that meets all of the requirements of a claim of the '398 patent. You must compare the product or process with each and every one of the disputed requirements of a claim to determine whether all of the requirements of that claim are met.

You must determine, separately for each asserted claim, whether or not there is infringement. There is one exception to this rule. If you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim. On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the product or process meets additional requirements of any claims that depend on the independent claim, thus, whether any or all of those dependent claims have also been infringed. A dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

You have heard evidence about both GTT's commercial product and method, known as Opticom and Defendants' accused product and method, known as the Emtrac GPS System. However, in deciding the issue of infringement you may not compare the Emtrac GPS System to GTT's Opticom product. Rather, you must compare the Emtrac GPS System to the claims of the '398 patent when making your decision regarding infringement.

20

**A121**

Whether or not Defendants knew its product or method infringed or even knew of the
'398 patent does not matter in determining direct infringement.

The Emtrac GPS System should be compared to the invention described in each patent
claim it is alleged to infringe, not to GTT's preferred or commercial embodiment of the claimed
invention.

21

JURY INSTRUCTION NO. 20

Claim 1 of the Asserted Claims includes a requirement that is in means-plus-function form. When a claim requirement is in means-plus-function form, it covers the structure described in the patent specification for performing the function stated in the claim, and also any structure "equivalent" to the described structure.

A product meets a means-plus-function requirement of a claim if: (1) it has a structure that performs the identical function recited in the claim, and (2) that structure is either identical or "equivalent" to the described structure that I defined earlier as performing the function.

If the Emtrac GPS System does not perform the specific function recited in the claim, the "means-plus-function" requirement is not met, and the Emtrac GPS System does not literally infringe the claim. Alternatively, even if the Emtrac GPS System has a structure that performs the function recited in the claim but the structure is not either identical or "equivalent" to the structure that I defined to you as being described in the '398 patent and performing this function, the Emtrac GPS System does not literally infringe the asserted claim.

A structure may be found to be "equivalent" to the structure I have defined as being described in the '398 patent if a person having ordinary skill in the field of technology of the '398 patent either would have considered the differences between them to be insubstantial at the time the '398 patent issued or if that person would have found the structure performed the function in substantially the same way to accomplish substantially the same result. In deciding whether the differences would be "insubstantial," you may consider whether a person having an ordinary level of skill in the field of technology of the patent would have known of the interchangeability of the two structures or sets of structures. Interchangeability itself is not

22

**A123**

sufficient; in order for the structures to be considered to be interchangeable, the

interchangeability of the two structures must have been known to persons of ordinary skill in that

art at the time the patent issued. The fact that a structure is known now and is "equivalent" is not

enough. The structure must also have been available at the time the '398 patent issued.

JURY INSTRUCTION NO. 21

If a person or company makes, uses, sells, or offers to sell within the United States a product or process that does not meet all of the requirements of a claim and thus does not literally infringe that claim, there can still be direct infringement if that product or process satisfies that claim under the "doctrine of equivalents."

Under the doctrine of equivalents, a product or process infringes a claim if the accused product or process contains elements or performs steps corresponding to each and every requirement of the claim that is equivalent to, even though not literally met by, the accused product or process. You may find that an element or step is equivalent to a requirement of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the structure or action: (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the requirement of the claim. In order for the structure or action to be considered interchangeable, the structure or action must have been known at the time of the alleged infringement to a person having ordinary skill in the field of technology of the patent. Interchangeability at the present time is not sufficient. In order to prove infringement by "equivalents," GTT must prove the equivalency of the structure or actions to a claim element by a greater weight of the evidence.

When the claim requirement that is not met by the product is a "means-plus-function" requirement, and if you determined that there is no "literal infringement" because there is no structure in the accused product that performs the specific function of the means-plus-function requirement, you may decide that the structure nonetheless corresponds to the requirements of

24

**A125**

the claim under the doctrine of equivalents if it performs an "equivalent" function and has an "equivalent" structure.

On the other hand, if you find that the accused product has no corresponding structure to the structure that I defined as performing that function, then you must find that there is no infringement under the doctrine of equivalents. This is the case even if you find that the accused product has some other structure that performs the specific function of the means-plus-function requirement. In other words, for a means-plus-function requirement, a determination that there is no "equivalent" structure for purposes of "literal infringement" precludes you from finding infringement under the "doctrine of equivalents."

JURY INSTRUCTION NO. 22

GTT alleges that each Defendant is liable for infringement by actively inducing another to directly infringe the '398 patent literally or under the doctrine of equivalents. As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

A defendant is liable for active inducement of a claim only if GTT proves by a greater weight of the evidence that:

(1)     the acts are actually carried out by another and directly infringe an Asserted Claim;

(2)     the particular defendant took action during the time the '398 patent was in force intending to cause the infringing acts by another; and

(3)     the particular defendant was aware of the '398 patent and knew that the acts, if taken, would constitute infringement of that patent, or, the particular defendant believed there was a high probability that the acts, if taken, would constitute infringement of the '398 patent but deliberately avoided confirming that belief.

In order to establish active inducement of infringement, it is not sufficient that the particular defendant itself directly infringes the claim. Nor is it sufficient that the particular defendant was aware of the act(s) by another that allegedly constitute the direct infringement. Rather, you must find that the particular defendant knew that the acts it induced its customers to take constituted infringement of the '398 patent or that the particular defendant believed there was a high probability that another would infringe the '398 patent, but remained willfully blind to the infringing nature of the other entity's acts, in order to find inducement of infringement.

26

**A127**

In order to establish active inducement of infringement, direct evidence of intent or knowledge is not required; rather, circumstantial evidence of intent or knowledge is sufficient. For example, when a manufacturer who has knowledge of a patent sells a product that can only be used to infringe the patent, you may infer that infringement is intended. Likewise, offering to sell or selling a product with the object of promoting its use to infringe, advertising an infringing use, or instructing how to engage in an infringing use, are all examples of evidence that may show an affirmative intent that the product be used to infringe. Finally, knowledge that the induced acts constitute infringement may be inferred where, for example, a defendant had both knowledge of the patent and specific intent to cause acts that constitute direct infringement.

27

**A128**

JURY INSTRUCTION NO. 23

GTT also argues that Defendants have contributed to infringement by another. Contributory infringement may arise when someone supplies something that is used to infringe one or more of the patent claims.

In order for there to be contributory infringement by Defendants, someone other than Defendants must directly infringe an Asserted Claim of the '398 patent; if there is no direct infringement by anyone, there can be no contributory infringement.

If you find someone has directly infringed the '398 patent, then contributory infringement exists if:

(1)     Defendants supplied an important component of the infringing part of the product or method;

(2)     The component is not a common component suitable for non-infringing use; and

(3)     Defendants supplied the component with the knowledge of the '398 patent and knowledge that the component was especially made or adapted for use in an infringing manner.

A "common component suitable for non-infringing use" is a component that has uses other than as a component of the patented product or patented method, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

28

**A129**

JURY INSTRUCTION NO. 24

In this case, GTT argues that Defendants KM Enterprises, Inc., STC, Inc., and Rodney "Kris" Morgan infringed and, further, that each of those Defendants infringed willfully. If you have decided that one or more of the Defendants have infringed, you must go on and address the additional issue of whether or not this infringement was willful with respect to each Defendant. Willfulness requires you to determine by clear and convincing evidence that the particular Defendant acted recklessly.

To prove that a particular Defendant acted recklessly, GTT must prove two things by clear and convincing evidence. The first part of the test is objective: GTT must persuade you that the individual Defendant acted despite a high likelihood that its actions infringed a valid and enforceable patent. In making this determination, you may not consider the Defendant's state of mind. Legitimate or credible defenses to infringement, even if not ultimately successful, demonstrate a lack of recklessness.

Only if you conclude that the Defendant's conduct was reckless do you need to consider the second part of the test. The second part of the test does depend on the state of mind of the particular Defendant. GTT must persuade you that the particular Defendant actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent. To determine whether the particular Defendant had this state of mind, consider all the facts which may include, but are not limited, to:

 (1)  Whether or not one or more Defendants acted in accordance with the standards of commerce for its industry;

 (2)  Whether or not one or more Defendants intentionally copied a product of GTT

**A130**

that is covered by the '398 patent;

(3)     Whether or not there is a reasonable basis to believe that one or more Defendants did not infringe or had a reasonable defense to infringement;

(4)     Whether or not  one or more Defendants made a good-faith effort to avoid infringing the '398 patent, for example, whether  one or more Defendants attempted to design around the '398 patent;

(5)     Whether or not one or more Defendants tried to cover up its infringement; and,

(6)     Whether or not one or more Defendants sought legal advice for the purpose of determining whether it was infringing GTT's patent.  You may not assume that merely because a party did not obtain an opinion of counsel, the opinion would have been unfavorable.  However, you may consider the fact that none of the Defendants sought a legal opinion as one factor in assessing whether, under the totality of the circumstances, any infringement by a particular Defendant was willful.

