Nos. 2014-1537, -1566

# United States Court of Appeals
# for the Federal Circuit

GLOBAL TRAFFIC TECHNOLOGIES, LLC,

*Plaintiff-Appellee,*

*v.*

RODNEY K. MORGAN, KM ENTERPRISES, INC.,

*Defendants-Appellants.*

*and*

STC, INC.,

*Defendant-Appellant.*

*Appeals from the United States District Court for the District of Minnesota in Case No. 0:10-cv-04110-ADM-JJG, Judge Ann D. Montgomery*

## BRIEF OF APPELLANTS RODNEY KRIS MORGAN AND KM ENTERPRISES, INC.

Jana Yocom, P.C
Jana Yocom (#6193677)
320 S. 11th, Suite 1
Mount Vernon, Illinois 62864
618-731-1944
jana.yocom@gmail.com

*Attorney for Defendants
KM Enterprises, Inc., and Rodney
Kris Morgan*

Filed: September 8, 2014
Corrected: September 18, 2014

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellants KM Enterprises, Inc. and Rodney K. Morgan
certify the following:

1.  The full name of every party or *amicus* represented by us is:

    KM Enterprises, Inc.

    Rodney K. Morgan

2.  The names of the real party in interest represented by us is:

    Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent
    or more of the stock of the party or amicus curiae represented by me are:
    None.

4.  The names of all law firms and the partners or associates that appeared for
    the party or amicus now represented by me in the trial court or agency or are
    expected to appear in this court are:

HELLMUTH & JOHNSON: Terrance C. Newby, Jonathan D. Jay (both formerly of
Leffert Jay & Polglaze).

RASMUS LAW OFFICE, LLC: R Daniel Rasmus, Andrew G Birkeland.

ROBINS KAPLAN MILLER & CIRESI LLP: Andrew D Hedden, Jacob M  Holdreith,
Carrie M Lambert, Kelly M McLain, Shira T Shapiro.

SHUMAKER & SIEFFERT, PA: Nicholas S. Kuhlmann (formerly of Leffert Jay &
Polglaze).

JANA YOCOM, P.C.: Jana L. Yocom

Elizabeth L Taylor

Dated: July 28, 2014                         */s/ Jana L. Yocom*
                                             JANA YOCOM, P.C.

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED FOR REVIEW ...................................................3

STATEMENT OF THE CASE................................................................3

STATEMENT OF FACTS .....................................................................5

SUMMARY OF THE ARGUMENT ...................................................11

   A.   *As Emtrac Systems, Inc. was voluntarily dismissed, the pleadings
do not support a judgment against Rodney Kris Morgan, individually,
nor do the merits* ...........................................................................13

   B.   *Finding of direct infringement is not supported by substantial evidence;
inducement and contribution fail as a result.* ...............................15

   C.   *Non-infringement is also shown under the traditional analysis* .................18

      1.  *The district court applied an outdated claim constructionstandard,
inappropriately broadening the scope of the patent.* ...............................19

      2.  *KME and Morgan succeed on their non-infringement defense
under the doctrine of equivalents, as the differences between
the structure and functions claimed against those accused
are substantia* ............................................................................26

   D.   *The willfulness determination against Morgan and KME should
be reversed.* ...................................................................................29

CONCLUSION

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*ACTV , Inc. v. Walt Disney Co.,*
    346 F.3d 1082 (Fed.Cir. 1003) ...........................................................20

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Ass., Inc.,*
    682 F.3d 1003 (Fed.Cir. 2012) ...........................................................30

*BMC Resources, Inc. v. Paymentech, L.P.,*
    498 F.3d 1373 (Fed.Cir. 2007) ...........................................................16

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed.Cir.1998) ............................................................18

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
    567 F.3d 1314 (Fed.Cir. 2009) ...........................................................26

*Dow Chemical Co. v. Sumitomo Chem. Co.,*
    257 F.3d 1364 (Fed.Cir. 2001) ...........................................................19

*Electra Instrument S.A. v. O.U.R. Scientific Intern., Inc.,*
    214 F.3d 1302 (Fed.Cir. 2000) ...........................................................21

*Genentech, Inc. v. Wellcome Found. Ltd.,*
    29 F.3d 1555 (Fed.Cir.1994) ..............................................................18

*Global Traffic Technologies, LLC v. Emtrac Systems, Inc. et al,*
    946 F.Supp.2d 884 (D.Minn. 2013).....................................................12

*Howard v. Mo. Bone & Joint Ctr., Inc.,*
    615 F.3d 991 (8th Cir. 2010) ...................................................... 13, 15

*Interactive Gift Exp., Inc. v. Compuserve, Inc.,*
    256 F.3d 1323 (Fed.Cir. 2001) ...........................................................20

iv

*K-2 Corporation v. Salomon S.A.,*
   191 F.3d 1356 (Fed.Cir. 1999) ...............................................................26

*Limelight Networks, Inc. v. Akamai Technologies, Inc.,*
   134 S.Ct. 2111 (2014)................................................................... 15, 17

*Markman v. Westview Instrs., Inc.,*
   52 F.3d 967 (Fed.Cir. 1995) (en banc),
   *aff'd*, 517 U.S. 370 (1996) ........................................................... 18, 19

*Muniauction, Inc. v. Thomson Corp.,*
   532 F.3d 1318 (Fed.Cir. 2008) ............................................. 15, 16, 17

*Oracle Am., Inc. v. Google Inc.,*
   750 F.3d 1339 (Fed.Cir. 2014) .................................................. 13, 15

*Phillips v. AWG Corp.,*
   415 F.3d 1303 (Fed.Cir. 2005) ...................................................... 4, 20

*QR Spex, Inc. v. Motorola, Inc.,*
   507 F.Supp.2d 650, (E.D.Tex.2007)....................................................18

*Richardson v. Suzuki Motor Co.,*
   868 F.2d 1226, 9 USPQ2d 1913 (Fed.Cir.1989)..................................29

*Teleflex, Inc. v. Ficosa N. Am. Corp. Inc. v. Brunswick Corp.,*
   299 F.3d 1313 (Fed.Cir. 2002) ...........................................................19

*U.S. Phillips Corp. v. Iwasaki Elec. Co., Ltd.,*
   505 F.3d 1371 (Fed.Cir. 2007) ...........................................................25

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed.Cir. 2002) ..................................................... 19, 20

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
   520 U.S. 17 (1997)................................................................................27

*Wilson Sporting Goods Co., v. David Geoffrey & Assoc.,*
   904 F.2d 677 (Fed.Cir. 1990) .............................................................26

*Wordtech Systems, Inc. v. Integrated Network Solutions, Inc.,*
  609 F.3d 1308 (Fed.Cir. 2010) ...............................................................15

## Statutes

28 U.S.C. § 1295 ...............................................................................2

28 U.S.C. § 1331 ...............................................................................2

28 U.S.C. § 1338(a) ...........................................................................2

35 U.S.C. § 1 .....................................................................................2

35 U.S.C. § 112(6) ...........................................................................19

35 U.S.C. § 271(a) ...........................................................................15

805 ILCS 5/8.65(a)(3).......................................................................14

## Patents

U.S. Patent No. 4,914,434........................................................ 6, 9, 27, 28

U.S. Patent No. 5,539,398............................................... 4, 5, 8, 10, 28, 30

U.S. Patent No. 5,926,113................................................................ 5, 10

## STATEMENT OF RELATED CASES

No other appeals from this action were previously before this or any other appellate court.

On July 21, 2014, Appellants KM Enterprises, Inc. and Rodney K. Morgan filed a motion for an emergency stay pending appeal. On July 22, 2014, this Court (Bryson, J.) temporarily stayed enforcement of the judgment pending the Court's consideration of the motion. That same day, Appellant STC, Inc. ("STC") filed its own motion for an emergency stay pending appeal. On July 24, 2014, this Court (Bryson, J.) temporarily stayed enforcement of the judgment against STC. On August 25, 2014, a motions panel of this Court (O'Malley, Wallach, and Hughes, JJ.) lifted the temporary stay of enforcement "[w]ithout prejudicing the ultimate disposition by a merits panel."

Appellee Global Traffic Technologies, Inc. has commenced enforcement proceedings in several counties in Illinois and Minnesota against Rodney Kris Morgan and KM Enterprises, Inc., to collect on the judgment in this case: *Global Traffic Technologies, Inc. v. Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.*, Case No. 27-CV-14-12221 (District Court of the Fourth Judicial Circuit, County of Hennepin, Minnesota); *Global Traffic Technologies, Inc. v. Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.*, Case No. 2014-L-5 (Circuit Court of the Second Judicial Circuit, Hamilton County, Illinois); *Global Traffic*

*Technologies, Inc. v. Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.*,

Case No. 14-L-52 (Circuit Court of the Second Judicial Circuit, Jefferson County,

Illinois).  Those actions will be directly affected by this Court's decision in this

appeal.

## JURISDICTIONAL STATEMENT

A) Jurisdiction in the district court arises under 28 U.S.C. §§1331 and 1338(a),

claims asserted under the Patent Laws of the United States, 35 U.S.C. 1, *et*

*seq* . Plaintiff Global Traffic Technologies, LLC is a Delaware corporation.

KM Enterprises, Inc. is an Illinois corporation.

B) Jurisdiction in the court of appeals arises under 28 U.S.C. §1295 from a final

judgment of the district court on a jury verdict of patent infringement, no

invalidity, and willfulness.

C) Judgment after the jury verdict was entered on September 24, 2014. Post-

trial motions were timely filed. Final judgment was entered on April 28,

2014. GTT filed a letter to the judge on May 6, 2014 seeking that the

judgment be amended.  The district court amended the judgment on May 16,

2014, stating that the deadline for filing the notice of appeal was extended

accordingly. KME's and Morgan's Notice of Appeal was timely filed on

June 4, 2014.

D) This appeal is from a final judgment that disposes of all of the parties'
claims.

## ISSUES PRESENTED FOR REVIEW

1. Did the lower court correctly construe the ambiguous term, "location, "
objectively under the general test, in light of intrinsic evidence, including the
prior art Morgan patent cited in the prosecution history and on the face of
the patent, the patent terms and the specifications?

2. Did the court correctly apply the doctrine of equivalents, which required that
the terms be limited rather than broadened, in order to avoid ensnaring the
Morgan patent prior art and to recognize the substantial differences between
the Emtrac product and the asserted claims?

3. Did substantial evidence support the determination of willfulness against
Morgan and KME in light of district's court's use of testimony out of
context, Morgan's belief that GTT violated his patent, GTT's purchase
overtures and good faith defense?

## STATEMENT OF THE CASE

This case involves a complex analysis of patent law complicated by the
court-imposed restrictions on the jury's infringement determination, limited only to
claims without context from the intrinsic evidence. A2637, 2638. That approach
has been disavowed by this Court as it improperly restricts the role of the

3

specification in claim construction. *Phillips v. AWG Corp.,* 415 F.3d 1303, 1320 (Fed.Cir. 2005). The claims used by the jury to determine infringement are at issue on this appeal, as the construction skewed the claim language and ignored the intrinsic evidence. Evaluation of the claimed technology, developed in 1993 and patented in1996, was required to be viewed as a person of ordinary skill in the art at the time. Because the time element was deemphasized, the accused product, developed near the end of the patent's term in 2007, was subjected to contrived analysis of infringement theories that did not clearly address the realities of the accused technology in light of the claims of the patent.

The record supports an analysis that allows a correct determination of how the patent in suit reads on the accused product. Claim construction is an important issue. Even if the accused product is deemed to read on every claim of the '398 patent, however, non-infringement is clear under the doctrine of equivalents, as the jury determination unreasonably exceeds the instructed limitations of the doctrine.

Additionally, as Morgan reasonably believed that the Emtrac product did not infringe the '398 patent, the record will demonstrate lack of substantial evidence to support the jury verdict of willfulness. Finally, the damages formula instructed by the court was improper and, if necessary, should be revisited.

## STATEMENT OF FACTS

Defendants Rodney Kris Morgan and KM Enterprises, Inc. were accused in this case of infringing U.S. Patent No. 5,539,398 ("the '398 patent"). The '398 patent addresses a traffic control preemption system which uses data received from a global positioning system ("GPS") to determine whether a vehicle issuing a preemption request is within an allowed approach of an intersection. The '398 patent is embodied in a product manufactured, marketed and sold by Global Traffic Technologies, LLC, ("GTT").  GTT purchased the patent from Minnesota Mining and Manufacturing Company ("3M") in 2007, together with 3M's optical version of its traffic preemption technology known as "Opticom" and a GPS traffic preemption patent, U.S. Patent No. 5,926,113 ("'113"), previously marketed as Priority One.

The optical product, developed in the 1960's by 3M, used light pulses to trigger traffic signals to allow emergency vehicles to pass through intersections on a green light. Although the '398 patent was issued on July 23, 1995, 3M did not market a GPS version of the product until 2001. At that time 3M purchased the Priority One GPS technology, which was based on the designs initiated by Brad Cross ("Cross") in May, 1993, and developed by others to form a patented product on July 20, 1999, patent '113. A2381-2384. GTT purchased 3M's assets for $80

million, A2384, A2386, A32183, and began marketing the GPS version of the

product in 2007. A2384, A2386.

KM Enterprises, Inc. ("KME") markets and distributes the Emtrac System,

which is a competing traffic control preemption product. KME's predecessors

began marketing traffic preemption control products in 1988, after Rodney Kris

Morgan ("Morgan"), together with Cross, invented a radio frequency version of the

Emtrac product, by which the emergency vehicle communicated with the

intersection via radio signal transmissions. A2483. Distance was determined by

received radio signal strength and direction of travel was determined by an

electronic compass. A2410. The Morgan patent, U.S. Patent No. 4,914,434 ("

'434"), was issued in April, 1990. A2488, A30001-30068.

In May and June of 1993, Cross began publishing work toward development

of a GPS version of the technology. A2352, A5151, A5242-5250, A2367. The

product was later reduced to practice, developed, and marketed by others. A2360,

A2419, A2420, A2427, 2432, 2434. Apart from the use of the same telemetry

(sending data via radio), the Vectored Zone approach was not viewed by STC as

compatible with the Emtrac System. A2370, A2372, 2376. That is because the old

radio frequency Emtrac System was a "smart vehicle" system. A2371. In other

words, originally there were push buttons to be used inside the vehicle to indicate

the direction of travel and vehicle ID which was transmitted via radio to the

6

intersection where the preemption request would be processed. A2371. The push-button function was later replaced by an electronic compass. A2371.

The GPS product, Priority One, which grew out of Cross's Vectored Zone memorandum, used a "smart intersection," or "smart cabinet". A2427, A2436, A2472, 2508, 2509, 2542. The switch from "smart vehicle" to "smart intersection" by Cross in his 1993 work toward modification of the Emtrac product was a result of lack of processor power to accomplish memory capacity necessary for the continual positional data transmission from multiple vehicles and simulteaneous comparisons that track of positions with the pre-stored track of positions in each approach direction to determine if any of the vehicles were within the approach. A2542. If any vehicles were in the approach long enough, a priority signal would issue to the intersection controller. A2542. There was not processor capacity for storage of approach criteria for the 5000 intersections necessary for a "smart vehicle" at that time. A2509. The approach data in the Vectored Zone idea was stored at the intersection for that reason. *See* A2509, 2510.

An additional reason for use of a "smart intersection" in the early GPS traffic preemption technology is the induced error incorporated in GPS functionality at that time. A2427. It was necessary to enhance the accuracy of GPS navigation for use in traffic preemption with differential GPS. A2427. This was embodied in the Priority One system, which was purchased and marketed by 3M in

2001. A2427. Differential GPS was noted in the Cross Vectored Zone memorandum and in the '398 patent. A2427, A5188, A5186, A5198 (s.6, l. 5-30; 45-65), A5200 (Claim 9). The '398 patent was issued on July 23, 1996.

Between 1993 and 2004, Cross and Morgan were not in contact while the RF Emtrac product was marketed under a licensing agreement with Econolite. In 2004, Morgan regained the marketing rights and, together with Cross, began servicing equipment owned by existing customers. A2525, 2526. During that time, Cross began addressing improvements to the Emtrac product using GPS capability, which had greatly improved since his early experience in 1993. A2526, 2527. The Emtrac product was substantially similar to its early versions.  For instance, previously written code was revisited. A2363. There was no change to the intersection components. A2528.  Cross was now able to add GPS advantages while retaining the "smart vehicle" functions. The product went through three versions. The version at issue here was developed in 2006. In that version the previous electronic compass was replaced with a GPS receiver located inside the vehicle computer unit ("VCU") box in the transmitter. A2496. Also the radio was changed from a narrow band FM radio to a frequency hopping spread spectrum radio. A2496. The intersection does not have a GPS receiver.

To summarize, the VCU includes a GPS receiver, a computer board, and a transceiver module. A2530-32. The transceiver module transmits priority requests

to the intersection equipment. A2531. A priority request is a packet of information which includes intersection ID and direction of preemption. A2531. This makes the intersection unit respond to the call or pass it on. A2531. It is likened to the old Emtrac push-button model. A2531. "There was always a field in that priority request that has direction at preemption, so the intersection knows which way to go green." A2531. There is computer memory on board the vehicle in the new model, which stores general configuration data and also the table of zones. A2531-33.

GTT accuses, as violative, Emtrac's virtual zone innovation for determining a vehicle's approach to an intersection. When Cross developed the functionality, he used the exact old Emtrac hardware and wrote a program that would identify a "zone." A2529. In other words, it would find a place when it was driving toward the intersection where it could initiate the request from the vehicle and end the request from the vehicle for preemption. A2529. At that point, the technology was not different from the old Emtrac System. A2529. The idea evolved, however. A2529. Cross added intersection addressing, which was kind of a variant of the earlier '434 patent structure, where he made a modification to the intersection firmware and also the vehicle firmware, to allow it to add a field where it would send an intersection ID, along with the vehicle transmission, and be able to recognize that in the intersection. A2529-2530. So an intersection would ignore a transmission from a vehicle unless it had the correct intersection ID in it. A2530.

9

Functionally, the table of zones is compared to the latitude and longitude information provided by the GPS signal, within the VCU to determine whether a priority request will be generated by the computer board. A2538. The computer board creates the packet—intersection ID and direction of preemption—and that is output to the radio module. A2539. Vehicle position data is not transmitted. A2539.  The zone functionality has nothing to do with the vehicle path. A2565. [plurality of zones—curved roadway A2566] That is because there is no GPS module or GPS positioning capability at the intersection that can receive the longitude and latitude information. A2540.

The product was marketed and distributed by KME. Morgan participated as President of KME, but was found to be individually liable for willful infringement without any veil-piercing allegations.

STC first learned of the '398 patent when Morgan was sued in October, 2010. At a June 12, 2009, meeting in Mt. Vernon, Illinois, at which Morgan met with representatives of GTT to discuss GTT's the idea of private labeling the Emtrac product, GTT did not mention the '398 patent or the '113 patent. A2624. Morgan believed GTT was infringing his patent and that he was not infringing GTT's patent. A2632. Morgan informed GTT that the '398 patent was invalid. A2632.

