# In The United States Court Of Appeals
# For The Federal Circuit

---

**Nos. 14-1537, 14-1566**

---

**GLOBAL TRAFFIC TECHNOLOGIES LLC,**
**Plaintiff-Appellee,**

v.

**RODNEY K. MORGAN and KM ENTERPRISES, INC.,**
**Defendants-Appellants,**

**And**

**STC, INC.,**
**Defendant-Appellant.**

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA IN 10-CV-4110-ADM-SER**
**HON. ANN D. MONTGOMERY, Presiding**

---

**RESPONSIVE BRIEF OF GLOBAL TRAFFIC TECHNOLOGIES**

FAEGRE BAKER DANIELS LLP
James W. Poradek
Chad Drown
Timothy E. Grimsrud
Eva B. Stensvad
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Tel.: (612) 766-7000

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS.......................................................................i

TABLE OF AUTHORITIES ................................................................v

CERTIFICATE OF INTEREST ...................................................... xiii

STATEMENT OF RELATED CASES...................................................1

STATEMENT OF THE ISSUES ...........................................................1

STATEMENT OF THE FACTS ............................................................2

I.    GTT AND OPTICOM™. ...........................................................2

II.   THE '398 PATENT CLAIMS A GPS-BASED TRAFFIC PREEMPTION
      SYSTEM. ...................................................................................3

III.  THE INFRINGING EMTRAC SYSTEM. ......................................4

IV.   THE DISTRICT COURT'S SCHEDULING ORDER SET A DETAILED
      MARKMAN PROCESS. ..............................................................6

      A.    The Scheduling Order Included Specific Requirements for
            Claim Construction. .......................................................6

      B.    Defendants Took Specific Positions at Markman..............6

V.    DEFENDANTS' REPEATED ATTEMPTS TO MAKE NEW AND UNTIMELY
      CLAIM CONSTRUCTION ARGUMENTS.......................................8

VI.   THE RECORD EVIDENCE OF INFRINGEMENT...............................9

      A.    GTT's Expert Thoroughly Explained Infringement at Trial. ..............9

      B.    Morgan Admitted the Emtrac System Included All
            Limitations of Claim 16. ..................................................10

      C.    Defendants Knew of the '398 Patent and Intended to Cause
            Infringement. ...................................................................10

SUMMARY OF THE ARGUMENT ...................................................13

ARGUMENT ....................................................................................16

I.    THIS COURT SHOULD AFFIRM THE JUDGMENT BASED ON DEFENDANTS'
      INFRINGEMENT OF CLAIM 16 ALONE. .......................................16

      A.    STC's Only Claim Construction Argument for Claim 16
            Fails. .................................................................................17

1.      STC waived its new claim construction argument for claim 16.................................................................17

2.      The "map of allowed approaches" is not limited to "routes, not rectangles."..........................................20

3.      The Emtrac System has a "map of allowed approaches."......22

B.    Defendants Did Not Preserve for Appellate Review Their Arguments for Either Indirect or Direct Infringement of Claim 16. ..........................................................................25

1.      Defendants failed to preserve their arguments on induced infringement of claim 16.............................25

2.      Defendants failed to preserve contributory infringement of claim 16. ...................................................27

3.      Defendants failed to preserve direct infringement of claim 16..................................................................27

C.    Substantial Evidence Supports Defendants' Indirect and Direct Infringement of Claim 16........................................28

1.      KME/Morgan Do Not Appeal Liability for Their Inducement of and/or Contribution to Their Customers' Direct Infringement. ..............................29

2.      There was substantial evidence that Defendants had knowledge of the patent and intent for indirect infringement. ..........................................................30

3.      Defendants do not challenge the sufficiency of the evidence of willful blindness. ..................................36

4.      There was substantial evidence that KME and STC themselves directly infringed Claim 16.................37

II.   MORGAN IS PERSONALLY LIABLE FOR INDUCING INFRINGEMENT UNDER 35 U.S.C. § 271(b). ..........................................................................38

A.    Morgan Actively Assisted with KME's Infringement and Is Personally Liable for Inducing Infringement.....................38

B.    Morgan's "Pleading" Argument Is Meritless. ....................39

1.      The Amended Complaint pled Morgan's personal liability....40

2.      The pleading was effectively amended by operation of law under Rule 15(b). ..............................................40

3.      Rule 54(c) also permits recovery on the theory that
Morgan is personally liable for inducement. ...........................43

III.    STC'S "MAPPING MEANS" ARGUMENT FOR CLAIM 1 IS WITHOUT
MERIT. ................................................................................................44

A.      The "Mapping Means" Itself Does Not Have a Physical
Location Requirement. ...........................................................45

B.      GTT Is Entitled to the Full Scope of the Broad Term
"Associated With." ..................................................................46

IV.     STC'S OTHER "MEANS" ARGUMENTS FOR CLAIM 1 CANNOT
BE PURSUED AND ARE WITHOUT MERIT. ..........................................48

A.      The District Court Did Not Abuse Its Discretion by Refusing
to Construe Improperly Presented Terms. ..........................48

1.      The Scheduling Order set an orderly process for claim
construction. ................................................................49

2.      STC strategically chose not to request construction
for claim 1's "means" terms. .....................................49

3.      STC never attempted to show "good cause" for its
failure to comply with the Scheduling Order. .........51

B.      STC Did Not Properly Object to the Jury Instructions on
Claim Construction. ...............................................................53

1.      STC did not object to the claim construction jury
instruction before closing arguments. ......................54

2.      STC's untimely objection failed to preserve the issue
for appeal. ...................................................................55

3.      STC did not object with specificity under Rule 51. ...............56

4.      STC does not challenge the jury instruction on appeal. ..........56

C.      STC's Claim Construction Arguments Regarding "Means"
for Claim 1 Are Meritless. ....................................................56

1.      The "means for transmitting" includes wires. .........56

2.      The "means . . . for receiving" includes a processor. .............59

V.      KME/MORGAN'S "LOCATION" CLAIM CONSTRUCTION ARGUMENT
FOR CLAIM 1 IS MERITLESS. ...............................................................61

A.      "Location" Does Not Mean "Vehicle." .............................62

B.   The District Court Did Not Construe "Location" To
     Mean "Vehicle." ................................................................ 63

C.   The Phrase "Associated With" Does Not Require Physical
     Connection or Location. .................................................... 63

VI.   KME/MORGAN'S BRAND NEW "DOCTRINE OF EQUIVALENTS
      DEFENSE" MAKES NO SENSE AND WAS NEVER PRESENTED
      TO THE DISTRICT COURT. .............................................. 64

VII.   KME/MORGAN'S "VEHICLE DATA" ARGUMENT FAILS. ............. 65

VIII.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
       ADMITTING GTT'S DAMAGES EXPERT'S TESTIMONY ON
       PRICE EROSION. ......................................................... 67

IX.   THE EVIDENCE SUPPORTED A FINDING OF WILLFUL INFRINGEMENT. ............ 70

A.   Defendants Acted Despite an Objectively High Likelihood
     that Their Actions Constituted Infringement. ................... 70

B.   Defendants Knew of the Patent for the Subjective Prong. ................ 72

X.   STC'S MARKING ARGUMENTS ARE WITHOUT MERIT. ................ 73

A.   STC's Bright Line Rule Should Be Rejected. ................... 74

B.   There Was Substantial Evidence that GTT's Marking
     Was Sufficient. ............................................................ 77

CONCLUSION ...................................................................... 80

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
  687 F.3d 1292 (Fed. Cir. 2012) .......................................................... 60

*Abbott Labs. v. Brennan*,
  952 F.2d 1346 (Fed. Cir. 1991) .......................................................... 48

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) .......................................................... 68

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
  607 F.3d 817 (Fed. Cir. 2010) ........................................... 26, 30, 36, 56

*Ajinomoto Co. v. ITC*,
  597 F.3d 1267 (Fed. Cir. 2010) .......................................................... 70

*Am. Bank of St. Paul v. TD Bank, N.A.*,
  713 F.3d 455 (8th Cir. 2013) .............................................................. 77

*Am. Family Mut. Ins. Co. v. Hollander*,
  705 F.3d 339 (8th Cir. 2013) .................................................. 41, 42, 43

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) .................................................. 47, 70

*Atl. Thermoplastics Co. v. Faytex Corp.*,
  970 F.2d 834 (Fed. Cir. 1992) .......................................................... 71

*Bank of Nova Scotia v. United States*,
  487 U.S. 250 (1988) ......................................................................... 55

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
  682 F.3d 1003 (Fed. Cir. 2012) .......................................................... 71

*Bauer v. Curators of Univ. of Mo.*,
  680 F.3d 1043 (8th Cir. 2012) .......................................................... 56

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
  303 F.3d 1332 (Fed. Cir. 2002) .......................................................... 45

*Bettcher Indus. v. Bunzl USA, Inc.*,
    661 F.3d 629 (Fed. Cir. 2011) .......................................................... 49

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) .......................................................... 60

*Biomedino LLC v. Waters Tech. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007) .......................................................... 57

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141 (1989) ......................................................................... 74

*Bonner v. ISP Techs., Inc.*,
    259 F.3d 924 (8th Cir. 2001) ............................................................ 67

*Bowling v. Hasbro, Inc.*,
    490 F. Supp. 2d 262 (D.R.I. 2007) .............................................. 76, 77

*Bradford v. DANA Corp.*,
    249 F.3d 807 (8th Cir. 2001) ............................................................ 48

*Broadcom Corp. v. Qualcomm, Inc.*,
    543 F.3d 683 (Fed. Cir. 2008) ..................................................... 18, 34

*Central Admixture Pharmacy Serv. v. Advanced Cardiac Solutions*,
    482 F.3d 1347 (Fed. Cir. 2007) .............................................. 18, 49, 51

*Chicago Pneumatic Tool Co. v. Hughes Tool Co.*,
    192 F.2d 620 (10th Cir. 1951) .......................................................... 76

*Cohesive Techs., Inc. v. Waters Corp.*,
    543 F.3d 1351 (Fed. Cir. 2008) ........................................................ 72

*Comark Commc'ns. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998) ............................................... 31, 35, 73

*Commil USA, LLC v. Cicso Sys., Inc.*,
    720 F.3d 1361 (Fed. Cir. 2013) ........................................................ 35

*Conoco, Inc. v. Energy & Envtl. Int'l*,
    460 F.3d 1349 (Fed. Cir. 2006) ........................................................ 19

*Cook v. City of Bella Villa*,
  582 F.3d 840 (8th Cir. 2009)..............................................................42

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993)..........................................................................70

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012)........................................................57

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009)........................................................64

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006)........................................................34

*Duro-Last, Inc. v. Custom Seal, Inc.*,
  321 F.3d 1098 (Fed. Cir. 2003)........................................................28

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004)........................................................29

*Energy Transp. Grp. v. William Demant Holding*,
  697 F.3d 1342 (Fed. Cir. 2012)...................................................37, 66

*Ericsson, Inc. v. Harris Corp.*,
  352 F.3d 1369 (Fed. Cir. 2003)........................................................68

*Ethicon Endo–Surgery, Inc. v. Hologic, Inc.*,
  689 F. Supp. 2d 929 (S.D. Ohio 2010) ......................................76, 77

*Fanning v. Potter*,
  614 F.3d 845 (8th Cir. 2010)............................................................42

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
  394 F.3d 1368 (Fed. Cir. 2005)........................................................35

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
  616 F.3d 1357 (Fed. Cir. 2010)........................................................75

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
  383 F.3d 1352 (Fed. Cir. 2004)...................................................46, 60

*Genentech, Inc. v. Amgen, Inc.*,
 289 F.3d 761 (Fed. Cir. 2002)....................................................49, 51

*Global-Tech Appliances, Inc. v. SEB S.A.*,
 131 S. Ct. 2060 (2011).............................................................36, 37

*Griffin v. Foley*,
 542 F.3d 209 (7th Cir. 2008)..........................................................54

*Harris v. Chand*,
 506 F.3d 1135 (8th Cir. 2007)........................................................67

*Harris v. FedEx Nat'l LTL, Inc.*,
 760 F.3d 780 (8th Cir. 2014).....................................................52, 53

*Heraeus Electro-Nite Co. v. Midwest Instrument Co.*,
 2007 WL 3407128 (E.D. Penn. Nov. 14, 2007) ....................75, 76, 77

*Hopkins v. Chip-In-Saw, Inc.*,
 630 F.2d 616 (8th Cir. 1980)..........................................................55

*Huggins v. FedEx Ground Package Sys.*,
 592 F.3d 853 (8th Cir. 2010)..........................................................49

*i4i Ltd. P'ship v. Microsoft Corp.*,
 598 F.3d 831 (Fed. Cir. 2010)......................................25, 29, 36, 69, 70

*Jiminez v. Wood Cnty.*,
 660 F.3d 841 (5th Cir. 2011)..........................................................54

*Johnson v. United States*,
 520 U.S. 461 (1997).....................................................................55

*Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*,
 83 F.3d 253 (8th Cir. 1996).......................................................54, 55

*JVW Enters. v. Interact Accessories, Inc.*,
 424 F.3d 1324 (Fed. Cir. 2005) ......................................................51

*Kara Tech. Inc. v. Stamps.com Inc.*,
 582 F.3d 1341 (Fed. Cir. 2009)...................................................21, 47

*Koito Mfg., Ltd. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004) ........................................................53

*Lazare Kaplan Int'l v. Photoscribe Techs.*,
628 F.3d 1359 (Fed. Cir. 2010) ........................................................54

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ..........................................................47

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006) ........................................................73

*Loral Fairchild Corp. v. Sony Corp.*,
181 F.3d 1313 (Fed. Cir. 1999) ..................................................46, 60

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ........................................................37

*Maxwell v. J. Baker, Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) ..........................................................75

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
420 F.3d 1369 (Fed. Cir. 2005) ........................................................33

*Metrologic Instruments, Inc. v. PSC, Inc.*,
2004 WL 2851955 (D.N.J. Dec. 13, 2004) ......................................76

*Micro Chem., Inc. v. Lextron, Inc.*,
317 F.3d 1387 (Fed. Cir. 2003) ........................................................67

*Mirror Worlds, LLC v. Apple, Inc.*,
692 F.3d 1351 (Fed. Cir. 2012) ........................................................26

*Mitsubishi Elec. Corp. v. Ampex Corp.*,
190 F.3d 1300 (Fed. Cir. 1999) ........................................................43

*Morgan Distrib. Co. v Unidynamic Corp.*,
868 F.2d 992 (8th Cir. 1989) ............................................................43

*Morse v. S. Union Co.*,
174 F.3d 917 (8th Cir. 1999) ...........................................29, 66, 77, 80