**A131**

JURY INSTRUCTION NO. 25

    I will now instruct you on the rules you must follow in deciding whether or not Defendants have proven that claims 1, 3, 8, 10, 16, and 17 of the '398 patent are invalid. To prove that any claim of a patent is invalid, Defendants must persuade you by clear and convincing evidence, i.e., you must be left with a clear conviction that the claim is invalid.

JURY INSTRUCTION NO. 26

Under the patent laws, a person is entitled to a patent only if the invention claimed in the patent is new and non-obvious in light of what came before. That which came before is referred to as the "prior art."

Defendants are relying on various items that it believes constitute prior art.

Defendants must prove by clear and convincing evidence that these items are prior art. In order to do so, Defendants must prove that the items fall within one or more of the different categories of prior art recognized by the patent laws. These categories include:

First, anything that was publicly known or publicly used in the United States by someone other than the inventors before the date of the invention of the '398 patent.

Second, anything that was patented or described in a printed publication anywhere in the world before the date of the invention of the '398 patent, or more than one year before January 7, 1994.

Third, anything that was invented by another person in the United States before the date of the invention of the '398 patent, if the other person did not abandon, suppress or conceal his or her prior invention.

**A133**

JURY INSTRUCTION NO. 27

In this case, you must determine the date of the invention of the '398 patent.

The date of invention is either when the invention was reduced to practice, or, when it was conceived, provided the inventors were diligent in reducing the invention to practice. Diligence means working continuously, though not necessarily every day.

Conception is the mental part of an inventive act, i.e., the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice, even if the inventor did not know at the time that the invention would work. Conception of an invention is complete when the idea is so clearly defined in the inventor's mind that, if the idea were communicated to a person having ordinary skill in the field of the technology, he or she would be able to reduce the invention to practice without undue research or experimentation. This requirement does not mean that the inventor has to have a prototype built, or actually explained her or his invention to another person. But, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea. Conception may be proven when the invention is shown in its complete form by drawings, disclosure to another person, or other forms of evidence presented at trial.

A claimed invention is "reduced to practice" when it has been constructed, used, or tested sufficiently to show that it will work for its intended purpose, or, when the inventor files a patent application. An invention may also be reduced to practice even if the inventor has not made or tested a prototype of the invention if it has been fully described in a filed patent application.

I will now give you more detail regarding the categories of prior art.

33

**A134**

JURY INSTRUCTION NO. 28

Knowledge or use in the United States of a patented invention can be prior art to the patent claims. The knowledge or use will be prior art if Defendants prove by clear and convincing evidence the following:

First, the knowledge or use must be by someone other than the inventors.

Second, the knowledge or use must be before the inventors' date of invention.

Third, the knowledge or use must be in the United States. Prior knowledge or use outside the United States cannot be relied upon to invalidate a patent claim.

Fourth, the knowledge or use must have been publicly accessible. Private or secret knowledge or use by someone other than the inventors is not prior art. And Defendants must prove that the alleged knowledge or use was publicly accessible on a non-confidential basis.

Finally, Defendants may not rely on oral testimony alone to establish that an item was publicly accessible on a non-confidential basis or to establish the date of the alleged prior knowledge or use. Rather, oral testimony must be corroborated by documents or other evidence.

Defendants must introduce clear and convincing evidence to prove a reference qualifies as prior art based on prior public knowledge or public use.

34

**A135**

JURY INSTRUCTIONS NO. 29

Printed publications from anywhere in the world are prior art if the printed publications were published, either before the date of the invention of the '398 patent or more than one year before January 7, 1994.

A document is a printed publication if it has been disseminated or otherwise made available to the public to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, could have located it and recognized and comprehended therefrom the essentials of the claimed invention without need of further research or experimentation.

The date that a printed publication becomes prior art is the date that it becomes available to the relevant public on a non-confidential basis. Published patent applications are printed publications as of their publication dates.

A defendant may not rely on oral testimony alone to establish that an item was reasonably accessible to or distributed to the public or to establish the date of publication of a particular reference. Rather, oral testimony must be corroborated by documents or other evidence.

Defendants must introduce clear and convincing evidence to prove a reference qualifies as prior art based on a printed publication.

35

**A136**

JURY INSTRUCTION NO. 30

An invention made by another person before the date of the invention of the '398 patent is prior art to the patent claim, unless that other person abandoned, suppressed or concealed his or her invention.

I have previously given you an instruction on how to determine the date of invention of the '398 patent. I will now give you an instruction on how to determine whether another person made an invention before the date of invention of the '398 patent.

As a general rule, the first person to reduce an invention to practice is said to be the first inventor. As I have explained, a claimed invention is "reduced to practice" when either it has been constructed, used, or tested sufficiently to show that it will work for its intended purpose or, in the case of the claimed invention of the '398 patent, when the inventors filed a patent application on January 7, 1994. Reduction to practice by filing a patent application does not apply to any prior invention by another or alleged prior art in this case.

Let's consider an example. Mr. Smith has a patent on a table. He reduced his table to practice on April 1. Ms. Jones invents the same table. She built her table on March 1, one month before Mr. Smith reduced his table to practice. Provided Ms. Jones did not abandon, suppress, or conceal her invention, Ms. Jones' invention of the table is prior art to Mr. Smith's patent claims because Ms. Jones reduced her table to practice one month before Mr. Smith's reduction to practice.

There is, however, an important exception to this general rule. Someone who was first to conceive of an invention but reduced it to practice after someone else will be the first inventor if he or she was the first to conceive of the invention and he or she exercised "reasonable

36

**A137**

diligence" in reducing the invention to practice from a time beginning just before the other person's conception.

As I have explained in Jury Instruction No. 27, conception is the mental part of an inventive act.

"Reasonable diligence" means that the inventor worked continuously on reducing the invention to practice. Interruptions necessitated by the everyday problems and obligations of the inventor or those working with him or her do not prevent a finding of diligence.

Let's change our example slightly. Mr. Smith conceived of his table on February 1 and reduced it to practice on April 1. Ms. Jones conceived of the table on January 1, one month before Mr. Smith's conception, and built it on May 1, one month after Mr. Smith's reduction to practice. If Ms. Jones was reasonably diligent in building the table from the time just before Mr. Smith's February 1 conception up to the time that she built the table on May 1, she is the first inventor of the table and her invention is prior art to Mr. Smith's patent claims provided that Ms. Jones did not abandon, suppress, or conceal her invention.

The final requirement for a prior invention to be prior art is that the prior inventor did not abandon, suppress or conceal his or her invention. Generally, an invention was not abandoned, suppressed or concealed if the invention was made public, sold or offered for sale, or otherwise used for a commercial purpose. The failure to file a patent application, to describe the invention in a published document, or to use the invention publicly, within a reasonable time after first making the invention may constitute abandonment, suppression, or concealment.

Defendants must prove by clear and convincing evidence that an alleged prior invention qualifies as prior art. The requirements to qualify an alleged prior invention as prior art must be

sufficiently corroborated by evidence other than oral testimony of witnesses.

38

JURY INSTRUCTION NO. 31

In order for someone to be entitled to a patent, the invention must actually be "new." The '398 patent was new if the identical product has not been made, used, or disclosed before the date of invention of the patent. Anticipation must be determined on a claim-by-claim basis. Defendants must convince you of this by clear and convincing evidence.

In order for a patent claim to be anticipated by the prior art, each and every limitation of the claim must be present within a single item of prior art, whether that prior art is a publication, a prior patent, a prior invention, or some other item of prior art. You may not find that the prior art anticipates a patent claim by combining two or more items of prior art.

Here is a list of ways that Defendants can show that a patent claim was not new or that the patentee lost the right to patent the claims:

(1)     An invention is not new if it was known to or used by others in the United States before the date of the invention of the product or processes covered by the '398 Patent.

(2)     An invention is not new if it was already patented or described in a printed publication, anywhere in the world before the date of invention of the patented product or processes.

(3)     An invention is not new if it was described in a published patent application filed by another in the United States before the date of the patented invention.

(4)     An invention is not new if the claimed invention was described in a patent granted on an application for patent by another filed in the United States and the application was filed before the date or reduction to practice or the filing date of

**A140**

the application for the '398 Patent.

(5)     An invention is not new if the invention was made by someone else in the United States before the invention was made by the patent holder and the other person did not abandon, suppress, or conceal the invention.