10

## SUMMARY OF THE ARGUMENT

Individual liability of Morgan is based solely upon allegations against Emtrac Systems, Inc., an Illinois corporation that was dissolved in 2009. Because Emtrac Systems, Inc. was dismissed as a party, there can be no individual liability against Morgan. Proper claim construction analysis involving the term, "location," leads to a conclusion of non-infringement as the intrinsic evidence indicates situation at the intersection. Similarly, non-infringement under the doctrine of equivalents is demonstrated by evidence that the prior art developed by Defendant STC, Inc., was limited by technological capability at the time to an intersection-based system. Also prior art patented by Morgan and Cross are ensnared by the claims of the patent in suit, legally limiting availability of the doctrine of equivalents to prove infringement. Finally, the record does not support a determination of willfulness on the part of Morgan and KME.

## ARGUMENT

GTT sued Emtrac Systems, Inc. and Morgan, individually, among others, alleging patent infringement in September, 2010. KM Enterprises, Inc. ("KME") sued for declaratory judgment of non-infringement, in addition to other claims, shortly thereafter. The cases were stayed in August, 2011 after initial document production and service of prior art statements.  GTT amended its complaint on April 28, 2011, adding KME as a defendant. Its allegations against Morgan,

11

individually, are only made in his capacity as sole shareholder of the dissolved Emtrac Systems, Inc. There are no allegations of personal wrongdoing or alter ego liability. The cases were consolidated in January, 2012 and STC, Inc. ("STC") was joined as a defendant. Emtrac Systems, Inc. was voluntarily dismissed as a defendant.

Claim construction occurred early in the proceeding with a Joint Statement filed on December 12, 2011, briefing beginning in May, 2012 before a July, 2012 Markman ruling. Reconsideration of the claim construction in light of new evidence which shed light on 3M's view of how its patent should be construed was denied. Defendant's request for further claim construction a year later was also denied. Defendant's motion for judgment as a matter of law on that issue was denied.

Cross-motions for summary judgment were denied, *Global Traffic Technologies, LLC v. Emtrac Systems, Inc. et al,* 946 F.Supp.2d 884 (D.Minn. 2013), and the case went to trial on September 9, 2013. The jury entered a verdict of willful patent infringement against all defendants and assessed lost profits damages in the amount of $5,052,118. The jury found for the Plaintiff on the issue of invalidity. The court denied motions for judgment as a matter of law on the issues including individual liability of Morgan, infringement, invalidity and assessed enhanced damages of $2,526,059, pre-judgment interest if $923,965 and

$1,384.14 per day after October 31, 2013. The special verdict form sought determination of "direct infringement" and "indirect infringement." A2959. The court instructed the jury there are two types of direct infringement: literal infringement and infringement under the doctrine of equivalents. A2902. It is not clear from the record whether the jury found literal infringement or infringement under the doctrine of equivalents. It is also not clear how the jury allocated infringement liability as the instructions did not differentiate between liability based on KME's sales and marketing activities and STC's design and manufacturing activities.

Defendants KME and Morgan appeal the judgment, concentrating their argument on claim construction, non-infringement, invalidity and willfulness in order to demonstrate to this Court the correct answer under patent law principles in light of the record. KME and Morgan ask that this Court reverse the judgment and, alternatively, to remand the case for clarification.

A. *As Emtrac Systems, Inc. was voluntarily dismissed, the pleadings do not support a judgment against Rodney Kris Morgan, individually, nor do the merits*

Regional circuit law applies to review of the denial of a motion for judgment as a matter of law. *Oracle Am., Inc. v. Google Inc.,* 750 F.3d 1339, 1378 (Fed.Cir. 2014). The Eighth Circuit reviews such a denial *de novo,* using "the same

standards as the district court." *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010).

GTT alleged in its amended complaint that Morgan is individually liable for any infringement activities of Emtrac Systems, Inc., an Illinois corporation that was dissolved in 2009. A5001, A5050. The complaint alleges that Morgan is liable as the sole shareholder of Emtrac Systems, Inc. A5050. The complaint does not allege any individual wrongdoing on the part of Morgan and does not allege alter ego liability. It is undisputed that Emtrac Systems, Inc. was dismissed as a party to this lawsuit. A52, A53. As no infringement was proven against Emtrac Systems, Inc., no derivative liability based on Morgan's status as shareholder or director can result. The judgment against Morgan, individually, should be reversed.

Even on the merits, there is no basis for personal liability against Morgan. The complaint alleges liability as sole shareholder. On summary judgment, GTT alleged Morgan's liability as a director. Under Illinois law, shareholders and directors are not liable for claims against a dissolved corporation. GTT cited 805 ILCS 5/8.65(a)(3), which states:

> (3) The directors of a corporation that carries on its business after the filing by the Secretary of State of articles of dissolution, otherwise than so far as may be necessary for the winding up thereof, shall be jointly and severally liable to the creditors of such corporation for all debts and liabilities of the corporation incurred in so carrying on its business.

805 ILCS 5/8.65(a)(3).

14

In this case, it is undisputed the KME was incorporated in 2007 and carried on the marketing activities of the Emtrac Systems product. Emtrac Systems, Inc. was involuntarily dissolved in 2009. There is no evidence or even an allegation that Morgan infringed the patent at issue here after 2009 using the Emtrac Systems, Inc. entity. Even on the merits, there is no basis of individual liability on the part of Morgan. This Court clearly recognizes that corporate officers are not liable for patent infringement apart from invocation of veil-piercing principles. *Wordtech Systems, Inc. v. Integrated Network Solutions, Inc.,* 609 F.3d 1308, 1313 (Fed.Cir. 2010). The judgment against Morgan should be reversed.

> B. *Finding of direct infringement is not supported by substantial evidence; inducement and contribution fail as a result.*

Regional circuit law applies to review of the denial of a motion for judgment as a matter of law. *Oracle Am., Inc. v. Google Inc.,* 750 F.3d 1339, 1378 (Fed.Cir. 2014). The Eighth Circuit reviews such a denial *de novo,* using "the same standards as the district court." *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010).

"Under Federal Circuit case law, liability for direct infringement under 35 U.S.C. §271(a) requires performance of all steps of a method patent to be attributable to a single party." *Limelight Networks, Inc. v. Akamai Technologies, Inc.,* 134 S.Ct. 2111, 2113 (2014), citing *Muniauction, Inc. v. Thomson Corp.,* 532

15

F.3d 1318 (Fed.Cir. 2008). It is undisputed that Claim 16 is a method claim. It

reads:

> A traffic control preemption method which uses data received
> from a global positioning system (GPS) to determine whether a
> vehicle, having an associated vehicle path, is allowed to preempt
> traffic signals at an intersection, comprising the steps of:
>
> (a) receiving GPS signals;
>
> (b) processing the GPS signals on board the vehicle so as to
> generate vehicle data;
>
> (c) transmitting the vehicle data;
>
> (d) providing a map of allowed approaches, wherein the map
> of allowed approaches comprises a plurality of
> preprogrammed allowed approaches ;
>
> (e) comparing the vehicle data with the map of allowed
> approaches;
>
> (f) determining, based on comparing step (e), whether the
> vehicle is within one of the allowed approaches; and
>
> (g) allowing the vehicle to preempt the traffic signals
> associated with the intersection if the vehicle is within
> one of the allowed approaches.

Under *Muniauction,* joint infringement is rejected as an available theory.

*Muniauction,* 532 F.3d at 1328. The law in this circuit is axiomatic that a method

claim is directly infringed only if each step of the claimed method is performed.

*Id., citing BMC Resources, Inc. v. Paymentech, L.P.,* 498 F.3d 1373, 1378-79

(Fed.Cir. 2007). GTT 's expert testified that the end users of the Emtrac product—

not KME or Morgan—performed the actions that allegedly infringe Claim 16. *See*

A1500, A1755. In response to KME and Morgan's post-trial motion, GTT cited no evidence that KME or Morgan performed any steps of Claim 16, but instead argued that customers' use of the Emtrac GPS System necessarily performs each and every step of claim 16." A20982. GTT did not seek any evidence concerning how the method of Claim 16 was performed and whether any steps were performed by any defendant. There is a lack of substantial evidence to support a determination by a reasonable jury of direct infringement justifying reversal. *Muniauction,* 532 F.3d at 1330.

Similarly, indirect infringement was not demonstrated. The United States Supreme Court has restated the well-settled principle that liability for inducement must be predicated on direct infringement. *Limelight,* 134 S.Ct. at 2117. In *Limelight,* the court reversed a Federal Circuit determination of inducement which the court based on the idea that the alleged infringer and its customers jointly performed steps which would infringe the patent at issue if all the steps were performed by the same person. *Id.* at 2118. The supreme court held that, because no direct infringement had occurred by definition, no indirect infringement could be proved. *Id.* Likewise with contributory infringement. Substantial evidence to support the jury verdict of indirect infringement is lacking and the denial of judgment as a matter of law on this issue should be reversed. Claim 1 is also a method claim, and thus not directly or indirectly infringed as set forth above.

17

If, for some reason, either claim is deemed an apparatus claim, they were not directly infringed by KME or Morgan. Neither Morgan nor KME were involved in the development of the Emtrac GPS product beyond assistance with field testing and customer feedback. A2543. KME provides marketing and installation. A2550-51. Marketing, installation, and service activities are not subject to direct infringement claims. *See QR Spex, Inc. v. Motorola, Inc.*, 507 F.Supp.2d 650, (E.D.Tex.2007).  Direct infringement is addressed in this brief, as an alternative argument, and in order to ensure that any finding of indirect infringement against KME and Morgan will be reversed.

### C. Non-infringement is also shown under the traditional analysis

A determination of infringement, both literal and under the doctrine of equivalents, is a question of fact, reviewed for substantial evidence when tried to a jury. *Genentech, Inc. v. Wellcome Found. Ltd.,* 29 F.3d 1555, 1565 (Fed.Cir.1994). Claim interpretation is a question of law, which this Court reviews *de novo*. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

A two-step process is used in the analysis of patent infringement: first, the scope of the claims are determined as a matter of law, and second, the properly

construed claims are compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by a substantial equivalent, in the accused product. *Teleflex, Inc. v. Ficosa N. Am. Corp. Inc. v. Brunswick Corp.,* 299 F.3d 1313, 1323 (Fed.Cir. 2002). For purposes of this brief, because GTT disputes that Claims 1 and 16 are means-plus-function claims, and thus subject to 35 U.S.C. 112(6) construction, Morgan and KME begin their claim construction argument with a general analysis. Then, any additional limitations that would arise under Section 112(6) are discussed.

1. *The district court applied an outdated claim construction standard, inappropriately broadening the scope of the patent.*

The construction of a patent, including terms of art within its claim, is exclusively within the province of the court. *Markman v. Westview Instrs., Inc.,* 52 F.3d 967, 986 (Fed.Cir. 1995), *aff'd,* 517 U.S. 370 (1996)."It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specifications and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir. 2002)**.** All intrinsic evidence is not equal, however. Courts begin the claim construction analysis with the words of the claim, to define the scope of the patented invention. *Dow*

19

*Chemical Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1372 (Fed.Cir. 2001). As a starting point, the court gives terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir.2005).

The district court here appears to be applying the rule as it was sometimes viewed prior to *Phillips.* Some of the earlier cases looked only at the claim language if it was clear on its face, considering the rest of the intrinsic evidence only to determine if a deviation from the clear language of the claims was specified. *See Interactive Gift Exp., Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.Cir. 2001). Under *Phillips,* this Court made clear that the decision making process is undertaken as would the person skilled in the art, including the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning the state of the art . *Phillips,* 415 F.3d at 1313-14. Apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms. *Id.; see Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 967, 979-81 (Fed.Cir. 1995); *see also, ACTV , Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1088 (Fed.Cir. 1003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.")

The district court determined that the term "associated with the location," found in Claim 1 is unambiguous, well-understood, and in no need of construction from the Court. A5. Claim 1 used the phrase in two instances:

> "…means, associated with the location for receiving the vehicle data…;" and
> "…mapping means, associated with the location, for storing a plurality of positions corresponding to the allowed approaches to the location…"

A5.

The district court considered dictionary definitions of "associate" as dealing generally with connection or relationship in the mind, memory or imagination. *Id.* From these definitions, the court reasoned that the term "associated" does not "require physical connection or location." *Id.* at 6 The court concluded that "[t]he meaning of the phrase "associated with the location"—being logically or intangibly connected or related to a given place—is understandable by a juror, and further explanation risks confusion and redundancy. *Id.* Essentially, the court determined that the term "the location" is construed to mean either the vehicle or the intersection. KME and Morgan contend that the district court's construction inappropriately expands the scope of the patent terms.

Even under the district courts strict reasoning, the term "location" must be construed in light of intrinsic evidence. By way of illustrating the construction methodology, a discussion of this Court's interpretation of the term, "location," in *Electra Instrument S.A. v. O.U.R. Scientific Intern., Inc.,* 214 F.3d 1302 (Fed.Cir.

21

2000), is helpful. Claim language in that case referred to a space "only within a zone extending between latitudes 30°- 45°>>, as seen from said diametrical plane." *Id.* at 1304. The lower court construed the language to encompass beams located at the edge of the helmet, at 0°, and extending to a point between 30°-45°>>, determining literal infringement. The defendant argued that the district court erred in including beam channels located between 0°and 30° within the patent coverage. This Court held the meaning to its unambiguous terms, reversing the lower court decision, despite language in the description and composition of the preferred embodiment, which it was argued supported the lower court ruling. *Id.* at 1307. The court explained:

> It is true that, while "one may not read a limitation into a claim from the written description, …one may look to the written description to define a term already in a claim limitation, for a claim must be read in light of the specification of which it is a part." [citation] The parties do not dispute that the written description discloses a gamma unit with radiation sources and beam channels located between the attitude of 0° and 45°… However, the unambiguous language of the amended claim controls over any contradictory language in the written description."

*Id.* at 1307-08.

In this case, the written description clearly provides that vehicle data is received and processed at the intersection and that the map of allowed approaches is located at the intersection:

1) "Each intersection has an associated intersection module, which if within range of the vehicle's transmitting equipment, compares the received vehicle data…"A173 (Abstract);

2) "Each intersection is equipped with an intersection module adapted to receive and process the vehicle data. Each intersection module contains a preprogrammed map of allowed approaches to the intersection. Each intersection module within range of a vehicle's transmitting equipment compares the received vehicle data with the map of allowed approaches. If the vehicle data sufficiently matches the map of allowed approaches to a particular intersection, the intersection module forwards the vehicle's preemption request to the intersection controller."  A185, s.3 Summary;

3) "The vehicle position can be measured and processed by the present vehicle module100  and intersection module 200 by any one of many known navigational coordinate systems." A186, s.5, l.3-5.

4) "All of the data generated by GPS receiver 40 and by processor 60 …is then transmitted via transmitter 80 and antenna 101 to the intersection module 200. Intersection module 200 includes a data receiving antenna 210 which receives the vehicle from the vehicle transmitting antenna 101." A186, s.5, l.21-27.

5) "However, in a radio-based system, preemption requests from all of the allowed approaches, and even those on approaches belonging to different intersection (within range of the receiver antenna 210), are received by the intersection controller." A186, s.5, l. 43-46.

6) "The intersection module 200 tracks the path of a vehicle requesting preemption to determine whether it is within any of the allowed approaches for that intersection." A186, s.5, l.55-58.

7) "The map is programmed into the intersection module while the module 200 is in "mapping" mode, …A186, s.5, l. 59-61.

23

8) "Instead of a separate base station such as shown in FIG. 2, intersection module 200 is positioned at a known location and includes a GPS antenna 220 and GPS receiver 240…In this way, both vehicle GPS receiver 40 and intersection GPS 240 are tuned to receive navigational data from the same set of satellites, such that the induced GPS error is common to the computed locations for the vehicle and the intersection. When the relative distance between the vehicle location and the intersection location is computed, the actual distance between the vehicle and the intersection is obtained and the common induced error is removed." A186, s.6, l. 47-61.

9) "A vehicle follows roadway 460 toward intersection 490 along approach path 440. Intersection 490 has an associated intersection module (not shown). At periodic intervals 400 along approach path 440, the vehicle transmits vehicle data to an intersection module 200 located at the intersection 490. A186-87, s.7, l67-5.

10) "At periodic intervals 507 along the roadway 508, the vehicle module transmits vehicle data to the intersection module…Because both the vehicle module and intersection module are tuned to the same set of satellites, the GPS induced error is common to both the vehicle location and the intersection location." A187, s.7, l.23-30.

11) "The vehicle data thus determined is then transmitted in the normal way to intersection module 200 to determine whether the vehicle is within an allowed approach for that intersection." A187, s.7, l.64-67.

12) "To perform this procedure, a vehicle including a vehicle module 100 begins approaching the intersection module to be programmed along a desired approach such as a roadway 460 of FIG. 4…at periodic intervals, …the vehicle transmits vehicle data,… to the intersection module 200." A187, s.8, l.4-9.

13) "The vehicle data is received by the intersection module 200 and is stored in mapping memory 260." A186, s.8, l.13-14.

As this Court stated in *Electra,* it is appropriate to look at the written description to define the term here, for the claim must be read in light of the specification of which it is a part. Looking at the patent as a whole, "associated with the location" clearly means "associated with the intersection" and cannot mean "associated with the vehicle." *See also, U.S. Phillips Corp. v. Iwasaki Elec. Co., Ltd.,* 505 F.3d 1371, 1376 (Fed.Cir. 2007) (Court affirmed lower court construction of term, "between $10^{-6}$ and $10^{-4}$ µmol/mm³" to express a specific range and not to imply a range between two values that are themselves ranges, using indicia from the specifications as support).

As to "means, associated with the location, for receiving vehicle data," A188, s.9, l.34-36, nothing in the specifications indicates that the odd idea of a means associated with the vehicle for receiving vehicle data was intended. Indeed, the facts of the case indicate that the "smart intersection" concept was a limitation imposed by the technology available at the time. A2542, 2509, 2510, 2427.

The claim language, as properly interpreted, does not read on the Emtrac Systems device. The claims in the Hall patent, read in light of the specifications, prosecution history and prior art, must be interpreted as limited to a structure that is operated in which the vehicle data is transmitted wirelessly to the intersection, where it is processed to make the preemption determination. As such no reasonable jury could find that a structure not operated in that manner infringes the patent.

25

Reversal is warranted. Alternatively, a remand with instructions is sought for appropriate factual determinations.

   2.   *KME and Morgan succeed on their non-infringement defense under the doctrine of equivalents, as the differences between the structure and functions claimed against those accused are substantial.*

Assuming every limitation of at least one properly construed claim is infringed, as GTT contends and the jury determined, KME and Morgan may nevertheless succeed on their non-infringement defense if the differences between the accused structure and the claimed structure were substantial at the time the patent was issued, as determined by a person having ordinary skill in the art, or if the accused structure performed the claimed function in a substantially different way to accomplish substantially the same result. A2905.

There are several legal limitations on the doctrine of equivalents. First the doctrine of equivalents cannot allow a patent claim to encompass subject matter that could not have been patented; nor can it be used to ignore the actual language of the patent. *K-2 Corporation v. Salomon S.A.,* 191 F.3d 1356, 1367 (Fed.Cir. 1999). Thus, this Court has held that the doctrine of equivalents cannot allow a patent to encompass subject matter existing in the prior art. *Id.; see Wilson Sporting Goods Co., v. David Geoffrey & Assoc.,* 904 F.2d 677, 684 (Fed.Cir. 1990) ("[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by

literal claims."); *see also DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1323 (Fed.Cir. 2009), *citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21 (1997) (the defense of ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare' the prior art" that this is a legal limitation on the doctrine of equivalents to be decided by the court.")