*Niemiec v. Union Pac. R.R. Co.*,
   449 F.3d 854 (8th Cir. 2006).........................................................54, 55

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
   138 F.3d 1437 (Fed. Cir. 1998)............................................................75

*Northrop Grumman Corp. v. Intel Corp.*,
   325 F.3d 1346 (Fed. Cir. 2003)............................................................45

*NTP, Inc. v. Research In Motion*,
   418 F.3d 1282 (Fed. Cir. 2005)............................................................20

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*,
   467 F.3d 1355 (Fed. Cir. 2006)......................................................52, 53

*Pall Corp. v. Micron Separations, Inc.*,
   66 F.3d 1211 (Fed. Cir. 1995)..............................................................16

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................20, 47, 72

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
   400 F.3d 901 (Fed. Cir. 2005)..............................................................57

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)........................................28, 29, 31, 73, 80

*Ricoh Co., Ltd. v. Quanta Computer, Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008)......................................................31, 33

*Rodime PLC v. Seagate Tech., Inc.*,
   174 F.3d 1294 (Fed. Cir. 1999)............................................................59

*Rutherford v. Trim-Tex, Inc.*,
   803 F. Supp. 158 (N.D. Ill. 1992).........................................................76

*Saf-Gard Prods., Inc. v. Serv. Parts, Inc.*,
   491 F. Supp. 996 (D. Ariz. 1980).........................................................77

*Sage Prods. v. Devon Indus.*,
   126 F.3d 1420 (Fed. Cir. 1997)......................................................19, 25, 67

*Sandisk Corp. v. Memorex Prods.*,
  415 F.3d 1278 (Fed. Cir. 2005) ........................................................ 49

*Sessions v. Romadka*,
  145 U.S. 29 (1892) ........................................................................... 74

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
  502 F. App'x 945 (Fed. Cir. 2013) ................................................... 35

*Solvay S.A. v. Honeywell Int'l*,
  742 F.3d 998 (Fed. Cir. 2014) ......................................................... 53

*Stryker Corp. v. Zimmer Inc.*,
  2012 WL 6821683 (W.D. Mich. Nov. 29, 2012) .................................. 75, 76, 79

*Studiengesellschaft Kohle, m.B.H. v. Shell Oil Co.*,
  112 F.3d 1561 (Fed. Cir. 1997) ....................................................... 41

*SynQor, Inc. v. Artesyn Techs., Inc.*,
  709 F.3d 1365 (Fed. Cir. 2013) ............................................. 64, 70, 72

*Terminal R. Ass'n of St. Louis v. Staengel*,
  122 F.2d 271 (8th Cir. 1941) ........................................................... 55

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ................................................. 46, 47

*Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*,
  753 F.3d 1375 (Fed. Cir. 2014) .......................................... 17, 45, 62

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
  546 U.S. 394 (2006) ................................................................ 18, 26, 28

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255, 1262 (Fed. Cir. 2013) ............................................ 19

*Wahpeton Canvas Co. v. Frontier, Inc.*,
  870 F.2d 1546 (Fed. Cir. 1989) ....................................................... 28

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997) ........................................................................... 64

*Water Techs. Corp. v. Calco, Ltd.*,
   850 F.2d 660 (Fed. Cir. 1988).................................................35

*Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010)..............................................39

**FEDERAL STATUTES**

35 U.S.C. § 271.................................................................40

35 U.S.C. § 271(b) ...........................................16, 38, 40, 42

35 U.S.C. § 287.............................................................75, 77

35 U.S.C. § 287(a) .............................................................74

**STATE STATUTES**

805 Ill. Comp. Stat. 5/3.20..................................................40

**RULES**

Fed. R. Civ. P. 15(b).......................................................40, 41

Fed. R. Civ. P. 15(b)(2) ...................................................40, 41

Fed. R. Civ. P. 16(b)(4) .......................................................6, 52

Fed. R. Civ. P. 37(c)...........................................................27

Fed R. Civ. P. 50(a)............................................................28

Fed. R. Civ. P. 50(b)...................................................15, 18, 28

Fed. R. Civ. P. 51......................................................54, 55, 56

Fed. R. Civ. P. 51(b)(2) .......................................................53

Fed. R. Civ. P. 51(c) ......................................................53, 56

Fed. R. Civ. P. 51(c)(2)(A)...................................................53

Fed. R. Civ. P. 51(d)(2) .......................................................56

Fed. R. Civ. P. 54(c) ......................................................43, 44

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Appellee Global Traffic Technologies certifies the following:

1.     The full name of every party or amicus represented by me is:

Global Traffic Technologies LLC.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Global Traffic Technologies, Inc.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

<u>Faegre Baker Daniels LLP:</u>
David J.F. Gross
James W. Poradek
Chad Drown
Timothy E. Grimsrud
Ari B. Lukoff
Katherine S. Razavi
Lucas Tomsich
Lauren J. Frank
Timothy M. Sullivan
Eva B. Stensvad

January 9, 2015
Date

/s/ *Chad Drown*
Signature of Counsel

Chad Drown
Printed Name of Counsel

## STATEMENT OF RELATED CASES

Global Traffic Technologies ("GTT") states that no other proceedings were previously before this Court, except for Defendants-Appellants STC, Inc.'s ("STC"), KM Enterprises, Inc.'s ("KME") and Rodney K. Morgan's ("Morgan") motions for an emergency stay of enforcement of the judgment.

## STATEMENT OF THE ISSUES

(1)    Whether Defendants preserved for appeal the issues of indirect and/or direct infringement of claim 16, and if those issues were properly preserved, whether substantial evidence supported a finding of either indirect or direct infringement of claim 16.

(2)    Whether the district court erred by not adopting constructions for the following claim terms when those constructions were never argued to the district court and are being raised for the first time on appeal:

   (a)    "map of allowed approaches"

   (b)    "mapping means, associated with the location" and

   (c)    "location."

(3)    Whether the district court abused its discretion by refusing to construe two means-plus-function claim terms that were untimely raised in violation of

the court's Scheduling Order, and whether STC even properly preserved these claim construction issues for appeal.

(4)    Whether Morgan can be personally liable for inducing infringement when he actively and personally assisted with KME's infringement.

(5)    Whether KME/Morgan raised any "doctrine of equivalents defense" at the district court or now before this Court that permits reversal of the judgment.

(6)    Whether there was substantial evidence that the Emtrac System generates "vehicle data."

(7)    Whether the district court abused its discretion by denying STC's motion to exclude GTT's damages expert's testimony on price erosion.

(8)    Whether the evidence supported a finding of willful infringement.

(9)    Whether the district court properly refused to create a bright-line rule regarding marking and instead submitted this fact question to the jury.[1]

## STATEMENT OF THE FACTS

### I.    GTT AND OPTICOM™.

GTT was formed in 2007 when it was spun off from 3M Company's pioneering Intelligent Transportation Systems business.  (A1825-26.)  GTT's Opticom™ product line includes GPS-based traffic preemption technology and has been the leading product on the market for about 40 years.  (A1825-26, A1829-30.)

---

[1] Pursuant to this Court's December 30, 2014 Order, GTT is responding in one brief to the separate opening briefs filed by STC and KME/Morgan.

## II.   THE '398 PATENT CLAIMS A GPS-BASED TRAFFIC PREEMPTION SYSTEM.

The invention of U.S. Patent No. 5,539,398 ("the '398 patent") is used by, for example, emergency vehicles to safely pass through an intersection.  (A17662-63.)  At a high level, the invention uses GPS to obtain information about a given vehicle—such as position, speed, and direction—and then compares that information to maps that are stored in the system to determine if the vehicle is within an allowed approach to an intersection.  Independent claim 16 provides a straightforward description of a method for "traffic control preemption" comprising seven steps, including: (a) "receiving GPS signals," (b) processing them to generate "vehicle data," such as the vehicle's position, (c) "transmitting the vehicle data," (d) providing a "map of allowed approaches" and (e) "comparing" the vehicle data to the map to (f) "determin[e]" whether the vehicle is "within one of the allowed approaches," and finally (g) "allowing the vehicle to preempt the traffic signals" if it is in an allowed approach.  (A188.)

The specification of the '398 patent describes the preferred embodiment of the invention.  In the preferred embodiment, some components, such as the memory storing the map of allowed approaches, are physically located at the intersection, while others are located on the vehicle.  But the specification does not state that this particular physical configuration is required or criticize systems that use other configurations.

### III.    THE INFRINGING EMTRAC SYSTEM.

The infringing Emtrac System was introduced in 2007.  (A17673.)  STC designed and manufactured the Emtrac System, and KME and Morgan marketed and sold it to customers.  (A1692-94.)  Morgan and Brad Cross, the president of STC, have been close "friends" for many years, and Defendants operated in a "joint venture."  (A2548-49.)  Generally, the Emtrac System is marketed to cities that directly use the system to preempt traffic.  (A1755.)  Defendants "help cities use" the Emtrac System.  (A1757, A1755-57, A2550-52.)

Many of the similarities between the patent claims and the Emtrac System are apparent from the manuals for the System, which provide a roadmap of Defendants' infringement.  The image below, for example, shows how the Emtrac System uses GPS to determine the location of a vehicle, and then issues a preemption request to a traffic light if the vehicle is within a detection zone:

EMTRAC Priority Control – Emergency Vehicle Installation

## About EMTRAC



**Figure 1 – EMTRAC System, Intersection Overview**

A27302

The Emtrac manual often uses the **same words** as claim 16, clearly

demonstrating infringement of that claim.  The manual explains that the Emtrac

System uses "GPS" to track a "vehicle's position, speed, and direction."  (A27309;

*see also* A27302 ("vehicle position data").)  The System then "compares the

vehicle's current position, speed, and direction" to allowed "street approaches" or

"detection zones" that are "stored in its memory," and "determines" whether the

vehicle is within an allowed approach to an intersection.  (A27309.)  The manual

5

also explains that the "EMTRAC system performs all of these functions automatically." (*Id.*)  Indeed, the only difference between the Emtrac System described in the manual and the preferred embodiment disclosed in the '398 patent is that the memory chip that stores the map of allowed approaches in the Emtrac System is located on the vehicle instead of at the intersection—a difference that is not relevant to claim 16 or the other asserted claims, which do not require specific locations for the maps.

## IV.    THE DISTRICT COURT'S SCHEDULING ORDER SET A DETAILED *MARKMAN* PROCESS.

### A.    The Scheduling Order Included Specific Requirements for Claim Construction.

The Scheduling Order in this case issued on December 20, 2010.  (A5039-46; *see also* A5098-5104, A5135-40, A36001-02.)  It set procedures and deadlines for claim construction to control party disclosures, including: claim charts, a list of terms for construction, preliminary proposed constructions, and a joint claim construction statement.  (A5041-43.)  The Scheduling Order, in accord with Rule 16(b)(4) and Local Rule 16.3, provided that it "may be modified only upon formal motion and a showing of good cause."  (A5039.)

### B.    Defendants Took Specific Positions at *Markman.*

On August 2, 2011, Defendants served their Preliminary List of Claim Terms for Construction, in which they designated 26 claim terms as needing

6

construction.  (A18134-38.)  By their November 28, 2011 Proposed Claim Construction Chart, however, Defendants withdrew their requests for construction of 19 of the originally identified terms.  (A19946-51.)  In the parties' December 13, 2011 Joint Claim Construction Statement, Defendants continued to seek construction for only 7 of the originally identified terms (plus one additional term), and GTT expressly stated that it understood Defendants' defenses would "be resolved by construing only the narrowed set of claim terms."  (A5112.) Defendants' said nothing to contradict that understanding.[2]

In its Opening Claim Construction Brief, Defendants requested that the district court construe the following terms relevant to this appeal: "associated with the location"; "mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches"; "map of allowed approaches"; and "transmitting the vehicle data."  (A5164-71, A5173-74, A5176-78.)

Notably, Defendants did **not** request that the court construe the "**means**" for "receiving the vehicle data" or for "transmitting the vehicle data" at *Markman*. (A5141-79.)  Likewise, Defendants did **not** argue at *Markman* that "approaches" could not include static, rectangular geographic areas.  Instead, Defendants focused

---

[2] STC "adopt[ed]" the Joint Claim Construction Statement when STC was added to the consolidated case, and never suggested that it wanted additional terms construed at that time.  (A36006-07.)

solely on "placing location-specific limitations on the terms," such that certain components needed to be located at the intersection.  (A17688, A5173-74.)  On July 13, 2012, the court issued its claim construction order, rejecting each of Defendants' proposed location-specific limitations.  (A1-16.)

## V. DEFENDANTS' REPEATED ATTEMPTS TO MAKE NEW AND UNTIMELY CLAIM CONSTRUCTION ARGUMENTS.

Throughout the litigation, Defendants tried repeatedly to inject new claim constructions into arguments, contravening the process set by the Scheduling Order.  First, in its opening claim construction brief at *Markman*, Defendants raised what the district court termed "impermissibly tardy" indefiniteness arguments.  (A12.)

Then, at summary judgment—6½ months later—Defendants asked the district court "to construe numerous claim terms not raised at the *Markman* hearing." (A17686.)  The district court found that Defendants' tactic was "**unjustified** and **prejudices** GTT." (A17689 (emphasis added).)  The district court explained that it would not consider Defendants' new arguments unless Defendants showed (1) "good cause for the delay in raising the [claim construction] issue" and (2) the "context" that makes an additional *Markman* proceeding necessary.  (A17689-90.)

On the eve of trial, Defendants filed a motion *in limine* "seeking further claims construction." (A19605-21.)  In Defendants' post-trial Rule 50(b) motion,

Defendants tried yet again to introduce claim construction arguments that they had never before asserted.  (A23 n.2.)  The district court noted that Defendants' conduct "create[d] frustrating confusion."  (A44.)

## VI.    THE RECORD EVIDENCE OF INFRINGEMENT.

### A.    GTT's Expert Thoroughly Explained Infringement at Trial.

GTT's technical expert, Dr. Neuhauser, went through each and every limitation of the asserted claims and explained in detail where each limitation is found in the Emtrac System.  (A1471-1512.)  He showed the jury the inside wiring of the accused products (A1479-80) and explained relevant lines of source code (*e.g.*, A1484-85, A1490).  He also explained how the manuals for the Emtrac System provided a roadmap of infringement, confirming that the Emtrac System met each of the claim limitations.  (A1495-99.)  The Emtrac System manual provided below, for example, is highlighted to correspond to the steps of claim 16. And as Dr. Neuhauser explained, the manual "in some cases" uses "the same words" as claim 16.  (A1495-96.)