40

**A141**

JURY INSTRUCTION NO. 32

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

Defendants may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the patent.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of the invention that someone would have had at the time the claimed invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. In considering whether a claimed invention is obvious, you may but are not required to find obviousness if you find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in a way the claimed invention does, taking into account such factors as: (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior

41

**A142**

art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and (6) whether the change resulted more from design incentives or other market forces.

To find it rendered the invention obvious, you must find that the prior art provided a reasonable expectation of success. Obvious to try is not sufficient in unpredictable technologies.

In determining whether the claimed invention was obvious, consider each claim separately. Do not use hindsight. Consider only what was known at the time of the invention.

In making these assessments, you should take into account any objective evidence (sometimes called "secondary considerations") that may have existed at the time of the invention and afterwards that may shed light on the obviousness or not of the claimed invention, such as:

a.      Whether the invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

b.      Whether the invention satisfied a long-felt need;

c.      Whether others had tried and failed to make the invention;

d.      Whether others invented the invention at roughly the same time;

e.      Whether others copied the invention;

f.      Whether there were changes or related technologies or market needs contemporaneous with the invention;

g.      Whether the invention achieved unexpected results;

h.      Whether others in the field praised the invention;

i.      Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

j.      Whether others sought or obtained rights to the patent from the patent holder; and,

k.      Whether the inventor proceeded contrary to accepted wisdom in the field.

A144

JURY INSTRUCTION NO. 33

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.

The scope and content of prior art for deciding whether the invention was obvious includes prior art in the same field as the claimed invention, regardless of the problem addressed by the item or reference, and prior art from different fields that a person of ordinary skill in the art using common sense might combine if familiar so as to solve the problem, like fitting together the pieces of a puzzle. When a party attacking the validity of a patent relies on prior art which was specifically considered by the Examiner during the prosecution of the application leading to the issuance of the patent, that party bears the burden of overcoming the deference due a qualified government agency official presumed to have performed his or her job.

**A145**

JURY INSTRUCTION NO. 34

If you find that one or more Defendants infringed any valid claim of the '398 patent, you must then consider what amount of damages to award to GTT. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, on any issue.

The damages you award must be adequate to compensate GTT for the infringement. They are not meant to punish an infringer. Your damages award, if you reach this issue, should put GTT in approximately the same financial position that it would have been in had the infringement not occurred.

GTT has the burden to establish the amount of its damages by a greater weight of the evidence. In other words, you should award only those damages that GTT establishes that it more likely than not suffered.

There are two different types of damages that GTT may be entitled to recover: lost profits and a reasonable royalty. In this case, GTT seeks lost profits due to lost sales and lost profits due to price erosion. Lost profits consist of any actual reduction in business profits GTT suffered as a result of Defendants' alleged infringement. A reasonable royalty is defined as the money amount GTT and Defendants would have agreed upon as a fee for use of the invention at the time prior to when infringement began. However, GTT is not entitled to damages that are remote or speculative.

I will give more detailed instructions regarding damages shortly. Note, however, that GTT is entitled to recover no less than a reasonable royalty for each infringing sale, use, or manufacture.

45

**A146**

JURY INSTRUCTION NO. 35

The amount of damages GTT can recover is limited to those acts of infringement by Defendants that occurred after GTT gave Defendants notice that it infringed the '398 patent. Notice of infringement can be actual or constructive.

Actual notice means that GTT communicated to Defendants a specific charge of infringement of the '398 patent by the Emtrac GPS System. This notice is effective as of the date given. The filing of this lawsuit on September 30, 2010, constitutes actual notice of infringement of the '398 patent, and therefore damages in this case begin at least by September 30, 2010.

Constructive notice means that GTT complied with the marking requirement of the patent law. "Marking" means that substantially all of the products, or if reasonable under the circumstances, the packaging of the products, made, offered for sale, or sold under the '398 patent are marked to display the word 'patent' or the abbreviation 'pat.', together with the number of the patent. The purpose of the constructive notice marking requirement is to provide notice to the public that a product is covered by a patent. GTT has the burden of establishing substantial compliance with the marking requirement. To do so, GTT must show by a greater weight of the evidence that substantially all of the products, or if reasonable under the circumstances, the packaging of the products, it made, offered for sale, or sold under the '398 patent were marked.

Your job is to calculate damages from the date Defendants received either actual or constructive notice, whichever was first. You should not award damages for any infringement by Defendants occurring before it first received actual or constructive notice.

46

**A147**

JURY INSTRUCTION NO. 36

I will first instruct you about lost profits damages. Simply stated, lost profit damages are the profits GTT lost because of the infringement. They are not the profits Defendants made.

GTT says that it lost profits because Defendants' infringement took away sales that GTT would have made. This is called lost profits due to lost sales. To prove that it lost sales, GTT must prove by a greater weight of the evidence that GTT would have made additional sales if Defendants had not sold an infringing product. GTT must also prove by a greater weight of the evidence the amount of profit that GTT would have made on those lost sales.

There is not a set formula or exclusive way of proving lost profits due to lost sales. Rather, in the end, GTT must establish causation between its lost profits and the infringement or, in other words, a reasonable probability that, but for the infringement, it would have made the sales that were made by Defendants.

One factor to consider in deciding if GTT has proven that Defendants' infringement caused GTT to lose profits is whether GTT and Defendants competed in a two-supplier market for GPS traffic preemption products. If you find that GTT has proven by a greater weight of the evidence that GTT and Defendants competed in a two-supplier market for GPS traffic preemption products, then it is reasonable to infer that GTT would have made the sales made by Defendants.

You should also consider whether GTT has proven the following factors by a greater weight of the evidence:

(1)     that there was a demand for the patented product;

(2)     that GTT had the manufacturing and marketing capacity to make the sales that

47

**A148**

GTT says that it would have made if Defendants had not infringed;

(3)     that there were no acceptable non-infringing substitute products or, if there were, that GTT would have made a portion of Defendants' sales despite the availability of acceptable non-infringing substitutes; and,

(4)     the amount of profit that GTT would have made but for Defendants' sales.

I will now give you more detailed instructions on each of these factors.

JURY INSTRUCTION NO. 37

Demand for the patented product can be proven by significant sales of a patent holder's patented product or significant sales of an infringing product containing the patented features.

49

**A150**

JURY INSTRUCTION NO. 38

To be an "acceptable, non-infringing substitute," a product must have the advantages of the patented invention that were important to people who purchased an alleged infringer's product. If purchasers of an alleged infringer's product were motivated to buy that product because of features available only from that product and a patent holder's patented product, then some other, alternative product is not an acceptable substitute, even if it otherwise competed with a patent holder's and an alleged infringer's products. On the other hand, if the realities of the marketplace are that competitors other than the patentee would likely have captured the sales made by the infringer, despite a difference in the products, then the patentee is not entitled to lost profits on those sales.

In considering this factor, GTT need not negate every possibility that purchasers of Defendants' products might have bought a product other than GTT's product or might have foregone the purchase altogether. And the mere existence of a competing device does not make that device an acceptable substitute. However, GTT is not entitled to damages that are remote and speculative.

JURY INSTRUCTION NO. 39

An alternative product may be considered "available" as a potential substitute even if the product was not actually on sale during the infringement period. Factors suggesting the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available at the time of infringement. Factors suggesting the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether an alleged infringer had to design or invent around the patented technology to develop an alleged substitute.

JURY INSTRUCTION NO. 40

A patent holder is only entitled to lost profits for sales it could have actually made. In other words, GTT must show that it had the manufacturing and marketing capability to make the sales it said it lost. This means GTT must prove it is more probable than not that it could have made and sold, or could have had someone else make or sell for it, the additional products it says it could have sold but for the infringement.

52

**A153**

JURY INSTRUCTION NO. 41

A patent holder may calculate its lost profits on lost sales by computing the lost revenue for sales it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs. Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from a patent holder's lost revenue.

JURY INSTRUCTION NO. 42

If a patent holder establishes it would have made some, but not all, of an alleged infringer's sales but for the infringement, the amount of sales that the patent holder lost may be shown by proving the patent holder's share of the relevant market, excluding infringing products. A patent holder may be awarded a share of profits equal to its market share even if there were noninfringing substitutes available. In determining a patent holder's market share, the market must be established first, which requires determining which products are in that market. Products are considered in the same market if they are considered "sufficiently similar" to compete against each other. Two products are sufficiently similar if one does not have a significantly higher price than, or possess characteristics significantly different from, the other.