In this case, the "means for transmitting the vehicle data" found in Claims 1 and 16 cannot be infringed by the Emtrac product without ensnaring the Morgan patent '434, which was cited as prior art in the patent in suit. Specifically, Claim 21 of the Morgan patent reads:

> 21. A traffic signal preemption system for enabling emergency vehicles to cause a traffic light controller at an intersection to preempt traffic signals at the intersection, said system comprising:
>
> A vehicle information transmission system installed in at least one emergency vehicle and including directional transmission means actuatable by the vehicle's occupants for generating information identifying said emergency vehicle and for repeatedly transmitting said information as a vehicle identification signal in the direction of vehicular motion; vehicle detection, identification, and preemption system connecting to at least one traffic light controller and including radio signal receiving means for receiving vehicle identification signals from one or more of said transmission systems, for extracting information identifying the emergency vehicle therefrom, and for determining, based upon preprogrammed preemption criteria including the identity of the vehicles, when and in favor of which direction and for how long to preempt an intersection;

27

Wherein wired vehicle detection, identification and preemption system contains intersection entry direction information for each of said at least one emergency vehicles, which information is stored within each said vehicle detection, identification and preemption system;

And wherein this intersection entry direction information enables said vehicle detection, identification, and preemption a system to determine the direction from which a given vehicle is approaching the intersection.

A5378. s. 86, l. 37-69. Even if the Emtrac device technically meets the limitations of Claim 1 and Claim 16 of "transmitting the vehicle data," and/or Claim 5 which speaks to the "system of Claim 1 wherein the transmitting means is a radio frequency transmitter," there is no infringement in this case because it ensnares the prior art and vitiates one or more claims. Emtrac cannot violate the provision for "means for transmitting the vehicle data," as the Morgan patent '434 is identified as a prior art reference for the '398 patent. The Morgan patent, especially Claim 21, gives Morgan and Cross the right to perform that function, if not to exclude others from doing so. A30062.

Moreover, the "vehicle data" portion of that phrase is not literally infringed. That is because Claim 1 and Claim 16 require "vehicle data" to be generated along a vehicle path. A188, s.9, l. 30-31; s.10, l. 45. There is no evidence that the Emtrac product generates vehicle data along any path. A2565. As to Claim 1, the patented "navigation means" involves "generating vehicle data are periodic intervals along a vehicle path." A188, s.9, l. 290-31. The Emtrac vehicle data is not generated at

periodic intervals along a vehicle path. A188, s.9, l.29-30.  Instead, a beginning point and ending point are recorded as part of preparation of a rectangular zone, which is stored along with all of the city's other zones, up to 5000, on the vehicle. A2509.

Also "vehicle data" is defined as including "vehicle position data." A188, s.9, l.31-32; Claim 8; Claim 17. In the Emtrac product, vehicle position cannot be transmitted to the intersection as there is no GPS receiver located at the intersection to process such information. A2539, A2540. While the GPS technology at the time of the patent here required differential GPS, involving two locations, Emtrac does not use differential GPS. Its only GPS unit is on the vehicle. It is undisputed that the patent in suit includes only one embodiment. Figure 1, setting forth a GPS system without the assistance of differential technology discloses a plus or minus 100 yard error rate. That embodiment was waived by Plaintiff. But even if considered, it cannot be deemed insubstantial. The Emtrac product does not infringe the elements dealing with transmitting vehicle data as a matter of law.

### D. The willfulness determination against Morgan and KME should be reversed.

Willfulness of infringement is a question of fact, for it includes elements of intent, reasonableness, and belief. *See Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1250, 9 USPQ2d 1913, 1932 (Fed.Cir.1989). The Court reviews the

objective prong of a willful infringement determination *de novo* and the subjective

prong for substantial evidence. *Bard Peripheral Vascular, Inc. v. W.L. Gore &*

*Ass., Inc.,* 682 F.3d 1003, 1006-07 (Fed.Cir. 2012).

To establish willful infringement, a patentee must show by clear and

convincing evidence that the infringer acted despite an objectively high likelihood

that its actions constituted infringement of a valid patent. *Id.* Once the threshold

objective standard is satisfied, the patentee must also demonstrate that this

objectively-defined risk was either known or so obvious that it should have been

known to the accused infringer. *Id.* The district court in this case stated:

> Morgan testified he intentionally chose not to read the Patent,
> read the 3M (which later became GTT) product manual for its
> GPS traffic preemption system, and designed and developed the
> Emtrac System. Trial Tr. 609-11. Morgan, as a developer,
> professed intimate knowledge of the Emtrac System. Pl.'s Trial
> Ex. 77. Morgan testified that he "encourag[ed] [Brad] Cross to
> help design it and manufacture" his Emtrac System with GPS.
> Trial Tr. 637. Morgan repeatedly claimed the Emtrac System did
> not infringe and the Court allowed GTT to ask Morgan questions
> on that point. Id. 611-12.

A24, A25. The district court forgot to include Morgan's testimony that he did not

read the patent because he did not think it was relevant and that he did not want to

copy. A1729-1835. Cross designed and manufactured the product and he did not

read the patent. He thought it did not apply. Morgan thought he was not violating

the '398 patent. He thought he had a defense to the lawsuit. He was not informed

of the gravity of the district court's claim construction ruling and procedural

determinations. That is obvious in his testimony at trial. A1729-1835. Morgan and KME in fact have a valid defense to the lawsuit and the willfulness determination should be reversed.

## CONCLUSION

For the foregoing reasons, KME and Morgan request that this Court reverse the judgment of infringement and willfulness against them.

Respectfully submitted,

 /s/Jana Yocom
Jana Yocom, P.C
Jana Yocom (#6193677)
320 S. 11th, Suite 1
Mount Vernon, Illinois 62864
618-731-1944

*Attorney for Defendants-Appellants*
*KM Enterprises, Inc.,*
*and Rodney Kris Morgan*

# ADDENDUM

# **ADDENDUM**

*Page*

July 13, 2012 Memorandum Opinion and Order (D.Ct. Docket Entry 96)............A1

September 24, 2013 Judgment in a Civil Case (D.Ct. Docket Entry 327)...........A17

April 25, 2014 Memorandum Opinion and Order (D.Ct. Docket Entry 431)......A19

April 28, 2014 Judgment in a Civil Case (D.Ct. Docket Entry 432)....................A50

May 14, 2014 Order (D.Ct. Docket Entry 469).....................................................A52

May 16, 2014 Judgment in a Civil Case (D.Ct. Docket Entry 470)....................A55

U.S. Patent No. 5,539,398...................................................................................A172

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Global Traffic Technologies,
LLC,

            Plaintiff,

        v.

Emtrac Systems, Inc.;
Kristopher Morgan; Andrew
Morgan; Rodney K. Morgan; and
KM Enterprises, Inc.,

            Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-4110 ADM/JJG

---

Chad Drown, Esq., Timothy M. Sullivan, Esq., Ari B. Lukoff, Esq., David J. F. Gross, Esq., James W. Poradek, Esq., Katherine S. Razavi, Esq., Lucas J. Tomsich, Esq., and Timothy E. Grimsrud, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Plaintiffs.

Jonathan D. Jay, Esq., Terrance C. Newby, Esq., and Nicholas S. Kuhlmann, Esq., Leffert Jay & Polglaze, PA, Minneapolis, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On May 30, 2012, a <u>Markman</u> hearing was held before the undersigned United States District Judge in this patent infringement action by Plaintiff Global Traffic Technologies, LLC ("GTT") against Defendants Emtrac Systems, Inc., Kristopher Morgan, Andrew Morgan, Rodney K. Morgan, and KM Enterprises, Inc. ("KME") (collectively "Emtrac"). GTT alleges that Emtrac infringed claims of U.S. Patent No. 5,539,398 (the "'398 Patent"). Emtrac denies the infringement allegations and counterclaims for declaratory judgment of non-infringement and invalidity of the '398 Patent.

**A1**

## II. BACKGROUND

The '398 Patent relates to a traffic preemption system ("TPS") based on Global Positioning Systems ("GPS"). Emergency vehicles and public transportation vehicles, referred to as "priority vehicles," are often equipped with a TPS. See Jay Aff. [Docket No. 83] Ex. 1 ("the '398 Patent") at 1:22-23. Without a TPS, priority vehicles would often be required to cross at intersections against a red light to get swiftly to their destination, thereby increasing the likelihood of traffic accidents. Id. at 1:27-32. A TPS functions to either prolong a green light to allow that vehicle to proceed through the intersection or switch the light from red to green. Id. at 1:41-45.

From its inception in the 1960s, TPS has evolved significantly. The first generation TPS was an optical preemption system, whereby an emitter on top of a vehicle produced strobes of light directed at detectors mounted on or near traffic lights. See generally '398 Patent at 1:36-39) (citing U.S. Patent No. 3,500,078)). These detectors then relayed a signal to the intersection cabinet, which processed the signal and directed the traffic light to change from red to green. Id. Optical systems have several disadvantages however, including that the vehicle must have a direct line of sight to the intersection for the strobe light to hit the detector, and weather may interfere with the transmission of the strobe light. Id. at 2:55-58, 3:42-43.

The second generation TPS was a radio preemption system, which sent radio signals from the vehicle to the intersection. See '398 Patent at 2:65-67. Radio preemption systems did not require a direct line of sight and they were not as focused or directionally-oriented as the optical systems. Id. at 3:31-33. However, this sometimes resulted in the unintended triggering of traffic signal systems at

2

**A2**

adjacent intersections. Id. at 3:5-11.

Third generation TPS uses GPS, rather than diffused radio or optical signals, to enable priority vehicles to pass unimpeded through selected intersections. '398 Patent at 3:48-53. Both GTT and Emtrac have designed, patented, and produce TPS which utilize GPS technology.

On December 13, 2011, a Joint Claim Construction Statement [Docket No. 74] was filed, identifying eight disputed terms in the '398 Patent. At the Markman hearing, Emtrac withdrew its request for this Court to construct the claim "intersection," leaving seven claims for construction below.

## III. DISCUSSION

### A. Standard of Review

Claim construction is a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). In construing claims, courts should look first to intrinsic evidence, which includes the claims, the specification, and the prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim terms are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). However, a patentee can choose to be "his or her own lexicographer by clearly setting forth an explicit definition for a claim term." Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999). "[A] claim term "should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001). In addition, the specification is usually "dispositive; it is the single best guide to

3

the meaning of a disputed term." Vitronics, 90 F.3d at 1582. Courts are nonetheless cautioned not to import limitations from the specification into the claims. Phillips, 415 F.3d at 1323; Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[I]t is the *claims*, not the written description, which define the scope of the patent right."). However, specifications can limit the construction of a means-plus-function claim. Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1361 (Fed. Cir. 2000). Claims amenable to more than one construction should be interpreted so as to preserve their validity if reasonably possible. Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1356 (Fed. Cir. 1999) (quoting Modine Mfg. Co. v. U.S. Int'l Trade Comm'n, 75 F.3d 1545, 1556 (Fed. Cir. 1996)).

While courts can consider extrinsic evidence to educate themselves about the patent and technology at issue, it is improper to rely on extrinsic evidence in construing claims unless, after consideration of all the intrinsic evidence, ambiguity remains. Mantech Envtl. Corp. v. Hudson Envtl. Serv., Inc., 152 F.3d 1368, 1373 (Fed. Cir. 1998); Vitronics, 90 F.3d at 1584. Extrinsic evidence is "evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." Vitronics, 90 F.3d at 1584. Dictionaries may be useful to courts in understanding the ordinary and customary meaning of words, and courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Phillips, 415 F.3d at 1322-23 (quoting Vitronics, 90 F.3d at 1584 n.6)). Where the meaning of a word is readily understood without need for clarification or explanation, no claim construction is necessary. See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("[Claim construction] is not an

4

**A4**

obligatory exercise in redundancy.").

**B.      Claim Construction**

**1.      "associated with the location"**

GTT submits that the phrase "associated with the location" as used in Claim 1, does not need to be construed.  Emtrac disagrees and asks the Court to construe the phrase to mean "at the intersection where the traffic signal that is to be preempted is located, which also contains the intersection module that receives the vehicle data."

Claim 1 refers to "means, <u>associated with the location</u>, for receiving the vehicle data" and "mapping means, <u>associated with the location</u>, for storing a plurality of positions corresponding to the allowed approaches to the location. . ."  '398 Patent at 9:34–39 (emphasis added).  The phrase "associated with the location" is unambiguous, well-understood, and a phrase which needs no construction by the Court.  See <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").  Dictionaries "are often useful to assist in understanding the commonly understood meaning of words" and are routinely used in claim interpretation.  <u>Id</u> at 1322.  "Associate" is alternatively defined as "to bring together or into relationship in any of various intangible ways (as in memory or imagination)," Merriam-Webster's Collegiate Dictionary 74 (11th Ed. 2007), "[t]o connect in the mind or imagination," The American Heritage Dictionary of the English Language 108 (5th ed. 2011), "[t]o correlate or connect logically or causally," <u>id.</u>, or to "connect (someone or something) with something else in one's mind," New Oxford

5

**A5**

American Dictionary 97 (3d. ed. 2010).  These definitions neither specify nor require physical connection or location within the definition of "associate."  The meaning of the phrase "associated with the location" — being logically or intangibly connected or related to a given place — is understandable by a juror, and further explanation risks confusion and redundancy.  See U.S. Surgical Corp., 103 F.3d at 1568.  Although the terms "associated" and "location" are broad words, inventors are "free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning. . . ." Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1367 (Fed. Cir. 2012).  Emtrac's proposed construction, with its locational limitation, would unduly limit the broad phrase "associated with the location."

While the words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in context of the specification and prosecution history, two exceptions to this rule exist: "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  Thorner, 669 F.3d at 1365 (citing Vitronics, 90 F.3d at 1580). Neither of these exceptions applies here.  Emtrac does not argue GTT acted as its own lexicographer, but instead appears to argue that GTT disavowed the full scope of the claim term in the specification. Emtrac's argument for incorporating these spatial limits relies on (1) the surrounding context of the claim and (2) the specification.  The specification cannot be used to incorporate limitations in this way. Phillips, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Moreover, the context of Claim 1 does not require the incorporation of spatial limits as Emtrac

requests. Emtrac argues that "location" in Claim 1 is limited to the intersection, in that it states it is a "system for determining whether a vehicle having an associated vehicle path is within an allowed approach of a location." '398 Patent at 9:26–28 (emphasis added). However, the phrase "associated with a location," even if the word "location" is interpreted to mean only an intersection, does not require Emtrac's claim construction limiting the intersection module to be located only at the intersection.

Emtrac also cites to the summary section of the '398 Patent, which states that "[e]ach intersection is equipped with an intersection module adapted to receive and process the vehicle data." Id. at 3:56–58. This argument fails, however, since the equipping of each intersection with an intersection module does not require that the module be physically located at the intersection. Further, GTT did not expressly and clearly disavow the full scope of its claim language. See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."); SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) (finding disavowal where the patentee disparaged prior art, repeatedly described his invention as a certain kind of design, and where the specification stated that the specific design was the basic "structure for all embodiments of the present invention contemplated and disclosed herein."). To disclaim or disavow a particular definition, the patentee must do so clearly and unmistakably. See Thorner, 669 F.3d at 1367. The '398 Patent did not criticize prior art where the TPS components were located in a vehicle, nor did it list reasons or advantages for locating maps at the intersection. Because GTT did not clearly disavow the plain and ordinary meaning and full scope of its claim, the

7

disavowal exception does not apply and "associated with the location" is given its plain and ordinary meaning.

### 2. "mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches"

In addition to arguing for a new construction of the phrase "associated with the location," Emtrac next contends that the entire phrase surrounding that language in Claim 1 falls under a means-plus-function limitation analysis and should thus be read as follows: "the device that stores a preprogrammed map of allowed approaches to the intersection is located at the intersection where the traffic signal that is to be preempted is located, and not in the vehicle." GTT retorts that the phrase does not implicate the means-plus-function analysis.

Means-plus-function claim elements are interpreted according to 35 U.S.C. § 112, ¶ 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

"Whether certain claim language invokes 35 U.S.C. § 112, ¶ 6 is an exercise in claim construction and . . . a question of law." Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 702 (Fed. Cir. 1998). Under 35 U.S.C. § 112, ¶ 6, the Court engages in a two-step process in construing means-plus-function terms: (1) the Court construes the function recited, and (2) then determines what structures have been disclosed in the specification that correspond to the means for performing the identified function. Kemco Sales, 208 F.3d at 1361. A court "may not import into the

claim features that are unnecessary to perform the claimed function." Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1352 (Fed. Cir. 2003) (citation omitted).

The parties do not agree that this claim phrase is in a means-plus-function form. The use of the phrase "means for" typically invokes means-plus-function analysis. Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1318 (Fed. Cir. 1999); see Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("Claim drafters conventionally use the preface 'means for' (or 'step for') when they intend to invoke [35 U.S.C. § 112(6)] . . . ."). The language here, "mapping means . . . for" is in means-plus-function form and invokes that analysis.

The function set forth in Claim 1 is plain: "storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches." '398 Patent 9:37-40. The second part of the analysis is what structures in the specification correspond to the means for performing these functions. Here, the "mapping means" is clarified in the specification as "map memory." '398 Patent at 5:57–59. GTT's proposed construction of this structure is "memory configured to store data," while Emtrac's proposed construction is "the device that stores a preprogrammed map of allowed approaches." Joint Claim Construction Statement 11, 14. Neither of these definitions adequately describes the structure. The Court construes the phrase "map memory" as "computer map memory," finding that "computer map memory" recites a sufficiently definite structure to perform the claimed function. See Optimal Recreation Solutions LLP v. Leading Edge Tech., Inc., 6 F. App'x 873 (Fed. Cir. 2001).

This structure definition does not include a specific placement; the physical location of the "computer map memory" is irrelevant to performing the twin functions of storing positions and providing

9

**A9**

a map of allowed approaches.  It appears that Emtrac argues that limitation should be based on the phrase "associated with the location," but as previously discussed, that phrase does not require that the mapping means be physically located at the intersection.  The past participial phrase is set-off by commas from the rest of the sentence, and it serves to modify "mapping means" rather than to impose a limitation on the means-plus-function phrase.   Therefore, no location limitation is warranted.

### 3.      "map of allowed approaches"

GTT proposes the term "map of allowed approaches" in Claims 1, 2, 11, 16, and 18 be given its plain meaning, while Emtrac urges a proposed construction of "a preprogrammed map of routes to the intersection where the traffic signal that is to be preempted is located, said map being stored at the intersection."  Joint Claim Construction Statement 16.  For the aforementioned reasons, this Court will not construe this claim to include a locational limitation and therefore rejects the language "said map being stored at the intersection."  As for the other term changes proposed by Emtrac, the map of allowed approaches is already defined as being programmed in the claim.  See '389 Patent at 10:24-25 ("a programmed map of allowed approaches to the intersection"), 10:27 ("the programmed map").  It is also defined as being programmed in the specification.  See also '389 Patent at 5:59-61 ("The map is programmed into the intersection module while the module is in 'mapping' mode, as is described in more detail below . . . .").  Although the phrase "preprogrammed" is used in Claim 16, the phrase is redundant and would serve no purpose here.  Further, because no location-specific limitation applies to the map of allowed approaches, the Court will construe the claim according to its plain meaning.