## Emergency Vehicle Installation

The EMTRAC emergency-vehicle equipment serves the following three main functions:

- Acquires the equipped vehicle's **position, speed, and direction** in real time. This function is performed by the combo **GPS/UHF receiver**/antenna, and the information is **transferred** through either Ethernet or serial cable to the EMTRAC Vehicle Computer Unit.

- **Compares** the vehicle's current position, speed, and direction to a set of pre-defined **geographic detection zones** (which correspond to **street approaches**) with EMTRAC-equipped intersections that are **stored in its memory.** If the vehicle computer **determines** the vehicle is within one of these pre-defined detection zones, has the proper heading, and is within a valid pre-programmed time window, **it initiates a priority request.**

- **Communicates** the priority request to the proper signalized intersection. This is achieved by secure, frequency-hopping spread spectrum radio transmissions generated by the FHSS transceiver and is sent by the combo GPS/UHF antenna. The encrypted vehicle transmission includes the vehicle ID number, priority request level, direction of desired passage through the intersection, and the intersection ID number for the detection zone.

The EMTRAC system performs all of these functions automatically, and the driver is not required to perform any action or input. Refer to Figure 1 for an illustration of the transmission process.

### A27309

### B.   Morgan Admitted the Emtrac System Included All Limitations of Claim 16.

Morgan, the president of KME, professed to be "the boss" and have "the final say on . . . how the product works." (A1756-57, A26538.) He admitted at trial that he knew the Emtrac System performed the method of claim 16. (A1745-53.)

### C.   Defendants Knew of the '398 Patent and Intended to Cause Infringement.

The jury heard evidence that all Defendants knew about the '398 patent as early as 2004. Morgan—Brad Cross's close "friend" and "joint venture" partner

(A2548-49)—testified that he became aware of the '398 patent as early as 2004 when he "looked up on the Internet what 3M had going on at the time and I saw that on there." (A1779.) Morgan then "went down and talked to Brad" and they "knocked it over a little bit and decided, yeah, we'd give it a shot." (A1779-80.) By 2007, when Defendants introduced the Emtrac System, Morgan and Cross "knew that there was a patent out there" that "related to GPS technology in traffic preemption" and they "both talked about that." (A1608; *see also* A1732.)

KME/Morgan directly used the System and induced and/or contributed to customers' infringement. By his own account, Morgan "get[s his] hands dirty everyday installing, testing, repairing and developing" the infringing Emtrac System. (A26539, A1757-58.) Morgan admitted that he **personally** installed, trained, and/or demonstrated how to use the infringing Emtrac System in every single city, as shown by the following exhibit admitted at trial:

| KME Activities | | | |
|---|---|---|---|
| **City** | **Installation** | **Training** | **Demonstration** |
| Washington, D.C. | Yes | Yes | Yes |
| San Jose, California | Yes Observe | Yes | Yes |
| Santa Clara VTA, California | Yes | Yes | Yes |
| Sunnyvale, California | Yes | Yes | Yes |
| Oxnard, California | Yes | Yes | Yes |
| Marin County, California | Yes | Yes | Yes |
| Anaheim, California | Yes | Yes | Yes |
| Houston, Texas | Yes | Yes | Yes |
| Waterloo, Canada | Observe | Yes | Yes |
| Brampton, Canada | Yes | Yes | Yes |
| Niagara Falls, Canada | Yes | Yes | Yes |
| Minneapolis, Minnesota | Yes | Yes | Yes |
| Columbia County, Georgia | Yes | Yes | Yes |
| Stillwater, Oklahoma | Yes | Yes | Yes |
| Coquitlam + Port Coquitlam, Canada | Yes | Yes | Yes |

Case No. 10-cv-4110
P# 76

EXHIBIT
13
R. Morgan

(A26536, A1758-61.)  He further admitted that he has used the Emtrac System in a
car to preempt traffic "many, many, many times."  (A1761.)

Evidence presented at trial also showed that STC performed affirmative acts
to cause cities to infringe, such as writing the manuals that taught customers how
to use the Emtrac System in an infringing manner (A2561), writing source code
that required customers to use the product in an infringing manner (A2549-50),
maintaining the product's website (A2550), providing customer support (*id.*), and

instructing how to resolve setup, firmware, equipment configuration, and GPS issues (A2550-52).

## SUMMARY OF THE ARGUMENT

The focus of the jury trial was method claim 16 because, as the user manuals unequivocally show, the Emtrac System operates in the same way as claim 16. Strikingly, the manuals often use the same words as claim 16 to describe the Emtrac System. This Court can affirm the infringement judgment based on claim 16 alone, which Defendants clearly infringed by inducing and contributing to their customers' infringing use of the Emtrac System as well as their own direct use of the System.

Defendants' arguments on appeal are a classic example of parties that regret the litigation choices made in the district court and try to use the appeal to litigate new and unpreserved arguments. During the eight-day trial, the jury heard testimony from 24 fact witnesses, 3 expert witnesses, and reviewed the contents of 145 exhibits. The jury heard evidence that Defendants not only knew about the '398 patent as early as 2004, but actually discussed it with each other. The jury also heard evidence of the active steps Defendants took to induce infringement, including writing the product's manuals and source code and instructing end users. Further, Defendants used and tested the Emtrac System themselves—a system which automatically performs the method of claim 16 whenever it is turned on.

The jury had substantial evidence to find that Defendants willfully infringed all asserted claims and to award damages.

This resounding defeat for Defendants was the product of overwhelming trial evidence and unsuccessful strategic choices made by Defendants (jointly represented throughout trial) that were criticized by the district court as "frustrating," "unjustified," and "prejudic[ial]." (A44, A17689.) Defendants cannot avoid the consequence of those choices by hiring new appellate counsel and then advancing entirely new or otherwise unpreserved arguments on appeal.

Defendants, for example, try to raise new claim constructions that were never raised in compliance with the careful claim construction requirements of the district court's Scheduling Order and rules. With respect to claim 16, STC (KME/Morgan do not raise any claim construction arguments for claim 16) raises on appeal an entirely new and baseless construction of "map of allowed approaches" that is contradicted by the intrinsic evidence and is actually STC's **fourth** proposed construction of that phrase. And with respect to claim 1, STC continues its tactic of making untimely constructions by throwing location-specific limitations at every possible claim term, hoping that something sticks. This approach is highlighted by STC's vacillations between sometimes trying to squeeze this limitation into the structure of means-plus-function terms and other times appearing to try to squeeze it into the phrase "associated with." There is no

basis for importing a location-based limitation into any of the claim language. Defendants' frantic last-ditch efforts to raise these and other new arguments on appeal should be rejected.

KME/Morgan's opening brief is largely filled with incoherent arguments. It is not even clear to GTT which issues KME/Morgan are appealing. In the few instances where KME/Morgan do make intelligible arguments, most of the arguments have been waived or not otherwise preserved. Most problematic for KME/Morgan is that they have not raised any arguments on appeal that, even if correct, would permit this Court to reverse the judgment.

Specifically, KME/Morgan's sole argument with respect to claim 16 is that there can be no direct or indirect infringement because they **themselves** did not directly perform the method of claim 16. This argument was not preserved for appeal with a Rule 50(b) motion. But even setting that problem aside, KME/Morgan do not contest the jury's finding that customers, such as cities, directly performed the claimed method when they used the Emtrac System. And KME/Morgan do not challenge the sufficiency of the evidence showing, for example, that their activities induced customers to directly infringe.

Morgan's argument that he cannot be personally liable for inducement absent piercing the corporate veil is flat wrong. It is black-letter law that a corporate officer can be (and in this case, is) personally liable for inducing

infringement, regardless of whether the corporate veil is pierced.  Furthermore,

Morgan's personal liability for inducement under 35 U.S.C. § 271(b) was pled in

the Complaint, disclosed during discovery, argued at summary judgment, and

proven with overwhelming evidence at trial.

KME/Morgan's other arguments regarding construction of the term

"location" in claim 1, the sufficiency of the evidence for "vehicle data," and their

supposed "doctrine of equivalents defense" are all meritless, as discussed below.

## ARGUMENT

### I.    THIS COURT SHOULD AFFIRM THE JUDGMENT BASED ON DEFENDANTS' INFRINGEMENT OF CLAIM 16 ALONE.

The jury found that Defendants willfully infringed all asserted claims,

including two independent claims—claims 1 and 16.  The Court should affirm the

verdict based on Defendants' infringement of claim 16 alone.  *See Pall Corp. v.*

*Micron Separations, Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995).

STC makes only two arguments regarding claim 16: (1) it offers a new

"routes, not rectangles" construction for the claim term "map of allowed

approaches," and (2) it argues that there is not substantial evidence of indirect

infringement or that STC directly performed the method of claim 16.  STC is

prohibited from making both arguments, which are meritless in any event.

As for KME/Morgan, their only argument for claim 16 is that there is "no evidence that KME or Morgan performed any steps of Claim 16." (KME Br. 17.) This argument was not preserved, and it is also meritless.

### A.    STC's Only Claim Construction Argument for Claim 16 Fails.

#### 1.    STC waived its new claim construction argument for claim 16.

STC never made its "routes, not rectangles" argument **at any time** to the district court—not at *Markman*, not prior to the jury trial, and not in its post-trial JMOL motion. STC is therefore foreclosed for at least **four independent reasons** from making it here. *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1380 (Fed. Cir. 2014) ("cannot make that argument for the first time on appeal").

*First*, STC did not propose a "routes, not rectangles" construction at *Markman*. On appeal, STC highlights the word "routes" in bold and italics, liberally sprinkling the word throughout its opening brief. (STC Br. 43-46.) But neither the word "routes" nor "rectangles" appeared **anywhere** in STC's opening or responsive claim construction briefs. (A5154-79, A5737-54.) In fact, the only time the word "routes" appeared was in a construction STC proposed in the parties' Joint Claim Construction Statement and **abandoned** before *Markman* briefing. (*Compare* A5124, *with* A5173.)

At *Markman*, STC contended that "map of allowed approaches" meant "a preprogrammed map of roadway paths to the intersection where the traffic signal to be preempted is located, said map being stored at the intersection." (A5173.) The only issue STC actually raised was with respect to the **location** of the "map of allowed approaches"—i.e., whether the map must be "stored at the intersection," and not on the vehicle. (A5174, A5748.) At **no** point did STC argue that "approaches" could not include static, rectangular geographic areas.

STC failed to request a "routes, not rectangles" construction during the court-ordered *Markman* phase, so the argument is waived on appeal. *Central Admixture Pharmacy Serv. v. Advanced Cardiac Solutions*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("[Defendant] waived any argument with respect to this term by failing to raise it during the claim construction phase.").

***Second***, STC never raised a "routes, not rectangles" construction **at any time** prior to this appeal—not before the jury trial, *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) ("'claim construction'" waived if "'raised for the first time after trial'"), and not in its post-trial Rule 50(b) motion, *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006) ("failure to comply with Rule 50(b) forecloses its challenge" on appeal).

STC's "routes, not rectangles" construction is actually the **fourth** construction STC has proposed for the term "map of allowed approaches." After

18

STC abandoned the first construction from the Joint Claim Construction Statement, and after the district court rejected STC's second proposed construction at *Markman*, STC offered a third construction in its Rule 50(b) motion, arguing that the claim term meant "an actual pathway proximate to a roadway established by a series of vehicle data transmissions having a starting point and an ending point that delineate the path." (A20771.) STC took several bites at the claim construction apple, but at **no point** did it advance the "routes, not rectangles" construction it now promotes, and STC's argument "cannot be heard for the first time on appeal." *Conoco, Inc. v. Energy & Envtl. Int'l*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006); *Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997); *see also Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013) (waived claim construction "becomes a pure factual issue").

*Third*, STC's "routes, not rectangles" construction impermissibly adds additional limitations that "alter the scope of the claim construction positions it took below." *Conoco*, 460 F.3d at 1358-59. STC now attempts to tack on a number of new limitations that were never before the district court. Namely, STC's new construction adds: (1) a shape limitation ("not a rectangle"), (2) a movement limitation (not a "static geographic area"), (3) a vehicle limitation ("traveled by a vehicle"), and (4) a directional limitation ("towards an intersection"). (STC Br. 43-46.) STC's new narrowing limitations were never

argued to the district court and are necessarily waived. *NTP, Inc. v. Research In Motion*, 418 F.3d 1282, 1296 (Fed. Cir. 2005).

**Fourth**, because STC chose not to raise its "routes, not rectangles" arguments during the *Markman* phase, it was required to object to the jury instructions concerning claim construction to even preserve the issue for appeal. (*See infra*, Part IV.B.)  But STC did not object to the jury instructions before closing arguments, *id.*, so STC waived its new claim construction argument for claim 16.

### 2. The "map of allowed approaches" is not limited to "routes, not rectangles."

Even if this Court considers STC's new construction (which it should not), the construction should be rejected.  First, "the claims themselves provide substantial guidance as to the meaning" of "map of allowed approaches." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  Claim 16 provides that the "map of allowed approaches **comprises a plurality of preprogrammed allowed <u>positions</u> proximate to the intersection**."  (A188 (10:52-55) (emphasis added).)  STC concedes that a "position" is a "static location."  (STC Br. 44.)  Under the claim's plain language, the "map of allowed approaches" is simply a plurality of such static positions.  And there is nothing to suggest that a particular shape is required or excluded.  Moreover, when the patentees intended to incorporate the concept of "routes" or "paths" into claim 16, they "did so

explicitly." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009). The preamble to claim 16, for example, uses the term "vehicle path." (A188 (10:45).)

Second, the patent specification counsels against STC's strained construction of "map of allowed approaches." For example, Figure 4 of the '398 patent illustrates one possible "allowed approach corridor" (A187 (7:9-10)), represented in the figure below as dashed line 480:



**FIG.4**

(A178.) As the figure depicts, an "approach" can be a static geographic area. What is more, if the road was straight, rather than bent, the "approach corridor"

might very well be rectangular in shape.  The patent specification clearly allows an "approach" to be rectangular, polygonal, curved, or any other shape.

Finally, STC's use of dictionary definitions of "approaches" is mystifying, as **none** of those definitions include the word "route" or even hint at the concepts of "routes" or "not rectangles."  (STC Br. 45-46.)  These definitions certainly do **not** show that the "plain and ordinary meaning" of "approaches" requires an "'approach' to be a route—not a rectangle."  (*Id.* at 46.)

### 3.    The Emtrac System has a "map of allowed approaches."

There was overwhelming evidence presented at trial that the Emtrac System includes a "map of allowed approaches."  First of all, the Emtrac System manual itself states four different times that the system has allowed "approaches," as shown in the following highlighted image of two manual pages.  In fact, the manuals go so far as to expressly state that the "detection zones" "**correspond to street approaches**."  (A27309 (emphasis added).)