54

**A155**

JURY INSTRUCTION NO. 43

GTT can recover additional damages if it can establish that it is more likely than not that, if there had been no infringement, GTT would have been able to charge higher prices for some of its products. If this fact is established, you may award as additional damages the difference between:

(A)     the amount of profits GTT would have made by selling its product at the higher price, and

(B)     the amount of profits GTT actually made by selling its product at the lower price GTT actually charged for its product.

This type of damage is referred to as price-erosion damage.

If you find that GTT suffered price erosion, you may also use the higher price in determining GTT's lost profits from sales that were lost because of the infringement. In calculating GTT's total losses from price erosion, you must take into account any drop in sales that would have resulted from charging a higher price.

You may also award as damages the amount of any increase in GTT's costs, such as additional marketing costs, caused by competition from the infringing product.

55

**A156**

JURY INSTRUCTION NO. 44

If you find that GTT has established infringement, GTT is entitled to at least a reasonable royalty to compensate it for that infringement. If you find that GTT has not proved its claim for lost profits, or has proved its claim for lost profits for only a portion of the infringing sales, then you must award GTT a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

JURY INSTRUCTION NO. 45

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed and the patent holder and infringer were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation. Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

57

**A158**

JURY INSTRUCTION NO. 46

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

(1)     The royalties received by GTT for the licensing of the '398 patent, proving or tending to prove an established royalty.

(2)     The rates paid for the use of other patents comparable to the '398 patent.

(3)     The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

(4)     GTT's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

(5)     The commercial relationship between GTT and Defendants, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(6)     The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to GTT as a generator of sales of its nonpatented items, and the extent of such derivative or convoyed sales.

(7)     The duration of the patent and the term of the license.

(8)     The established profitability of the product made under the patents, its commercial success, and its current popularity.

58

**A159**

(9)     The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

(10)    The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by GTT, and the benefits to those who have used the invention.

(11)    The extent to which Defendants have made use of the invention and any evidence probative of the value of that use.

(12)    The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

(13)    The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by Defendants.

(14)    The opinion and testimony of qualified experts.

(15)    The amount that a licensor (such as GTT) and a licensee (such as Defendants) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty Defendants would have been willing to pay and GTT would have been willing to accept, acting as normally prudent business people. The final factor establishes the framework which you should use in determining a reasonable royalty, that is, the payment that would have resulted from a negotiation between GTT and Defendants taking place at a time prior to when the infringement began.

JURY INSTRUCTION NO. 47

The fact that I have instructed you as to the proper measure of damages should not be considered as intimating any view of mine as to which party is entitled to your verdict in this case.  Instructions as to the measure of damages are given for your guidance in the event you should find in favor of a party from the greater weight of the evidence in the case in accordance with the other instructions.

JURY INSTRUCTION NO. 48

Nothing said in these instructions and nothing in any form of verdict prepared for your convenience is meant to suggest or convey in any way or manner any suggestion or hint as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

JURY INSTRUCTION NO. 49

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. You must each decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

JURY INSTRUCTION NO. 50

Upon retiring to the jury room, you will select one of your number to act as your presiding juror. The presiding juror will preside over your deliberations and will be your spokesperson here in Court. A Special Verdict Form has been prepared for your convenience. You will take this form to the jury room.

(SPECIAL VERDICT FORM READ)

You will note that some of the interrogatories or questions call for a "Yes" or "No" answer. The answer to each question must be the unanimous answer of the jury. Your presiding juror will write the unanimous answer of the jury in the space provided opposite each question. You will note that certain questions do not require a "Yes" or "No" answer, but require you to fill in a dollar amount. As with all other questions, your answer to these questions must be the unanimous answer of the jury.

Your verdict must be based solely on the evidence and on the law which I have given to you in my instructions. Nothing I have said or done is intended to suggest what your verdict should be -- that is entirely for you to decide. You must not permit sympathy, prejudice, or emotion to influence your verdict.

After the jury has answered each of the questions asked, the presiding juror will date and sign the special verdict as so completed, and the jury will then return with it to the courtroom.

**A165**

JURY INSTRUCTION NO. 51

If it becomes necessary during your deliberations to communicate with the Court, you may send a note by a court security officer, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing, and the Court will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing, or orally here in open Court.

You will note from the oath about to be taken by the court security officers that they too, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person - not even to the Court - how the jury stands, numerically or otherwise, on the questions before you, until after you have reached a unanimous verdict.

65

**A166**

JURY INSTRUCTION NO. 52

Your duty is to both the Plaintiff and the Defendants.  They each have a right to expect that you will see that justice is done.  Your responsibility should be borne courageously and without fear or favor.  It is not an arbitrary power, but one that must be exercised with fairness, sincere judgment and sound discretion.

The final test of the quality of your service will lie in the verdict you return to the Court, not in the opinions any of you hold as you retire from the case.  Remember, you are not partisans nor advocates but triers of fact.

**A167**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Global Traffic Technologies,

        Plaintiff,

                                     **SPECIAL VERDICT FORM**

v.                                    Civil No. 10-4110  ADM/JJG

KM Enterprises, Inc., Rodney K.
Morgan, and STC, Inc.,

        Defendants.

---

### SPECIAL VERDICT FORM

We, the jury in the above-entitled action, make these answers to the following questions:

## I.    INFRINGEMENT

A. Has GTT proven by a greater weight of the evidence that **KM Enterprises, Inc.** has directly or indirectly infringed any of the Asserted Claims of the '398 patent? (A "YES" answer to this question is a finding for GTT. A "NO" answer is a finding for Defendants.)

           Claim 1: Yes ✓ No ____

           Claim 3: Yes ✓ No ____

           Claim 8: Yes ✓ No ____

           Claim 10: Yes ✓ No ____

           Claim 16: Yes ✓ No ____

           Claim 17: Yes ✓ No ____


SCANNED
SEP 2 4 2013
U.S. DISTRICT COURT MPLS

**A168**

B. Has GTT proven by a greater weight of the evidence that **Rodney "Kris" Morgan** has directly or indirectly infringed any of the Asserted Claims of the '398 patent? (A "YES" answer to this question is a finding for GTT. A "NO" answer is a finding for Defendants.)

Claim 1: Yes ✓ No ___

Claim 3: Yes ✓ No ___

Claim 8: Yes ✓ No ___

Claim 10: Yes ✓ No ___

Claim 16: Yes ✓ No ___

Claim 17: Yes ✓ No ___

C. Has GTT proven by a greater weight of the evidence that **STC, Inc.** has directly or indirectly infringed any of the Asserted Claims of the '398 patent? (A "YES" answer to this question is a finding for GTT. A "NO" answer is a finding for Defendants.)

Claim 1: Yes ✓ No ___

Claim 3: Yes ✓ No ___

Claim 8: Yes ✓ No ___

Claim 10: Yes ✓ No ___

Claim 16: Yes ✓ No ___

Claim 17: Yes ✓ No ___

*Please continue to Section II.*

**A169**

## II.   VALIDITY

A. Have Defendants proven by clear and convincing evidence that any of the Asserted Claims of the '398 patent are "obvious"? (A "YES" answer to this question is a finding for Defendants. A "NO" answer is a finding for GTT.)

Claim 1: Yes ___ No ✓

Claim 3: Yes ___ No ✓

Claim 8: Yes ___ No ✓

Claim 10: Yes ___ No ✓

Claim 16: Yes ___ No ✓

Claim 17: Yes ___ No ✓

B. Have Defendants proven by clear and convincing evidence that any of the Asserted Claims of the '398 patent are "anticipated"? (A "YES" answer to this question is a finding for Defendants. A "NO" answer is a finding for GTT.)

Claim 1: Yes ___ No ✓

Claim 3: Yes ___ No ✓

Claim 8: Yes ___ No ✓

Claim 10: Yes ___ No ✓

Claim 16: Yes ___ No ✓

Claim 17: Yes ___ No ✓

*If you have found that any claim is both infringed (by answering "Yes" to any of the questions in Section I) and that the same claim is not invalid (by answering "No" to the question relating to that claim in Section II), then please complete Section III.*

**A170**

### III.   DAMAGES

If you have found one or more claims of the '398 Patent to be infringed by one or more of the Defendants and that claim is not invalid, what damages do you find GTT has proven by a greater weight of the evidence (i.e., more probable than not) that it is entitled to recover because of Defendants' sale of infringing products?

$ _5,052,118_

*If you have found that any claim is both infringed (by answering "Yes" to any of the questions in Section I) and that the same claim is not invalid (by answering "No" to the question relating to that claim in Section II), then please complete Section IV.*

### IV.   WILLFULNESS

Has GTT proven by clear and convincing evidence that any of the Defendants willfully infringed any of the Asserted Claims of the '398 patent? (A "YES" answer to this question is a finding for GTT. A "NO" answer is a finding for the individual Defendant.)