10

**A10**

4.      **"associated with the vehicle"; "associated with a vehicle"**

As with all the claims to be construed, GTT urges this Court to adopt the plain meaning of this

phrase as used in Claims 1 and 11.  Emtrac proposes that this Court construe these phrases as "within

or attached to the (a) vehicle that is approaching the intersection where the traffic signal that is to be

preempted is located."   As explained more fully in Section III(B)(1), the words "associated with a/the

vehicle" do not limit the navigation means in Claim 1 or the vehicle module in Claim 11 to the physical

location of the vehicle.  Notwithstanding the specification in Figure 1 depicting an embodiment in which

the navigation means is physically located on the vehicle, the word "associated" does not require such a

reading and will not be construed to so limit the claims.  Emtrac further argues that the geographic

limitation is part of a means-plus-function clause; however, for the aforementioned reasons, the word

"associated" is not such a limitation.  Both phrases will be construed in their plain meaning.

5.      **"associated with an intersection;" "associated with the intersection"**

GTT again urges this Court to adopt the plain meaning of this phrase as used in Claim 11, while

Emtrac requests this Court to construe the phrase as "within or attached to equipment at the

intersection where the traffic signal to be preempted is located."  Because it has previously been

determined that the phrases "associated with a/the location" and "associated with a/the vehicle" do not

specify a specific location, the word "associated" here  is likewise determined not to impose a physical,

geographical limitation to the '398 Patent.  The phrase will be construed in its plain meaning.

6.      **"transmitting the vehicle data"; "transmitting vehicle data"**

GTT proposes that this Court give the phrase "transmitting [the] vehicle data" its plain meaning

as used in Claims 1, 11, 16 and 17, while Emtrac proposes a construction of the phrase as "delivering

11

**A11**

data gathered by a vehicle to an intersection module that is located at an intersection." As previously explained, the '398 Patent does not require such geographic limitation.

Emtrac also argues, for the first time in its Opening Claim Construction Brief [Docket No. 82], that the phrase "vehicle data" is indefinite under 35 U.S.C. § 112, ¶ 2, which would render "any claims containing this term invalid." Opening Claim Construction Brief 34. Specifically, Emtrac contends that Dependent Claim 8 and Dependent Claim 10 are at odds with Claim 1. Dependant Claim 8 defines "vehicle data" as "position heading and velocity data corresponding to the vehicle," while Dependent Claim 10 defines vehicle data as "further includ[ing] vehicle heading and vehicle velocity data." From these essentially redundant statements, Emtrac urges this Court to find the two statements irreconcilable and therefore "insolubly ambiguous" and "indefinite" in violation of 35 U.S.C. § 112, ¶ 2.

Emtrac's argument fails for several reasons. Foremost, Emtrac raises this indefiniteness argument for the first time in its Opening Claim Construction Brief filed on May 3, 2012. The argument was conspicuously absent from the Joint Claim Construction Statement, as well as from its interrogatory responses submitted in February 2011 and February 2012 or its court-ordered prior art statement submitted on June 30, 2011. See Tomsich Decl. [Docket No. 89] Exs. A–C.[1] The argument is impermissibly tardy. Federal Rule of Civil Procedure 37 requires that "[i]f a party fails to provide information . . . , the party is not allowed to use that information . . . , unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 16 grants courts the authority to set

---

[1] The only mention of indefiniteness in any of these documents comes in the prior art statement, where Emtrac attempts to hedge its position by reciting that "In proffering this Prior Art Statement, [Emtrac] in no way waives its right to assert other invalidity and unenforceability defenses, including but not limited to indefiniteness. . . ." Tomsich Decl. Ex. C at 3.

**A12**

management deadlines and impose sanctions, such as exclusion, when those deadlines are violated.

Fed. R. Civ. P. 16(b, f). Courts have routinely excluded arguments and evidence raised at a "late stage

of the proceedings." ELCA Enter., Inc. v. Sisco Equip. Rental & Sales, Inc., 53 F.3d 186, 190 (8th

Cir. 1995) (finding that because "parties must provide clear and accurate responses to discovery

requests," a party's "eleventh hour attempt to switch the basis for its alleged damages" was properly

excluded); see also Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1376 n.4 (Fed. Cir. 2008)

(finding even evidence submitted in technical compliance with the prior art requirements of 35 U.S.C. §

282 to be excludable when the late disclosure "stripped [the opposing party] of any meaningful

opportunity to prepare an adequate cross-examination of the reference."); McDavid Knee Guard, Inc.

v. Nike USA, Inc., 809 F. Supp. 2d 863, 878 (N.D. Ill. 2011) (finding that a party waived the

invalidity defense of indefiniteness when it had not previously raised the issue and offered no valid

reason for its failure). The failure to make this argument any time prior to the month before the claim

construction hearing is unjustified and prejudices GTT. Moreover, Emtrac has failed to muster any

argument as to why the indefiniteness argument was not timely raised. As a result, this argument is

rejected.

Even were this argument timely asserted, it fails on its merits. While Emtrac attempts to conjure

a radical inconsistency between Dependent Claims 8 and 10, it is evident that they are a redundant

mistake. Emtrac does not explain how defining vehicle data as "position heading and velocity data"

which "further includes vehicle heading and vehicle velocity data" is anything beyond inartful. While

redundant, the phrase "vehicle data" is not "insolubly ambiguous" — the vehicle data definitely includes

heading and velocity, perhaps more. Emtrac has failed to prove that the claim is indefinite by clear and

13

**A13**

convincing evidence. Halliburton Energy Serv., Inc. v. M-I LLC, 514 F.3d 1244, 1249–50 (Fed. Cir. 2008). "[T]wo claims with different terminology can define the exact same subject matter," Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006), and so the test is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001). The mere use of redundant definitions of vehicle data, as well as the interchangeable use of "position" and "vehicle" to describe "heading," do not render this claim indefinite. The phrase, therefore, will be given its plain meaning.

Finally, Emtrac argues that the phrase "transmitting the vehicle data" or "transmitting vehicle data" should be construed as "delivering data via a wireless link gathered by a vehicle to an intersection module that is located within or attached to equipment at an intersection." Emtrac argues that these phrases are part of a means-plus-function claim and that the wireless link is the only structure disclosed by the specification which could perform the function of transmitting vehicle data. However, the phrase "transmitting [] vehicle data" is not a means-plus-function limitation — it is the function itself. Moreover, the word "transmitting" is not geographically limited. See American Heritage Dictionary 1846 ("To send from one person, thing, or place to another"); Oxford American Dictionary 1840 ("cause (something) to pass on from one place or person to another"). Accordingly, this phrase will be construed in its plain meaning.

7.    **"an intersection module associated with an intersection and adapted to track the vehicle path, the intersection module comprising:"**

GTT asserts that this phrase in Claim 11 can be given its plain meaning, while Emtrac proposes

14

that the phrase be construed to mean "a device located within or attached to the intersection where the traffic signal that is to be preempted is located, and which contains (1) a preprogrammed map of allowed approaches to the intersection and (2) a processor that receives data from a vehicle and compares that data with the preprogrammed map of allowed approaches."  Emtrac's proposed construction once again attempts to import a geographic location limitation into the term "intersection module" via the word "associated, but for the previously explained reasons, no such limitation is required.  While Emtrac highlights the phrase in the Summary section of the '398 Patent — "[e]ach intersection is equipped with an intersection module" — as support for its proposition that the intersection module must be physically located at the intersection itself, the word "equipped" carries no such locational requirement.  '398 Patent 3:56-57; see Oxford American Dictionary 586 (defining equip as to "supply with the necessary items for a particular purpose"); Merriam-Webster's Collegiate Dictionary 422 (defining "equip" as "to furnish for service or action by appropriate provisioning").  Further, the word "programmed" is not required to be construed as "preprogrammed."  See Oxford American Dictionary 1395 (defining "program" as to "(1) provide . . . with coded instructions for the automatic performance of a task . . . (2) arrange according to a plan or schedule . . . .").  The remainder of Emtrac's proposed construction tracks language already in Claim 11, thereby rendering it redundant and unnecessary.  Accordingly, this phrase will be construed in its plain meaning.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that, in interpreting the '398 Patent, the disputed terms will be construed in

accordance with this Order.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 13, 2012.

16

**A16**

≣AO450 (Rev. 5/85)   Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

GLOBAL TRAFFIC TECHNOLOGIES, LLC

V.

EMTRAC SYSTEMS, INC.

## JUDGMENT IN A CIVIL CASE

Case Number:  **10-4110 ADM/JJG**

**☒ Jury Verdict.** This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

**☐ Decision by Court.** This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

The issues have been tried and a decision has been rendered.  The jury awarded damages to Plaintiffs in the amount of  $5,052,118.00.

September 24, 2013
_____
Date

RICHARD D. SLETTEN, CLERK
_____

s/ Gertie Simon
_____
(By)                                        Gertie Simon,    Deputy Clerk

s/Ann D. Montgomery
_____
JUDGE ANN D. MONTGOMERY
UNITED STATES DISTRICT COURT



# UNITED STATES DISTRICT COURT
## District of Minnesota

Richard D. Sletten, Clerk
Lisa Rosenthal, Chief Deputy Clerk

| | | | |
|---|---|---|---|
| Warren E. Burger Federal Building and U.S. Courthouse 316 North Robert Street Suite 100 St. Paul, MN 55101 (651) 848-1100 | U.S. Courthouse 300 South Fourth Street Suite 202 Minneapolis, MN 55415 (612) 664-5000 | Gerald W. Heaney Federal Building and U.S. Courthouse and Customhouse 515 West First Street Suite 417 Duluth, MN 55802 (218) 529-3500 | U.S. Courthouse 118 South Mill Street Suite 212 Fergus Falls, MN 56537 (218) 739-5758 |

## CIVIL NOTICE

**The appeal filing fee is $455.00. If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

*This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

Form Modified 08/23/08

## A18

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Global Traffic Technologies,
LLC,

                    Plaintiff,

      v.

Emtrac Systems, Inc., Rodney K.
Morgan, STC, Inc., and KM
Enterprises, Inc.,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-4110 ADM/JJG

---

Chad Drown, Esq., Timothy E. Grimsrud, Esq., Timothy Sullivan, Esq., and Lauren J. Frank, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Global Traffic Technologies, LLC.

Jonathan D. Jay, Esq., Hellmuth & Johnson PLLC, Edina, MN; and, Terrance C. Newby, Esq., Leffert Jay & Polglaze, P.A., Minneapolis, MN, on behalf of KM Enterprises, Inc., STC, Inc., and Rodney K. Morgan.

---

## I. INTRODUCTION

      Defendants Rodney K. Morgan ("Morgan"), STC, Inc. ("STC"), and KM Enterprises,

Inc. ("KME") (collectively, the "Defendants") move for Judgment as a Matter of Law or New

Trial [Docket Nos. 411, 369, 372, 375, 378, 381], for a finding of Laches and Equitable Estoppel

[Docket No. 395], and for an amended ruling on the claim language of Claim 16 [Docket No.

401]. Plaintiff Global Traffic Technologies, LLC ("GTT") opposes these motions, and moves

for Confirmation of Willful Infringement, Enhancement of Damages, and Prejudgment Interest

[Docket No. 364]. For the reasons stated herein, Defendants' motions are denied and GTT's

motion is granted in part and denied in part.

**A19**

## II. BACKGROUND

On September 20, 2013, a jury found Defendants infringed GTT's Patent No. 5,539,398 (the "'398 Patent" or the "Patent"). The jury rejected Defendants' invalidity defenses concerning the '398 Patent and calculated damages in the amount of $5,052,118. Finally, the jury found by clear and convincing evidence that Defendants willfully infringed the '398 Patent.

## III. DISCUSSION

### A. Judgment as a Matter of Law ("JMOL") Standard

Rule 50(b) of the Federal Rules of Civil Procedure governs renewed motions for judgment as a matter of law. Under Rule 50, the court may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(1)- (3). The standard of review for granting a Rule 50(b) motion is whether sufficient evidence exists to support the jury verdict. A motion for judgment as a matter of law should only be granted when "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." Washburn v. Kan. City Life Ins. Co., 831 F.2d 1404, 1407 (8th Cir. 1987) (citation omitted). In deciding a motion for judgment as a matter of law, the court must view the evidence in the light most favorable to the party who prevailed before the jury, making all reasonable inferences in that party's favor. Id. (citation omitted). It is not the place of the court to substitute its own judgment for that of the trier of fact. Ryther v. KARE 11, 864 F. Supp. 1510, 1519 (D. Minn. 1994) (citing Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 803 (8th Cir. 1994)).

2

**A20**

## B. New Trial Standard

The decision whether to grant a new trial under Federal Rule of Civil Procedure 59(a) is committed to the discretion of the district court.  Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995).  "A new trial is required only when necessary to avoid a miscarriage of justice." Gearin v. Wal-Mart Stores, Inc., 53 F.3d 216, 219 (8th Cir. 1994) (citation omitted).  "While the standard for granting a new trial is less stringent than for judgment as a matter of law, a new trial shall be granted only to prevent injustice or when the verdict strongly conflicts with the great weight of evidence."  Maxwell v. J. Baker, Inc., 160 F.R.D. 580, 581 (D. Minn. 1995).  Similar to the standard for granting judgment as a matter of law, a court reviewing a motion for a new trial is "not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."  Fireman's Fund Ins. Co. v. Aalco Wrecking Co., 466 F.2d 179, 186 (8th Cir. 1972) (quoting Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 35 (1944)).

## C. Claim Construction and Sufficiency of the Evidence for Infringement

Defendants argue "the Jury's finding of infringement of Claim 1 is erroneous, unsupportable by the language of the Patent and contrary to the evidence offered at trial regarding how the Emtrac System functions."  Defs.' Br. Supp. JMOL [Docket No. 413] at 12. No reasonable jury, Defendants argue, could conclude the Emtrac System infringes Claim 1 of the '398 Patent, which provides:

> A system for determining whether a vehicle having an associated vehicle path is within an allowed approach of a location, comprising:
> navigation means, associated with the vehicle, for generating vehicle data at periodic intervals along the vehicle path, wherein the vehicle data includes vehicle position data;
> means for transmitting the vehicle data;

3

**A21**

means, associated with the location, for receiving the vehicle data;
mapping means, associated with the location, for storing a plurality of
positions corresponding to allowed approaches to the location and
providing therefrom a map of allowed approaches;
evaluation means for comparing the vehicle data to the map of
allowed approaches to determine whether the vehicle path
is within an allowed approach.

Defendants proceed line by line, making non-infringement arguments based, not on evidence presented at trial, but rather on their view of how claim terms should have been construed. Defs.' Br. Supp. JMOL, at 3-12. Defendants claim the Emtrac System does not generate "vehicle data" as that term is "defined by the Patent;" and does not transmit vehicle data; and does not receive data, "associated with the location;" and does not have "mapping means;" and does not determine if the vehicle is within an allowed approach. Id.

Claim terms are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

The Court construed the disputed Patent terms in July 2012. See Global Traffic Techs., LLC v. Emtrac Sys., No. 10-4110, 2012 U.S. Dist. LEXIS 96866 (D. Minn. July 13, 2012).[1] The Court determined all disputed terms in the claims are entitled to their plain and ordinary meaning. Id. Defendants suggested the Patent places location-specific limitations on the terms which would narrow the scope of the patent coverage. See id. The Court determined "that

---

[1] Claim construction is a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995).

4

**A22**

Defendants' proposed construction, with its locational limitation, would unduly limit the broad phrase "associated with the location." Id. at *8.

The Court addressed claim construction again in considering Defendants' summary judgment motion. See Global Traffic Techs., LLC v. Emtrac Sys., 946 F. Supp. 2d 884 (D. Minn. 2013). The Court determined further claim construction was unnecessary before trial. The Markman hearing was sufficient and all terms were to be considered by the jury using their plain meaning.[2]

The course of trial did not change the Court's view of claim construction. The language of the Patent was relatively clear, and no further claim construction was necessary. Defendants are not entitled to judgment as a matter of law on this basis.

In addition to their claim construction arguments, Defendants argue that based on the evidence presented at trial, no reasonable jury could have found that the Emtrac System infringed Claim 1 or Claim 16. In conflict with Defendants' argument, Plaintiff's expert, Dr. Charles Neuhauser, went through every limitation of the asserted claims and explained in detail where each limitation is found in the Emtrac GPS System. Trial Tr. 347-88. The jury evaluates the credibility of the parties' experts and the jury was entitled to credit Dr. Neuhauser's

_____

[2] Claim construction was made procedurally more difficult and complicated by Defendants' tardy raising of terms claimed to be disputed. See Global Traffic, 946 F. Supp. 2d at 904 ("The Court will not construe further claims at this time but will await the context of the trial to discern whether there are additional claim constructions germane to the contested issues at trial."). In their JMOL brief, Defendants assert non-infringement of Claim 16 based on a number of claim construction arguments (many that are the same or similar to claim construction arguments already addressed in Claim 1 arguments). Defendants did not request the Court to construe these terms for Claim 16. See Markman Brs. [Docket Nos. 74 and 82], Mem. Supp Summ. J. [Docket No. 125], Motion in Limine [Docket No. 268], Trial Brief [Docket No. 271]; see also Trial Tr. Section III.I. below discusses Defendants' Claim 16 "Indefiniteness" argument.

5

**A23**

testimony that the Emtrac System includes the features of Claims 1 and 16 of '398 Patent.

Energy Transp. Grp., Inc. v. William Demant Holding A/S, 697 F.3d 1342, 1352 (Fed. Cir.

2012). Defendants have not carried their "onerous burden" of showing that, even when the

record is viewed most favorably to GTT, there is a "complete absence of probative facts" to

support the jury's conclusions. Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 688-89

(8th Cir. 2001). Therefore, Defendants are not entitled to a judgment as a matter of law based on

sufficiency of the evidence with regards to infringement.

For these same reasons, the Court is convinced there was no miscarriage of justice. The

parties were given a fair opportunity to present their case and the jury weighed the evidence of

infringement. Defendants are not entitled to a new trial.

**D. Admission of Morgan Testimony**

"[A] district court has wide discretion in admitting and excluding evidence." Harris v.

Chand, 506 F.3d 1135, 1139 (8th Cir. 2007). The Eighth Circuit "will not set aside a jury verdict

unless the district court clearly and prejudicially abused its discretion in determining whether or

not to admit evidence." Shaw Group, Inc. v. Marcum, 516 F.3d 1061, 1068 (8th Cir. 2008). To

warrant a new trial, an evidentiary error must have been so prejudicial that a new trial, absent the

error, would be likely to produce a different result. Pointer v. DART, 417 F.3d 819, 822 (8th

Cir. 2005); Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008).

Defendants argue a new trial is warranted on Claim 16 because the Court permitted at

trial "extensive cross examination of Defendant Kris Morgan on this issue of whether the Emtrac

System infringed Claim 16." Defs.' Br. Supp. JMOL at 14. Morgan testified he intentionally

chose not to read the Patent, read the 3M (which later became GTT) product manual for its GPS

6

**A24**

traffic preemption system, and designed and developed the Emtrac System.  Trial Tr. 609-11.

Morgan, as a developer, professed intimate knowledge of the Emtrac System.  Pl.'s Trial Ex. 77.

Morgan testified that he "encourag[ed] [Brad] Cross to help design it and manufacture" his

Emtrac System with GPS.  Trial Tr. 637.  Morgan repeatedly claimed the Emtrac System did not

infringe and the Court allowed GTT to ask Morgan questions on that point.  Id. 611-12.  The jury

weighed the evidence and the testimony of Morgan.  Any new trial would also include vigorous

cross-examination of Morgan as a named defendant in the case.  This ground for a new trial is

rejected.