**Figure 1 – EMTRAC System, Intersection Overview**

The EMTRAC priority control system utilizes real-time vehicle position data, a database of user-programmable intersection approach detection zones, and secure wireless telemetry to enable precise control of priority detection. Using the EMTRAC Systems Manager software, priority calls can be restricted to specific areas of intersection approach streets and to specific time intervals for each intersection approach.

By using an advanced GPS receiver, the EMTRAC vehicle equipment determines the vehicle's position, direction, and velocity to a high degree of accuracy. The rectangular intersection detection zones are user-definable for each vehicle, and may be combined or overlapped to handle curved roadways. Each detection zone has a particular intersection controller's priority request associated with it. As an EMTRAC-equipped vehicle approaches the intersection, the vehicle computer compares the position and direction of the approaching vehicle with pre-defined detection-zone data (stored in its memory) to determine if a priority control request should be transmitted.

**A27302**

2                                    EMTRAC Systems – Rev. 9/17/2009

# Emergency Vehicle Installation

The EMTRAC emergency-vehicle equipment serves the following three main functions:

- Acquires the equipped vehicle's position, speed, and direction in real time. This function is performed by the combo GPS/UHF receiver/antenna, and the information is transferred through either Ethernet or serial cable to the EMTRAC Vehicle Computer Unit.

- Compares the vehicle's current position, speed, and direction to a set of pre-defined geographic detection zones (which correspond to street approaches) with EMTRAC-equipped intersections that are stored in its memory. If the vehicle computer determines the vehicle is within one of these pre-defined detection zones, has the proper heading, and is within a valid pre-programmed time window, it initiates a priority request.

- Communicates the priority request to the proper signalized intersection. This is achieved by secure, frequency-hopping spread spectrum radio transmissions generated by the FHSS transceiver and is sent by the combo GPS/UHF antenna. The encrypted vehicle transmission includes the vehicle ID number, priority request level, direction of desired passage through the intersection, and the intersection ID number for the detection zone.

The EMTRAC system performs all of these functions automatically, and the driver is not required to perform any action or input. Refer to Figure 1 for an illustration of the transmission process.

**A27309**

Second, STC's president confirmed that the Emtrac System "maintains a database of this information and graphically displays the streets and **approach**

23

**zones** for each intersection in an integrated map format." (A2569 (emphasis added); *see also* A1750-51.)

Third, Dr. Neuhauser testified that each detection zone stored by the Emtrac System is an "allowed approach" (A1497-98), with at least two points, or in the words of claim 16, "a plurality of positions," creating a zone that is "oriented in a certain direction" (A1482). And STC's own expert was badly impeached on this point: he testified at his deposition that the Emtrac System stores "a plurality of positions corresponding to allowed approaches to the location and providing therefrom **a map of allowed approaches**." (A2757-58 (emphasis added).)

Finally, even under STC's freshly-hatched "routes, not rectangles" construction, there was still sufficient evidence that the Emtrac System met this limitation. Dr. Neuhauser, for example, explained that the detection zones of the Emtrac System include information about the "orientation of the zone so that the vehicle can determine whether it's headed in the right direction through the zone," which is obviously information about the path, or "route," of the vehicle. (A1485, A1482.) Thus, even if the district court did somehow err in not adopting a construction that was never before it, any such error was harmless.

## B.    Defendants Did Not Preserve for Appellate Review Their Arguments for Either Indirect or Direct Infringement of Claim 16.

The jury "was instructed that it could rely on any of three legal theories—direct, contributory, or induced infringement." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010); (*see* A120 (instructions)).  If the Court finds that Defendants failed to preserve even one of these issues, then "the verdict must be upheld." *Id.*

### 1.    Defendants failed to preserve their arguments on induced infringement of claim 16.

During the time of JMOL briefing, Defendants were all represented by the same counsel.  In their Rule 50(b) motion, Defendants moved for judgment as a matter of law as to induced infringement **only** with respect to Rodney "Kris" Morgan.  (A20801-08.)  **STC and KME never challenged** the jury's finding that they induced infringement, let alone that they lacked knowledge or intent.

STC previously suggested to this Court, by citing to documents in the district court, that it had preserved the indirect infringement issue for appeal.  (Fed. Cir. Dkt. 40 at 2-3.)  But STC failed to inform the Court that it was citing only to footnotes in **inoperative** briefs rejected by the district court—not the operative JMOL brief that was actually filed (and considered) in support of its JMOL motion.  (A20749-50.)  *Sage Prods.*, 126 F.3d at 1426 (litigant "must first present that argument to the trial court").  In addition, arguments made only in a footnote

are not properly preserved for appeal.  *Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012).

Moreover, in the very footnote previously cited by STC, Defendants clearly explained that they were moving "for judgment as a matter of law in this motion **only with respect to Mr. Morgan**."  (A20598 n.1 (emphasis added).)  And if there was any doubt that the motion only pertained to Morgan, and **not** STC or KME, in a subsequent letter to the district court, Defendants confirmed that "**JMOL on inducement** to infringe . . . **pertains only to Kris Morgan**."  (A20752 (emphasis added).)

Therefore, STC and KME failed to preserve inducement for appeal with a Rule 50(b) motion, "foreclos[ing] [their] challenge to the sufficiency of the evidence."  *Unitherm*, 546 U.S. at 404.

Morgan, on the other hand, did file a Rule 50(b) motion on inducement (A20801-08), but in that motion he did not preserve the inducement argument he now asserts on appeal.  Morgan now argues that he cannot be liable for inducement if he himself did not directly infringe.  (KME Br. 17.)  But in his Rule 50(b) motion, he argued only that "the evidence in this case does not support a finding of either intent to induce or 'willful blindness'" (A20807-08), an argument he did not make in his opening appeal brief and cannot make now, *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 833 (Fed. Cir. 2010).

### 2. Defendants failed to preserve contributory infringement of claim 16.

None of the Defendants challenged the sufficiency of the evidence with respect to contributory infringement in their Rule 50(b) motion. As above, the only mention of contributory infringement in any post-verdict document was within a footnote in an inoperative brief that applied only to Mr. Morgan. (A20612 n.4.)

### 3. Defendants failed to preserve direct infringement of claim 16.

Defendants contend that there was no evidence to suggest that they—rather than end users and customers—directly performed the method of claim 16. (STC Br. 47; KME Br. 17.) But Defendants never made this argument before, during, or after trial.

Before trial, Defendants never contended that they did not use their own device—not in response to GTT's interrogatories (A18515-19) and not at summary judgment (A7102-12). Rule 37(c) forecloses Defendants from asserting this issue now.

During trial, in a Rule 50(a) motion, Defendants stated that they moved "for dismissal of all infringement claims asserted against the defendants on the basis that those claims have not been proven by Plaintiff" (A2152), and "for judgment as a matter of law on all infringement claims, direct and indirect" (A2784). These vague and generalized statements plainly fail to meet the specificity requirements

of Rule 50(a), which requires that a JMOL motion "afford the opposing party an opportunity to cure the defects in proof." *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1105-06 (Fed. Cir. 2003).

Finally, after trial, Defendants argued in their Rule 50(b) motion only: (1) that the Emtrac System itself did not include all of the claim limitations; and (2) that GTT's evidence only showed the Emtrac System was **capable** of being used to perform each step of the claimed method. (A20775.) Defendants never suggested that they did not directly use the System that they designed, manufactured, and tested. (A2549-52, A2561, A8748-49.) Defendants' "failure to comply with Rule 50(b) forecloses [their] challenge to the sufficiency of the evidence" for this issue. *Unitherm*, 546 U.S. at 404.

## C.    Substantial Evidence Supports Defendants' Indirect and Direct Infringement of Claim 16.

Even if Defendants' arguments were preserved for appeal (and they were not), there was overwhelming evidence of Defendants' indirect and direct infringement. Defendants "simply disregard[]" this evidence, and instead "labor[] under the delusion that this court is at liberty to substitute its selection of credible evidence for the selection made by the jury." *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989). But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 150-51 (2000).  And "review of a jury verdict is extremely

deferential."  *Morse v. S. Union Co.*, 174 F.3d 917, 922 (8th Cir. 1999).  If

sufficient evidence supports **either** of GTT's alternative theories, the "verdict must

be upheld."  *i4i*, 598 F.3d at 850.

> **1.    KME/Morgan Do Not Appeal Liability for Their Inducement of and/or Contribution to Their Customers' Direct Infringement.**

KME/Morgan's sole argument for claim 16 is that there can be no indirect

infringement because there is "no evidence that KME or Morgan performed any

steps of Claim 16."  (KME Br. 17.)  That, of course, is not the law.  "Indirect

infringement, whether inducement to infringe or contributory infringement, can

only arise in the presence of direct infringement," but "**the direct infringer is**

**typically someone other than the defendant** accused of indirect infringement."

*Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir.

2004) (emphasis added).

In this case, there was overwhelming evidence that KME/Morgan induced

and/or contributed to the direct infringement of claim 16 by **end users** of the

Emtrac System—such as cities.  Morgan, in fact, testified that there are "cities that

are actually **directly using** the Emtrac GPS system to preempt traffic."  (A1755

(emphasis added), A1758-60.)  And GTT's expert, Dr. Neuhauser, testified that

whenever a customer "turns on" the System, the System "performs all these steps

29

over and over and over again until the system is turned off." (A1500.) He further explained that in operation, the Emtrac System "always" performs all the steps of claim 16 and there is no way to operate the system without performing the steps of claim 16 because of how the source code is written. (A1475-76, A1500, *see also* A27309 ("functions automatically" performed).) KME/Morgan do not challenge the sufficiency of the evidence with respect to their inducement of or contribution to the direct infringement **by the end users** of the Emtrac System, and they have waived any such argument. *Advanced Magnetic Closures*, 607 F.3d at 833.

Nevertheless, GTT explains below the overwhelming evidence of all Defendants' inducement of or contribution to the direct infringement by end users.

> ### 2. There was substantial evidence that Defendants had knowledge of the patent and intent for indirect infringement.

*Customers directly infringe*. As discussed above, there was overwhelming evidence that customers of the Emtrac System directly infringe by performing each of the steps of claim 16. (*E.g.*, A1475-76, A1500; *see also* A27309.) Morgan testified that cities "are actually **directly using** the Emtrac GPS system to preempt traffic." (A1755 (emphasis added).) And GTT's expert explained that when a city uses the Emtrac System, it "always" performs all the steps of claim 16. (A1475-76, A1500.)

***Defendants knew of the patent***.  There was substantial evidence that all Defendants knew of the '398 patent.  Morgan—Cross's close "friend" and "joint venture" partner (A2548-49)—testified he became aware of the '398 patent as early as 2004 when he "looked up on the Internet what 3M had going on at the time and I saw that on there." (A1779.)  Morgan then "went down and talked to Brad." (A1779-80.)  Morgan confirmed that by 2007, Defendants "knew a patent existed," "knew that patent related to GPS," "knew that patent related to traffic preemption," and "knew that patent was owned by a competitor" (A1732) and he and Cross "both talked about that," (A1608).  The jury was entitled to rely on this direct testimony (of Cross's close friend and business partner) that all Defendants knew of the '398 patent.  And it "is not the province of an appellate court to second guess the jury's credibility determinations," *Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1192-93 (Fed. Cir. 1998), or "drawing of legitimate inferences from the facts," *Reeves*, 530 U.S. at 150-51.  Further, Defendants knew of the patent once the lawsuit was filed and continued with their same infringing activities. (*E.g.*, A1450.)  Therefore, any challenge to knowledge is fruitless.

***Defendants intended to cause customers to use the System***.  There was substantial evidence that Defendants had "specific intent to cause the acts constituting infringement," such as uses of the Emtrac System by cities.  *Ricoh Co., Ltd. v. Quanta Computer, Inc.*, 550 F.3d 1325, 1342 (Fed. Cir. 2008).  For

example, Morgan "get[s his] hands dirty everyday installing, testing, repairing" the

Emtrac System (A1757-58) so that cities can use the System:

> Q: And, now, we're talking about indirect infringement.
> A: Mm-hmm (Yes).
> Q: And the question is, Do you **help cities use** the Emtrac GPS product?
> A: Yes, I do.

(A1757 (emphasis added).)  He installed, trained, and/or demonstrated how to use

the infringing system in every single city in which it exists.

| KME Activities | | | |
|---|---|---|---|
| City | Installation | Training | Demonstration |
| Washington, D.C. | Yes | Yes | Yes |
| San Jose, California | Yes Possibly | Yes | Yes |
| Santa Clara VTA, California | Yes | Yes | Yes |
| Sunnyvale, California | Yes | Yes | Yes |
| Oxnard, California | Yes | Yes | Yes |
| Marin County, California | Yes | Yes | Yes |
| Anaheim, California | Yes | Yes | Yes |
| Houston, Texas | Yes | Yes | Yes |
| Waterloo, Canada | Observe | Yes | Yes |
| Brampton, Canada | Yes | Yes | Yes |
| Niagara Falls, Canada | Yes | Yes | Yes |
| Minneapolis, Minnesota | Yes | Yes | Yes |
| Columbia County, Georgia | Yes | Yes | Yes |
| Stillwater, Oklahoma | Yes | Yes | Yes |
| Coquitlam + Port Coquitlam, Canada | Yes | Yes | Yes |

Case No. 10-cv-4110

P# 76

P/ EXHIBIT

13

R. Morgan

(A26536, A1758-61.)  And Morgan absolutely knew that each of the cities was, in fact, using the Emtrac System to preempt traffic.  (A1758-60.)

Evidence presented at trial also showed that STC performed affirmative acts to cause cities to use the System, such as writing manuals that taught customers how to use the Emtrac System in an infringing manner (A2561), writing source code that required customers to use the product in an infringing manner (A2549-50), maintaining the product's website (A2550), providing customer support (*id.*), and instructing how to resolve setup, firmware, equipment configuration, and GPS issues (A2550-52).

***Defendants intended to cause infringement***.  ***First***, this Court has repeatedly held that "**specific intent may be inferred** from circumstantial evidence where a defendant has both **knowledge of the patent** and **specific intent to cause the acts constituting infringement**."  *Ricoh*, 550 F.3d at 1342 (emphasis added); *accord, e.g.*, *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 n.4 (Fed. Cir. 2005).  Here, the evidence of Defendants' knowledge of the patent combined with their intent to cause direct acts of infringement—*i.e.*, use of the Emtrac System—was by itself substantial evidence to permit the jury to infer that Defendants knew cities' use would be an infringement of the '398 patent.