KM Enterprises, Inc.: Yes ✓ No ___

Rodney "Kris" Morgan: Yes ✓ No ___

STC, Inc.: Yes ✓ No ___

Dated: Sept. 20, 2013

Case No. 10-cv-4110

P# 1

D 7426852

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office

July 05, 2013

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,539,398*
ISSUE DATE: *July 23, 1996*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. Tarver

M. TARVER
Certifying Officer

PTX 1-0001

US005539398A

# United States Patent [19]

## Hall et al.

[11] **Patent Number:** 5,539,398

[45] **Date of Patent:** Jul. 23, 1996

[54] **GPS-BASED TRAFFIC CONTROL PREEMPTION SYSTEM**

[75] Inventors: **Timothy J. Hall**, North St. Paul, Minn.; **Mark A. Schwartz**, River Falls, Wis.; **Steven M. Hamer**, Willernie, Minn.

[73] Assignee: **Minnesota Mining and Manufacturing Company**, St. Paul, Minn.

[21] Appl. No.: **515,933**

[22] Filed: **Aug. 16, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 178,881, Jan. 7, 1994, abandoned.

[51] **Int. Cl.⁶** ............................. **G08G 1/095**; G06F 7/70
[52] **U.S. Cl.** .......................... **340/907**; 340/906; 340/988; 340/990; 340/995; 364/436; 364/424.01
[58] **Field of Search** ...................................... 340/907, 906, 340/988, 989, 990–993, 995, 424.01, 424.02; 364/449, 450, 436, 437, 443

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,355,607 | 3/1940 | Shepherd | 177/337 |
| 3,831,039 | 8/1974 | Henschel | 307/234 |
| 3,886,515 | 5/1975 | Cottin et al. | 340/994 |
| 4,162,477 | 7/1979 | Munkberg | 340/32 |
| 4,230,992 | 10/1980 | Munkberg | 328/140 |
| 4,443,783, | 4/1984 | Mitchell | 340/32 |
| 4,573,049 | 2/1986 | Obeck | 340/924 |
| 4,701,760 | 10/1987 | Raoux | 340/993 |
| 4,713,661 | 12/1987 | Boone et al. | 340/994 |
| 4,734,863 | 3/1988 | Honey et al. | 364/449 |
| 4,734,881 | 3/1988 | Klein et al. | 364/900 |
| 4,791,571 | 12/1988 | Takahashi et al. | 364/436 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0574009A2 | 12/1993 | European Pat. Off. . |
| 2670002 | 6/1992 | France . |
| 2693820 | 1/1994 | France . |

### OTHER PUBLICATIONS

Ivan A. Getting, "The Global Positioning System", *IEEE Spectrum*, Dec. 1993, pp. 36–47.
Megadyne Information Systems, Software Product Briefs, Jan. 1987.
Megadyne Information Systems, V–TRAX Automated Vehicle Monitoring Information System, Jan. 1988, pp. 1–7.
METS, Inc., Automatic Vehicle Location Vehicle Management System Brochure Jan. 1994.
Differential Corrections Inc. (DCI), Differential Correction Services Product Brochures Jan. 1994.
Motorola, Automatic Vehicle Location System Brochure, Jan. 1985.
Motorola, Automatic Vehicle Locatin System Brochure, Jan. 1986.
Morrow, Inc., Vehical Tracking Brochure, Jan. 1987.
Etak Emergency Response System Brochure Jan. 1994.
ETAK, Inc. Product Brochures, Jan. 1986.
ACCQPOINT, Low–Cost Nationwide Real–Time Differential GPS Product Brochure, Jan. 1993.

*Primary Examiner*—Donnie L. Crosland
*Attorney, Agent, or Firm*—Gary L. Griswold; Walter N. Kim; Kari H. Bartingale

[57] **ABSTRACT**

A traffic control preemption system uses data received from a global positioning system (GPS) to determine whether a vehicle issuing a preemption request is within an allowed approach of an intersection. GPS signals are received and processed by the vehicle module to generate vehicle data, including the vehicle's position, heading and velocity. The vehicle data is transmitted via radio transmission or some other medium. Each intersection has an associated intersection module which, if within range of the vehicle's transmitting equipment, compares the received vehicle data with a preprogrammed map of allowed approaches to the intersection. If the vehicle data sufficiently matches the map of allowed approaches, the vehicle's preemption request is forwarded to the intersection controller to appropriately control the phase of the traffic signal at the intersection.

**19 Claims, 9 Drawing Sheets**



**5,539,398**
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,799,162 | 1/1989 | Shinkawa et al. | 364/436 |
| 4,914,434 | 4/1990 | Morgan et al. | 340/906 |
| 4,963,889 | 10/1990 | Hatch | 342/357 |
| 5,043,736 | 8/1991 | Darnell et al. | 342/357 |
| 5,068,656 | 11/1991 | Sutherland | 340/988 |
| 5,072,227 | 12/1991 | Hatch | 342/357 |
| 5,119,102 | 6/1992 | Barnard | 342/357 |
| 5,172,113 | 12/1992 | Hamer | 340/907 |
| 5,177,489 | 1/1993 | Hatch | 342/357 |
| 5,214,757 | 5/1993 | Mauney et al. | 340/990 |
| 5,334,974 | 8/1994 | Simms et al. | 340/990 |
| 5,345,232 | 9/1994 | Robertson | 340/995 |
| 3,550,0778 | 3/1967 | Long | 340/32 |

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A174

PTX 1-0003



*FIG.1*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0004



*FIG.2*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A176

PTX 1-0005



*FIG.3*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A177



*FIG.4*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0007



*FIG.5*

PTX 1-0008



*FIG.6*



*FIG.7*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0010



*FIG.8*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0011



*FIG.9*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A183

5,539,398

1

## GPS-BASED TRAFFIC CONTROL PREEMPTION SYSTEM

This is a continuation of application Ser. No. 08/178,881 filed Jan. 7, 1994, now abandoned.

### FIELD OF THE INVENTION

This invention relates to a traffic preemption system and, more particularly, to a preemption system that receives data from a global positioning system (GPS) to track the approach of a vehicle requesting preemption of a traffic signal.

### BACKGROUND

Traffic signals have long been used to regulate the flow of traffic. Generally, traffic signals have relied on timers or vehicle sensors to determine when to change the phase of traffic signal lights, thereby signaling alternating directions of traffic to stop, and others to proceed.

Emergency vehicles, such as police cars, fire trucks and ambulances, are generally permitted to cross an intersection against a traffic signal. Emergency vehicles have typically depended on horns, sirens and flashing lights to alert other drivers approaching the intersection that an emergency vehicle intends to cross the intersection. However, due to hearing impairment, road noise, air conditioning, audio systems and other distractions, a driver of a vehicle approaching an intersection will often not be aware of the warning signal being emitted by an approaching emergency vehicle, thus resulting in a dangerous situation.

This problem was addressed in the commonly assigned U.S. Pat. No. 3,550,078 to Long, which is incorporated herein by reference. The Long patent discloses that as an emergency vehicle approaches an intersection, the emergency vehicle emits a preemption request comprised of a stream of light pulses occurring at a predetermined repetition rate. A photocell, which is part of a detector channel, receives the stream of light pulses emitted by the approaching emergency vehicle. An output of the detector channel is processed by a phase selector, which then issues a phase request to a traffic signal controller to change or hold green the traffic signal light that controls the emergency vehicle's approach to the intersection.

While the system disclosed by Long proved to be a commercial success, it became apparent that the system did not have adequate signal discrimination. In addition, the length of time during which the pulse request signal remained active after the termination of light pulses was not uniform and sometimes too short to allow safe transit of the emergency vehicle.

Commonly assigned U.S. Pat. No. 3,831,039 (Henschel), which is incorporated herein by reference, improves on the system disclosed in the Long patent by improved selectivity of low repetition rate light sources of gas discharge lamps, such as fluorescent lights, neon signs, and mercury vapor lights. Further, Henschel improves the discrimination between a series of equally spaced light pulses and a series of irregularly spaced light pulses such as lightning flashes.

In the system disclosed by Henschel, the stream of light pulses must have proper pulse separation and continue for a predetermined period of time. Also, once a preemption call is issued to the traffic signal controller, the preemption call must remain active for at least a predetermined time period. The discrimination circuit disclosed by Henschel provides

2

an improvement over the discrimination circuit disclosed by Long and results in improved discrimination.