**E.  JMOL Damages**

Defendants' contend Plaintiff's expert, Donald A. Gorowsky, used a fatally flawed

methodology to calculate the damages of infringement.  In a pretrial order, the Court has

addressed Gorowsky's methodology, and found Gorowsky used methodologies approved by the

Federal Circuit.  Global Traffic, 946 F. Supp. 2d at 910-13.  The Court held, to the extent

Defendants disagreed with the expert's conclusions, Defendants could challenge them at trial.

Id.  At trial Defendants thoroughly cross-examined Gorowsky.  Defendants also presented

competing evidence and theories, arguing that there were viable competitors sufficient to justify

rejecting Gorowsky's two-supplier market theory.  This argument may have been accepted by

the jury's decision to ameliorate Plaintiff's requested damages.  Gorowsky estimated total

damages of $7.1 million, but the jury nevertheless returned a damages calculation of

approximately $5 million.  The lower verdict implies the jury weighed the evidence and believed

GTT proved its case by a greater weight of the evidence on some, but not all of Gorowsky's

conclusions and the other evidence presented by GTT.  The Court "will not engage in a weighing

or evaluation of the evidence, as these are jury functions." <u>Warren v. Prejean</u>, 301 F.3d 893, 903

(8th Cir. 2002). The evidence presented at trial supports a jury finding on damages. <u>See, e.g.,</u>

Trial Tr. 481, 519, 639, 689, 719, 880, 946-53.

Defendants also argue the Court created prejudicial error by permitting Gorowsky to

offer a "rebuttal opinion" using a report from Defendants' damages expert, Dr. Kenneth Serwin,

that was never offered at trial. The only testimony that was elicited from Gorowsky about

Defendants' unoffered expert report concerned methodology. Gorowsky testified that Serwin's

report showed the use of the same methodology Gorowsky used, but came to different

conclusions about the amount of damages. Trial Tr. 1666-68. GTT offered this testimony to

rebut Defendants' attempts to undermine Gorowsky's methodology. The admission of this

limited rebuttal opinion was not error. <u>See</u> <u>id.</u> 1670-71.

## F. Jury Instructions

Defendants object to Jury Instruction No. 35 regarding the notice and marking

requirements of 35 U.S.C. § 287(a). <u>See</u> Final Jury Instr. [Docket No. 311].

"The trial court has a great deal of discretion in framing the jury instructions and

the court need not give the exact language desired by the parties." <u>Ryther</u>, 108 F.3d at 847.

Instructions do not have to be "technically perfect or even a model of clarity." <u>Gill</u>, 546 F.3d at

563. Rather, the relevant question is "whether the instructions, taken as a whole and viewed in

light of the evidence and applicable law, fairly and adequately submitted the issues in the case to

the jury." <u>Shaw</u>, 516 F.3d at 1068-69; <u>accord</u> <u>Chiron Corp. v. Genentech, Inc.</u>, 363 F.3d 1247,

1259 (Fed. Cir. 2004).

The issue of marking was fairly and adequately submitted to the jury. The instruction stated, "'Marking' means that substantially all of the products, or if reasonable under the circumstances, the packaging of the products, made, offered for sale, or sold under the '398 patent are marked . . . ." This language reflects the state of the law. The law states:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a). Numerous courts, including the United States Supreme Court, have "focused on whether the method of marking the patented product provided notice, rather than on the precise mechanistic compliance with the statute." Heraeus Electro-Nite Co. v. Midwest Instr. Co., Civil No. 06-355, 2007 WL 3407128, at *3-4 (E.D. Pa. Nov. 14, 2007) (collecting cases); see Sessions v. Romadka, 145 U.S. 29, 50 (1892) ("It is not altogether clear that the stamp could not have been made upon the smaller sizes, but, in a doubtful case, something must be left to the judgment of the patentee . . . ."); Chicago Pneumatic Tool Co. v. Hughes Tool Co., 192 F.2d 620, 626 (10th Cir. 1951) (marking sufficient where containers of drill bit for deep wells marked).

At trial, GTT witnesses testified that GTT marks the packaging of its Opticom GPS product. Trial Tr. 856-57; see also Pl.'s Tr. Exs. 41, 43, 45, 47, 51. GTT's witness, the chief

9

**A27**

operating officer, testified that GTT's marking was consistent and continuous since 2004, a holdover from how GTT's predecessor, 3M, marked its products.  Trial Tr. 849, 855, 858. Furthermore, GTT testified that it marked the packaging and the operations manuals because the product was a system wherein the components were scattered in different places and often out of the view of the public.  Id.  853-54, 856-57 (Opticom products are installed in a vehicle's trunk and/or in a locked equipment cabinet, and/or on the traffic signal mast above the street); see also Pl.'s Trial Exs. 52-58, 60, 61, 65 (manuals).

Because the purpose of the statute is to provide notice to the public, "[n]umerous courts have found that placing patent numbers on a product's packaging complies with the Marking Statute even in situations where it was plainly possible to have physically placed the patent number on the product itself."  Heraeus, 2007 WL 3407128, at *4.  For example, marking the packaging may be sufficient when "marking the article itself would not provide sufficient notice to the public," Ethicon Endo-Surgery, Inc. v. Hologic, Inc., 689 F. Supp. 2d 929, 945 (S.D. Ohio 2010), when "conditions of use" make marking the packaging reasonable, or when marking the packaging is the "custom of this industry," Heraeus, 2007 WL 3407128, at *4.  Instruction No. 35 reflects the reasonable approach taken by the courts in judging notice and marking. Therefore, Instruction No. 35  "fairly and adequately submitted the issues in the case to the jury." Shaw, 516 F.3d at 1068.

Defendants also believe the Court erred by not giving Defendants' Proposed Jury Instructions No. 4 (Means Plus Function Requirements/Step Plus Function Requirements), No. 5

10

**A28**

(Method Claim–Order of Performance of Steps)[3] and No. 8 (Claim Interpretation/Person of Ordinary Skill in the Art). Defendants modified Federal Circuit Bar Association Model Patent Jury Instructions with language from cases they believed would enhance the jury's understanding of the applicable law. To the extent Defendants properly objected to the Court's instructions on the record, the Court addressed the objections and found that its Instructions conveyed to the jury the applicable law, fairly and adequately. See, e.g., Final Jury Instruction Nos. 17, 20, and 21.

## G. JMOL Infringement Defenses

Defendants seem to confuse JMOL and objections to jury instructions. Defendants submit that the Court should have granted Defendants motions for JMOL regarding (1) the conception date issue, including the Court's refusal to give Defendants' proposed jury instruction regarding GTT's lack of independent corroboration of its claimed 1992 invention date; (2) the prior art issue under 35 U.S.C. § 102(a); and (3) the 35 U.S.C. § 102(g) issues, including the Court's refusal to read the jury Defendants' proposed instruction regarding multiple inventors. None of the jury instruction objections, to the extent they were properly made, warrant a new trial. And, the jury had ample evidence to find Defendants' prior art evidence did not anticipate the '398 Patent and that a prior invention did not precede the '398 Patent invention.

---

[3] Defendants' objection to the Court's failure to give Defendants' Proposed Jury Instructions Nos. 4 and 5 are covered more fully below.

### 1. Conception Date

The instructions given to the jury regarding the date of invention used the exact language of the current Federal Circuit Bar Model Instructions, which includes language about corroboration:

> But, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea.

See Federal Circuit Bar Model Instruction 4.3(a). "In assessing corroboration of oral testimony, courts apply a rule of reason analysis; [u]nder a rule of reason analysis, an evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed. Cir. 1996) (internal citations and quotations omitted). GTT presented testimony of its inventors, the inventors' notebooks, and a supervisor's signature on the notebooks. The jury instruction appropriately reflects the requirement of corroboration and a reasonable jury could have believed that this evidence was reliable, accurate, and favorable to GTT.

### 2. Anticipation by Publication

Defendants offered the Gerland/Bradfield papers as prior art that anticipated the '398 Patent. At trial GTT offered several reasons why these papers did not anticipate the invention. As an example, GTT's expert Dr. Neuhauser testified that the Gerland/Bradfield papers do not disclose a number of limitations found in the asserted claims of the '398 Patent, including "maps of allowed approaches." Trial Tr. 392-96. The jury could reasonably find this expert testimony more credible than Defendants' expert. For this reason alone, Defendants are not entitled to JMOL with regard to anticipation.

12

**A30**

### 3. Prior Invention

Defendants fault the Court for failing to give the jury their "multiple inventors" instruction. See Defs.' Proposed Jury Instruction No. 27. However, Defendants do not complain that the prior invention instruction, Final Jury Instruction No. 30, included an incorrect statement of the law. And nothing in the instruction prevented Defendants from making their arguments about multiple inventors to the jury. Thus, the instruction adequately stated the law and Defendants were not entitled to the specific language they requested. Ryther, 108 F.3d at 847.

### H. Morgan's Personal Liability

Morgan is liable for inducement if (1) he knew of the patent, (2) intended to cause directly infringing acts, such as a city's use of the Emtrac GPS System, and (3) had specific intent or "knowledge that the induced acts constitute patent infringement." See Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2068, 2071 (2011). The evidence at trial showed Morgan knew about the '398 Patent in 2004, knew it related to GPS, and knew it related to traffic preemption. Trial Tr. 608-09, 655-56. Morgan intended cities to use the Emtrac GPS System. Morgan "get[s his] hands dirty everyday installing, testing, repairing" the Emtrac GPS System. Pl.'s Trial Ex. 77. Morgan testified that he "help[s] cities use the Emtrac GPS product." Trial Tr. 633.

Defendants argue GTT failed to introduce or offer evidence that Morgan specifically intended to cause infringement. Defendants contend that the only evidence on record is that Morgan knew of the '398 Patent but did not specifically review its language; therefore, since he did not read the '398 Patent, he could not have developed specific intent to infringe.

Willfulness, and willful blindness, is discussed further below, but, in this context "specific intent may be inferred from circumstantial evidence." Ricoh Co., Ltd. v. Quanta Computer Inc., 550 F.3d 1325, 1342 (Fed. Cir. 2008). The Supreme Court has stated that the doctrine of willful blindness has two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. Global-Tech, 131 S. Ct. at 2071 (finding it hard to fathom under the circumstances of that case, how defendant could have ignored the patent "other than to manufacture a claim of plausible deniability in the event [defendant] was later accused of patent infringement."). Morgan was himself an owner of patents. Given his knowledge that a patent existed related to GPS traffic preemption, Morgan's refusal to look at the patent or to consult his company's counsel about the patent lacks credibility. GTT offered evidence and made precisely this argument at trial. The jury could have reasonably concluded Morgan believed there was a high probability that the patent would cover his Emtrac product if he examined it and that he deliberately avoided learning facts that would inform that risk.

Alternatively, the jury may not have found credible Morgan's ignorance of the '398 Patent. Morgan professed a knowledge of patent law and he claimed intimate involvement with the design, production, and sale of traffic preemption systems. A reasonable jury could have concluded Morgan read the Patent but nevertheless chose to infringe.

For these reasons, Morgan is not entitled to a JMOL on personal liability.

14

**A32**

## I.  Claim 16 Indefiniteness

Defendants' indefiniteness argument is based on their assertion that Claim 16 of the '398 Patent contains a step-plus-function limitation.  Defendants then argue that under step-plus-function requirements, Claim 16 is invalid for indefiniteness.

Yet again, Defendants essentially ask the Court to reopen claim construction for Claim 16.  As discussed above, this attempt to reopen claim construction is extremely tardy.  The Court sees no reason to reopen claim construction, as the claims are entitled to their plain and ordinary meaning.

Claim 16 does not include a step-plus-function limitation and the term "allowing" for Claim 16(g) is not indefinite.[4]  The parties agree that indefiniteness is an issue properly decided by the Court because it is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  <u>Atmel Corp. v. Information Storage Devices</u>, 198 F.3d 1374, 1378 (Fed. Cir. 1999).  Defendants argue Claim 16 is a step-plus-function claim simply because it uses the phrase "comprising the steps of."

Step-plus-function claims are a rarity in patent law, with "[o]nly a few cases hav[ing] found the existence of a step-plus-function claim element."  <u>Seal-Flex, Inc. v. Athletic Track & Court Const.</u>, 172 F.3d 836, 850 n.5 (Fed. Cir. 1999) (Rader, J., concurring).  Step-plus-function claims typically use the phrase "steps for."  <u>See</u> <u>Masco Corp. v. United States</u>, 303 F.3d 1316, 1327 (Fed. Cir. 2002) (finding no step-plus-function claim where the claims used "steps of"

---

[4] Relatedly, Defendants argue that Claim 16's step-plus-function format required the Court give Defendants' Proposed Jury Instructions Nos. 4 and 5.  Since claim construction for Claim 16 is impermissibly tardy, and since Claim 16 is not a step-plus-function claim, Defendants were not entitled to these jury instructions.

15

instead of "steps for"; the "step for" language "signals the drafter's intent to invoke [35 U.S.C.] § 112, paragraph 6"). The Court in <u>Masco</u> explained that even where the drafter employs "steps for" language, paragraph 6 of § 112 is implicated "only when steps plus function <u>without acts</u> are present." <u>Id.</u> (citing <u>Seal-Flex</u>, 172 F.3d at 849-50); <u>see also</u> <u>Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.</u>, 279 F.3d 1022, 1028 (Fed. Cir. 2002).

In this case, Claim 16 is not in step-plus-function form. The language of Claim 16 does not employ the "steps for" format.[5] In addition, the language of Claim 16 clearly includes acts. Claim 16(a) refers to the act of "receiving", 16(b) recites the act of "processing." Claim 16(c), (d), (e), and (f) respectively refer to the acts of "transmitting," "providing," "comparing," and "determining." Finally, 16(g), which is the only specific limitation Defendants focus on, refers to the act of "allowing the vehicle to preempt the traffic signals associated with the intersection if the vehicle is within one of the allowed approaches." <u>See</u> <u>Masco</u>, 303 F.3d at 1327 (concluding that it will not "constrain the scope of coverage of a claim limitation without a showing that the limitation contains nothing that can be construed as an act").

Even if Claim 16 were in step-plus-function form, under established Federal Circuit law, the standard for indefiniteness "does not compel absolute clarity." <u>Datamize, LLC v. Plumtree Software, Inc.</u>, 417 F.3d 1342, 1347 (Fed. Cir. 2005). Accordingly, to prove indefiniteness, Defendants must show "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution

---

[5] Defendants also make an argument that if the Court finds that Claim 16 is in a steps-plus-function form, or even if it is a method claim, then the steps need to be performed in the order they are written. But the presumption, unrebutted by Defendants, is that the steps of a method claim do not need to be performed in any particular order. <u>See, e.g.</u>, <u>Baldwin Graphic Sys. v. Siebert, Inc.</u>, 512 F.3d 1338, 1345 (Fed Cir. 2008).

history, as well as her knowledge of the relevant art area." <u>Halliburton Energy Serv. v. M-I LLC</u>, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). Moreover, "claims are not indefinite merely because they present a difficult task of claim construction." <u>Id.</u> at 1249. Rather, "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," then the claim is "sufficiently clear to avoid invalidity on indefiniteness grounds." <u>Id.</u>

In this case, Defendants cannot meet the clear and convincing evidence standard. GTT's expert Dr. Neuhauser walked through each part of Claim 16, explaining how a person skilled in the art at the time of the invention would understand the language. Trial Tr. 475-76. In particular, he testified that "allowing" is understood as the act of "releasing the request, allowing the request to issue." <u>Id.</u> This testimony reflects the plain and ordinary meaning of the claim, so Defendants would not be entitled to a ruling of indefiniteness, even if this issue had been properly raised.

## J. Issues Reserved for Court Determination

The issues of laches and equitable estoppel were not submitted to the jury, as these issues are "committed to the sound discretion of the trial judge." <u>A.C. Aukerman Co. v. R.L. Chaides Constr. Co.</u>, 960 F.2d 1020, 1028 (Fed. Cir. 1992). The Court reserved its decision on these issues after hearing the full trial testimony and receiving supplemental post-trial briefing. Trial Tr. 1660-63.

### 1. Laches

Laches is "an equitable defense to a claim for patent infringement." <u>Aukerman</u>, 960 F.2d at 1028. "In a legal context, laches may be defined as: (1) the neglect or delay in bringing suit to

remedy an alleged wrong, (2) which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." Id. at 1028-29. The Court weighs "the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability." Id. at 1034. "The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." Id. at 1032. The prejudice against the defendant is measured as evidentiary or economic:

> Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts. Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.

Wanless v. GE, 148 F.3d 1334, 1337 (Fed. Cir. 1998). "A delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial." Id. If laches is established, damages prior to suit may be barred. Id. at 1028.

Seeking summary judgment, Defendants argued the laches "clock" started ticking when GTT learned that GPS was used to enhance an Emtrac System in 2004 or 2005. Global Traffic Tech., 946 F. Supp. 2d at 902. GTT responded that the clock only started to run sometime after 2007, when Defendants began selling the Emtrac GPS System accused of infringement. Id. GTT argues that earlier Emtrac systems, even the ones that used a GPS compass, did not infringe the '398 Patent. Id. In denying summary judgment, the Court held that these arguments represented genuine issues of material fact that would need to be developed at trial, but if the clock did not start until 2007 "three years is not an unreasonable time in which to consider whether or not to bring suit." Id.

At trial, through Morgan's testimony, the evidence developed that the "second generation Emtrac GPS product accused of infringement" was launched in 2007. Trial Tr. 588. From 2004 through 2006, Defendants did not sell second generation units. Id. at 578-80, 585. Although Defendants showed that GTT was concerned about Emtrac's development of a GPS traffic priority system in 2004-2006, there was no clear act of infringement during that time to justify starting the laches clock. Defs.' Trial Exs. 27, 28, 31, and 32. A party may be charged with constructive knowledge of another's infringement in certain circumstances, including where the infringer's activities are "pervasive, open, and notorious" such that "a reasonable patentee would suspect they were infringing." Wanlass, 148 F.3d at 1338. Defendants have not shown that their incorporation of GPS into their Emtrac GPS System was pervasive, much less open and notorious. Simply "dabbling whether to get back into this market" as Morgan described his conduct, Trial Tr. 587-88, is not sufficient to place GTT on notice.

STC argues that even if KME is not entitled to laches, GTT unreasonably delayed bringing suit against STC until December 2011. GTT's explanation for its delay at trial was that in September 2010, GTT did not understand STC's deep involvement with Morgan, KME, and the infringing Emtrac GPS System. Instead, GTT thought that STC was "a contract manufacturer." Id. at 745. Through the discovery process in the lawsuit against KME and Morgan, GTT learned, as Brad Cross confirmed at trial, that STC's involvement was deeper than GTT initially though. STC, KME, and Morgan are a "joint venture" with respect to selling the Emtrac GPS System, id. at 1425, and STC also writes the source code, id. at 1426, provides technical support to customers id. at 1426-28, and drafts the product manuals, id. at 1437. Once GTT learned of this relationship, it filed suit against STC.