***Second***, Defendants admittedly took active steps of "instructing how to engage in an infringing use"—Morgan installing and training in every city and STC writing the manuals showing how to infringe—which "show[s] an affirmative intent that the product be used to infringe." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006).  As Dr. Neuhauser explained, the Emtrac System manual—which STC wrote—describes the system "in some cases in the same words" as claim 16.  (A1495-96, A1489.)  Moreover, Morgan professed to "have the final say on . . . how the product works," so he knew its use would infringe.  (A1756-57, A26538.)  Still further, Defendants never went to a lawyer—despite the fact that Morgan had been working with patent lawyers for decades and there was even a lawyer just "down the hall"—to determine whether the Emtrac System infringed.  (A1753-55.)  This further suggests that they knew use of the Emtrac System would infringe the '398 patent.  *See Broadcom*, 543 F.3d at 699.

***Third***, this is an unusual case in which there **actually was direct evidence** of knowledge that use of the Emtrac System would infringe.  Morgan admitted that he knew the Emtrac System performed the method of claim 16 of the '398 patent.  (A1745-53.)  For example, Morgan testified:

> Q:  My simple question is, You absolutely knew that the Emtrac GPS system transmits vehicle data?

> A:  Yes.

(A1749.)  Morgan then went on to admit that use of the Emtrac System met the other limitations of claim 16 as well.  (A1745-53.)

The jury was entitled to infer intent to infringe from the totality of this evidence.  *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) ("[I]ntent is a factual determination particularly within the province of the trier of fact . . . ." (quotations omitted)); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988) ("[I]ntent to induce infringement may be inferred from all of the circumstances.").

***Finally***, STC's argument regarding its supposed "good-faith belief in noninfringement" is a nonstarter.  First, the law is clear that an infringer's good-faith belief is only "relevant evidence" that "should be considered by the fact-finder," and it does **not** "preclude[] a finding of induced infringement."  *Commil USA, LLC v. Cicso Sys., Inc.*, 720 F.3d 1361, 1367-68, 1369 (Fed. Cir. 2013).  The jury evaluated the evidence and found against STC, as it was entitled to do.  *Fuji*, 394 F.3d at 1378; *Comark*, 156 F.3d at 1192.  The jury's finding should not be disturbed.  *E.g.*, *Smith & Nephew, Inc. v. Arthrex, Inc.*, 502 F. App'x 945, 950 (Fed. Cir. 2013) (nonprecedential) (A36012-18).

Moreover, the district court did not find that STC had good faith noninfringement defenses.  Rather, when assessing STC's **behavior as a litigant**, in the context of the enhancement of damages factors, the court stated that STC's

claim construction arguments were not "asserted in bad faith." (A44.) And

Defendants "could not have had a good faith belief" of noninfringement before the

lawsuit was filed because, according to them, "they claim that they did not read the

Patent." (*Id.*)

### 3. Defendants do not challenge the sufficiency of the evidence of willful blindness.

Even if the record did not contain such compelling evidence of knowledge

and intent, Defendants' conduct falls squarely within the willful blindness

doctrine—an independent ground for indirect infringement liability. The jury was

instructed on willful blindness and it was argued during closing arguments. (A127,

A2848-49.) Because Defendants do not address willful blindness in their opening

briefs, the issue is waived. *Advanced Magnetic Closures*, 607 F.3d at 833. This is

yet another reason why the jury's finding of infringement must be upheld. *i4i*, 598

F.3d at 851.

Moreover, there was overwhelming evidence of Defendants' willful

blindness. The two requirements for willful blindness are: "(1) the defendant must

subjectively believe that there is a high probability that a fact exists and (2) the

defendant must take deliberate actions to avoid learning of that fact." *Global-Tech

Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). Here, Morgan testified

that he and Cross "talked about" GTT's patent and then "decided that we would

not look at any patents." (A1608.) Morgan confirmed they made "an intentional

decision" not to read the patent, "so if there was a problem down the road," they could not be accused of "copy[ing] it." (A1609, A1733-34.) This was substantial evidence for the jury to conclude that Morgan and Cross deliberately chose not to read the '398 patent (that they knew existed) in order "to manufacture a claim of plausible deniability in the event that [their] compan[ies were] later accused of patent infringement." *Global-Tech*, 131 S. Ct. at 2071.

### 4.    There was substantial evidence that KME and STC themselves directly infringed claim 16.

A finding of direct infringement "can rest on as little as one instance of the claimed method being performed." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009). In this case, by its own admission, KME (through Morgan) itself directly performed the method of claim 16 "many, many, many times" by actually driving in a car and using the Emtrac System. (A1761, *see also* A1757-58, A26539.) Thus, there was overwhelming evidence of KME's direct infringement.

And as explained above, GTT's expert testified that when in operation, the Emtrac System "always" performs all the steps of claim 16, and that there is no way to operate the System without performing the steps of claim 16. (A1475-76, A1500.) *Energy Transp. Grp. v. William Demant Holding*, 697 F.3d 1342, 1352 (Fed. Cir. 2012) (jury can choose to believe expert).

GTT also presented circumstantial and direct evidence from which the jury could infer that STC directly infringed claim 16 by using or testing its own product. STC's involvement with the Emtrac System was extensive: STC wrote the code for the Emtrac System, maintained the Emtrac website, instructed customers, visited customers, and wrote the manuals. (A2549-52, A2561.) STC was responsible for "the engineering, the designing, and the manufacturing of the product." (A1692.) STC even did "remote computer support," in which STC would "actually take control of a customer's computer." (A2552.) Importantly, STC tested the Emtrac product—it would "make the product, **test it**, [and] ship it to the customer." (A1693-94 (emphasis added); *see also* A2543 (Morgan would assist Cross with testing the Emtrac System).) What is more, in the face of this evidence, STC never so much as suggested that it had never operated the Emtrac System. Thus, based on this record, a reasonable jury could have concluded that STC practiced the method of claim 16 by using the Emtrac System.

## II.    MORGAN IS PERSONALLY LIABLE FOR INDUCING INFRINGEMENT UNDER 35 U.S.C. § 271(b).

### A.    Morgan Actively Assisted with KME's Infringement and Is Personally Liable for Inducing Infringement.

It is black-letter law that "corporate officers who actively assist with their corporation's infringement may be personally liable for inducing infringement **regardless** of whether the circumstances are such that a court should disregard the

corporate entity and pierce the corporate veil." *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308, 1316 (Fed. Cir. 2010) (emphasis added). Morgan appears to base his argument that he is not personally liable for infringement on his belief that "corporate officers are not liable for patent infringement apart from invocation of veil-piercing principles." (KME Br. 15.) Yet the only case he cites on this point (*Wordtech*) says exactly the opposite. Morgan's arguments regarding his personal liability can be rejected on that basis alone.

Moreover, as explained above, there was overwhelming evidence that Morgan, a corporate officer of KME, actively assisted with KME's infringement with every single customer. Morgan does not challenge any of this evidence on appeal.

### B.    Morgan's "Pleading" Argument Is Meritless.

To the extent Morgan is contending that the issue of his personal liability was not part of the case because it was not pled, he is grossly mistaken. Morgan's personal liability for inducement was (1) pled in GTT's complaint (A5055 ¶ 31), (2) disclosed in GTT's interrogatory answer (A11046-47), (3) argued in GTT's summary judgment brief (A13848-49), (4) recognized by the district court in its summary judgment order (A17693), (5) argued in GTT's trial brief (A19455-56),

(6) included without objection in jury instructions (A127, A130), (7) included without objection in the verdict form (A169), and (8) proven at trial.

### 1.    The Amended Complaint pled Morgan's personal liability.

The Amended Complaint pled two theories of personal liability: (1) Morgan was liable for his activities that induced infringement under 35 U.S.C. § 271(b); and (2) Morgan was liable for the activities of a company called Emtrac Systems, Inc. under Illinois corporate law because he operated that company after it was dissolved.  Specifically, the Amended Complaint included a "Claim for Relief for Patent Infringement against . . .  Rodney K. Morgan," that stated that Rodney K. Morgan "directly infringed, actively induced others to infringe, and/or contributed to the infringement of the '398 patent by making, using, marketing, offering to sell, selling, and installing the Emtrac System . . . in violation of 35 U.S.C. § 271." (A5055 ¶ 31.)  GTT separately pled that Morgan was "jointly and severally liable for all debts and liabilities, including liability for patent infringement, incurred by Emtrac after its dissolution pursuant to 805 Ill. Comp. Stat. 5/3.20."  (A5056 ¶ 35.) Thus, Morgan's personal liability for inducing infringement under § 271(b) was explicitly pled.

### 2.    The pleading was effectively amended by operation of law under Rule 15(b).

Even if Morgan's personal liability was not explicitly pled in the Amended Complaint, the pleading was effectively amended by operation of law under Rule

15(b)(2). "With regard to amendments by operation of law under Fed. R. Civ. P. 15(b) this court applies the law of the regional circuit." *Studiengesellschaft Kohle, m.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1566 (Fed. Cir. 1997). In the Eighth Circuit, a complaint can be effectively amended in four ways. *Am. Family Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 349 (8th Cir. 2013). Here, all four ways of amendment by operation of law apply.

*First*, as noted above, Morgan had notice in nearly every way possible of the claim regarding his personal liability for inducement. During discovery, for example, GTT specifically stated in an interrogatory answer that Morgan "personally induces and/or contributes to the direct infringement of customers by, among other things, instructing, training, demonstrating, and teaching customers to use the infringing Emtrac Priority Control System, [and] installing the system in cities," and "personally take[s] part in the making, use, sale, or offer to sell the infringing Emtrac Priority Control System on behalf [of] KM Enterprises, Inc." (A11046-47.) Morgan therefore had "actual notice" of the claim and "an adequate opportunity to cure any surprise." *Am. Family*, 705 F.3d at 349.

*Second*, at summary judgment, GTT argued, citing *Wordtech*, that "Rodney Morgan as an individual defendant is personally liable for 'actively induc[ing] others to infringe'" on behalf of KME. (A13848.) Morgan never objected on the grounds that this theory was not pled. He instead squarely addressed the claim.

41

(A17371.)  Morgan therefore implicitly acquiesced to trying the claim.  *Fanning v. Potter*, 614 F.3d 845, 851 (8th Cir. 2010) (where the parties "squarely address the claim in their summary judgment briefs," there is implied consent to try a claim); *Cook v. City of Bella Villa*, 582 F.3d 840, 852 (8th Cir. 2009) (where a party "responded to [the] claim as if the claim had been expressly pled," the court "assume[s] the complaint was amended").

Moreover, even the district court acknowledged the claim was part of the case at summary judgment, noting that Morgan could "be held personally liable for his actions in selling the Emtrac systems, in his capacity working for Emtrac Systems, Inc. **and KME**."  (A17693 (emphasis added).)

*Third*, in its pretrial brief, GTT explained that Morgan was personally liable under two distinct theories, including an inducement theory under § 271(b). (A19455-56.)  And then at the beginning of trial, GTT again reiterated that it was pursuing a claim of personal liability against Morgan for inducement.  (A1015.)

Despite this clear notice, Morgan failed to object to introduction of evidence of his personal liability at trial.[3]  He also did not object to the relevant parts of the

---

[3] It is irrelevant that evidence relevant to the claim against Morgan personally was also relevant to the claims against the corporate defendants.  *See Am. Family*, 705 F.3d at 349 ("This overlap . . . does not excuse American Family from objecting to evidence relevant to the unpleaded [claim].").

jury instructions or special verdict form regarding Morgan's personal liability.[4]

(A127, A130, A169, A2868-74.)  He therefore "certainly impliedly consented to trying the claim" by failing to object to evidence.  *Am. Family*, 705 F.3d at 350.

**Fourth**, Morgan's personal liability for inducing infringement was "'not inconsistent with' the position taken by [KME/Morgan] earlier in the proceedings." *Id.* at 348.  KME/Morgan's "position from the start" was that their activities did not infringe, *id.* at 351, including arguing specifically at summary judgment that they "lacked both knowledge of the patent, and specific intent and action to induce infringement" (A17371).

Thus, the complaint was effectively amended by operation of law, even if Morgan's personal liability for inducement was somehow found not to have been explicitly pled.

### 3.    Rule 54(c) also permits recovery on the theory that Morgan is personally liable for inducement.

Rule 54(c) states that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded the relief in its pleadings." Fed. R. Civ. P. 54(c); *see also Morgan Distrib. Co. v Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) ("party may obtain relief on a theory of recovery not expressly pleaded in the complaint but proved at trial").  Morgan had explicit

---

[4] KME/Morgan's failure to object to the verdict form waived any "objection to the form of the verdict as grounds for reversal or a new trial."  *Mitsubishi Elec. Corp. v. Ampex Corp.*, 190 F.3d 1300, 1304 (Fed. Cir. 1999).

notice of his personal liability for induced infringement, as discussed above.  There was overwhelming evidence supporting Morgan's active assistance with KME's infringement.  GTT was therefore entitled to obtain relief on this theory under Rule 54(c), in the alternative.

## III.  STC'S "MAPPING MEANS" ARGUMENT FOR CLAIM 1 IS WITHOUT MERIT.

At *Markman*, the district court construed the phrase "mapping means, associated with the location, for storing a plurality of positions corresponding to allowed approaches to the location and providing therefrom a map of allowed approaches."  (A8-10.)  First, the court identified the function, which **STC does not challenge** on appeal.  (A9.)  With respect to the structure, "GTT's proposed construction of this structure [was] 'memory configured to store data,' while [Defendants'] proposed construction [was] 'the device that stores a preprogrammed map of allowed approaches.'"  (*Id.*)  The court construed the structure as "computer map memory."  (*Id.*)  **STC does not challenge** this construction on appeal, either.  Finally, the court rejected STC's attempt to import a physical location requirement into the phrase "associated with the location."  (A9-10.)  The court construed "associated with the location" as a stand-alone phrase, concluding that it did not "specify nor require physical connection or location."  (A6.)  On appeal, **STC does not challenge** this construction, either.

STC is therefore not challenging **any** aspect of the district court's construction of the "mapping means . . ." limitation.  Instead, STC now argues that the district court should have imported a location-specific limitation into the "mapping means" **structure itself**, for some other undeveloped and unspecified reason.  (STC Br. 42.)  But STC "cannot make that argument for the first time on appeal."  *Triton Tech*, 753 F.3d at 1380.  And in any event, STC's new construction is wrong.

### A.    The "Mapping Means" Itself Does Not Have a Physical Location Requirement.

"What the '[mapping] means' is and where it is located are two different things."  *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1344 (Fed. Cir. 2002).  The phrase "associated with the location," which is cordoned off from "mapping means" by commas, is "a separate limitation not subject to section 112, paragraph 6."  *Id.*; (*see also* A10).  The court gave "associated with the location" its plain and ordinary meaning—"neither specify[ing] nor requir[ing] physical connection or location."  (A6.)  STC does not challenge this construction on appeal.