Although such systems contemplated that preemption systems would be used for emergency vehicles, it was desirable to use them with non-emergency vehicles such as buses and maintenance vehicles. It thus became necessary to differentiate between different types of emergency and non-emergency vehicles. The commonly assigned U.S. Pat. Nos. 4,162,477 (Munkberg) and 4,230,992 (Munkberg), which are incorporated herein by reference, disclose an optical traffic preemption system wherein different vehicles transmit preemption requests having different priority levels, and in which the signal controller can discriminate between requests of differing priority and give precedence to the higher priority signal. The optical emitter disclosed by Munkberg transmits light pulses at a variety of selected predetermined repetition rates, with the selected repetition rate indicative of a priority level.

Commonly assigned U.S. Pat. No. 4,734,881 (Klein and Oran) which is incorporated herein by reference, provides for performance of the optical preemption functions with logic based circuitry replacing a large number of discrete and dedicated circuits. The microprocessor circuitry utilizes a windowing algorithm to validate that pulses of light were transmitted from a valid optical traffic preemption system emitter.

Commonly assigned U.S. Pat. No. 5,172,113 (Hamer) which is incorporated herein by reference, discloses a method of optically transmitting data from an optical emitter to a detector mounted along a traffic route used specifically to receive data or to an optical traffic preemption system located at an intersection. Hamer allows variable data to be transmitted in a stream of light pulses by interleaving data pulses between priority pulses. For example, an emergency vehicle can transmit data in a stream of light pulses from an optical emitter that can include an identification code that uniquely identifies the emitter, an offset code that causes a phase selector to create a traffic signal timing core offset, and an operation code that causes traffic signal lights to assume at least one phase. Further, an emitter can transmit setup information, for example a range setting code that causes a phase selector to set a threshold to which future optical transmissions will be compared. Phase selectors constructed in accordance with the Hamer disclosure are provided with a discrimination algorithm which is able to track a plurality of optical transmissions with each detector channel. Optical emitters as disclosed by Hamer are provided with a coincidence avoidance mechanism which causes overlapping optical transmission from separate optical emitters to drift apart. Hamer discloses an optical signal format that allows variable data to be transmitted, while maintaining compatibility with existing optical traffic preemption systems.

One problem with all of the above described optical systems is that they require a line-of-sight to the signal controller at the intersection due to the optical nature of the preemption signal. Thus, while they may work acceptably for road systems which follow a rectangular grid pattern, they suffer several disadvantages. For example, where approaches to an intersection are blocked from line-of-sight or follow an irregular, curved or abruptly angled pattern, optically-based systems are not effective because they require a line of sight to the receiver.

Radio based, as opposed to optically based systems, for traffic control preemption have also been developed. For example, U.S. Pat. No. 2,355,607 (Shepherd) describes

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

**A184**

5,539,398

3

radio communications systems for vehicular traffic control
wherein a directional transmission and/or reception located
at the intersection, or on the vehicle, provides traffic light
control based on coded signals transmitted from emergency
vehicles. However, the inherent lack of directional precision
of the radio system causes numerous traffic lights positioned
parallel to the direction of travel to be affected. This is a
major disadvantage because such prior art radio transmitter
systems may erroneously pre-empt signal lights which are
not on the approach route of an on-coming vehicle demand-
ing preemption.

Radio transmitter systems also suffer from range inaccu-
racies which may be caused by signal attenuation or reflec-
tion. For example, a building may block, reflect, or attenuate
a radio frequency which is not a line-of-sight signal. Since
radio transmitter systems typically use signal strength to
estimate range, signal attenuation gives rise to inaccurate
range estimates at the receiving intersection electronics.
Adverse weather, such as precipitation or fog, may also
adversely affect the range sensitivity of existing radio trans-
mitter dependent systems.

Efforts to reinforce radio systems with additional control
functions are disclosed in U.S. Pat. No. 4,443,783 (Mitchell)
wherein a directional transmitter is located in the approach-
ing vehicle with omnidirectional receivers at intersections
and multiple frequencies, selected frequency combinations,
and selected red and amber light combinations provide
accommodation for inaccuracies. U.S. Pat. No. 4,573,049
(Orbeck) discloses two way communication of information
on intersection preemption request and action.

A major drawback of radio transmitters is that while they
do not require a line-of-sight approach, their inherent lack of
directionality means that they may erroneously control a
signal light which is not on the vehicle's route but which is
proximate the route.

There is therefor a need for a traffic preemption system for
locations where approaches to an intersection are not line-
of-sight or where road systems do not follow a rectangular
grid pattern. Such a system would desirably offer the fol-
lowing advantages: (1) discretion without the need for a
strobe as used in optical systems; (2) immunity from
weather effects on system range; and (3) capability for easy
implementation in applications with curving or abruptly
angled approaches.

SUMMARY

The present preemption system provides a traffic control
preemption system using data received from a global posi-
tioning system (GPS). GPS signals are received and pro-
cessed by a GPS receiver and a processor module in the
vehicle to generate navigational vehicle data, such as posi-
tion, heading and velocity. The vehicle data, along with
other data such as vehicle identification codes, priority codes
or a preemption request, are transmitted via radio waves or
some other medium. Each intersection is equipped with an
intersection module adapted to receive and process the
vehicle data. Each intersection module contains a prepro-
grammed map of allowed approaches to the intersection.
Each intersection module within range of a vehicles trans-
mitting equipment compares the received vehicle data with
the map of allowed approaches. If the vehicle data suffi-
ciently matches the map of allowed approaches to a par-
ticular intersection, the intersection module forwards the
vehicle's preemption request to the intersection controller.

The present preemption system also preferably includes
speed and heading sensors which provide vehicle data in

4

areas of GPS signal obstruction or multipath. The system
also provides multiple priority levels for different types of
vehicles requesting preemption. In addition to traffic signal
preemption, the system may also be used to provide for
automatic vehicle location information for scheduling or
traffic flow control purposes.

BRIEF DESCRIPTION OF THE DRAWINGS

The various objects, features, and advantages of the
present preemption system will become apparent upon read-
ing and understanding the following detailed description and
accompanying drawings in which:

FIG. 1 shows a system level block diagram of a first
embodiment of the present traffic control preemption sys-
tem;

FIG. 2 shows a system level block diagram of an alternate
embodiment of the present traffic control preemption sys-
tem;

FIG. 3 shows a system level block diagram of an addi-
tional alternate preferred embodiment;

FIG. 4 shows a schematic roadway diagram illustrating
operation of the traffic control preemption systems of FIGS.
1 and 2;

FIG. 5 shows a schematic roadway diagram illustrating
operation of the traffic control preemption system of FIG. 3;

FIG. 6 shows a schematic roadway illustrating operation
of the present preemption system in a GPS obstruction or
multipath zone;

FIG. 7 shows the control flow of absolute position map-
ping of the preemption system of FIGS. 1 and 2;

FIG. 8 shows the control flow for relative position map-
ping of the preemption system of FIG. 3; and

FIG. 9 shows the control flow for tracking of vehicle
position to determine whether a vehicle is in the allowed
preemption corridor.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

FIG. 1 shows a system level block diagram of a preferred
embodiment of the present GPS-based traffic control pre-
emption system. The present preemption system utilizes
information received from a global positioning system
(GPS) 5 to determine whether a particular vehicle is within
an allowed approach of an intersection. The GPS 5 is well
known and has many defense and civillian uses. The GPS 5
is a space-based radio navigation system maintained by the
U.S. Department of Defense, and consists of a constellation
of 18 or more orbiting satellites. From these satellites, any
user equipped with appropriate GPS receivers can determine
their position anywhere in the world to within ±100 meters.
Error purposely induced into the system by the U.S. Depart-
ment of Defense limits the accuracy of the GPS for civillian
use to ±100 meters. This GPS induced error varies over time.
More detail regarding the GPS can be found in the article,
"The Global Positioning System", by Ivan A. Getting, IEEE
Spectrum, pp. 36–37, December 1993.

The preemption system of FIG. 1 also comprises a vehicle
module 100 and an intersection module 200. The GPS signal
10 is received by GPS receiver antenna 20 and transmitted
to GPS receiver 40, which is available from Rockwell
International Corporation, Richardson, Tex., as Rockwell
Corporation Model NAVCORE V™. The GPS receiver 40
processes the GPS signal 10 to determine various naviga-

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

**A185**

PTX 1-0014

5

tional data regarding the vehicle, such as the vehicle's position, heading and velocity.

The vehicle position can be measured and processed by the present vehicle module **100** and intersection module **200** by any one of many known navigational coordinate systems. For example, the World Geodetic System (WGS-84) measures position in terms of latitude and longitude. The Earth-Centered, Earth-Fixed (ECEF) system is a spherical coordinate system with its origin at the center of the earth. It shall be understood that position may be measured in these or any other coordinate systems without departing from the scope of the present invention.