19

**A37**

Defendants also cannot satisfy the prejudice prong of their laches defense. Defendants have not argued that they suffered evidentiary prejudice. To prove economic prejudice, Defendants must show a change in economic position that occurred "because of and as a result of" delay by GTT bringing suit, "not simply a business decision to capitalize on a market opportunity." Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 774 (Fed. Cir. 1995). There was evidence at trial that Defendants' radio signal traffic preemption system was no longer selling after 2004. Trial Tr. 587. Morgan "looked up on the Internet what 3M [GTT's predecessor] had going on at the time." Id. at 655. He then "talked to Brad [Cross] about the equipment" and they "knocked it over a little bit and decided, yeah, we'd give it a shot and see if we could revive the Emtrac system, you might say." Id. at 655-56. Defendants argue that if GTT had caught them infringing sooner, then Defendants may not have invested further resources into the project. But, Morgan has testified that he knew about the '398 Patent in 2004. Id. at 608-09, 655-56. He just refused to look at it. Instead, Morgan looked at a 3M manual and tried to design with Brad Cross a device that was different enough from the product in the 3M manual that they hoped they would not be infringing. Defendants made a business decision to launch KME in 2007 and begin selling the Emtrac GPS System despite knowing there was a patent covering GPS traffic priority systems. Defendants cannot now claim prejudice for GTT's alleged delay, when Defendants did not do a thorough investigation of the legal risks they could be exposing themselves to when they launched their product. Defendants have not shown prejudice due to a delay in suit.

20

**A38**

## 2. Equitable Estoppel

"Three elements must be established to bar a patentee's suit by reason of equitable estoppel: (a) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. . . . ; (b) the alleged infringer relies on that conduct; and (c) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." Aukerman, 960 F.2d at 1028.

A patentee's "silence alone will not create an estoppel," id. at 1043-44, because "[n]o principle is better settled than that a party is not estopped by his silence unless it has misled another to his hurt," Philadephia, W. & B.R. Co. v. Dubois, 79 U.S. 47, 64 (1870). Rather, for "a patentee's 'misleading conduct' [to be] essentially misleading inaction," the "plaintiff's inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned." Aukerman, 960 F.2d at 1042.

Defendants argue that in 2009, GTT and Morgan met to discuss their competing products. Morgan claims GTT "suggested several times that GTT should resell his product rather than [GTT's] own." Trial Tr. 730. Defendants further argue Morgan was led to believe GTT would not sue him for infringement. GTT has its own version of the 2009 meeting with Morgan. Given the jury's consistent finding of infringement and its finding of willful infringement (discussed further below), the Court does not fully accept Defendants' version of this 2009 discussion. However, even if Morgan's version of the 2009 meetings could be believed, the equitable estoppel argument still fails because GTT's conduct was not

21

**A39**

"misleading." See Altech Controls Corp. v. EIL Instr., Inc., 8 Fed. Appx. 941, 946 (Fed. Cir.

2001) ("district court abused its discretion in finding estoppel" based on meeting between parties

in which a "possible merger" was discussed). To prevail, Defendants must prove GTT

"abandoned" an infringement claim against Defendants through misleading conduct. Aukerman,

960 F.2d at 1042. But a plaintiff's "willingness to engage in licensing negotiations with

[defendant] cannot be the basis of misleading conduct." Vectra Fitness v. Icon Health & Fitness,

288 F. Supp. 2d 1155, 1166 (W.D. Wash. 2003). Furthermore, even if GTT "attempt[ed] to

negotiate licenses" for the '398 Patent "followed by a period of silence," that would not

constitute "the necessary misleading conduct." Meyers v. Asics Corp., 974 F.2d 1304, 1308

(Fed. Cir. 1992). Defendants have not proven that its license negotiation with GTT was

misleading under this standard. Therefore, Defendants are not entitled to equitable estoppel.

**K. Willful Infringement**

The Federal Circuit has established a two-part test for determining willful infringement.

The plaintiff must first show that "the infringer acted despite an objectively high likelihood that

its actions constituted infringement of a valid patent." In re Seagate, 497 F.3d 1360, 1371 (Fed.

Cir. 2007) (en banc). Willful infringement "requires at least a showing of objective

recklessness." Id. The plaintiff then must show that the "objectively-defined risk" was "either

known or so obvious that it should have been known to the accused infringer" (the subjective

prong). Id.

While the first part of the willfulness test—the objective prong—often involves "mixed

questions of law and fact," the Federal Circuit holds that it is ultimately a question of law subject

to de novo review that "is best decided by the judge." Bard Peripheral Vascular, Inc. v. W.L.

22

**A40**

Gore & Associates, Inc., 682 F.3d 1003, 1005-06 (Fed. Cir. 2012) (en banc). In determining the objective prong, however, the Federal Circuit holds that the Court may rely on underlying findings of fact by the jury. Indeed, because the objective prong "tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement," the question "often posed is whether a defense or noninfringement theory was 'reasonable.'" Id. at 1005-06. A court may therefore "allow the jury to determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness." Id. at 1008. But "the ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge." Id. Accordingly, at the end of the day, "the court should determine, 'based on the record ultimately made in the infringement proceedings,' whether a 'reasonable litigant could realistically expect' [the asserted defenses] to succeed." Id. (citation omitted).

In this case, Morgan's trial testimony is dispositive. Morgan, himself a holder of patents, testified that he became aware of the '398 Patent around 2004. Trial Tr. 608-09, 655-56. He discussed the fact of the Patent's existence with Brad Cross. Morgan also testified that he refused to review the Patent because he did not want to risk infringement. However, he did study 3M's product manual. Cross and Morgan testified they then attempted to design a product that was different than the 3M/GTT GPS system. In 2007, Defendants began selling the accused GPS system.

No reasonable litigant, and certainly not a savvy businessman such as Morgan, could expect to avoid infringement by simply refusing to look at a patent, and then by designing around the patent holder's embodiment of its patent. Plaintiff's product is not the same as

Plaintiff's patent.  See Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834, 846 (Fed. Cir. 1992).  The Court finds that an objectively reasonable person, with knowledge that a patent exists in the field in which the potential infringers wish to compete, would not ignore the patent, but would investigate whether its design would infringe.[6]

The second part of the test is "subjective," and the jury can aid the Court in determining the underlying facts as to Defendants' subjective intent.  The jury found, from Defendants' testimony and the evidence, that GTT proved by clear and convincing evidence the second part of the test.  GTT persuaded the jury that Defendants "actually knew or should have known that their actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent."  Final Jury Instruction No. 24; Special Verdict Form [Docket No. 326] IV.  The evidence of record supports this conclusion.  The Court relies on the jury's verdict in finding Defendants' infringement was willful.

## L.  Enhancement of Damages

Under 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed" by the jury.  An award of enhanced damages is appropriate when (1) the fact-finder determines that the infringer engaged in culpable conduct (i.e., willful infringement); and (2) the Court exercises its discretion to determine whether and to what extent to enhance damages.  Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996).  "An act of

---

[6] Even when a defendant has willfully ignored a patent, it is still possible that a defendant could create a product which did not infringe, or that the ignored patent was invalid.  Defendants might have fortunately been successful in designing around GTT's embodiment instead of the patent.  Or, Defendants might have been forgiven their inattention to the patent if the patent was invalid as anticipated or obvious.  When a jury or the Court finds a patent claim is invalid the question of willfulness is largely moot.  See, e.g., Krippelz v. Ford Motor Co., 667 F.3d 1261, 1269-1270 (Fed. Cir. 2012).

willful infringement satisfies [the] culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award." Id.

With respect to the second requirement, the Federal Circuit in Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992) set forth multiple factors to guide courts in determining whether to enhance damages. "The paramount determination . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances." Id. at 826. The Read factors include (1) "whether the infringer deliberately copied the ideas or design of another;" (2) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;" (3) "the infringer's behavior as a party to the litigation;" (4) "defendant's size and financial condition;" (5) "the closeness of the case;" (6) "the duration of defendant's misconduct;" (7) "remedial action by the defendant;" (8) "defendant's motivation for harm;" and (9) "whether defendant attempted to conceal its misconduct." Id. at 827.

GTT's request that the Court triple the damages award is denied.

## 1. Deliberate Copying

Defendants clearly had knowledge of the '398 Patent in 2004. Defendants claim they did not look at the '398 Patent, but rather looked at product manuals and attempted to design a system different from GTT's embodiment, presumably so as not to infringe. The Court and jury found that Defendants unreasonably, recklessly, and likely intentionally failed to read the '398 Patent. Defendants chose to risk ignoring the '398 Patent, but there is little evidence that Defendants took the '398 Patent and deliberately copied it. Some evidence suggests Defendants

25

**A43**

were trying to build something new, but their conduct was reckless and willfully blind. Therefore, this factor weighs in favor of enhancing damages.

### 2. Good-Faith Belief of Invalidity

Defendants could not have had a good-faith belief in the invalidity of the '398 Patent at the time that they became aware of it in 2004 because they claim that they did not read the Patent. Therefore, this factor weighs in favor of GTT.

### 3. Behavior as Litigant

Even though Defendants could not have had a good-faith belief in the invalidity of the '398 Patent at the time that they became aware of it in 2004, as litigants they were entitled to attempt to and prove that they either did not infringe or that '398 Patent is invalid. Defendants argued vigorously through claim construction for a narrow reading of the patent. This view was not so unreasonable that it was asserted in bad faith. Similarly, Defendants' anticipation and obviousness defenses were honestly presented. The jury ultimately found the '398 Patent valid, but that does not make preserving their defenses bad faith litigation. That said, Defendants did create frustrating confusion with repeated attempts, some of dubious value and merit, to slip new claim construction analysis into arguments long after it was clear how the Court had construed the terms. This factor weighs in GTT's favor.

### 4. Defendants' Size and Financial Condition

GTT contends Defendants are a major player in the market for GPS Traffic Systems and Defendants have made millions of dollars in this market. Even so, Defendants will likely not be a major player in this market following this litigation. STC and KME have represented to the Court that they will have to conduct layoffs and possibly declare bankruptcy following entry of

26

**A44**

judgment.[7] That said, January 7, 2014, marked the end of the '398 Patent's protection of GTT's invention. STC and Morgan will not be excluded from the market going forward, to the extent that they can find funding to restart production. Therefore this factor weighs neutrally.

### 5. Closeness of the Case

GTT asserts Defendants knew of the patent in 2004, sold the infringing Emtrac GPS System starting in 2007, and Defendants continued to sell the infringing system after being sued for infringement. As mentioned above, Defendants had good-faith invalidity defenses once litigation began; therefore, the Court finds that this factor does not weigh in favor of enhancing damages.

### 6. Duration of Defendant's Misconduct

The duration of the infringement was long, but the jury's damage award reflects the period of infringement. As mentioned before, Defendants were entitled to make invalidity defenses and contest claim construction. Clearly, willfully ignoring a patent is misconduct, but enhancement of damages on this basis would be double or triple punishing Defendants. There is no additional misconduct to which the Court can point to justify enhancing damages.

### 7. Remedial Action by Defendants

GTT contends Defendants never took remedial action to cease infringement and never attempted to implement any design around the '398 Patent. Defendants explain that there is no evidence of remedial action because Defendants reasonably believed that the patent was invalid.

---

[7] Defendants did not supply any direct evidence to this effect, but did submit declarations under oath [Docket Nos. 349 and 350].

The jury rejected Defendants' assertion that the patent was invalid, but the defense was not so unreasonable as to enhance damages on that basis.

### 8. Defendants' Motivation for Harm

GTT contends Defendants specifically targeted GTT and sought "total supremacy over" GTT in the market. But GTT also claims that it was the only competitor in a two-supplier market. Therefore, since GTT was Defendants' only competition, it is unsurprising that the two companies would have competed vigorously. There is no evidence of any special maneuvering that would indicate competition beyond that expected between two competitors in a narrow niche market; therefore, this factor weighs against enhancing damages.

### 9. Defendants' Attempts to Conceal

GTT asserts that Defendants sought to conceal its infringing activity by insisting that the '398 Patent was invalid. Defendants contend that there is no evidence that they attempted to conceal their acts. The Court agrees. Defendants openly sold its Emtrac System starting in 2007. Therefore, this factor weighs against enhancing damages.

After reviewing the totality of the circumstances and weighing the <u>Read</u> factors, the Court concludes that an award of enhanced damages is warranted. Given that some significant factors weigh in favor of enhancing damages, the Court awards half the compensatory damage amount, $2,526,059, as an appropriate enhancement of damages.

## M. Prejudgment Interest

The Supreme Court has explained that "prejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." <u>Gen. Motors Corp. v. Devex Corp.</u>, 461 U.S. 648, 654 (1983). Prejudgment interest is not a penalty

but "serves to make the patent owner whole, for damages properly include the foregone use of money of which the patentee was wrongly deprived." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed. Cir. 1996). Accordingly, awarding "prejudgment interest is the rule, not the exception." Id.

The Federal Circuit affords district courts "wide latitude in the selection of interest rates." Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991). A variety of rates have been utilized by courts in patent cases, including statutory rates set by state statutes, the U.S. Treasury bill rate, the prime rate, the prime rate plus a percentage, and a rate on borrowed funds. See, e.g., 7-20 D. Chisum, Chisum on Patents, § 20.03 (citing cases that gather examples of different rates used by courts). In addition, "the determination whether to award simple or compound interest similarly is a matter largely within the discretion of the district court." Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 557 (Fed. Cir. 1984).

Prejudgment interest shall be awarded at a simple rate of 10% per annum not compounded on the $ 5,052,118 award. See Minn. Stat. § 549.09. As 35 U.S.C. § 284 does not specify a rate to be used for prejudgment interest, courts often use the statutory interest rate of the state in which they sit. See Bowling v. Hasbro, Inc., 582 F. Supp. 2d 192, 208 (D.R.I. 2008) (awarding the Rhode Island state rate of 12%). In Minnesota, this rate is 10% per annum. Minn. Stat. § 549.09. Even though the damages period began in 2007, the jury did not award GTT's full request for damages. Therefore, prejudgment interest will run from 2010, assuming that the jury discounted early infringement cases that it did not believe warranted recovery.[8] At 10% per

---

[8] In response to GTT's recommendation of the Minnesota state statutory rate of 10%, see Minn. Stat. § 549.09, Defendants suggest using the 52-week United States Treasury bill rate or the prime interest rate (estimated by Defendants' damages expert at 3.25%), compounded

annum from January 1, 2010, through October 31, 2013, the prejudgment interest is $923,965.

Daily interest is $1,384.14 for each day after October 31, 2013.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendants Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.'s Motions

for Judgment as a Matter of Law or New Trial [Docket Nos. 411, 369, 372, 375,

378, 381] are **DENIED**;

2.  Defendants' Motion for Laches and Equitable Estoppel [Docket No. 395] is

**DENIED**;

3.  Defendants' Motion for an Amended ruling on Claim 16 Indefiniteness [Docket

No. 401] is **DENIED**;

4.  Plaintiff Global Traffic Technologies, LLC's Motion for Confirmation of Willful

Infringement, Enhancement of Damages, and Prejudgment Interest [Docket No.

364] is **GRANTED IN PART**, and **DENIED IN PART**;

5.  Enhancement of Damages is awarded in the amount of $2,526,059; and,

---

annually.  Defendants' expert did not even calculate the amount for the 52-week Treasury bill rate and that low rate does not serve to make the patent owner whole.  The prime interest rate is also extremely low and does not serve to make the plaintiff whole.

6.     Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 25, 2014.

AO450 (Rev. 5/85)  Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

Global Traffic Technologies,
LLC,

                              Plaintiff,

**JUDGMENT IN A CIVIL CASE**

V.

                              Case Number:  10-4110 ADM/JJG

Emtrac Systems, Inc., Rodney K.
Morgan, STC, Inc., and KM
Enterprises, Inc.,

                              Defendants.

☐ **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. Defendants Rodney K. Morgan, STC, Inc., and KM Enterprises, Inc.'s Motions for Judgment as a Matter of Law or New Trial [Docket Nos. 411, 369, 372, 375, 378, 381] are **DENIED**;

2. Defendants' Motion for Laches and Equitable Estoppel [Docket No. 395] is **DENIED**;

3. Defendants' Motion for an Amended ruling on Claim 16 Indefiniteness [Docket No. 401] is **DENIED**;

4. Plaintiff Global Traffic Technologies, LLC's Motion for Confirmation of Willful Infringement, Enhancement of Damages, and Prejudgment Interest [Docket No. 364] is **GRANTED IN PART**, and **DENIED IN PART**;

5. Enhancement of Damages is awarded in the amount of $2,526,059; and,

6. Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

|                                   |                                        |
|-----------------------------------|----------------------------------------|
| April 28, 2014                    | RICHARD D. SLETTEN, CLERK              |
| Date                              |                                        |
|                                   | s/ M. Price                            |
|                                   | (By)          M. Price   Deputy Clerk  |

C:\Users\price\Desktop\Blank Judgment Form.wpd

**A50**

Form Modified:  09/16/04



# UNITED STATES DISTRICT COURT
## District of Minnesota

Warren E. Burger Federal
Building and U.S. Courthouse
316 North Robert Street
Suite 100
St. Paul, MN  55101
(651) 848-1100

U.S. Courthouse
300 South Fourth Street
Suite 202
Minneapolis, MN 55415
(612) 664-5000

Gerald W. Heaney Federal
Building and U.S.
Courthouse
515 West First Street
Suite 417
Duluth, MN 55802
(218) 529-3500

Edward J. Devitt U.S.
Courthouse and Federal
Building
118 South Mill Street
Suite 212
Fergus Falls, MN  56537
(218) 739-5758

## CIVIL NOTICE

**The appeal filing fee is $505.00.  If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> *This is a summary only.  For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1.  Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2.  Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3.  Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4.  Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal.  This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires.  If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it.  The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

**A51**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Global Traffic Technologies,
LLC,

              Plaintiff,

**ORDER**

     v.

Civil No. 10-4110 ADM/JJG

Rodney K. Morgan, STC, Inc.,
and KM Enterprises, Inc.,

              Defendants.

_____

Chad Drown, Esq., Timothy E. Grimsrud, Esq., Timothy Sullivan, Esq., and Lauren J. Frank, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Global Traffic Technologies, LLC.

Jonathan D. Jay, Esq., Hellmuth & Johnson PLLC, Edina, MN; and, Terrance C. Newby, Esq., Leffert Jay & Polglaze, P.A., Minneapolis, MN, on behalf of STC, Inc.

Jana Yocom, Esq., Jana Yocom PC, Mount Vernon, IL; and, Andrew G. Birkeland, Rasmus Law Office, LLC, Minneapolis, MN, on behalf of KM Enterprises, Inc. and Rodney K. Morgan.

_____

       On September 24, 2013, the undersigned United States District Judge recorded a

Judgment in the above captioned case. The document [Docket No. 327] was miscaptioned,

listing Emtrac Systems, Inc. as a Defendant.[1]  On September 20, 2013, the jury had found KM

Enterprises, Inc., Rodney "Kris" Morgan, and STC, Inc. (collectively, "Defendants") infringed

claims 1, 3, 8, 10, 16 and 17 of United States Patent No. 5,539,398 ("'398 patent"). The jury had

also found that the asserted claims of the '398 patent were not invalid. The jury awarded

damages in the amount of $5,052,118. Finally, the jury had found Defendants willfully infringed

the '398 Patent.

_____

[1] At trial for simplicity reasons Defendants were collectively referred to as "Emtrac." The Court's orders and the jury's special verdict form correctly identified the Defendants at trial.