When construing a means-plus-function term, "[a] court may not import into the claim features that are unnecessary to perform the claimed function."  *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003).  The district court found—and STC does not dispute—that "computer map memory" is the

structure for the "mapping means."  (A9.)  And "the physical location of the 'computer map memory' is irrelevant to performing the twin functions of storing positions and providing a map of allowed approaches."  (A9-10.)

Unlike cases in which the claim language explicitly requires a particular physical placement for a component, *e.g.*, *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1371 (Fed. Cir. 2004) ("storage means **in a data processor**" (emphasis added)); *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1328 (Fed. Cir. 1999) ("**buried within** the semiconductor material" (emphasis added)), the claims here do not include any such limitations.  Importing STC's proposed location-specific limitation into the corresponding structure would have been clearly erroneous.

## B.   GTT Is Entitled to the Full Scope of the Broad Term "Associated With."

To the extent STC is trying—and permitted—to now challenge the court's construction of "associated with the location," STC cannot simply replace the words "associated with" with "located at."  A "patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012).

The phrase "associated with" has a plain and ordinary meaning that is readily understood, and it does not require a physical location.  For example, as the

district court noted, dictionaries define "associate" as "to bring together or into relationship in any of various intangible ways (as in memory or imagination)," "[t]o connect in the mind or imagination," or "[t]o correlate or connect logically or causally." (A5.) The Federal Circuit has even explained that "[f]rom a general sense, the plain meaning of associating relates to a mere commonality." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1306 (Fed. Cir. 2014).

STC does not—and cannot—contend that the inventors acted as their own lexicographers by "clearly set[ting] forth a definition" of "associated with" that differs from "its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365. And STC also does not argue that the specification of the '398 patent contains any disclaimer, let alone a "clear and unmistakable" one, that represents a "clear disavowal of claim scope." *Id.* at 1366-67. Rather, STC is limited to the assertion that the preferred embodiment in the patent illustrates a "map located at the intersection." (STC Br. 42.) But this Court has repeatedly instructed that "[i]t is not enough for a patentee to simply disclose a single embodiment." *Thorner*, 669 F.3d at 1365; *accord Phillips*, 415 F.3d at 1323; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004).

The flaw in STC's construction is further highlighted by the fact that "when the inventor[s] wanted to restrict the claims" to components located in a specific location, they "did so explicitly." *Kara Tech. Inc.*, 582 F.3d at 1347. Claim 16,

for example, discloses a step of "processing the GPS signals **on board the vehicle**." (A188 (10:49-50 (emphasis added)).)

The district court did not err by refusing to import a location-specific limitation into the structure corresponding to the "mapping means," or by refusing to construe "associated with the location" to mean "located at the intersection."

## IV. STC'S OTHER "MEANS" ARGUMENTS FOR CLAIM 1 CANNOT BE PURSUED AND ARE WITHOUT MERIT.

### A. The District Court Did Not Abuse Its Discretion by Refusing to Construe Improperly Presented Terms.

STC made the **strategic decision not to** request construction of the "means for transmitting the vehicle data" and "means, associated with the location, for receiving the vehicle data" during the *Markman* process set by the Scheduling Order. (*See supra*, Statement of Facts, Part IV.B.) After losing at *Markman*, STC tried to "slip new claim construction into arguments" (A44), in blatant disregard of the district court's Scheduling Order and directions. It now has the chutzpah to complain on appeal that the district court did not construe these two terms.

As "a vehicle designed to streamline the flow of litigation through our crowded dockets, [appellate courts] do not take case management orders lightly, and will enforce them." *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001). And "[i]t is improper on appeal to disturb a district court's trial management, absent a clear abuse of judicial discretion." *Abbott Labs. v. Brennan*,

952 F.2d 1346, 1351 (Fed. Cir. 1991).  The Federal Circuit has repeatedly held that a district court does not abuse its discretion by refusing to construe claims that were never raised in accordance with the requirements of a Scheduling Order.  *See, e.g.*, *Bettcher Indus. v. Bunzl USA, Inc.*, 661 F.3d 629, 640-41 (Fed. Cir. 2011); *Central Admixture*, 482 F.3d at 1356 ("[Defendant] waived any argument with respect to this term by failing to raise it during the claim construction phase."); *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005) (same). The district court here did not abuse its discretion, either.

## 1.     The Scheduling Order set an orderly process for claim construction.

"[D]istrict courts have broad discretion to manage their dockets and address particular circumstances by enforcing local rules and by setting enforceable time limits."  *Huggins v. FedEx Ground Package Sys.*, 592 F.3d 853, 856 (8th Cir. 2010); *see also Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 774 (Fed. Cir. 2002). As outlined above, the Scheduling Order in this case contained a detailed, orderly process for raising claim construction issues.  (*Supra*, Statement of Facts, Part IV.)

## 2.     STC strategically chose not to request construction for claim 1's "means" terms.

Pursuant to the Scheduling Order, on August 2, 2011, Defendants served their "Preliminary List of Claim Terms for Construction," in which they designated 26 claim terms as needing construction, **including** the terms: "means for

transmitting the vehicle data" and "means, associated with the location, for receiving the vehicle data." (A18136-37.) By the time the parties exchanged their proposed claim constructions, however, Defendants made a tactical decision to abandon construction of 19 of the originally identified terms, including the two "means" terms at issue now. (A19945-51.) STC strategically chose to focus its non-infringement position and hence claim construction position on "placing location-specific limitations on the terms" (A17688), which can be seen in each of its proposed constructions in the *Markman* briefing. (A5164-78.) The parties' December 13, 2011 Joint Claim Construction Statement also did not include any request by STC to construe the "means" terms at issue. (A5116-19, A5130-32.)

In its Opening Claim Construction Brief, STC again did **not** request construction of the "means" terms at issue now. (A5164-78.) The court held a *Markman* hearing and issued a claim construction order rejecting STC's location-based constructions. (A1-16.) Specifically, with respect to the term "transmitting the vehicle data," the court noted that "transmitting the vehicle data" is "**the function itself**," and held that "the word 'transmitting' is not geographically limited." (A14 (emphasis added).)

Defendants subsequently requested leave to file a motion for reconsideration of the *Markman* ruling, arguing that the court erred in its construction of the term "transmitting the vehicle data" by failing to limit the structure to "a wireless

modem." (A5755.)  The district court rejected the request, explaining that

Defendants had only requested "the phrase 'transmitting the vehicle data' be

construed as 'delivering data gathered by a vehicle to an intersection module that is

located at an intersection'" and that "[s]uch a proposed limitation on a function is

inappropriate." (A5792.)

STC deliberately chose not to request any construction for the "means . . .

for receiving" at *Markman*, and intentionally limited its request related to the

"means for transmitting" to only the claimed **function**, which is "distinct" from

identifying the corresponding structure that performs that function. *JVW Enters. v.

Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).  STC must accept

the consequences of its decision.  The Scheduling Order set specific claim

construction-related deadlines and procedures "designed to prevent the shifting

sands approach to claim construction" that STC tries to employ here. *Genentech*,

289 F.3d at 774 (quotations omitted).  STC chose not to request construction of the

two "means" terms in compliance with the Scheduling Order, and therefore has

"waived any argument with respect to th[ese] term[s] by failing to raise [them]

during the claim construction phase." *Central Admixture*, 482 F.3d at 1356.

### 3.    STC never attempted to show "good cause" for its failure to comply with the Scheduling Order.

STC did not seek to modify the Scheduling Order to amend the claim

construction deadlines or request a further *Markman* hearing.  Instead, STC waited

until summary judgment—6½ months after the *Markman* hearing—to resurrect its second-string "means" arguments. (A7105-06.) The district court admonished Defendants for their tardy, "unjustified," and "prejudicial" claim construction arguments. (A17689.) Recognizing the possibility of significant sanctions under the Federal Rules, the court nevertheless stated that Defendants may be able to obtain further claim construction if they showed "good cause for the delay in raising the issue" and the "context" that made an additional *Markman* hearing necessary. (A17689-90.)

The Scheduling Order, the district court's Summary Judgment Order, Rule 16(b)(4), and Local Rule 16.3 all required a showing of "good cause" to modify the Scheduling Order to permit STC to raise these untimely claim construction arguments. "'[G]ood cause' requires a showing of diligence." *O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006); *see also Harris v. FedEx Nat'l LTL, Inc.*, 760 F.3d 780, 786 (8th Cir. 2014). STC knew how its Emtrac System operated for purposes of its noninfringement arguments. Yet STC did not ask that these "means" terms be construed at any required stage—not in the Joint Claim Construction Statement, not in its *Markman* brief, and not at the *Markman* hearing. STC easily could have presented these terms for construction in a timely manner—it simply **chose not to** and instead focused on location-specific constructions. STC's "shifting sands approach to claim construction" violated the

Scheduling Order and is a far cry from the diligence and the exacting "good cause" required. *See O2 Micro*, 467 F.3d at 1364, 1366; *Harris*, 760 F.3d at 786.

There was no abuse of discretion in refusing to construe terms that were not raised in compliance with the Scheduling Order.

## B.    STC Did Not Properly Object to the Jury Instructions on Claim Construction.

An additional reason that STC cannot raise its claim construction arguments for claim 1 is that it failed to properly object to the jury instructions on claim construction. Because STC chose not to raise its "means" arguments during the *Markman* phase, it was required to object to the jury instructions concerning claim construction to even preserve the issue for appeal. *Solvay S.A. v. Honeywell Int'l*, 742 F.3d 998, 1004 (Fed. Cir. 2014) (party waived claim construction argument that arose during trial by not objecting to jury instruction); *Koito Mfg., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1150 (Fed. Cir. 2004) (same).

Rule 51(c) requires an objection to be "on the record, stating distinctly the matter objected to and the grounds for the objection." An objection also must be timely: it must be made "before the instructions **and arguments** are delivered." Fed. R. Civ. P. 51(b)(2) & (c)(2)(A).

## 1. STC did not object to the claim construction jury instruction before closing arguments.

The Federal Circuit "look[s] to regional circuit law to determine whether a party has satisfied the requirements of Rule 51." *Lazare Kaplan Int'l v. Photoscribe Techs.*, 628 F.3d 1359, 1372 (Fed. Cir. 2010). The Eighth Circuit has been clear: "To be timely, a party must object before the jury is instructed **and before final jury arguments**." *Niemiec v. Union Pac. R.R. Co.*, 449 F.3d 854, 857 (8th Cir. 2006) (emphasis added); *accord Jiminez v. Wood Cnty.*, 660 F.3d 841, 845 (5th Cir. 2011); *Griffin v. Foley*, 542 F.3d 209, 221 n.17 (7th Cir. 2008). And the Eighth Circuit "does not relieve parties from making an objection to preserve errors for review," regardless of "concern that the trial judge would prefer no objection or the view that the objection would be futile." *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 256 (8th Cir. 1996).

The district court gave Instruction 16 on claim construction. (A118.) Prior to closing arguments on September 19, 2013, the district court provided the parties with a copy of the court's final jury instructions. (A2884-85.) STC had ample opportunity to review and object to the district court's jury instructions prior to closing arguments, but failed to do so. (A2792-94, A2884-85.) Right before closing arguments, the district court indicated that after a short recess, "[w]e'll come back and anything you have to have ruled on on the record before you argue, let's do that." (A2792.) When proceedings resumed, the court stated a willingness

to "discuss jury instructions" and asked whether Defendants were "ready to proceed with arguments," at which point they stated, "I think so, Your Honor." (A2794.)  STC's failure to object before closing arguments waives its arguments on claim construction.[5]

### 2.    STC's untimely objection failed to preserve the issue for appeal.

STC did not address its proposed jury instruction until after closing arguments.  But under Rule 51, objections must be made "before final jury arguments," *Niemiec*, 449 F.3d at 857, so "that counsel may argue the facts in the light of the law which, in so far as the requests go, they may presume the Court will later charge the jury," *Terminal R. Ass'n of St. Louis v. Staengel*, 122 F.2d 271, 278 (8th Cir. 1941).  Indeed, the parties relied upon the jury instructions during their closing arguments.  (A2805-06, A2856-59.)

Rule 51 sets forth the "mandatory procedure" for making objections to jury instructions, and the "requirements of Rule 51 must be observed."  *Hopkins v. Chip-In-Saw, Inc.*, 630 F.2d 616, 621-22 (8th Cir. 1980) *accord Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988); *Johnson v. United States*, 520 U.S. 461, 466 (1997).  In short, regardless of whether the district court or STC

---

[5] STC did propose its own jury instruction on claim construction prior to trial. (A19529-31.)  "The mere tender of an alternative instruction," however, "does not preserve the error for appeal."  *Jones Truck Lines*, 83 F.3d at 256.

believed the later objection to be properly preserved, STC plainly did not object before closing arguments and therefore waived any objection under Rule 51.

### 3.    STC did not object with specificity under Rule 51.

STC's post-closing argument "objection" (A2879)—even if it were somehow timely—fell woefully short of Rule 51(c)'s requirement that objections "distinctly stat[e] the matter objected to and the grounds for the objection." *E.g.*, *Bauer v. Curators of Univ. of Mo.*, 680 F.3d 1043, 1044-45 (8th Cir. 2012).

### 4.    STC does not challenge the jury instruction on appeal.

On top of its failure to follow the Scheduling Order and properly object to the jury instruction, STC fails to even argue on appeal that the jury instruction on claim construction was "plain error" or "affect[ed] substantial rights." Fed. R. Civ. P. 51(d)(2). This issue is therefore waived. *Advanced Magnetic Closures*, 607 F.3d at 833 (issue not in opening brief is waived).

## C.    STC's Claim Construction Arguments Regarding "Means" for Claim 1 Are Meritless.

### 1.    The "means for transmitting" includes wires.

STC attempts to limit the structure for the "means for transmitting vehicle data" to a "wireless" transmitter, arguing "nothing in the '398 patent links wires with" the means. (STC Br. 37.) STC's argument is meritless. For starters, the specification of the '398 patent makes clear that the means for transmitting is not limited to wireless radio transmissions, as it expressly states twice that "vehicle

data is transmitted via radio transmission **or some other medium**." (A173, A185 (3:53-55) (emphasis added).)

Second, while "the specification must contain structure linked to claimed means, this is not a high bar." *Biomedino LLC v. Waters Tech. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). And "the written description may disclose distinct and alternative structures for performing the claimed function," *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1329 (Fed. Cir. 2012) (quotations omitted), which may be found in the text or figures of the specification, *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005). The '398 patent satisfies this low bar, clearly disclosing wires as structure for transmitting vehicle data.