In addition to the navigational data regarding the vehicle such as position and heading, the GPS receiver **40** also generates information regarding which set of GPS satellites were used to determine the navigational data. Other data regarding the vehicle, such as priority codes, mode commands, identification codes and traffic control preemption request may also be generated as appropriate by processor **60**.

All of the data generated by GPS receiver **40** and by processor **60** (hereinafter referred to collectively as "vehicle data") is then transmitted via transmitter **80** and antenna **101** to the intersection module **200**. Intersection module **200** includes a data receiving antenna **210** which receives the vehicle data from the vehicle transmitting antenna **101**. The vehicle data is then transmitted to a data receiver **230**, which converts the radio frequency signal to digital form and outputs the vehicle data to a processor **250**. The receiver antenna **210**, receiver **230**, transmitter antenna **201** and transmitter **80** are available as Modpak Plus Wireless Modem™, available from Curry Controls Company, Lakeland, Fla.

Each intersection includes an intersection controller **320**, which controls the phase of traffic signals at the intersection, allowing alternating directions of traffic to proceed or stop. Such intersection controllers are well-known in the art. Each intersection controller thus controls the traffic signal for all possible approaches to a particular intersection. At a 4-way intersection, vehicles may approach from the north, south, east or west, for example. However, in a radio-based system, preemption requests from all of the allowed approaches, and even those on approaches belonging to different intersections (within range of the receiver antenna **210**), are received by the intersection controller. The present preemption system therefor determines whether a vehicle is within one of the allowed approaches to that intersection. In order to properly control the phase of the traffic signal, the intersection module also determines which allowed approach the vehicle is on. This ensures that the intersection controller correctly adjusts the phase of the traffic signals to allow the vehicle to travel in the desired manner and direction through the intersection.

The intersection module **200** tracks the path of a vehicle requesting preemption to determine whether it is within any of the allowed approaches for that intersection. A preprogrammed map of allowed approaches to the intersection is stored in map memory **260**. The map is programmed into the intersection module **200** while the module **200** is in "mapping" mode, as is described in more detail below with respect to FIG. 7. To track the vehicle, the vehicle module generates and transmits vehicle data as it travels toward the intersection. Processor **250** compares the received vehicle data with the map of allowed approaches stored in map memory **260**. If the vehicle data sufficiently matches one of the allowed approaches, processor **250** determines which

6

phase of the traffic signal is desired and forwards the corresponding preemption request to intersection controller **320**.

Now referring to FIG. 2, an alternate preferred embodiment of the present GPS-based traffic control preemption system is shown. This embodiment employs differential GPS to reduce the effects of the error induced in the GPS signal and improve the accuracy of the present preemption system. For example, the use of differential GPS allows vehicle position to be determined within ±10 meters as opposed to ±100 meters in the system of FIG. 1. The vehicle module **100** of FIG. 2 includes a differential GPS receiver **50** and differential antenna **25**. Base station **15** determines the induced error of GPS signal **10**, and periodically transmits appropriate correction terms for each visible GPS satellite to the vehicle module via differential antenna **25**. To do this, base station **15** is positioned at a surveyed location. Base station **15**, as well as GPS antenna **20** in the vehicle module **100**, receives the GPS signal **10** and calculates its position therefrom. However, because base station **15** is positioned at a known location, it compares its known position to the position determined from GPS signal **10** to determine the induced error for each visible satellite in the GPS **5**. Based on known variation rates of past GPS induced error, base station **15** preferably transmits updates of the induced error for each satellite to the vehicle module at least once every 10 seconds. Differential GPS receiver **50** then applies the correction terms to the vehicle data determined from GPS signals **10** to arrive at corrected, and thus more accurate, set of vehicle data. Base station **15** and differential GPS receiver **50** are available from Trimble Navigation, Sunnyvale, Calif. Differential GPS corrections are also available via FM subcarrier broadcast service from Differential Corrections, Inc., Cupertino, Calif.

In the preemption system of FIG. 2, in addition to receiving vehicle data such as heading, position and velocity from the GPS **5**, vehicle data is also provided by a speed sensor **130** and a heading sensor **110**, such as an electronic/magnetic compass or gyroscope. These sensors are used to provide vehicle data such as velocity and heading in the event that GPS signals should for some reason become unavailable, as described below with respect to FIG. 6. The information provided by these sensors also result in a more robust system as a check on the GPS generated vehicle data.

FIG. 3 shows a system level block diagram of another alternate preferred embodiment of the present preemption system. This system employs a pseudo-differential technique to reduce the effects of the GPS induced error. Instead of a separate base station such as shown in FIG. 2, intersection module **200** is positioned at a known location and includes a GPS antenna **220** and GPS receiver **240**. The vehicle data transmitted by the vehicle includes data regarding the set of GPS satellites used by the vehicle module **100** to generate the vehicle data. In this way, both vehicle GPS receiver **40** and intersection GPS receiver **240** are tuned to receive navigational data from the same set of satellites, such that the induced GPS error is common to the computed locations for the vehicle and the intersection. When the relative distance between the vehicle location and the intersection location is computed, the actual distance between the vehicle and the intersection is obtained and the common induced error is removed. Thus, the pseudo-differential preemption system of FIG. 3 has the advantage of improved accuracy. Although not shown, it shall be understood that the pseudo-differential of FIG. 3 could also include speed and heading sensors such as those shown in FIG. 2.

FIG. 4 shows the operation (not to scale) of the preemption systems of FIG. 1 and FIG. 2. A vehicle follows

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0015

5,539,398

7

roadway 460 toward intersection 490 along approach path 440. Intersection 490 has an associated intersection module (not shown). At periodic intervals 400 along approach path 440, the vehicle transmits vehicle data to an intersection module 200 located at intersection 490. For the first preferred embodiment of FIG. 1, the position component of the vehicle data is determined within an error radius 410 due to the GPS induced error. In addition, the GPS induced error encountered during mapping of the allowed approach adds an additional error of ±100 meters. Thus, the total allowed approach corridor for the embodiment of FIG. 1 is represented by dashed line 480, or ±200 meters.

For the alternate preferred embodiment of FIG. 2, use of differential GPS reduces the vehicle position error radius to radius 420 (±10 meters). Including the differential error encountered during mapping of the allowed approaches, the dimensions of the resulting allowed approach corridor 430 are thus reduced to ±20 meters, and thus more closely approximates the width of roadway 460.

Now referring to FIG. 5, the operation of the alternate preferred embodiment of FIG. 3 using pseudo-differential GPS is shown. The vehicle 502 is shown approaching an intersection 506, which includes the intersection module 200 of FIG. 3. At periodic intervals 507 along roadway 508, the vehicle module transmits vehicle data to the intersection module. For purposes of illustration, the vehicle is shown at only one point on roadway 508. The position component of the vehicle data has an error radius 504. Because both the vehicle module and intersection module are tuned to the same set of satellites, the GPS induced error is common to both the vehicle location and the intersection location. Thus the absolute distance between the vehicle and the intersection, represented by vector $D_1$ can be determined by subtracting the computed locations. If the computed vehicle location vectors match the preprogrammed map of allowed approaches, the vehicle is determined to be within the allowed preemption corridor.

For the embodiment of FIG. 3, use of pseudo-differential GPS reduces the vehicle position error radius to ±20 meters. Including the pseudo-differential error encountered during mapping of the allowed approaches, the dimensions of the resulting allowed approach corridor 505 is reduced to ±40 meters.

Now referring to FIG. 6, operation of the preemption system of FIG. 2 during obstruction of the GPS signal is shown. The GPS signal 10 as shown in FIGS. 1, 2 and 3 can be obstructed by tall buildings or other structures. When obstructed, an alternate navigation system is required. The vehicle 516 is shown in a first position 512a and a first velocity indicated by the magnitude of vector 520a and a first direction as indicated by the arrow of vector 520a. The vehicle 516 includes a speed sensor 130 and heading sensor 110 (both shown in FIG. 2) which are used to provide redundant data regarding the vehicle's velocity and heading. At position 512b, vehicle 516 is about to enter a GPS obstruction zone 526, a region where, for whatever reason, GPS signals are not available. The information from speed and heading sensors is used in the GPS obstruction zone for dead reckoning of the vehicle's position. Using well-known dead reckoning techniques, the vehicle position at location 512c can be determined knowing the vehicle's last known position 512b, last known velocity indicated by vector 520b and the current velocity and heading as determined by speed and heading sensors 130 and 110, and indicated by vector 520c. The vehicle data thus determined is then transmitted in the normal way to intersection module 200 to determine whether the vehicle is within an allowed approach for that intersection.