**A52**

On April 25, 2014, the Court decided issues it reserved for its own consideration following the full development of facts at trial [Docket No. 431]. The Court also decided issues of enhancement of damages and prejudgment interest. The Court found enhanced damages in the amount of $2,526,059 were appropriate to add to the jury's verdict. In addition, the Court found $923,965 in prejudgment interest through October 31, 2013, plus an additional $1,384.14 in interest for each day after October 31, 2013. On April 28, 2014, Judgment [Docket No. 432] was entered, again identifying Emtrac Systems, Inc. as a Defendant in the caption. The April 28 Judgment expected reference to Docket No. 327 to add the jury's awarded damages to calculate the total compensation award..

The purpose of this Order is to correct the captioning error and consolidate the damages information recorded in each judgment into one place for easy administration.[2]

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     The jury returned a verdict of willful infringement and no invalidity of claims 1, 3, 8, 10, 16 and 17 of United States Patent No. 5,539,398 in favor of Plaintiff Global Traffic Technologies, LLC and against Defendants KM Enterprises, Inc., Rodney "Kris" Morgan, and STC, Inc.;

---

[2] After being alerted to these clerical errors, but before the entering of this Order, Defendants filed motions to stay enforcement of judgment pending appeal and a motion to seal documents. [Docket Nos. 455, 459 and 464]. No appeal has yet been filed. Therefore, Defendants' motions to stay are denied as premature, and documents Defendants submitted in support of their motions, not yet under seal, will be returned.

The jury awarded damages to Plaintiff Global Traffic Technologies, LLC in the amount of $5,052,118;

2.    Enhancement of Damages is awarded in the amount of $2,526,059; and,

3.    Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

4.    Defendants Motions to Stay Enforcement of Judgment Pending Appeals [Docket Nos. 455 and 464] are **DENIED**, as premature; and,

5.    Defendants' Motion to Seal Pleading/Motion/Other Documents [Docket No. 459] is **DENIED** as moot.  Documents submitted will be returned and will not be filed at this time.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

                                        BY THE COURT:


                                        _____s/Ann D. Montgomery_____
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated:  May 14, 2014.

3

**A54**

✎ AO450 (Rev. 5/85)   Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

Global Traffic Technologies,
LLC,

Plaintiff,

**JUDGMENT IN A CIVIL CASE**

V.

Case Number:   10-4110 ADM/JJG

Rodney K. Morgan, STC, Inc., and KM
Enterprises, Inc.,

Defendants.

☒ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☐ **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. The jury returned a verdict of willful infringement and no invalidity of claims 1, 3, 8, 10, 16 and 17 of United States Patent No. 5,539,398 in favor of Plaintiff Global Traffic Technologies, LLC and against Defendants KM Enterprises, Inc., Rodney "Kris" Morgan, and STC, Inc.; The jury awarded damages to Plaintiff Global Traffic Technologies, LLC in the amount of $5,052,118;

2. Enhancement of Damages is awarded in the amount of $2,526,059; and,

3. Prejudgment Interest is $923,965, plus $1,384.14 for each day after October 31, 2013.

4. Defendants Motions to Stay Enforcement of Judgment Pending Appeals [Docket Nos. 455 and 464] are **DENIED**, as premature; and,

5. Defendants' Motion to Seal Pleading/Motion/Other Documents [Docket No. 459] is **DENIED** as moot. Documents submitted will be returned and will not be filed at this time.

|  |  |
|---|---|
| May 16, 2014 | RICHARD D. SLETTEN, CLERK |
| Date | |
| | s/  M. Price |
| | (By)              M. Price    Deputy Clerk |

C:\Users\price\Desktop\Blank Judgment Form.wpd

**A55**

Form Modified:  09/16/04



# UNITED STATES DISTRICT COURT
## District of Minnesota

| | | | |
|---|---|---|---|
| Warren E. Burger Federal Building and U.S. Courthouse 316 North Robert Street Suite 100 St. Paul, MN 55101 (651) 848-1100 | U.S. Courthouse 300 South Fourth Street Suite 202 Minneapolis, MN 55415 (612) 664-5000 | Gerald W. Heaney Federal Building and U.S. Courthouse 515 West First Street Suite 417 Duluth, MN 55802 (218) 529-3500 | Edward J. Devitt U.S. Courthouse and Federal Building 118 South Mill Street Suite 212 Fergus Falls, MN 56537 (218) 739-5758 |

## CIVIL NOTICE

**The appeal filing fee is $505.00. If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> *This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1.   Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2.   Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3.   Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4.   Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

**A56**



Case No. 10-cv-4110

P# 1

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

July 05, 2013

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,539,398*

ISSUE DATE: *July 23, 1996*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. Tarver

M. TARVER
Certifying Officer

PTX 1-0001

US005539398A

# United States Patent [19]

## Hall et al.

[11] **Patent Number:** 5,539,398

[45] **Date of Patent:** Jul. 23, 1996

[54] **GPS-BASED TRAFFIC CONTROL PREEMPTION SYSTEM**

[75] Inventors: **Timothy J. Hall**, North St. Paul, Minn.; **Mark A. Schwartz**, River Falls, Wis.; **Steven M. Hamer**, Willernie, Minn.

[73] Assignee: **Minnesota Mining and Manufacturing Company**, St. Paul, Minn.

[21] Appl. No.: **515,933**

[22] Filed: **Aug. 16, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 178,881, Jan. 7, 1994, abandoned.

[51] Int. Cl.6 .............................. **G08G 1/095**; G06F 7/70
[52] U.S. Cl. ............................ **340/907**; 340/906; 340/988; 340/990; 340/995; 364/436; 364/424.01
[58] Field of Search ................................ 340/907, 906, 340/988, 989, 990–993, 995, 424.01, 424.02; 364/449, 450, 436, 437, 443

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,355,607 | 3/1940 | Shepherd | 177/337 |
| 3,831,039 | 8/1974 | Henschel | 307/234 |
| 3,886,515 | 5/1975 | Cottin et al. | 340/994 |
| 4,162,477 | 7/1979 | Munkberg | 340/32 |
| 4,230,992 | 10/1980 | Munkberg | 328/140 |
| 4,443,783, | 4/1984 | Mitchell | 340/32 |
| 4,573,049 | 2/1986 | Obeck | 340/924 |
| 4,701,760 | 10/1987 | Raoux | 340/993 |
| 4,713,661 | 12/1987 | Boone et al. | 340/994 |
| 4,734,863 | 3/1988 | Honey et al. | 364/449 |
| 4,734,881 | 3/1988 | Klein et al. | 364/900 |
| 4,791,571 | 12/1988 | Takahashi et al. | 364/436 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0574009A2 | 12/1993 | European Pat. Off. . |
| 2670002 | 6/1992 | France . |
| 2693820 | 1/1994 | France . |

### OTHER PUBLICATIONS

Ivan A. Getting, "The Global Positioning System", *IEEE Spectrum*, Dec. 1993, pp. 36–47.
Megadyne Information Systems, Software Product Briefs, Jan. 1987.
Megadyne Information Systems, V–TRAX Automated Vehicle Monitoring Information System, Jan. 1988, pp. 1–7.
METS, Inc., Automatic Vehicle Location Vehicle Management System Brochure Jan. 1994.
Differential Corrections Inc. (DCI), Differential Correction Services Product Brochures Jan. 1994.
Motorola, Automatic Vehicle Location System Brochure, Jan. 1985.
Motorola, Automatic Vehicle Locatin System Brochure, Jan. 1986.
Morrow, Inc., Vehical Tracking Brochure, Jan. 1987.
Etak Emergency Response System Brochure Jan. 1994.
ETAK, Inc. Product Brochures, Jan. 1986.
ACCQPOINT, Low–Cost Nationwide Real–Time Differential GPS Product Brochure, Jan. 1993.

*Primary Examiner*—Donnie L. Crosland
*Attorney, Agent, or Firm*—Gary L. Griswold; Walter N. Kim; Kari H. Bartingale

[57] **ABSTRACT**

A traffic control preemption system uses data received from a global positioning system (GPS) to determine whether a vehicle issuing a preemption request is within an allowed approach of an intersection. GPS signals are received and processed by the vehicle module to generate vehicle data, including the vehicle's position, heading and velocity. The vehicle data is transmitted via radio transmission or some other medium. Each intersection has an associated intersection module which, if within range of the vehicle's transmitting equipment, compares the received vehicle data with a preprogrammed map of allowed approaches to the intersection. If the vehicle data sufficiently matches the map of allowed approaches, the vehicle's preemption request is forwarded to the intersection controller to appropriately control the phase of the traffic signal at the intersection.

**19 Claims, 9 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A173

PTX 1-0002

**5,539,398**
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,799,162 | 1/1989 | Shinkawa et al. | 364/436 |
| 4,914,434 | 4/1990 | Morgan et al. | 340/906 |
| 4,963,889 | 10/1990 | Hatch | 342/357 |
| 5,043,736 | 8/1991 | Darnell et al. | 342/357 |
| 5,068,656 | 11/1991 | Sutherland | 340/989 |
| 5,072,227 | 12/1991 | Hatch | 342/357 |
| 5,119,102 | 6/1992 | Barnard | 342/357 |
| 5,172,113 | 12/1992 | Hamer | 340/907 |
| 5,177,489 | 1/1993 | Hatch | 342/357 |
| 5,214,757 | 5/1993 | Mauney et al. | 340/990 |
| 5,334,974 | 8/1994 | Simms et al. | 340/990 |
| 5,345,232 | 9/1994 | Robertson | 340/995 |
| 3,550,0778 | 3/1967 | Long | 340/32 |

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0003



## FIG.1

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0004



*FIG.2*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0005



*FIG.3*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A177



*FIG.4*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

**A178**



## FIG.5

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0008



*FIG.6*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

**A180**

PTX 1-0009



*FIG.7*

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0010



*FIG.8*



FIG.9

A183

PTX 1-0012

5,539,398

1

# GPS-BASED TRAFFIC CONTROL PREEMPTION SYSTEM

This is a continuation of application Ser. No. 08/178,881 filed Jan. 7, 1994, now abandoned.

## FIELD OF THE INVENTION

This invention relates to a traffic preemption system and, more particularly, to a preemption system that receives data from a global positioning system (GPS) to track the approach of a vehicle requesting preemption of a traffic signal.

## BACKGROUND

Traffic signals have long been used to regulate the flow of traffic. Generally, traffic signals have relied on timers or vehicle sensors to determine when to change the phase of traffic signal lights, thereby signaling alternating directions of traffic to stop, and others to proceed.

Emergency vehicles, such as police cars, fire trucks and ambulances, are generally permitted to cross an intersection against a traffic signal. Emergency vehicles have typically depended on horns, sirens and flashing lights to alert other drivers approaching the intersection that an emergency vehicle intends to cross the intersection. However, due to hearing impairment, road noise, air conditioning, audio systems and other distractions, a driver of a vehicle approaching an intersection will often not be aware of the warning signal being emitted by an approaching emergency vehicle, thus resulting in a dangerous situation.

This problem was addressed in the commonly assigned U.S. Pat. No. 3,550,078 to Long, which is incorporated herein by reference. The Long patent discloses that as an emergency vehicle approaches an intersection, the emergency vehicle emits a preemption request comprised of a stream of light pulses occurring at a predetermined repetition rate. A photocell, which is part of a detector channel, receives the stream of light pulses emitted by the approaching emergency vehicle. An output of the detector channel is processed by a phase selector, which then issues a phase request to a traffic signal controller to change or hold green the traffic signal light that controls the emergency vehicle's approach to the intersection.

While the system disclosed by Long proved to be a commercial success, it became apparent that the system did not have adequate signal discrimination. In addition, the length of time during which the pulse request signal remained active after the termination of light pulses was not uniform and sometimes too short to allow safe transit of the emergency vehicle.

Commonly assigned U.S. Pat. No. 3,831,039 (Henschel), which is incorporated herein by reference, improves on the system disclosed in the Long patent by improved selectivity of low repetition rate light sources of gas discharge lamps, such as fluorescent lights, neon signs, and mercury vapor lights. Further, Henschel improves the discrimination between a series of equally spaced light pulses and a series of irregularly spaced light pulses such as lightning flashes.

In the system disclosed by Henschel, the stream of light pulses must have proper pulse separation and continue for a predetermined period of time. Also, once a preemption call is issued to the traffic signal controller, the preemption call must remain active for at least a predetermined time period. The discrimination circuit disclosed by Henschel provides

2

an improvement over the discrimination circuit disclosed by Long and results in improved discrimination.

Although such systems contemplated that preemption systems would be used for emergency vehicles, it was desirable to use them with non-emergency vehicles such as buses and maintenance vehicles. It thus became necessary to differentiate between different types of emergency and non-emergency vehicles. The commonly assigned U.S. Pat. Nos. 4,162,477 (Munkberg) and 4,230,992 (Munkberg), which are incorporated herein by reference, disclose an optical traffic preemption system wherein different vehicles transmit preemption requests having different priority levels, and in which the signal controller can discriminate between requests of differing priority and give precedence to the higher priority signal. The optical emitter disclosed by Munkberg transmits light pulses at a variety of selected predetermined repetition rates, with the selected repetition rate indicative of a priority level.

Commonly assigned U.S. Pat. No. 4,734,881 (Klein and Oran) which is incorporated herein by reference, provides for performance of the optical preemption functions with logic based circuitry replacing a large number of discrete and dedicated circuits. The microprocessor circuitry utilizes a windowing algorithm to validate that pulses of light were transmitted from a valid optical traffic preemption system emitter.

Commonly assigned U.S. Pat. No. 5,172,113 (Hamer) which is incorporated herein by reference, discloses a method of optically transmitting data from an optical emitter to a detector mounted along a traffic route used specifically to receive data or to an optical traffic preemption system located at an intersection. Hamer allows variable data to be transmitted in a stream of light pulses by interleaving data pulses between priority pulses. For example, an emergency vehicle can transmit data in a stream of light pulses from an optical emitter that can include an identification code that uniquely identifies the emitter, an offset code that causes a phase selector to create a traffic signal timing color offset, and an operation code that causes traffic signal lights to assume at least one phase. Further, an emitter can transmit setup information, for example a range setting code that causes a phase selector to set a threshold to which future optical transmissions will be compared. Phase selectors constructed in accordance with the Hamer disclosure are provided with a discrimination algorithm which is able to track a plurality of optical transmissions with each detector channel. Optical emitters as disclosed by Hamer are provided with a coincidence avoidance mechanism which causes overlapping optical transmission from separate optical emitters to drift apart. Hamer discloses an optical signal format that allows variable data to be transmitted, while maintaining compatibility with existing optical traffic preemption systems.

One problem with all of the above described optical systems is that they require a line-of-sight to the signal controller at the intersection due to the optical nature of the preemption signal. Thus, while they may work acceptably for road systems which follow a rectangular grid pattern, they suffer several disadvantages. For example, where approaches to an intersection are blocked from line-of-sight or follow an irregular, curved or abruptly angled pattern, optically-based systems are not effective because they require a line of sight to the receiver.

Radio based, as opposed to optically based systems, for traffic control preemption have also been developed. For example, U.S. Pat. No. 2,355,607 (Shepherd) describes

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0013

5,539,398

| 3 | 4 |

radio communications systems for vehicular traffic control wherein a directional transmission and/or reception located at the intersection, or on the vehicle, provides traffic light control based on coded signals transmitted from emergency vehicles. However, the inherent lack of directional precision of the radio system causes numerous traffic lights positioned parallel to the direction of travel to be affected. This is a major disadvantage because such prior art radio transmitter systems may erroneously pre-empt signal lights which are not on the approach route of an on-coming vehicle demanding preemption.

Radio transmitter systems also suffer from range inaccuracies which may be caused by signal attenuation or reflection. For example, a building may block, reflect, or attenuate a radio frequency which is not a line-of-sight signal. Since radio transmitter systems typically use signal strength to estimate range, signal attenuation gives rise to inaccurate range estimates at the receiving intersection electronics. Adverse weather, such as precipitation or fog, may also adversely affect the range sensitivity of existing radio transmitter dependent systems.

Efforts to reinforce radio systems with additional control functions are disclosed in U.S. Pat. No. 4,443,783 (Mitchell) wherein a directional transmitter is located in the approaching vehicle with omnidirectional receivers at intersections and multiple frequencies, selected frequency combinations, and selected red and amber light combinations provide accommodation for inaccuracies. U.S. Pat. No. 4,573,049 (Orbeck) discloses two way communication of information on intersection preemption request and action.

A major drawback of radio transmitters is that while they do not require a line-of-sight approach, their inherent lack of directionality means that they may erroneously control a signal light which is not on the vehicle's route but which is proximate the route.

There is therefore a need for a traffic preemption system for locations where approaches to an intersection are not line-of-sight or where road systems do not follow a rectangular grid pattern. Such a system would desirably offer the following advantages: (1) discretion without the need for a strobe as used in optical systems; (2) immunity from weather effects on system range; and (3) capability for easy implementation in applications with curving or abruptly angled approaches.

SUMMARY

The present preemption system provides a traffic control preemption system using data received from a global positioning system (GPS). GPS signals are received and processed by a GPS receiver and a processor module in the vehicle to generate navigational vehicle data, such as position, heading and velocity. The vehicle data, along with other data such as vehicle identification codes, priority codes or a preemption request, are transmitted via radio waves or some other medium. Each intersection is equipped with an intersection module adapted to receive and process the vehicle data. Each intersection module contains a preprogrammed map of allowed approaches to the intersection. Each intersection module within range of a vehicles transmitting equipment compares the received vehicle data with the map of allowed approaches. If the vehicle data sufficiently matches the map of allowed approaches to a particular intersection, the intersection module forwards the vehicle's preemption request to the intersection controller.

The present preemption system also preferably includes speed and heading sensors which provide vehicle data in

areas of GPS signal obstruction or multipath. The system also provides multiple priority levels for different types of vehicles requesting preemption. In addition to traffic signal preemption, the system may also be used to provide for automatic vehicle location information for scheduling or traffic flow control purposes.

BRIEF DESCRIPTION OF THE DRAWINGS

The various objects, features, and advantages of the present preemption system will become apparent upon reading and understanding the following detailed description and accompanying drawings in which:

FIG. 1 shows a system level block diagram of a first embodiment of the present traffic control preemption system;

FIG. 2 shows a system level block diagram of an alternate embodiment of the present traffic control preemption system;

FIG. 3 shows a system level block diagram of an additional alternate preferred embodiment;

FIG. 4 shows a schematic roadway diagram illustrating operation of the traffic control preemption systems of FIGS. 1 and 2;

FIG. 5 shows a schematic roadway diagram illustrating operation of the traffic control preemption system of FIG. 3;

FIG. 6 shows a schematic roadway illustrating operation of the present preemption system in a GPS obstruction or multipath area;

FIG. 7 shows the control flow of absolute position mapping of the preemption system of FIGS. 1 and 2;

FIG. 8 shows the control flow for relative position mapping of the preemption system of FIG. 3; and

FIG. 9 shows the control flow for tracking of vehicle position to determine whether a vehicle is in the allowed preemption corridor.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 shows a system level block diagram of a preferred embodiment of the present GPS-based traffic control preemption system. The present preemption system utilizes information received from a global positioning system (GPS) 5 to determine whether a particular vehicle is within an allowed approach of an intersection. The GPS 5 is well known and has many defense and civilian uses. The GPS 5 is a space-based radio navigation system maintained by the U.S. Department of Defense, and consists of a constellation of 18 or more orbiting satellites. From these satellites, any user equipped with appropriate GPS receivers can determine their position anywhere in the world to within ±100 meters. Error purposely induced into the system by the U.S. Department of Defense limits the accuracy of the GPS for civilian use to ±100 meters. This GPS induced error varies over time. More detail regarding the GPS can be found in the article, "The Global Positioning System", by Ivan A. Getting, IEEE Spectrum, pp. 36–37, December 1993.