The specification undisputedly discloses **wired** structures for transmitting vehicle data. In Figures 1-3, for example, GTT's expert explained that the arrow between GPS Receiver 40 and Vehicle Processor 60 would be understood by one of skill in the art as a conductive pathway, such as a wire or trace on a circuit board. (A1441, A1449, A1504-06, A9791.) The patent makes clear, in describing Figure 1, that vehicle data is created at GPS Receiver 40, and eventually makes its way to Processor 250 where it is compared to the maps saved on Mapping Memory 260. This pathway, highlighted below in yellow, clearly includes wires as structures "for transmitting the vehicle data." (*Id.*)



The weakness of STC's position is driven home by its own expert's opinion. Mr. Andrews testified that the non-zigzag connections, or straight arrows (highlighted in yellow above), would be understood as "transmission lines," "coaxial cables," "circuit traces," or "wires," all of which are forms of wires for transmitting vehicle data.  (A14893; *see also* A2676-78.)  And for purposes of invalidity, Mr. Andrews even opined that "vehicle cabling"—i.e., wires—qualified as a "means for transmitting the vehicle data."  (A10375.)  Thus, it is clear that a person of ordinary skill in the art would understand the specification to link wires as one structure "for transmitting vehicle data."

## 2.    The "means . . . for receiving" includes a processor.

STC makes three arguments with respect to the "means . . . for receiving,"
each one of which fails.  *First*, STC asserts that the structure cannot include a
"processor" because "[n]othing in the '398 patent links or associates a processor"
with the means.  (STC Br. 39.)  But the patent clearly links a processor as a
structure that receives the vehicle data.  Figure 1, for example, shows that Vehicle
Processor 60 receives the vehicle data generated by the GPS receiver, and then
Processor 250 again receives the vehicle data.  (A175.)  In fact, the patent
specification **explicitly** states that "Processor 250 compares **the received vehicle
data** with the map of allowed approaches."  (A186 (5:64-65 (emphasis added)).)
Indeed, STC admitted that Processor 250 "does receive 'vehicle data' (it needs to
in order to process it)."  (A7106.)  The processor structure, of course, "may
perform more than one function."  *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d
1294, 1305 (Fed. Cir. 1999).  Accordingly, a person of ordinary skill in the art
would understand the specification to link a processor as one structure "for
receiving vehicle data."

*Second*, STC argues that something cannot be "associated with the location"
if it is associated with more than one location.  (STC Br. 39-40.)  This argument is
baseless.  STC's entire argument hinges on the word "the" in the phrase
"associated with **the** location."  But "the location" is simply a reference to the

phrase "a location" in the preamble of claim 1. *E.g.*, *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 953 (Fed. Cir. 2006) ("[T]he references to **the** abutment in the body of the claim derive their antecedent basis from the preamble." (emphasis added)). And "the words 'a' or 'an' in a patent claim carry the meaning of 'one or more,'" and the "'subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule.'" *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1296-97 (Fed. Cir. 2012). Thus, there is nothing to suggest that a component cannot be associated with more than one location.

*Third*, STC asserts that disclosure of a structure "in a specific location limits the claim to a structure in that specific location," relying on *Gemstar-TV* and *Loral Fairchild*. (STC Br. 40.) STC's argument again misses the mark. The claims at issue in those cases used language such as "**in a** data processor," *Gemstar-TV Guide Int'l*, 383 F.3d at 1371 (emphasis added), and "**buried within** the semiconductor material," *Loral Fairchild Corp.*, 181 F.3d at 1328 (emphasis added). The '398 patent's claims, on the other hand, use the broad language "associated with," and GTT is entitled to that broad claim language—language STC does not even challenge on appeal.

The "means, **associated with** the location, for receiving the vehicle data" does not have to be **located at** the intersection. Dr. Neuhauser testified that the

processor is "associated with" the intersection because it stores maps of the intersection and loads and evaluates information that includes "a unique ID that is associated with the particular location." (A1506-07.) There is nothing logically inconsistent with the fact that the processor is both associated with the vehicle (by virtue of being on the vehicle) and associated with the intersection (by virtue of processing and storing in its memory information regarding the specific intersection).

In sum, STC is trying to rewrite GTT's claims to read: "means, associated with only one location and located at that one location, for receiving the vehicle data." Unfortunately for STC, that is not what the claims recite.

## V.    KME/Morgan's "Location" Claim Construction Argument for Claim 1 Is Meritless.

KME/Morgan's claim construction arguments are largely incoherent. Based on GTT's best understanding of KME/Morgan's brief, KME/Morgan appear to make only one argument on appeal regarding claim construction—arguing for a new construction of the word "location," as it is used within the phrase "associated with the location." (KME Br. 3, 11, 21.) GTT notes that this phrase appears only in claim 1 of the '398 patent—not claim 16. Thus, KME/Morgan raise no claim construction issues for claim 16.

KME/Morgan argue that "location" means "intersection" and cannot mean "vehicle." For starters, this "location" argument was not made to the district court

and not preserved for the same reasons discussed above.  (*See supra*, Argument,

Part I.A.1); *e.g.*, *Triton Tech*, 753 F.3d at 1380.  In any event, this argument wildly

misses the mark for multiple reasons.

### A.   "Location" Does Not Mean "Vehicle."

GTT agrees with KME/Morgan that the word "location," as used within

claim 1, does not mean "vehicle."  This **has never been** a point of contention

between the parties.  The parties' positions at *Markman*, for example, with respect

to the phrase "associated with the location," are provided below:

| KME/Morgan's Construction | GTT's Construction |
|---|---|
| "within or attached to equipment at the intersection where the traffic signal to be preempted is located, which contains the intersection module that receives the vehicle data"  (A5164.) | No construction necessary. (A5425.) |

At *Markman*, Defendants argued that the phrase "associated with the

location" meant that something must be **physically located at** the intersection.

(A5165-68.)  GTT, in response, explained that "associated with" has a plain and

ordinary meaning that is broader than "located at," and so the district court should

reject Defendants' narrowing construction.  (A5636-39; *see also* A5425-32.)  At no

point did any party contend, or even suggest, that "location" should mean

"vehicle."

## B.    The District Court Did Not Construe "Location" To Mean "Vehicle."

KME/Morgan's assertion that the district court "essentially determined that the term 'the location' is construed to mean either the vehicle or the intersection" is mystifying.  (KME Br. 21.)  The district court refused to import Defendants' proposed physical location limitations, such as "within or attached to equipment at the intersection," into the phrase "associated with."  (A6, A5164.)  Instead, the court explained that the broad phrase "associated with the location" "does not require" that components "be located only at the intersection."  (A6-7.)

KME/Morgan appear to believe that a component cannot be simultaneously "associated with" more than one thing.  But there is nothing logically inconsistent with the fact that a component can be "associated with" a location (for example, by virtue of processing and storing information regarding a specific location) and also "associated with" a vehicle (for example, by virtue of being physically located on the vehicle).  (*E.g.*, A1506-07 (expert testimony regarding a processor that is located on a vehicle and also associated with a location).)  This interpretation does not somehow equate "location" with "vehicle."

## C.    The Phrase "Associated With" Does Not Require Physical Connection or Location.

Although GTT understands KME/Morgan's brief to challenge only the construction of the word "location," KME/Morgan sporadically make references to

other claim terms that include the phrase, "associated with the location."  (KME

Br. 21, 25.)  If KME/Morgan are challenging the district court's construction of

"associated with the location," any such argument is fatally undeveloped, *SynQor,*

*Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013), and fails for the

same reasons discussed above.  (*Supra*, Argument, Part III.B.)

## VI.  KME/MORGAN'S BRAND NEW "DOCTRINE OF EQUIVALENTS DEFENSE" MAKES NO SENSE AND WAS NEVER PRESENTED TO THE DISTRICT COURT.

KME/Morgan contend that they "succeed on their non-infringement defense

under the doctrine of equivalents," even "[a]ssuming every limitation of at least

one properly construed claim is infringed."  (KME Br. 26.)  But KME/Morgan did

not raise any "doctrine of equivalents defense" in the district court or in a pre- or

post-verdict JMOL motion.  The phrase "doctrine of equivalents" does not even

appear anywhere in KME/Morgan's Rule 50(b) motion.  (A20763-809.)  And

KME/Morgan's reference to the issue of "ensnarement," which is relevant only as

a defense **against** the doctrine of equivalents, *see DePuy Spine, Inc. v. Medtronic*

*Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009), was also never raised

at any point before the district court.  These arguments are therefore waived.

Further, KME/Morgan actually **assume that literal infringement exists**, so

the doctrine of equivalents is irrelevant.  (KME Br. 26.)  The doctrine of

equivalents is not a defense to literal infringement—in fact, it is not a "defense" at

all.  *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997)

(doctrine applies when "a product or process . . . does not literally infringe upon the express terms of a patent claim"). The doctrine of equivalents simply has no relevance whatsoever to this appeal.

## VII. KME/MORGAN'S "VEHICLE DATA" ARGUMENT FAILS.

Although embedded within the section of their brief addressing their "doctrine of equivalents defense," KME/Morgan also appear to contend that there is no literal infringement because they believe that the Emtrac System does not generate "vehicle data." (KME Br. 28.) To the extent that KME/Morgan are attempting to challenge the sufficiency of the evidence on "vehicle data," their argument quickly fails.

First, KME/Morgan contend that both claims 1 and 16 require "vehicle data" to "be generated along a vehicle path." (*Id.*) Only claim 1 contains this limitation—not claim 16. (A188.) This noninfringement argument, therefore, has no relevance to the jury's finding that KME/Morgan infringed claim 16. (A169.)

Second, there was substantial evidence that the Emtrac System generates vehicle data, including along a vehicle path. GTT's expert, Dr. Neuhauser, testified that the GPS receiver in the Emtrac System generates vehicle data, including position data, at periodic intervals along the vehicle path. (A1504.) In fact, "[i]t generates that vehicle data about every half second." (*Id.*) That is the

end of the matter because the "jury assessed the credibility of both sides' experts, and was entitled to credit [Dr. Neuhauser]." *Energy Transp.*, 697 F.3d at 1352.

Moreover, the Emtrac manual itself explains that the Emtrac System generates vehicle data:

> The EMTRAC priority control system utilizes real-time vehicle position data, a database of user-programmable intersection approach detection zones, and secure wireless telemetry to enable precise control of priority detection. Using the EMTRAC Systems Manager software, priority calls can be restricted to specific areas of intersection approach streets and to specific time intervals for each intersection approach.
>
> By using an advanced GPS receiver, the EMTRAC vehicle equipment determines the vehicle's position, direction, and velocity to a high degree of accuracy. The rectangular

(A27302 (highlights added).)  And on the witness stand, Morgan **admitted** that the GPS receiver in the Emtrac System "absolutely" generates and transmits "vehicle data."  (A1747, A1749.)

There was overwhelming evidence that the Emtrac System generated and transmitted vehicle data, and the jury's finding should not be disturbed. *Morse*, 174 F.3d at 922 ("review of a jury verdict is extremely deferential").

Finally, KME/Morgan also make some argument that the '398 patent somehow requires that the intersection itself be equipped with a GPS receiver, making an incoherent reference to "differential GPS."  (KME Br. 29.)  The '398 patent's only mention of "differential GPS" technology is in the specification, where it is described as an "**alternate** preferred embodiment" of the invention that

allows for more accurate determination of the vehicle position.  (A186 (6:4-33) (emphasis added).)  Claims 1 and 16 do not require that the intersection be equipped with a GPS receiver.  In fact, claim 1 requires that the "navigation means" that generates the vehicle data be "associated with the vehicle," and claim 16 explicitly requires that the GPS signals be processed "on-board the vehicle." (A188 (9:29-33, 10:49-50).)  Differential GPS technology was never part of this case, and it has no relevance on appeal.[6]

## VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING GTT'S DAMAGES EXPERT'S TESTIMONY ON PRICE EROSION.

STC appeals the denial of its *Daubert* motion on GTT's damages expert's testimony on price erosion.  To be clear, STC is not challenging the sufficiency of the evidence for price erosion or damages because it did not preserve that issue with a pre-verdict Rule 50(a) motion.  Thus, the issue is only whether the district court abused its "wide discretion" by denying STC's *Daubert* motion on price erosion.  *Harris v. Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007); *see also Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003).

STC's sole argument is that "Mr. Gorowsky did not account for the basic economic principle of price elasticity."  (STC Br. 63.)  It is as if STC did not read

---

[6] This argument was also never made to the district court, and is therefore not preserved for appeal.  *Sage Prods.*, 126 F.3d at 1426.

Gorowsky's expert report or his trial testimony. Gorowsky **specifically** accounted for price elasticity in his report and his testimony. Gorowsky simply reached a **conclusion** on price elasticity that STC disagrees with, but STC's "disagreements go to the weight to be afforded the testimony and not its admissibility." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

The accepted price erosion methodology requires the patentee to account for, among other things, "the effect of the hypothetically increased price on the likely number of sales at that price in the market." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1379 (Fed. Cir. 2003) (elasticity is "for the jury"). Here, Gorowsky dedicated five pages of his report to an "**analysis of the price elasticity of demand**," specifically outlining numerous facts to support his conclusion. (A5850-55.) Gorowsky first explained that the fact that GTT and Defendants competed in a two-supplier market supported his conclusion of an inelastic market (A5849)—a fact that Defendants conceded. (A1604-05, A1794; *see also* A2070-77 (trial testimony regarding two-supplier market).)

Next, he considered a benchmark market to determine how GTT's prices were affected (if at all) when GTT did not have to compete against STC's infringing product. (A5850.) Gorowsky examined sales to four customers in

situations in which Defendants did not compete, and he determined that GTT "was able to charge its list or dealer list prices," even in a weak economy.  (A5850.)

Finally, Gorowsky explained numerous other factors—citing ample evidence—that supported his conclusion on price elasticity, including:

- GTT's "dominant position in the relevant market" in which "it had already established its market share and pricing levels" (A5854-55);

- "GPS-based traffic preemption systems are considered by customers to be essential to public safety and efficiency" (A5850-51);

- Customers "have certain numbers of intersections and vehicles that need to be equipped with preemption equipment for the system to be worth the investment" (A5851);

- Customers with an existing system are willing to "replace that system and pay for an Opticom™ GPS System or Emtrac GPS System" (*Id.*); and

- "[C]ustomers over-budget for preemption systems" (*Id.*).

Gorowsky's testimony at trial mirrored his report.  (A2099-2103.)