8

FIG. 7 shows the control flow for programming the map of allowed approaches using the preemption system of FIGS. 1 or 2. This procedure is referred to as absolute position mapping. To perform this procedure, a vehicle including a vehicle module 100 begins approaching the intersection module to be programmed along a desired approach such as roadway 460 of FIG. 4. At periodic intervals, one second for example, or alternatively periodic interval positions, the vehicle transmits vehicle data, including a map mode command, to the intersection module. This causes the mapping mode control flow of FIG. 7 to begin execution in the intersection module. The vehicle data is received by the intersection module 200, and is stored in mapping memory 260. When the desired approach is completed, an end map mode command is transmitted by the vehicle to indicate that the mapping is complete, ending the mapping mode control flow of FIG. 7.

FIG. 8 shows the procedure for programming the map of allowed approaches for the preemption system of FIG. 3. This procedure employs pseudo-differential, or relative position mapping, in which the vehicle's data is determined relative to the data for the intersection. In this mapping mode, a vehicle approaching an intersection periodically transmits vehicle data, including a map mode command and data regarding which GPS satellites were used to determine the vehicle data, to the intersection module. This causes the pseudo differential mapping control flow of FIG. 8 to begin execution in the intersection module. The intersection data is also computed. The vehicle data relative to the intersection data is then determined as described above with respect to FIG. 3. This data is then stored in mapping meory 260. Again, when the mapping of the desired approach is completed, an end map mode command is transmitted to the intersection module to indicate that the mapping is complete.

FIG. 9 shows the control flow for tracking of a vehicle by any one of the intersection modules 200 shown in FIGS. 1, 2 or 3. Tracking is performed by the intersection module to determine whether a vehicle requesting preemption is within an allowed approach of an intersection. Intersection module 200 first receives an initial set Of vehicle data, which is compared to the map of allowed approaches. If the initial vehicle data matches data in the map of allowed approaches to within a defined degree of accuracy, an approach record is initialized, and the vehicle data is stored. If the initial vehicle data does not match any data points in the map, that vehicle is determined to be outside an allowed approach. However, the control flow continues to check subsequently received vehicle data in the event that the vehicle later enters an allowed approach.

Once an initial vehicle data point is found to match data in the map, the next vehicle data are received by the intersection module and compared to the map of allowed approaches. Each vehicle data point is stored as a "miss" or a "match". This process continues until a minimum number of matched vehicle data points are found (the "match threshold"). The match threshold tests that a vehicle is within an allowed approach for a minimum number of received vehicle data points. This ensures that the vehicle is within the allowed approach path for a sufficient length of time to distinguish vehicles that are merely passing through an allowed approach from those that desire to preempt the intersection.

The control flow of FIG. 9 next checks whether the "miss threshold" has been reached. The miss threshold allows for a limited number of non-matching vehicle data points to occur, to avoid a premature determination that a vehicle is

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

**A187**

PTX 1-0016

5,539,398

9

not within an allowed approach. After a defined number of successive non-matches is found (the "miss threshold"), the vehicle is determined to be outside an allowed approach.

A timeout procedure allows for the preemption request to be dropped after a defined length of time has elapsed. Such a feature is desirable, for example, when an emergency vehicle is stopped at an accident scene within an allowed approach, but which failed to disable the present preemption system. When the "miss threshold" is reached or a time out is reached, any outstanding preemption request is dropped, and the control flow returns to the top of FIG. 9 and continues to check subsequent preemption requests.

Although specific embodiments have been illustrated and described herein for purposes description of the preferred embodiments, it will be appreciated by those of ordinary skill in the art that a wide variety of alternate and/or equivalent implementations calculated to achieve the same purposes may be substituted for the specific embodiments shown and described without departing from the scope of the present invention. This application is intended to cover any adaptations or variations of the preferred embodiment discussed herein. Therefore, it is manifestly intended that this invention be limited only by the claims and the equivalents thereof.

We claim:

1. A system for determining whether a vehicle having an associated vehicle path is within an allowed approach of a location, comprising:

navigation means, associated with the vehicle, for generating vehicle data at periodic intervals along the vehicle path, wherein the vehicle data includes vehicle position data;

means for transmitting the vehicle data;

means, associated with the location, for receiving the vehicle data;

mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches;

evaluation means for comparing the vehicle data to the map of allowed approaches to determine whether the vehicle path is within an allowed approach.

2. The system according to claim 1 wherein the mapping means further includes:

means for generating allowed approach data, wherein the allowed approach data is generated at periodic intervals along the allowed approaches;

means for receiving and storing the allowed approach data and creating therefrom the map of allowed approaches.

3. The system of claim 1 wherein the navigation means is adapted to use signals received from a Global Positioning System (GPS).

4. The system of claim 3 further including dead reckoning means on board the vehicle for providing vehicle data when GPS signals are obstructed, the dead reckoning means comprising:

first sensing means for detecting the velocity of the vehicle;

second sensing means for detecting the heading of the vehicle; and

means, connected to receive the velocity and heading of the vehicle, for determining a vehicle position based on the velocity and heading of the vehicle.

5. The system of claim 1 wherein the transmitting means is a radio frequency transmitter.

10

6. The system of claim 1 wherein the transmitting means is an optical frequency transmitter.

7. The system of claim 1 wherein the vehicle data further includes identification codes and priority codes.

8. The system of claim 1 wherein the vehicle data comprises position, heading and velocity data corresponding to the vehicle.

9. The system of claim 1 wherein the navigation means is adapted to use signals received from a Differential Global Positioning System.

10. The system of claim 1 wherein the vehicle data further includes vehicle heading and vehicle velocity data.

11. A traffic control preemption system, comprising:

a vehicle module associated with a vehicle having a corresponding vehicle path, the vehicle module comprising:

means for receiving signals from a Global Positioning System and for generating therefrom vehicle data, wherein the vehicle data is generated at periodic interval positions along the vehicle path; and

means for transmitting the vehicle data; and

an intersection module associated with an intersection and adapted to track the vehicle path, the intersection module comprising:

a programmed map of allowed approaches to the intersection; and

a processor adapted to receive and compare the vehicle data to the programmed map to determine whether the vehicle path is within an allowed approach;

such that if the vehicle is within an allowed approach to the intersection the vehicle is allowed to preempt traffic signals associated with the intersection.

12. The system of claim 11 wherein the vehicle data further includes vehicle heading and vehicle velocity data.

13. The system of claim 11 wherein the intersection module is further adapted to send a preemption request to an intersection controller if the vehicle path is within an allowed approach.

14. The system of claim 11 wherein the transmitting means is a radio frequency transmitter.

15. The system of claim 11 wherein the transmitting means is an optical frequency transmitter.

16. A traffic control preemption method which uses data received from a global positioning system (GPS) to determine whether a vehicle, having an associated vehicle path, is allowed to preempt traffic signals at an intersection, comprising the steps of:

(a) receiving GPS signals;

(b) processing the GPS signals on-board the vehicle so as to generate vehicle data;

(c) transmitting the vehicle data;

(d) providing a map of allowed approaches, wherein the map of allowed approaches comprises a plurality of preprogrammed allowed positions proximate to the intersection;

(e) comparing the vehicle data with the map of allowed approaches;

(f) determining, based on comparing step (e), whether the vehicle is within one of the allowed approaches; and

(g) allowing the vehicle to preempt the traffic signals associated with the intersection if the vehicle is within one of the allowed approaches.

17. The traffic control preemption method of claim 16 wherein the step of transmitting vehicle data comprises the step of transmitting vehicle position, heading and velocity data.

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A188

5,539,398

**11**

18. The method of claim 16 wherein the step of providing a map of allowed approaches further comprises the steps of:

(a) receiving GPS signals at a first position of an allowed approach;

(b) processing the GPS signals to generate mapping data;

(c) transmitting the mapping data;

(d) programming the mapping data to generate the map of allowed approaches;

(e) receiving GPS signals at a next position of the allowed approach path;

(f) repeating steps (b)–(e) until the allowed approach path is completely mapped.

19. A method of determining whether a vehicle is allowed to preempt a traffic signal, comprising the steps of:

(a) receiving a first position signal indicative of a first location of the vehicle;

(b) determining whether the received position signal is within a mapped approach to the traffic signal;

**12**

(c) recording the received position signal as a match if the received position signal is within an allowed approach;

(d) receiving a next position signal indicative of a next location of the vehicle;

(e) determining whether the received position signal is within a mapped approach;

(f) recording the received position signal as a match if the received position signal is within a mapped approach;

(g) repeating steps (d)–(f) until a match threshold is reached;

(h) issuing a preemption request if the match threshold is reached;

(i) repeating steps (d)–(h) as long as next position signals are received.

* * * * *