The preemption system of FIG. 1 also comprises a vehicle module 100 and an intersection module 200. The GPS signal 10 is received by GPS receiver antenna 20 and transmitted to GPS receiver 40, which is available from Rockwell International Corporation, Richardson, Tex., as Rockwell Corporation Model NAVCORE V™. The GPS receiver 40 processes the GPS signal 10 to determine various naviga-

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0014

5,539,398

| 5 | 6 |

tional data regarding the vehicle, such as the vehicle's position, heading and velocity.

The vehicle position can be measured and processed by the present vehicle module 100 and intersection module 200 by any one of many known navigational coordinate systems. For example, the World Geodetic System (WGS-84) measures position in terms of latitude and longitude. The Earth-Centered, Earth-Fixed (ECEF) system is a spherical coordinate system with its origin at the center of the earth. It shall be understood that position may be measured in these or any other coordinate systems without departing from the scope of the present invention.

In addition to the navigational data regarding the vehicle such as position and heading, the GPS receiver 40 also generates information regarding which set of GPS satellites were used to determine the navigational data. Other data regarding the vehicle, such as priority codes, mode commands, identification codes and traffic control preemption request may also be generated as appropriate by processor 60.

All of the data generated by GPS receiver 40 and by processor 60 (hereinafter referred to collectively as "vehicle data") is then transmitted via transmitter 80 and antenna 101 to the intersection module 200. Intersection module 200 includes a data receiving antenna 210 which receives the vehicle data from the vehicle transmitting antenna 101. The vehicle data is then transmitted to a data receiver 230, which converts the radio frequency signal to digital form and outputs the vehicle data to a processor 250. The receiver antenna 210, receiver 230, transmitter antenna 201 and transmitter 80 are available as Modpak Plus Wireless Modem™, available from Curry Controls Company, Lakeland, Fla.

Each intersection includes an intersection controller 320, which controls the phase of traffic signals at the intersection, allowing alternating directions of traffic to proceed or stop. Such intersection controllers are well-known in the art. Each intersection controller thus controls the traffic signal for all possible approaches to a particular intersection. At a 4-way intersection, vehicles may approach from the north, south, east or west, for example. However, in a radio-based system, preemption requests from all of the allowed approaches, and even those on approaches belonging to different intersections (within range of the receiver antenna 210), are received by the intersection controller. The present preemption system therefor determines whether a vehicle is within one of the allowed approaches to that intersection. In order to properly control the phase of the traffic signal, the intersection module also determines which allowed approach the vehicle is on. This ensures that the intersection controller correctly adjusts the phase of the traffic signals to allow the vehicle to travel in the desired manner and direction through the intersection.

The intersection module 200 tracks the path of a vehicle requesting preemption to determine whether it is within any of the allowed approaches for that intersection. A preprogrammed map of allowed approaches to the intersection is stored in map memory 260. The map is programmed into the intersection module 200 while the module 200 is in "mapping" mode, as is described in more detail below with respect to FIG. 7. To track the vehicle, the vehicle module generates and transmits vehicle data as it travels toward the intersection. Processor 250 compares the received vehicle data with the map of allowed approaches stored in map memory 260. If the vehicle data sufficiently matches one of the allowed approaches, processor 250 determines which

phase of the traffic signal is desired and forwards the corresponding preemption request to intersection controller 320.

Now referring to FIG. 2, an alternate preferred embodiment of the present GPS-based traffic control preemption system is shown. This embodiment employs differential GPS to reduce the effects of the error induced in the GPS signal and improve the accuracy of the present preemption system. For example, the use of differential GPS allows vehicle position to be determined within ±10 meters as opposed to ±100 meters in the system of FIG. 1. The vehicle module 100 of FIG. 2 includes a differential GPS receiver 50 and differential antenna 25. Base station 15 determines the induced error of GPS signal 10, and periodically transmits appropriate correction terms for each visible GPS satellite to the vehicle module via differential antenna 25. To do this, base station 15 is positioned at a surveyed location. Base station 15, as well as GPS antenna 20 in the vehicle module 100, receives the GPS signal 10 and calculates its position therefrom. However, because base station 15 is positioned at a known location, it compares its known position to the position determined from GPS signal 10 to determine the induced error for each visible satellite in the GPS 5. Based on known variation rates of past GPS induced error, base station 15 preferably transmits updates of the induced error for each satellite to the vehicle module at least once every 10 seconds. Differential GPS receiver 50 then applies the correction terms to the vehicle data determined from GPS signals 10 to arrive at corrected, and thus more accurate, set of vehicle data. Base station 15 and differential GPS receiver 50 are available from Trimble Navigation, Sunnyvale, Calif. Differential GPS corrections are also available via FM subcarrier broadcast service from Differential Corrections, Inc., Cupertino, Calif.

In the preemption system of FIG. 2, in addition to receiving vehicle data such as heading, position and velocity from the GPS 5, vehicle data is also provided by a speed sensor 130 and a heading sensor 110, such as an electronic/magnetic compass or gyroscope. These sensors are used to provide vehicle data such as velocity and heading in the event that GPS signals should for some reason become unavailable, as described below with respect to FIG. 6. The information provided by these sensors also result in a more robust system as a check on the GPS generated vehicle data.

FIG. 3 shows a system level block diagram of another alternate preferred embodiment of the present preemption system. This system employs a pseudo-differential technique to reduce the effects of the GPS induced error. Instead of a separate base station such as shown in FIG. 2, intersection module 200 is positioned at a known location and includes a GPS antenna 220 and GPS receiver 240. The vehicle data transmitted by the vehicle includes data regarding the set of GPS satellites used by the vehicle module 100 to generate the vehicle data. In this way, both vehicle GPS receiver 40 and intersection GPS receiver 240 are tuned to receive navigational data from the same set of satellites, such that the induced GPS error is common to the computed locations for the vehicle and the intersection. When the relative distance between the vehicle location and the intersection location is computed, the actual distance between the vehicle and the intersection is obtained and the common induced error is removed. Thus, the pseudo-differential preemption system of FIG. 3 has the advantage of improved accuracy. Although not shown, it shall be understood that the pseudo-differential of FIG. 3 could also include speed and heading sensors such as those shown in FIG. 2.

FIG. 4 shows the operation (not to scale) of the preemption systems of FIG. 1 and FIG. 2. A vehicle follows

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0015

5,539,398

7

roadway 460 toward intersection 490 along approach path 440. Intersection 490 has an associated intersection module (not shown). At periodic intervals 400 along approach path 440, the vehicle transmits vehicle data to an intersection module 200 located at intersection 490. For the first preferred embodiment of FIG. 1, the position component of the vehicle data is determined within an error radius 410 due to the GPS induced error. In addition, the GPS induced error encountered during mapping of the allowed approach adds an additional error of ±100 meters. Thus, the total allowed approach corridor for the embodiment of FIG. 1 is represented by dashed line 480, or ±200 meters.

For the alternate preferred embodiment of FIG. 2, use of differential GPS reduces the vehicle position error radius to radius 420 (±10 meters). Including the differential error encountered during mapping of the allowed approaches, the dimensions of the resulting allowed approach corridor 430 are thus reduced to ±20 meters, and thus more closely approximates the width of roadway 460.

Now referring to FIG. 5, the operation of the alternate preferred embodiment of FIG. 3 using pseudo-differential GPS is shown. The vehicle 502 is shown approaching an intersection 506, which includes the intersection module 200 of FIG. 3. At periodic intervals 507 along roadway 508, the vehicle module transmits vehicle data to the intersection module. For purposes of illustration, the vehicle is shown at only one point on roadway 508. The position component of the vehicle data has an error radius 504. Because both the vehicle module and intersection module are tuned to the same set of satellites, the GPS induced error is common to both the vehicle location and the intersection location. Thus the absolute distance between the vehicle and the intersection, represented by vector $D_1$ can be determined by subtracting the computed locations. If the computed vehicle location vectors match the preprogrammed map of allowed approaches, the vehicle is determined to be within the allowed preemption corridor.

For the embodiment of FIG. 3, use of pseudo-differential GPS reduces the vehicle position error radius to ±20 meters. Including the pseudo-differential error encountered during mapping of the allowed approaches, the dimensions of the resulting allowed approach corridor 505 is reduced to ±40 meters.

Now referring to FIG. 6, operation of the preemption system of FIG. 2 during obstruction of the GPS signal is shown. The GPS signal 10 as shown in FIGS. 1, 2 and 3 can be obstructed by tall buildings or other structures. When obstructed, an alternate navigation system is required. The vehicle 516 is shown in a first position 512a and a first velocity indicated by the magnitude of vector 520a and a first direction as indicated by the arrow of vector 520a. The vehicle 516 includes a speed sensor 130 and heading sensor 110 (both shown in FIG. 2) which are used to provide redundant data regarding the vehicle's velocity and heading. At position 512b, vehicle 516 is about to enter a GPS obstruction zone 526, a region where, for whatever reason, GPS signals are not available. The information from speed and heading sensors is used in the GPS obstruction zone for dead reckoning of the vehicle's position. Using well-known dead reckoning techniques, the vehicle position at location 512c can be determined knowing the vehicle's last known position 512b, last known velocity indicated by vector 520b and the current velocity and heading as determined by speed and heading sensors 130 and 110, and indicated by vector 520c. The vehicle data thus determined is then transmitted in the normal way to intersection module 200 to determine whether the vehicle is within an allowed approach for that intersection.

8

FIG. 7 shows the control flow for programming the map of allowed approaches using the preemption system of FIGS. 1 or 2. This procedure is referred to as absolute position mapping. To perform this procedure, a vehicle including a vehicle module 100 begins approaching the intersection module to be programmed along a desired approach such as roadway 460 of FIG. 4. At periodic intervals, one second for example, or alternatively periodic interval positions, the vehicle transmits vehicle data, including a map mode command, to the intersection module. This causes the mapping mode control flow of FIG. 7 to begin execution in the intersection module. The vehicle data is received by the intersection module 200, and is stored in mapping memory 260. When the desired approach is completed, an end map mode command is transmitted by the vehicle to indicate that the mapping is complete, ending the mapping mode control flow of FIG. 7.

FIG. 8 shows the procedure for programming the map of allowed approaches for the preemption system of FIG. 3. This procedure employs pseudo-differential, or relative position mapping, in which the vehicle's data is determined relative to the data for the intersection. In this mapping mode, a vehicle approaching an intersection periodically transmits vehicle data, including a map mode command and data regarding which GPS satellites were used to determine the vehicle data, to the intersection module. This causes the pseudo differential mapping control flow of FIG. 8 to begin execution in the intersection module. The intersection data is also computed. The vehicle data relative to the intersection data is then determined as described above with respect to FIG. 3. This data is then stored in mapping meory 260. Again, when the mapping of the desired approach is completed, an end map mode command is transmitted to the intersection module to indicate that the mapping is complete.

FIG. 9 shows the control flow for tracking of a vehicle by any one of the intersection modules 200 shown in FIGS. 1, 2 or 3. Tracking is performed by the intersection module to determine whether a vehicle requesting preemption is within an allowed approach of an intersection. Intersection module 200 first receives an initial set Of vehicle data, which is compared to the map of allowed approaches. If the initial vehicle data matches data in the map of allowed approaches to within a defined degree of accuracy, an approach record is initialized, and the vehicle data is stored. If the initial vehicle data does not match any data points in the map, that vehicle is determined to be outside an allowed approach. However, the control flow continues to check subsequently received vehicle data in the event that the vehicle later enters an allowed approach.

Once an initial vehicle data point is found to match data in the map, the next vehicle data are received by the intersection module and compared to the map of allowed approaches. Each vehicle data point is stored as a "miss" or a "match". This process continues until a minimum number of matched vehicle data points are found (the "match threshold"). The match threshold tests that a vehicle is within an allowed approach for a minimum number of received vehicle data points. This ensures that the vehicle is within the allowed approach path for a sufficient length of time to distinguish vehicles that are merely passing through an allowed approach from those that desire to preempt the intersection.

The control flow of FIG. 9 next checks whether the "miss threshold" has been reached. The miss threshold allows for a limited number of non-matching vehicle data points to occur, to avoid a premature determination that a vehicle is

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A187

5,539,398

9

not within an allowed approach. After a defined number of successive non-matches is found (the "miss threshold"), the vehicle is determined to be outside an allowed approach.

A timeout procedure allows for the preemption request to be dropped after a defined length of time has elapsed. Such a feature is desirable, for example, when an emergency vehicle is stopped at an accident scene within an allowed approach, but which failed to disable the present preemption system. When the "miss threshold" is reached or a time out is reached, any outstanding preemption request is dropped, and the control flow returns to the top of FIG. 9 and continues to check subsequent preemption requests.

Although specific embodiments have been illustrated and described herein for purposes description of the preferred embodiments, it will be appreciated by those of ordinary skill in the art that a wide variety of alternate and/or equivalent implementations calculated to achieve the same purposes may be substituted for the specific embodiments shown and described without departing from the scope of the present invention. This application is intended to cover any adaptations or variations of the preferred embodiment discussed herein. Therefore, it is manifestly intended that this invention be limited only by the claims and the equivalents thereof.

We claim:

1. A system for determining whether a vehicle having an associated vehicle path is within an allowed approach of a location, comprising:

navigation means, associated with the vehicle, for generating vehicle data at periodic intervals along the vehicle path, wherein the vehicle data includes vehicle position data;

means for transmitting the vehicle data;

means, associated with the location, for receiving the vehicle data;

mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches;

evaluation means for comparing the vehicle data to the map of allowed approaches to determine whether the vehicle path is within an allowed approach.

2. The system according to claim 1 wherein the mapping means further includes:

means for generating allowed approach data, wherein the allowed approach data is generated at periodic intervals along the allowed approaches;

means for receiving and storing the allowed approach data and creating therefrom the map of allowed approaches.

3. The system of claim 1 wherein the navigation means is adapted to use signals received from a Global Positioning System (GPS).

4. The system of claim 3 further including dead reckoning means on board the vehicle for providing vehicle data when GPS signals are obstructed, the dead reckoning means comprising:

first sensing means for detecting the velocity of the vehicle;

second sensing means for detecting the heading of the vehicle; and

means, connected to receive the velocity and heading of the vehicle, for determining a vehicle position based on the velocity and heading of the vehicle.

5. The system of claim 1 wherein the transmitting means is a radio frequency transmitter.

10

6. The system of claim 1 wherein the transmitting means is an optical frequency transmitter.

7. The system of claim 1 wherein the vehicle data further includes identification codes and priority codes.

8. The system of claim 1 wherein the vehicle data comprises position, heading and velocity data corresponding to the vehicle.

9. The system of claim 1 wherein the navigation means is adapted to use signals received from a Differential Global Positioning System.

10. The system of claim 1 wherein the vehicle data further includes vehicle heading and vehicle velocity data.

11. A traffic control preemption system, comprising:

a vehicle module associated with a vehicle having a corresponding vehicle path, the vehicle module comprising:

means for receiving signals from a Global Positioning System and for generating therefrom vehicle data, wherein the vehicle data is generated at periodic interval positions along the vehicle path; and

means for transmitting the vehicle data; and

an intersection module associated with an intersection and adapted to track the vehicle path, the intersection module comprising:

a programmed map of allowed approaches to the intersection; and

a processor adapted to receive and compare the vehicle data to the programmed map to determine whether the vehicle path is within an allowed approach;

such that if the vehicle is within an allowed approach to the intersection the vehicle is allowed to preempt traffic signals associated with the intersection.

12. The system of claim 11 wherein the vehicle data further includes vehicle heading and vehicle velocity data.

13. The system of claim 11 wherein the intersection module is further adapted to send a preemption request to an intersection controller if the vehicle path is within an allowed approach.

14. The system of claim 11 wherein the transmitting means is a radio frequency transmitter.

15. The system of claim 11 wherein the transmitting means is an optical frequency transmitter.

16. A traffic control preemption method which uses data received from a global positioning system (GPS) to determine whether a vehicle, having an associated vehicle path, is allowed to preempt traffic signals at an intersection, comprising the steps of:

(a) receiving GPS signals;

(b) processing the GPS signals on-board the vehicle so as to generate vehicle data;

(c) transmitting the vehicle data;

(d) providing a map of allowed approaches, wherein the map of allowed approaches comprises a plurality of preprogrammed allowed positions proximate to the intersection;

(e) comparing the vehicle data with the map of allowed approaches;

(f) determining, based on comparing step (e), whether the vehicle is within one of the allowed approaches; and

(g) allowing the vehicle to preempt the traffic signals associated with the intersection if the vehicle is within one of the allowed approaches.

17. The traffic control preemption method of claim 16 wherein the step of transmitting vehicle data comprises the step of transmitting vehicle position, heading and velocity data.

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

A188

PTX 1-0017

5,539,398

11

**18.** The method of claim **16** wherein the step of providing a map of allowed approaches further comprises the steps of:

(a) receiving GPS signals at a first position of an allowed approach;

(b) processing the GPS signals to generate mapping data;

(c) transmitting the mapping data;

(d) programming the mapping data to generate the map of allowed approaches;

(e) receiving GPS signals at a next position of the allowed approach path;

(f) repeating steps (b)–(e) until the allowed approach path is completely mapped.

**19.** A method of determining whether a vehicle is allowed to preempt a traffic signal, comprising the steps of:

(a) receiving a first position signal indicative of a first location of the vehicle;

(b) determining whether the received position signal is within a mapped approach to the traffic signal;

12

(c) recording the received position signal as a match if the received position signal is within an allowed approach;

(d) receiving a next position signal indicative of a next location of the vehicle;

(e) determining whether the received position signal is within a mapped approach;

(f) recording the received position signal as a match if the received position signal is within a mapped approach;

(g) repeating steps (d)–(f) until a match threshold is reached;

(h) issuing a preemption request if the match threshold is reached;

(i) repeating steps (d)–(h) as long as next position signals are received.

*   *   *   *   *

Copy provided by USPTO from the PIRS Image Database on 07/01/2013

PTX 1-0018

# CERTIFICATE OF SERVICE

I certify that I filed the foregoing document with the Clerk of the United States District Court for the Federal Circuit and served a copy on counsel of record via the CM/EFC system and electronic mail on September 8, 2014 and resubmitted on September 18, 2014

/s/ Jana Yocom

_____

| | |
|---|---|
| Law Firm: | Jana Yocom, P.C. |
| Address: | 320 S. 11th, Suite 1 |
| City, State, Zip: | Mount Vernon, Illinois 62864 |
| Telephone: | 618-731-1944 |
| Facsimile: | 618-244-0697 |
| Email: | jana.yocom@gmail.com |

Dated:  September 18, 2014.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains   7,001   words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X    The brief has been prepared in a proportionally spaced typeface using MS Word 2013  in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using MS Word 2002  in a ___ characters per inch_____ font.

September 18, 2014               /s/ Jana Yocom_____
                                Jana Yocom
                                *Counsel for Appellants*
                                *Rodney Kris Morgan*
                                *and Km Enterprises, Inc.*