STC had the opportunity at trial to cross-examine Gorowsky and present contrary evidence.  *See i4i*, 598 F.3d at 856.  But by the end of trial, it was not even controversial that sale of the infringing Emtrac System caused price erosion.  Morgan agreed that "Emtrac's presence in the market caused competitors . . . to lower their prices when bidding."  (A1605-06.)  Even STC's damages expert

(whom STC chose not to call at trial) agreed with Gorowsky's methodology. (A2790-91.)

It is fundamental that STC's disagreement with the facts Gorowsky relied upon, or the conclusions he reached from those facts, goes only to the weight of his testimony—not to its admissibility. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (1993); *Apple*, 757 F.3d at 1314; *i4i*, 598 F.3d at 854. The district court did not abuse its wide discretion by admitting Gorowsky's well-supported price erosion testimony.

## IX.    THE EVIDENCE SUPPORTED A FINDING OF WILLFUL INFRINGEMENT.

### A.    Defendants Acted Despite an Objectively High Likelihood that Their Actions Constituted Infringement.

STC's argument that it was not a willful infringer is contained in a single cryptic sentence in its opening brief: STC "believed that the EMTRAC System did not infringe." (STC Br. 51.) Likewise, KME/Morgan's argument is a simple statement that they "have a valid defense." (KME Br. 31.) But it is a mystery which of the laundry list of Defendants' noninfringement defenses they think was reasonable. Defendants' undeveloped arguments, "noted in a single sentence of the opening brief, is unpersuasive and insufficient to raise the issue on appeal." *SynQor*, 709 F.3d at 1385; *accord Ajinomoto Co. v. ITC*, 597 F.3d 1267, 1278 (Fed. Cir. 2010).

Based on the record, no "reasonable litigant could realistically expect [Defendants' non-infringement defenses] to succeed." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1008 (Fed. Cir. 2012). For example, Defendants focused much of their noninfringement defense at trial on arguments based on comparing the Emtrac System to preferred or commercial embodiments of the '398 patent. (A2664, A2668, A2679-81, A2730, A2811-13.) But no reasonable litigant could expect these arguments to succeed because this Court has "repeatedly emphasized that infringement analysis compares the accused product with the patent claims, not an embodiment." *Atl. Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 846 (Fed. Cir. 1992). Defendants also unreasonably continued to push at trial a noninfringement position based on physical-location arguments that the district court already expressly rejected during *Markman*. (A1211, A2584, A2689-90, A2723, A2812-13.)

Moreover, as explained above, the district court **did not** find that Defendants had a good-faith belief in noninfringement. Rather, the district court stated that Defendants did not behave in "bad faith" as litigants. (A44.) In any event, arguments not asserted in bad faith do not equate to arguments in which a "reasonable litigant could realistically expect . . . to succeed." *Bard*, 682 F.3d at 1008.

Finally, claim construction in this case was not a "sufficiently close question." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 n.4 (Fed. Cir. 2008). As the district court noted, many of Defendants' claim construction arguments were, in fact, "of dubious value and merit." (A44.) The only claim construction issue properly raised did not even involve claim 16 and consisted of Defendants attempting to import a physical-location limitation into the terms for claim 1, in violation of established law. *See Phillips*, 415 F.3d at 1323. Moreover, Defendants blatantly abused the claim construction process in this case by engaging in a strategy that was "frustrating" (A44), "unjustified," and "prejudic[ial]" (A17689). It was unreasonable for Defendants to rely on such a defense strategy.

## B.    Defendants Knew of the Patent for the Subjective Prong.

STC contends that it was not aware of the '398 patent until the lawsuit. But as discussed above, there was overwhelming evidence that STC knew of the '398 patent as early as 2004. (A1608, A1779-80.) STC does not address any other issue regarding the subjective prong.

As for KME/Morgan, they generically assert that "Morgan thought he was not violating" the patent. (KME Br. 30.) That simple statement is fatally undeveloped. *SynQor*, 709 F.3d at 1385. In any event, Morgan lost whatever shred of credibility he had when he testified that in 2007, "I knew that we weren't

infringing" (A1735), right after claiming that he "did not" even "read their patent" (A1733). Moreover, Morgan incredibly boasted at trial that "I know the law of infringement" (A1735-38), and then confirmed that he also knew the Emtrac System performed the method of claim 16 (A1745-53). But instead of going to a patent lawyer and asking "hey, I know my product does all of that. Am I okay?" (A1753), KME/Morgan chose to willfully use the invention of the '398 patent to launch the Emtrac System and seek "total supremacy over Global Traffic in the marketplace" (A1763-64).

The jury judged Defendants' credibility (or complete lack thereof), and "[i]t is not the province of an appellate court to second guess the jury's credibility determinations or to reevaluate the weight to be given the evidence." *Comark*, 156 F.3d at 1192. This is "particularly" true with respect to "an intent-implicating question such as willfulness," which is "peculiarly within the province of the fact finder that observed the witnesses." *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006); *accord Reeves*, 530 U.S. at 150-51. There was substantial evidence to support the jury's subjective willfulness finding.

## X.    STC'S MARKING ARGUMENTS ARE WITHOUT MERIT.

GTT requested $2,755,197 in pre-suit damages, $4,404,963 in post-suit damages, and $7,160,160 in total damages. (A2105.) The jury awarded GTT $5,052,118 in damages, less than what GTT requested. (A171.) STC argues that

GTT should not be entitled to presuit damages because GTT marked the packaging of its Opticom™ system, not the components.

## A.    STC's Bright-Line Rule Should Be Rejected.

STC urges this Court to adopt a bright-line rule regarding the particular "character" traits an article must have (or not have) in order to allow for marking of packaging under 35 U.S.C. § 287(a).  (STC Br. 54.)  STC's bright-line rule ignores the purpose of the marking statute and the flexible approach endorsed by the Supreme Court and this Court.[7]

The marking statute "is designed 'for the information of the public.'"  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989).  The Supreme Court has explained that, even where marking the product itself might be possible, "**something must be left to the judgment of the patentee**."  *Sessions v. Romadka*, 145 U.S. 29, 50 (1892) (emphasis added).

Consistent with this Supreme Court precedent, this Court has refused to draw bright-line rules governing compliance with the marking statute in other contexts, and instead has endorsed a pragmatic, "rule of reason" analysis that considers the totality of the circumstances.  This Court has explained, for example, that in "determining whether the patentee marked its products sufficiently to comply with the constructive notice requirement, the focus is . . . on whether the

---

[7] STC does not challenge on appeal the marking jury instruction and did not object to the instruction before closing arguments.

patentee's actions were sufficient, **in the circumstances**, to provide notice in rem."
*Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998)
(emphasis added) (marking must be "substantially consistent and continuous");
*e.g.*, *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996) (endorsing
"rule of reason" approach allowing consideration of patentee's "reasonable efforts"
to comply with marking statute); *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616
F.3d 1357, 1374–75 (Fed. Cir. 2010) (adopting "rule of reason" approach and
rejecting argument that marking statute permits no lapse in completeness).

Section 287 provides for two methods of marking: marking the patented
articles themselves, or marking the packaging of those articles.  In determining
whether marking the packaging is acceptable, a majority of district courts have
adopted a "practical approach" that "emphasize[s] the marking statute's notice-
serving purpose over the precise mechanics of compliance."  *Stryker Corp. v.
Zimmer Inc.*, 2012 WL 6821683, at *3 (W.D. Mich. Nov. 29, 2012) (collecting
cases).

Courts have taken into account numerous "practical considerations,"
including: industry practice, the size of the product, the cost of marking the product
itself, and whether an alternative form of marking would provide adequate notice
of the patent.  *Id.*  Additionally, courts examine: (1) "conditions of use" of the
article, *Heraeus Electro-Nite Co. v. Midwest Instrument Co.*, 2007 WL 3407128, at

*4 (E.D. Penn. Nov. 14, 2007) (considering the single usage of the patented probes and the obstructive gear worn by users); *Chicago Pneumatic Tool Co. v. Hughes Tool Co.*, 192 F.2d 620, 625 (10th Cir. 1951) (drill bits used in deep wells); (2) the method of marking that would provide the most up-to-date patent information, *Ethicon Endo–Surgery, Inc. v. Hologic, Inc.*, 689 F. Supp. 2d 929, 945-46 (S.D. Ohio 2010); (3) the "appearance of the [article] with the statutory label," *Bowling v. Hasbro, Inc.*, 490 F. Supp. 2d 262, 277 (D.R.I. 2007); (4) health or safety risks associated with marking the product, *Stryker*, 2012 WL 6821683, at *3; and (5) the "burden of adding a manufacturing step," *Rutherford v. Trim-Tex, Inc.*, 803 F. Supp. 158, 164 (N.D. Ill. 1992).

Consistent with the Supreme Court's guidance in *Sessions v. Romadka*, district courts have concluded that "the marking statute generally is construed to allow some discretion in the patentee to alternatively mark its product (by marking the product's packaging, for example)," and "[t]his is true **regardless of whether it is physically possible** to place the patent number on the article itself." *Bowling*, 490 F. Supp. 2d at 276 (emphasis added); *accord Metrologic Instruments, Inc. v. PSC, Inc.*, 2004 WL 2851955, at *20-21 (D.N.J. Dec. 13, 2004) ("great discretion," even though "physically possible" to mark product). For example, the patented articles in *Heraeus Electro-Nite Co.* were six-foot-long probes that at times had included non-patent information such as the "trade name, a four digit

internal part code, a size identifier, a date code sticker, and an internal press date code." 2007 WL 3407128, at *1-2. But even though marking the article—which contained non-patent information—would have been physically possible, the court concluded that marking the packaging was sufficient compliance with section 287 because of other conditions of use of the probes. *Id.* at *3; *see also Saf-Gard Prods., Inc. v. Serv. Parts, Inc.*, 491 F. Supp. 996, 1010 (D. Ariz. 1980) ("affixing the statutory notice to packages containing its patented [radiator accessory kits]" sufficient).

The bright-line rule STC asks this Court to draw fails to allow for consideration of other "character" traits, beyond the size of and other markings on the product. "[T]he best approach is not to create a hard and fast rule like the limitation" STC proposes, "but to consider the presence of other markings on an article as an additional factor." *Ethicon Endo-Surgery*, 689 F. Supp. 2d at 946. "The balancing of these factors is a job best suited for a jury," *Bowling*, 490 F. Supp. 2d at 277, and STC's bright-line rule should be rejected.

### B.    There Was Substantial Evidence that GTT's Marking Was Sufficient.

JMOL is appropriate only if "there is a complete absence of probative facts to support the verdict," *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 462 (8th Cir. 2013), viewing all evidence and inferences in favor of the verdict, *Morse*, 174 F.3d at 922.

The jury was instructed that "marking" meant "that substantially all of the products, or if reasonable under the circumstances, the packaging of the products" were marked with the patent information. (A147.) GTT presented evidence as to why it was reasonable to mark the packaging of its Opticom™ system. First, the conditions of use of GTT's system made it reasonable to mark the packaging. As the jury learned at trial, many of the components are hidden from view when installed. Brian VanDerBosch testified, for example, that the Phase Selector component is installed in a locked traffic cabinet, the Mast Arm Radio component is installed on top of the mast arm (see diagram below), and typically components installed in the vehicle are installed in the vehicle's trunk or in a locked equipment cabinet. (A1980-81.)



**Figure 5-2. Mast Arm Installation**

(A26030.)

Next, VanDerBosch testified that GTT follows the industry custom established by 3M in marking its packaging and manuals.  (A1979, A1982.) VanDerBosch also testified that the Opticom™ product "is a system," and the "only time" that the system "is really together is when it is shipped from the manufacturer."  (A1980.)  Marking the packaging, therefore, was an effective way of providing notice of the system covered by the '398 patent.  (*Id.*)  The Opticom™ manuals that are "included in the packaging" with the system are also marked with the '398 patent.  (A1978-80, A25987, A26016, A26076, A26105, A26167, A26230, A26293, A26355, A26389, A26459.)  Thus, there was substantial evidence—conditions of use, type of product, and industry custom—to support the jury's finding that GTT's marking of the packaging was reasonable under the circumstances.

"At a minimum . . . whether [GTT's] method of marking the packages for its [Opticom™] products complies with the marking statute is a question about which reasonable factfinders can differ."  *Stryker*, 2012 WL 6821683, at *3.  STC's arguments about the public accessibility of the Opticom™ components, whether customers receive and/or retain the packaging, or whether 3M's historical practices sufficiently establishes an industry-wide custom—are merely challenges to the weight and credibility of the evidence.  But this Court must be "extremely

deferential" to the jury's findings, *Morse*, 174 F.3d at 922, and weighing and resolving conflicts in the evidence "are jury functions, not those of a judge," *Reeves*, 530 U.S. at 150.  There was substantial evidence to support the jury's verdict regarding marking.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Dated: January 9, 2015

**FAEGRE BAKER DANIELS LLP**

*/s/ Chad Drown*
_____

James W. Poradek
Chad Drown
Timothy E. Grimsrud
Eva B. Stensvad
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Tel.: (612) 766-7000

**Attorneys for Global Traffic Technologies, LLC**

## PROOF OF SERVICE

The undersigned hereby certifies that on the 9th day of January, 2015, I filed a copy of the following document with the Clerk of Court via this Court's CM/ECF Electronic Filing:

RESPONSIVE BRIEF OF GLOBAL TRAFFIC TECHNOLOGIES

That a copy was served electronically upon the below-listed appellants' counsel of record via this Court's CM/ECF Electronic Filing System:

Jana Yocom
Jana Yocom P.C.
320 S. 11th, Suite 1
Mount Vernon, IL 62864
(618) 731-1944
jana.yocum@gmail.com

Counsel for Appellants KM Enterprises, Inc. and Rodney K. Morgan

Louis W. Tompros
Anant K. Saraswat
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Robert A. Arcamona
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave, N.W.
Washington, DC 20006
(202) 663-6000

Counsel for Appellant STC, Inc.

*/s/ Chad Drown*
Chad Drown

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) as extended by the December 30, 2014 Order (Dkt. No. 76) because:

    The brief contains 16,411 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because:

    The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.


Dated: January 9, 2015          **FAEGRE BAKER DANIELS LLP**

                                                */s/ Chad Drown*
                                                _____

                                                James W. Poradek
                                                Chad Drown
                                                Timothy E. Grimsrud
                                                Eva B. Stensvad
                                                2200 Wells Fargo Center
                                                90 South Seventh Street
                                                Minneapolis, MN 55402
                                                Tel.: (612) 766-7000

                                                ***Attorneys for Global Traffic Technologies, LLC***